**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

REGIONAL DIRECTOR CORNELE A. OVERSTREET,

Petitioner,

vs.

NP RED ROCK, LLC,

Respondent.

Case No.: 2:20-cv-02351-GMN-VCF

**ORDER**

Pending before the Court is Petitioner Cornele A. Overstreet's ("Petitioner's" or "the Regional Director's") Petition for Temporary Injunction, (ECF No. 1), which he brings in his capacity as the Regional Director of the National Labor Relations Board ("NLRB"). Respondent NP Red Rock, LLC ("Red Rock") filed a Response, (ECF No. 19), and Petitioner filed a Reply, (ECF No. 25).

Also pending before the Court is Petitioner's Motion to Try the Petition on the Basis of the Administrative Record, (ECF No. 3). Red Rock filed a Response, (ECF No. 23), and Petitioner filed a Reply, (ECF No. 24).[1]

Also pending before the Court is Red Rock's Motion for Leave to File Excess Pages, (ECF No. 17). Petitioner did not file a response.[2]

For the reasons discussed below, the Court **GRANTS in part** and **DENIES in part** the Petition, and the Court **GRANTS** the Motions.

[1] The Court finds the Petition suitable for adjudication without an evidentiary hearing. The Court's conclusions below are largely based on evidence whose character is not genuinely in dispute. To the extent Red Rock contests the reliability of some of Petitioner's affidavits, the Court finds no indicia that they are "stale" or unreliable beyond Red Rock's mere assertion. Accordingly, the Court finds little utility for an evidentiary hearing and concludes that the parties' arguments are suitably presented as briefed.

[2] Considering the necessary depth of factual briefing, the Court finds good cause to grant Red Rock leave to file excess pages *nunc pro tunc*.

## I. BACKGROUND

This case arises from Red Rock's allegedly unlawful response to a union organizing campaign. (*See* Pet. Temp. Inj., ECF No. 1). Red Rock is one of ten hotel-casinos that Station Casinos, LLC ("Station Casinos") owns[3] and manages in the Las Vegas area. (Admin. Tr. Vol. 2 at 13:4–8, PX 28, ECF No. 1-2).

Years of organizing by Local Joint Executive Board of Las Vegas, affiliated with UNITE HERE ("the Union") preceded the election that forms the basis of the instant Petition. (*Id.* 17:4–19:16, 21:12–17); (*see also* Admin. Trial Tr. Dated Nov. 9, 2020 at 14:7–14, RX 1, ECF No. 20-1); (Aff. Tina Moayedi at 1, PX 48, ECF No. 1-4). But Red Rock is just one example of a Station Casinos' property to draw interest from the Union; before the Red Rock election, the Union became an employee collective bargaining representative at six Station Casinos' properties between August of 2016 and September of 2019. (Admin. Trial Tr. Dated Nov. 9, 2020 at 12:3–27:18, RX 1, ECF No. 20-1). In response to the Union's growing support, Red Rock allegedly augmented its union avoidance strategy in 2019.

As part of its strategy, on or about June 15, 2019, Red Rock began: playing "sound bytes" informing employees about unions on the televisions in employee areas; conducting regular meetings to review business initiatives, morale, and management; implementing quarterly efforts to appreciate employees, including enhanced menus and pizza parties; holding biannual town hall meetings to review projects on the property, reintroduce executives, and review expectations; implementing biannual focus groups to "re-enforce[] Leadership's credibility with the [team members]" by quickly responding to team members' concerns; increasing management visibility on the property; regularly communicating the lack of progress the Union had been able to make over three years of negotiations at other properties that had

[3] The Court's recitation of facts is based upon the date of the Petition, before Station Casinos' recent sale of The Palms Hotel and Casino.

unionized while promoting the recent progress made at Red Rock; and activating "voices" to reinforce the message of Red Rock's progress. (Admin Tr. Vol. 2 at 21:19–29:22, PX 28); (Scott Nelson Email with Pre-Petition Initiatives at 1–3, PX 34, ECF No. 1-3); (Scott Nelson Email with Updated Pre-Petition Initiatives at 1–3, PX 35, ECF No. 1-3); (Mari Jackson E-mail with Pre-Petition Soundbytes at 1–51, PX 36, ECF No. 1-3.). The strategy did not slow Union support, and as of September 2019, the Union had incrementally succeeded at gaining approximately 39 union authorization cards per month on average. (Summary of Signed Authorization Cards, PX 51 AY, ECF No. 1-13). Union support swelled in October, and the Union collected more than 200 authorization cards that month. (*Id.*). Meanwhile, as the Union's support at Red Rock grew, Station Casinos made personnel changes to its leadership. (Decl. Jeff Welch ¶ 17, RX 4, ECF No. 20-1).

During the prior union campaigns at the other properties, Valerie Murzl ("Murzl") served as Station Casinos' Vice President of Human Resources. (*Id.* ¶ 11). Murzl employed a union avoidance strategy that restricted communication between managers and employees regarding the union. (Admin. Trial Tr. Dated Nov. 9, 2020 at 23:14–19, 25:25–26:7, RX 1). In February 2019, Bob Finch ("Finch") became the Chief Operating Officer ("COO") of Station Casinos. (Admin. Trial Tr. Dated Dec. 11, 2020, at 37:4–6, RX 2, ECF No. 20-1). That spring, Finch expressed a desire to replace Murzl, and Station Casinos began conducting interviews for her replacement in July of 2019 while allowing Murzl to retire. (*Id.* at 50:2–21). In August, days before Murzl's retirement, she predicted that the Union would win majority status based upon its growing levels of support. (Valerie Murzl Email with Red Rock Election Prediction, PX 37, ECF No. 1-3) (dated August 16, 2019); (Admin. Tr. Vol. 3 at 7:3–11, PX 39, ECF No. 1-3).[4] On August 29, 2019, Station Casinos hired Phil Fortino ("Fortino") to serve as Murzl's

[4] Contrary to Red Rock's version of events, Murzl's email indicates that despite a slow trickle of authorization cards before October, the Union was nearing majority status before Fortino was hired. (*Cf.* RR Resp. 28:5–13).

replacement. (Decl. Jeff Welch ¶ 17, RX 4, ECF No. 20-1). The next day, the Union began its "button-up" campaign that encouraged employees to wear buttons demonstrating their support for the Union. (Aff. Adam Christian ¶ 11, PX 38, ECF No. 1-3).

Fortino began his tenure by changing Station Casinos' union avoidance communications strategy, beginning with Red Rock. Fortino and Red Rock General Manager, Scott Nelson ("Nelson"), held mandatory meetings with managers and supervisors of employee units targeted by the Union. (Admin. Tr. Vol. 3 at 9:19–20:4, PX 39). At these meetings, Nelson introduced Fortino, and the two presented a PowerPoint about the union campaign and how they could lawfully engage team members about the union organizing effort, effectively abandoning Murzl's previous strategy of non-engagement. (*Id.*); (*see also* Admin R. Tr. Vol. 5, PX 33, ECF No. 1-3); (Phil Fortino Union Avoidance Power Point Presentation, PX 40, ECF No. 1-3). Additionally, Fortino would explain he had been hired to make significant changes at Station Casinos regarding the employee experience, including potentially introducing an on-site medical center, as well as improving employee compensation and health benefits. (*See* Admin. Tr. Vol. 9 at 7:10–8:19, PX 42, ECF No. 1-4). Fortino also instructed managers and supervisors to keep lists of people they believed supported the company, the Union, or remained undecided. (Admin. Tr. Vol. 3 at 27:7–28:14, PX 39); (*see also* Phil Fortino Union Avoidance Power Point Presentation at 13, PX 40).

While Fortino implemented Red Rock's new messaging campaign, he simultaneously developed a strategic plan of benefits to offer Station Casinos' employees. (*Id.* 26:20–21:6). To develop the new benefits, Fortino compared Station Casinos' current benefits with those offered by competitors, those highlighted by the Union's campaign, those offered at Union-organized properties on the Las Vegas Strip, and feedback from employee focus groups. (*See* Email about Phil Fortino Changes to Salaried Medical Tier STP, PX 43, ECF No. 1-4); (Phil Fortino Email Copying Health Benefits from Union Website, PX 44, ECF No. 1-4); (Phil

Fortino Email with Union Contract Comparison, PX 45, ECF No. 1-4); (Admin. Tr. Vol. 3 at 31:7–34:20, PX 39). Among Fortino's consideration were benefits that would "[t]ake[] away union power and [its] major emotional draw to team members." (Email about Phil Fortino Changes to Salaried Medical Tier STP, PX 43) (discussing a proposal to offer free HMO benefits to team members making under $40,000.00 per year, many of whom were in positions the union targeted).

On November 19, 2019, Fortino presented the proposed strategic plan to Station Casinos' senior leadership. (*See* 2020 Corporate Human Resources Strategic Plan Presentation, PX 46, ECF No. 1-4); (Calendar Appointment for Strategic Plan 2020 Presentation, PX 47, ECF No. 1-4). The plan included building on-site medical centers for employees; offering some classes of employees a zero-deductible HMO plan that "more closely matches union plan;" providing free healthcare benefits to employees, their spouses, and families; providing 401(k) benefits to "help incentivize Team Members in [union-type positions] to not vote for a union" in non-union facilities; replacing unpopular time and attendance policies; implementing new training programs; and streamlining hiring for entry-level positions. (*Id.*).

On November 22, 2019, the Union filed a Petition for Election with the NLRB for a bargaining unit of about 1,350 Red Rock employees. (RC Pet., PX 49, ECF No. 1-4); (Voter List, PX 50, ECF No. 1-4). By that date, the Union had successfully collected 811 union authorization cards from the bargaining unit. (*See* Aff. Tina Moayedi 2:9–21, PX 48, ECF No. 1-4); (Red Rock Union Authorization Cards, PX 51, ECF No. 1-5). The Board scheduled an election for December 19–20. (Stipulated Election Agreement, PX 31, ECF No. 1-2) (*see also* Aff. Tina Moayedi 2:9–21, PX 48, ECF No. 1-4).

On November 22 and 23, Fortino sent text messages to Finch, indicating, "RR just got a petition" and "Lots of union activity at Santa Fe today." (Phil Fortino and Bob Finch Text

Messages, PX 55, ECF No. 1-14). Finch responded, "Damn. The games are beginning." (*Id.*). Fortino replied, "Yeah. We need to announce ASAP new programs." (*Id.*).

Red Rock began advertising the changes to employees through rollout meetings on December 10 and 11, about ten days before the election. (Admin. Trial Tr. Dated Dec. 11, 2020, at 56:13–59:1, RX 2); (Admin. Tr. Vol. 3 at 29:14–30:10, PX 39). At the meetings, Nelson explained the new benefits package to employees in detail. (Admin. R. Tr. Vol. 3 at 30:4–50:24, PX 39); (PowerPoint for the Exciting News Meetings, PX 56, ECF No. 1-14). On December 12, 2019, Station Casinos developed pamphlets to mail Red Rock employees that announced the new HMO plan, medical centers, and retirement plan; executives rushed the mailers' development. (*See* Emails Finalizing Trifold Mailer to Red Rock Unit Employees, PX 58, ECF No. 1-14) (including subject line "URGENT REVIEW – NEED BY 6:30pm TODAY – CONFIDENTIAL; limiting debate on the Spanish translation's content "[b]ased on the current timing;" and asking if further changes were "too late?"). Leading up to the election, Red Rock managers and supervisors allegedly reiterated the promised benefits to employees and risk that promised benefits could be lost if the Union succeeded in the election; anti-union posters were hung throughout employee areas; union consultants distributed flyers emphasizing the risk of unionizing; a website was created and publicized that highlighted the risks of unionizing; and at least one supervisor questioned a team member about her union support in light of the benefits Station Casinos committed to offering. (Aff. Robert Franz 2:22–23, PX 60, ECF No. 1-14); (Aff. Yusett Diaz, 2:1–3:22, PX 61, ECF No. 1-14); (Aff. Balmore Orellana at 3, PX 69, ECF No. 1-15) (telling a Union organizer, "I do know that if the Union wins, you are not going to receive your money as a cook, you're going to be [demoted to] a runner"); (Screenshots from myscfacts.com, PX 83–84, ECF No. 1-15); (Aff. Blanca Herrera 2:8–20, PX 68, ECF No. 1-15).

On December 16 and 17, Nelson and Fortino held captive audience meetings with large groups of Red Rock employees. (Admin. Tr. Vol. 3 at 39:1–24, PX 39). At the meetings, they emphasized the new benefits for employees and asked employees why they would want to take a chance with the Union and pay dues in light of the new benefits. (*See* Captive Audience Presentation at 29, PX 86, ECF No. 1-15) ("Why Take A Chance With Union Promises When You ALREADY Have The Most Important Things????? FREE HEALTH CARE, PAID RETIREMENT, FREE MEDICAL CENTERS, AND . . . ALL This without paying Dues Every Year."). They warned that if the Union succeeded, they could no longer promise the new benefits because everything would be subject to collective bargaining, and if Boulder Station and Palace Station's three-plus year negotiations were any indication, it could be quite a long time before bargaining reached any conclusion. (Admin. Tr. Vol. 3 at 53:15–60:25, PX 39).

On December 19 and 20, the Union lost the election 534 to 627. (Red Rock Election Tally of Ballots, PX 87, ECF No. 1-16). Station Casinos began implementing its new benefits in January of 2020, beginning with the 401(k) program, free HMO options, and the construction of and hiring for onsite medical centers. (Aff. Adam Christian 2:9–3:4, PX 88, ECF No. 1-16); (Email with Notice Posting for Med. Center Construction, PX 89, ECF No. 1-16); (Photo of Notice Posting for Med. Center Construction, PX 90, ECF No. 1-16).

Most recently, Petitioner alleges that Red Rock used the COVID-19 pandemic as cover to terminate two Union activists, Yaneth Chavez and Teresa Powers, by failing to recall them to work as required after they were laid off. (Example of Red Rock Layoff Letter to Employees, PX 92, ECF No. 1-16); (Affs. Yaneth Chavez and Teresa Powers, PX 93–94, ECF No. 1-16) (noting their visibility as Union activists); (Station Casinos Human Resources Manual for Operations – Reductions of Force, PX 95, ECF No. 1-16) (noting that length of service is supposed to determine order of recall at Red Rock); (Job Classification Seniority Spreadsheets, PX 96–97, ECF No. 1-16); (Emails Regarding Recall, PX 98, ECF No. 1-16) (indicating that

"local company [team members]" with less service were recalled, but Chavez and Powers were not). The Regional Director now petitions this Court for a temporary injunction to remedy Red Rock's alleged unfair labor practices during the pendency of the National Labor Relations Board case against Red Rock arising from the same conduct.

## II. LEGAL STANDARD

The National Labor Relations Act, 29 U.S.C. §§ 151, *et seq.* ("NLRA"), regulates relations between "private sector employers, labor unions, and employees." *See Chamber of Commerce of the United States v. NLRB*, 721 F.3d 152, 154 (4th Cir. 2013). The NLRA's stated purpose is to "restor[e] equality of bargaining power" between employees and employers by, "encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment." 29 U.S.C. § 151. To that end, the NLRA prohibits employers from engaging in defined "unfair labor practices" that discourage or restrain employees from collective bargaining. *See* 29 U.S.C. § 158. If an employer engages in unfair labor practices intended to undermine a union campaign, the union may petition the National Labor Relations Board ("NLRB" or "the Board") for relief. 29 U.S.C. §§ 158–160. After initiating an NLRB proceeding, the Board may petition a district court for "temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j) ("section 10(j)").

"[W]hen a Regional Director seeks § 10(j) relief, he 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Frankl ex rel. NLRB v. HTH Corp.*, 650 F.3d 1334, 1355 (9th Cir. 2011) (quoting *Winter v. Nat. Res. Dev. Council*, 555 U.S. 7, 20–21 (2008). "'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the [Regional Director] can support

issuance of a preliminary injunction, so long as the [Regional Director] also shows that there is a likelihood of irreparable harm and that the injunction is in the public interest." *Id.* (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal modifications original)). Under either standard, the Regional Director "must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." *Alliance for the Wild Rockies*, 632 F.3d at 1131 (emphasis omitted); *see Small v. Operative Plasterers' Int'l Ass'n, Local 200*, 611 F.3d 483, 491 (9th Cir. 2010) (acknowledging *Winter* abrogated the Circuit's previous rule that a mere "possibility of irreparable harm" may be sufficient).

## III. DISCUSSION

Petitioner alleges that Red Rock has engaged in unfair labor practices by: (1) promising substantial new benefits intended to deter a union organizing campaign; (2) threatening employees that unionization would prove futile in generating favorable benefits; and (3) failing to recall union organizers after mass layoffs despite their seniority. (*See* Pet. Temp. Inj. 12:9–21:2). Petitioner contends that the unfair labor practices have been so egregious that they have undermined the possibility of a fair election. (*Id.* 21:3–32:10). Therefore, Petitioner requests that the Court issue an interim bargaining order wherein Red Rock will be compelled to bargain with the Union as the representative of the bargaining unit during the pendency of the NLRB proceeding. (*Id.*). Petitioner also requests that the Court issue a cease-and-desist order against Red Rock that, among other steps, requires Red Rock to refrain from engaging in many alleged unfair labor practices; post the Court's Order in employee areas; and hold mandatory meetings at which the Order will be read. (*See* Pet. Temp. Inj. 19:14–24:17). The Court's below discussion addresses whether Petitioner has met his burden to receive the relief sought under § 10(j).

//

**A. Likelihood of Success on the Merits**

To demonstrate a likelihood of success on the merits, the Regional Director must show a "probability that the Board will issue an order determining that the unfair labor practices alleged by the . . . Director occurred and that [the circuit] would grant a petition enforcing that order." *Frankl ex rel. NLRB v. HTH Corp.*, 693 F.3d 1051, 1062 (9th Cir. 2012) (quoting *Frankl ex rel. NLRB v. HTH Corp.*, 650 F.3d 1334, 1355 (9th Cir. 2011)). A petitioner meets this burden by "produc[ing] some evidence to support the unfair labor practice charge, together with an arguable legal theory." *Id.* (quoting *Frankl*, 650 F.3d at 1356)

Petitioner alleges that Red Rock has violated §§ 8(a)(1), (8)(a)(3), and 8(a)(5) of the NLRA. (*See* Pet. Temp. Inj. 12:9–21:2). Section 8(a)(1) prohibits employers from interfering with, restraining, or coercing employees from exercising their collective bargaining rights. 29 U.S.C. § 158(a)(1). Section 8(a)(3) prohibits employers from discriminating against employees in any way to discourage membership in a labor organization. 29 U.S.C. § 158(a)(3). Section 8(a)(5) prohibits employers from refusing to bargain in good faith with the collective bargaining representative of his employees. 29 U.S.C. § 158(a)(5). An employer may violate § 8(a)(5) by engaging in unfair labor practices that undermine a union's majority support prior to an election. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 611 (1969) ("*Gissel*"). Election-based § 8(a)(5) violations may persuade courts petitioned under § 10(j) to order an employer to bargain with a union where the employer's unfair labor practices "have made the holding of a fair election unlikely or which have in fact undermined a union's majority and caused an election to be set aside." *Scott ex rel. NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 661 (9th Cir. 2001). The Court assesses Petitioner's likelihood of success on the merits of each violation below.

//

//

1. <u>8(a)(1)</u>

Under § 8(a)(1) of the NLRA, "it [is] an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights [to join labor unions and bargain collectively.]" 29 U.S.C. § 158(a)(1). "The broad purpose of § 8(a)(1) is to establish 'the right of employees to organize for mutual aid without employer interference.'" *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409 (1964) (quoting *Republic Aviation Corp. v. Labor Board*, 324 U.S. 793, 798 (1945)). The provision "prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." *Id.* Here, Petitioner alleges that Red Rock has violated § 8(a)(1) by: (i) promising substantial benefits just before a union election in order to deter union support; and (ii) threatening employees that supporting the union would be futile. (*See* Pet. Temp. Inj. 12:15–15:11).

*i. Benefits*

An employer's promise to grant future benefits, motivated by the intent to thwart a union drive, is an unfair labor practice under § 8(a)(1). *Exchange Parts Co.*, 375 U.S. at 409. Offering benefits to deter unionization is inherently coercive because, "[e]mployees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged." *Id.* When an employer grants new benefits during a union campaign, courts will presume the employer did so with an unlawful motive. *Bakery, Confectionery & Tobacco Workers & Grain Millers Int'l Union, Local 37 v. NLRB*, 185 F. App'x 691, 693 (9th Cir. 2006) ("Employers may justify the conferral of benefits prior to a representation election if they can overcome the presumption that the benefits were related to the pending election."). Apart from the presumption, evidence

probative of an employer's motive may include the timing[5] of the announcement of benefits, when the employer finalized the benefits' details, whether the timing of the announcement was at the employer's discretion, and if the employer coupled anti-union messaging with the announcement. *Divi Carina Bay Resort*, 356 NLRB 316, 316 (2010), *enfd*. 451 F. App'x 143 (3d Cir. 2011); *K-Mart Corp.*, 336 NLRB 455, 456 (2001); *E.L.C. Elec., Inc.*, 344 NLRB 1200, 1201 (2005); *Waste Mgmt. of Palm Beach*, 329 NLRB 198, 199 n.4 (1999) (citing *Speco Corp.*, 298 NLRB 439, 443 (1990)). In rebutting evidence of unlawful motive, the employer bears the burden to show that it would have announced the same benefits at the same time had there been no union activity. *See K-Mart Corp.*, 336 NLRB at 456; *see also E.L.C. Elec., Inc.*, 344 NLRB at 1201 ("The employer may rebut this inference by providing a persuasive explanation, other than the pending election, for the timing of the grant or promise of benefits.").

Petitioner has presented evidence that Red Rock offered extensive benefits that, at minimum, were timed to deter the Red Rock unionization effort. Station Casinos hired Fortino as the Union drive gained momentum, and Fortino immediately put together a proposal for a substantial suite of benefits for employees. (*See* 2020 Corporate Human Resources Strategic Plan Presentation, PX 46, ECF No. 1-4). The emails Fortino and others sent discussing the benefits explicitly promoted which benefits would be successful at undermining the Union. (*See, e.g.*, Email about Phil Fortino Changes to Salaried Medical Tier STP, PX 43) (highlighting a proposal that would "[t]ake[] away union power and major emotional draw to

---

[5] The timing of the announcement is essential to the analysis. When enforcing a Board order, the Fifth Circuit has explained, "The examiner and Board have every right to conclude that the manna dropping from heaven was based upon fear that sustenance would flow from unionization. . . . To permit a company to time its announcement and allocation of benefits in such a fashion would be a great disservice to the ideal of organizational freedom so deeply imbedded in the NLRA." *See NLRB v. WKRG-TV, Inc.* 470 F.2d 1302, 1308 (5th Cir. 1973).

team members”); (*see also* 2020 Corporate Human Resources Strategic Plan Presentation, PX 46) (indicating that non-union properties would receive training on the new “Focus on Family” program “depending on election” in 2020 before other properties, implying a hope to deter unionization; proposed creating a “No Deductible Plan that more closely matches union plan” as a response to the Union’s promises; offering a 401(k) plan because the Union has used “H&W and the Pension a the main emotional drivers to sign cards and vote Yes for unionization . . . . this would help incentivize Team Members in these positions to not vote for a union”).

Evidence also indicates that Fortino timed the benefits’ rollout to defeat the Union at the upcoming election. In November, Fortino texted Station Casinos’ COO the day after the Union filed its petition for election that they needed to announce benefits “ASAP.” (Phil Fortino and Bob Finch Text Messages, PX 55, ECF No. 1-14). However, when announcing the benefits to employees, Red Rock timed the rollout to occur between December 10 and 17, just before the December 19–20 election, and Red Rock coupled the benefits presentations with anti-union messaging. (*See* Admin. Trial Tr. Dated Dec. 11, 2020, at 56:13–59:1, RX 2); (PowerPoint for the Exciting News Meetings, PX 56, ECF No. 1-14); (*see also* Emails Finalizing Trifold Mailer to Red Rock Unit Employees, PX 58, ECF No. 1-14) (Captive Audience Presentation at 29, PX 86, ECF No. 1-15) (“Why Take A Chance With Union Promises When You ALREADY Have The Most Important Things????? FREE HEALTH CARE, PAID RETIREMENT, FREE MEDICAL CENTERS, AND . . . ALL This without paying Dues Every Year.”). The timing of the announcement not only raises a presumption of Red Rock’s unlawful motive, but there is substantial evidence—based upon the strategy to offer benefits derived in part to undermine the Union and the intentional rollout of benefits just before the election—indicative of the same.

Red Rock argues that it did not intend to use the benefits to defeat the Union; rather, it planned to offer this new suite of benefits to address its competitiveness in the hospitality

market. (RR's Resp. 4:4–5:4, 6:23–7:22, 29:17–30:7). It contends that Station Casinos hired Fortino to rebuild a company culture that years earlier had led Station Casinos to be the sole casino operator on the Forbes list of 100 best companies to work for. (*Id.* 3:12–4:3, 6:23–7:22). Red Rock contends that Station Casinos began Fortino's hiring process in July—before the union effort at Red Rock gained steam—and Fortino began developing the strategic plan of new benefits after being hired in September. (*Id.* 8:4–12:18, 29:17–30:7). Red Rock contends that Fortino based the plan primarily on advice of consultants who looked at peer casinos' benefits, and the new benefits had to be offered before December 31, 2019, when the prior contract expired. (*Id.*). The implication of Red Rock's argument is that the timing of the announcement vis-à-vis the unionization effort was a coincidence, not an intentional strategy to defeat the union. (*Id.* 16:5–17:9, 25:17–27:4, 29:17–30:7).

Red Rock's position is not sufficiently persuasive to overcome Petitioner's showing of a likelihood of success on the merits. The Court does not doubt that Station Casinos had competitive incentives to offer the new benefits at its properties, including Red Rock, but the evidence indicates that the benefits' quality and rollout was intended to deter Red Rock employees' exercise of their collective bargaining rights. Direct evidence shows that Red Rock intended to counter the Union's allure when putting together the benefits. When developing the benefits package, Fortino expressly considered what benefits would most successfully blunt the draw of unionization. The benefits' announcement to employees came days before the Union election, maximizing its impact. Not only does the timing raise an inference of an intent to defeat the Union in the election, but Fortino sent Station Casino's COO a text message indicating that they needed to announce the benefits as soon as possible *because of* the Union's petition for election. When presenting the new benefits, Red Rock coupled the presentation with extensive anti-union messaging. Even if Red Rock would have offered a generous new benefits package anyway, and the benefits needed to be finalized before the new year, Red

Rock does not explain why it could not have waited to announce the benefits until after the Union election at its discretion. After all, without a union, Red Rock could later offer the benefits without needing employees to agree to them. Instead, Red Rock likely announced sweeping changes to defeat the Union. The behavior constitutes an unfair labor practice prohibited by the NLRA.

*ii. Threats*

Petitioner argues that Red Rock coercively threatened employees to reject the Union. (Pet. Temp. Inj. 14:9–15:11). Petitioner contends that Red Rock made statements to employees, not based in fact, that the Union would not attain similar benefits to those Red Rock had recently offered. (*Id.* 14:16–5). Petitioner further argues that Red Rock threatened its employees that if they went on strike for leverage in negotiations, they could be permanently replaced. (*Id.* 15:6–10).

Employers have a First Amendment right to communicate with their employees, which cannot be abrogated by a union campaign. *Gissel*, 395 U.S. at 617; 29 U.S.C. § 158(c). The employer may freely express "any views, argument, or opinion" without committing an unfair labor practice "so long as such expression contains no threat of reprisal or force or promise of benefit in violation of § 8(a)(1)." *Id.* (internal quotations omitted). "In determining whether questioned statements are permissible . . . the statements must be considered in the context in which they were made and in view of the totality of the employer's conduct." *NLRB v. Marine World USA*, 611 F.2d 1274, 1277 (9th Cir. 1980).

When an employer offers a prediction on the effects of unionization, "the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control . . . ." *Gissel*, 395 U.S. at 618. "If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is

no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment." *Id.*

Here, Petitioner has presented some likelihood of success on the merits that Red Rock impermissibly threatened employees. Preliminarily, the Court notes that Red Rock's official posture about Union messaging would not have run afoul of the NLRA because, as Red Rock argues, it comprised protected expressions of fact. (RR Resp. 30:9–31:13). Through multiple channels, Red Rock explained that if the Union were elected, benefits would be negotiated, and the Union could achieve a lesser deal, a better deal, or no deal with Red Rock. (*See* Admin Tr. Vol. 3 at 22:2–16, PX 39). Red Rock highlighted that three other Station Casinos' properties had been in negotiations for years without securing a contract, which is a statement of fact. (*Id.* 55:6–56:25). Likewise, Red Rock highlighted that if the employees went on strike to try to provide more leverage in a yet unsuccessful union negotiation, it would be within Red Rock's rights to replace the striking employees. (*Id.* 60:9–23).

The propriety of Red Rock's messaging diminishes when viewed in the context in which employees received it. The strongly anti-union messaging accompanying the factual presentation implied that employees would likely lose their newly promised benefits if they authorized the Union as their collective bargaining representative. For example, Red Rock distributed fliers asking things like, "IS UNIONIZING WORTH THE RISK???," and the implied risk—given Red Rock's reference to properties where union bargaining was yet unsuccessful—was that Red Rock would no longer offer generous new benefits if it was forced to negotiate with the Union. (Email of Is Unionizing Worth the Risk Flyer, PX 72) (strongly insinuating that Red Rock would revoke its new benefits if employees voted to join the Union); (*see also* Email with Handouts for Red Rock Captive Audience Meetings, PX 74) ("Why Take a Chance with Union Promises When You ALREADY Have the Most Important

Things?????"); (Email with Top Ten Reasons to Vote No Flyer) ("PROTECT WHAT YOU ALREAY [sic] HAVE."); *Cf. Sante Fe Drilling Co. v. NLRB*, 416 F.2d 725, 728 (9th Cir. 1969) ("Blair's repeated enumerations of existing benefits in head-to-head confrontations with employees constituted implicit threats of reprisal, because Blair thereby reasonably conveyed the impression that benefits might be withdrawn . . . if they voted for a union.").[6] Additionally, at least one supervisor warned employees that they would be retaliated against if the Union were elected. (*See, e.g.*, Aff. Balmore Orellana at 3, PX 69) (describing her supervisor saying at a team meeting to a union organizer, "I do know if the Union wins you are not going to receive your money as a cook, you're going to be a runner.").

Whether to offer the same benefits in negotiations with the Union was entirely in Red Rock's control, and if the Union rejected the same benefits package, then the employee unit could have voted to decertify the Union. Painting a foreboding appearance of "risk" strongly suggested that Red Rock would pull the rug out from under the employees if forced to negotiate, which violates § 8(a)(1). *Cf. UNF West, Inc. v. NLRB*, 844 F.3d 451, 459 (5th Cir. 2016); *HarperCollins San Francisco v. NLRB*, 79 F.3d 1324, 1330 (2nd Cir. 1996) (finding a § 8(a)(1) violation where there was evidence of "an implicit threat of repercussions for union loyalty, as opposed to company loyalty."). While not a strong showing, given the absence of express threats, Petitioner has shown some evidence in support of an arguable legal theory to demonstrate a § 8(a)(1) claim.[7]

---

[6] Petitioner also presents additional evidence of communications he alleges are implied threats in and of themselves. (*See* Pet. Temp. Inj. 7:6–14). In these materials, Red Rock indicated that the Union had not succeeded at attaining a contract at other Station Casinos properties after over 1,100 days of bargaining, and Red Rock sought to combat statements of fact the Union had made which were allegedly inaccurate in a presentation entitled "Big Fat Union Lie." The Court finds that these messages do not offend § 8(a)(1) because they present facts about the Union and the Union's messaging campaign, but the materials did not imply that Red Rock would work to ensure a less successful outcome from collective bargaining than that offered to employees before the election.

[7] However, the Court does not rely on Petitioner's threat-based § 8(a)(1) claim to issue an interim bargaining order.

2. 8(a)(3)

Petitioner alleges that two union organizers—Yaneth Chavez and Teresa Powers — should have been recalled to work after COVID-related layoffs based on Station Casinos' human resources' policies, but they were not out of retaliation. (Pet. Temp. Inj. 16:1–17:15). Red Rock responds that Chavez has not been recalled due to lack of business need, and Powers was not recalled based on her skills and qualifications. (*Id.* 31:15–35:2).

Section 8(a)(3) of the NLRA prohibits employers from discriminating against an employee on the basis of membership in or support of a labor organization. *See* 29 U.S.C. § 158(a)(3). Courts employ a burden-shifting analysis for section 8(a)(3) violations wherein "Petitioner must show that employees were engaged in union activities, Respondent knew of these activities, and harbored the requisite anti-union animus." *Overstreet ex rel. NLRB v. Gunderson Rail Servs, LLC* 5 F. Supp. 3d 1073, 1082 (D. Ariz. 2014) (reversed in part and vacated in part on other grounds). The employer then must demonstrate a legitimate reason for its allegedly unlawful action and that it would have taken the action irrespective of the protected activity. *Peter Vitalie Co., Inc.*, 310 NLRB 865, 871 (1993); *see also Healthcare Employees Union, Local 399 v. NLRB*, 463 F.3d 909, 923 (9th Cir. 2006).

The Court finds that Red Rock has demonstrated legitimate, non-discriminatory reasons for not recalling Chavez and Powers. Chavez worked for Red Rock as a pantry manager in Garde Manger. (Admin. Trial Tr. Dated Dec. 15, 2020, at 420:9–10, RX 25, ECF No. 21-5). After its March 2020 closure, Red Rock laid off all but three pantry workers at Garde Manger, including Chavez, based upon unit seniority. (*Id.* at 420:9–422:24). Since the initial layoffs, no other Garde Manger pantry workers have been recalled, and the layoffs—which considered classification seniority rather than company seniority—were consistent with how Red Rock has allegedly always determined layoffs and recalls. (Admin. Trial Tr. Dated Dec. 15, 2020, at 400:1–406:12, RX 25); (Decl. Teresa Sanchez Ramirez ¶ 24, RX 24, ECF No. 25-1); (Admin.

Trial Tr. Dated Nov. 13, 2020, at 151:2–24, RX 6). The Court finds that Red Rock has met its burden to show it did not terminate Chavez for a discriminatory reason.

Powers worked for Red Rock as a cook in Feast Buffet. (Decl. Teresa Sanchez Ramirez ¶ 22, RX 24). Feast Buffet has been closed since March, and all its employees were laid off. (*Id.* ¶ 3). Some cooks, including those with less seniority, have been recalled to the Food Administration Board department within Red Rock. (*Id.* ¶¶ 8–9). Red Rock contends that these cooks have been recalled based on their skill set, and recall decisions have been made by Sous Chef Teresa Ramirez. (*Id.* ¶¶ 10–19, 21) (explaining which employees were recalled and the skills that determined the bases for the recall decisions, and also indicating Ramirez was unaware of Powers's Union support and that Ramirez recalled other Union supporters). Given Powers's seniority, she was previously able to choose her station at Feast Buffet, and she allegedly worked almost exclusively at the omelet station. (*Id.* ¶ 21). As a result, Red Rock contends that it did not recall Powers because she did not have as useful a skillset as the employees recalled. (*Id.*).

To support his claim, Petitioner emphasizes one email indicating that only "loyal" employees were recalled as evidence of Red Rock's discrimination, but the evidence is unreliable. In an email regarding who would be recalled from Feast Buffett, Cinthia Pedroza indicated that "Chef Lupe" recommended to recall named employees who were "loyal company team members." (Emails Regarding Recall of Loyal Company Employees, PX 98, ECF No. 1-16). The evidence does not demonstrate a likelihood of success on the merits. First, there is no context to the email that would enable the Court to reasonably conclude that "loyalty" refers to the employees' preference for Red Rock over the Union. Rather, it could indicate that the employees were willing to come to work during a pandemic. Even if "loyalty" did refer to company support, there is no indication that Chef Lupe had the authority to determine which employees were recalled. In contrast, Red Rock presents sworn testimony

that only Teresa Ramirez determined who would be recalled, she did not know Powers was a Union supporter, she recalled other Union supporters, and she presents justification for why each employee was recalled based on their skills. Accordingly, the Court finds that Petitioner has not demonstrated a likelihood of success on the merits of a § 8(a)(3) violation.

3. 8(a)(5)

Under § 8(a)(5), it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a)." 29 U.S.C. § 158(a)(5). Section 9(a) provides for exclusive representation "for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." 29 U.S.C. § 159(a). Union representation of an employee unit is demonstrated through the union's attainment of majority support among the bargaining unit. *Sahara Datsun, Inc. v. NLRB*, 811 F.2d 1317, 1321–22 (9th Cir. 1987). While majority support is generally achieved through an election, "[i]n some instances, however, the Board will require an employer to recognize and bargain with a union which has never achieved a majority in a Board election." *Id.* at 1321.

"[A] bargaining order is an extraordinary and disfavored remedy for violations of the NLRA." *Scott ex rel. NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 664 (9th Cir. 2001). Section 8(a)(5) violations may support a bargaining order, depending upon "the effect of the alleged unfair labor practices on a subsequent representation election." *Id.* A bargaining order is appropriate where where: (1) the employer has engaged in pervasive and egregious unfair labor practices such that "a fair and reliable election can't be held"; and (2) the union previously attained majority support, as evidenced by authorization cards signed prior to the alleged unfair labor practices. *Gissel*, 395 U.S. at 614–15 (internal quotations and citation omitted); *see also Scott*, 241 F.3d at 660–61 (explaining the test is the same for § 10(j) orders). Under such circumstances, successful bargaining may regenerate union support; whereas, a

cease and desist order will have no teeth because the unfair labor practices have already reached fruition. *Id.* at 612. The Court first addresses the Union's majority status before turning to the nature of Red Rock's alleged unfair labor practices.

*i. Majority Status*

To demonstrate a § 8(a)(5) violation, Petitioner must demonstrate that the Union previously held majority status with the relevant bargaining unit. *Scott*, 241 F.3d at 661. Petitioner may demonstrate the Union's majority status by presenting union authorization cards from a majority of employees in the bargaining unit executed prior to the challenged, unsuccessful election. *Id.* at 662–63. The cards must demonstrate an intent to authorize the Union to represent the employees. *Id.*

Here, Petitioner has produced 723 authorization cards, but contends in its brief and a supporting affidavit that approximately 811 authorization cards supported the election Petition. (Pet. Temp. Inj. 5:1–3); (*See* Aff. Tina Moayedi 2:9–21, PX 48); (Authorizations, Ex. *See* Exs. PX 51–51(AY)). Red Rock argues that "it is unknown whether the Union ever even had majority support" given that authorization cards from a majority of employees have not been produced and authenticated. (RR Resp. 28:17 n.28). Even if only 723 authorization cards were executed, that is over half of the approximately 1350 employee bargaining unit here, and not all cards need be authenticated to demonstrate a likelihood of success on the merits. *See, e.g.*, *Rubin ex rel. NLRB v. Vista Del Sol Health Servs., Inc.*, 80 F. Supp. 3d 1097–98 (C.D. Cal. 2015). Accordingly, Petitioner has demonstrated that the Union likely attained majority status.

*ii. Pervasive Unfair Labor Practices*

The nature of an employer's unfair labor practices determines the appropriate remedy for § 8(a)(5) claims arising from a failed election. If an employer's misconduct taints the outcome of an election, but does not threaten to continually undermine employee free choice, the Board will generally: "(1) vacate the election, (2) enjoin the employer from engaging in such

misbehavior, (3) require him to post 'contrition' notices to his employees, disavowing any future interference, and (4) direct him to give union representatives reasonable access to the employees." *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 212 (2d Cir. 1980). In some circumstances, employer misconduct is so "outrageous" or "pervasive" that traditional remedies cannot ensure a fair rerun election. *See Gissel*, 395 U.S. at 613–14. When a fair rerun election cannot be ensured, courts should issue an "interim bargaining order," directing the employer to bargain with the union in good faith during the pendency of NLRB proceedings. *Id.* To assess the appropriateness of a bargaining order, the court should determine where the employer's misconduct lies on the spectrum between "hallmark" violations of the NLRA to "minor or less extensive practices." *Id.*

"Hallmark" violations have the tendency to be so coercive that their presence will support issuance of a bargaining order absent mitigating circumstances. *See Scott*, 241 F.3d at 666; *Jamaica Towing, Inc.*, 632 F.2d at 212–13. Hallmark violations tend to preclude fair elections in the future because they have "a lasting inhibitive effect on a substantial percentage of the work force[.]" *Jamaica Towing, Inc.*, 632 F.2d at 213. "[A] wage increase (or grant of a benefit) designed to impact the outcome of a representation election is a 'hallmark' violation of the NLRA and is as 'highly coercive' in its effect as discharges or threats of business failure." *Scott*, 241 F.3d at 666.

One hallmark violation of the NLRA may be sufficient to support a bargaining order, provided Petitioner has shown the violation's tendency to undermine majority strength and impede elections, and Petitioner has also met his burden under the remaining *Winter* factors. *Gissel*, 395 U.S. at 586; *Scott* 241 F.3d at 666. To determine whether the violation(s) will undermine future elections, the Court should consider factors bearing on the coerciveness of a violation, including: the size of the bargaining unit; the number of employees affected by the unfair labor practice; the identity of the perpetrators; the timing of the unfair labor practice; the

evidence of its impact on the union's majority; the likelihood of recurrence; and the change in circumstances after violation. *See* NLRB, Gen. Counsel Memorandum 99-8, "Guideline Memorandum Concerning *Gissel*," (Nov. 10, 1999).

Red Rock's offer of benefits was a hallmark violation that justifies the issuance of an interim bargaining order. Offering generous new benefits has a substantial tendency to undermine future elections because "[t]he danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged." *Exchange Parts*, 375 U.S. at 410; *see also Scott* 241 F.3d at 666 (applying *Exchange Parts* to reverse denial of interim bargaining order). While a large bargaining unit like Red Rock's generally undermines the propriety of a bargaining order, that is not the case where, as here, the entire bargaining unit has been unlawfully promised the benefits. *Scott*, 241 F.3d at 665. Given that the benefits were offered so close in time to the election, they had the maximum possible impact on the outcome of the election, as well as employees' likely beliefs regarding the Union's efficacy and Red Rock's potential hostility to unionization efforts going forward. *Cf. Jamaica Towing, Inc.*, 632 F.2d at 213; *WKRG-TV, Inc.*, 470 F.2d at 1302. The circumstances following the violation demonstrate a substantial impact on the Union's majority. When the Union filed its petition for election, 811 employees in the bargaining unit of about 1,336 had signed authorization cards, 747 employees authorized the Union to use their images in pro-Union materials, and 752 employees wore pro-Union buttons. (*See* Aff. Tina Moayedi 1:1–3:14, PX 48, ECF No. 1-4); (RC Pet., PX 49, ECF No. 1-4); (Voter List, PX 50, ECF No. 1-4). After the unfair labor practices, the Union only received 534 votes, and many employees admitted not voting for the Union because they feared losing the new healthcare and 401(k) benefits that Red Rock had just promised. (Aff. Tina Moayedi at 6–13, PX 48); (*see also* Red Rock Election Tally of

Ballots, PX 87, ECF No. 16-1). Additionally, previously active Union supporters ceased their pro-union activities, and many still do not return union organizers' calls. (*Id.*). At least 20 Union Committee Leaders have resigned their posts, and organizers have been unable to recruit replacements. (*Id.*). The totality of the evidence indicates that the unfair labor practices have had a sizeable impact on the Union's majority, and the fear of losing the recently accrued benefits likely taints the prospect of fair future elections.

The Court finds that Petitioner has demonstrated that Red Rock's grant of benefits and subsequent failure to bargain with the Union rises to the level of a § 8(a)(5) violation. Red Rock's grant of benefits likely thwarted the Union's majority status and was so outrageous that it undermined the fairness of future elections. The Court concludes that Petitioner has shown that an interim bargaining order is the only appropriate interim remedy.[8]

**B. Irreparable Harm**

To prevail on his § 10(j) Petition, the Regional Director "must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." *Frankl ex rel. NLRB v. HTH Corp.*, 650 F.3d 1334, 1355 (9th Cir. 2011) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "In the context of the NLRA, 'permit[ting an] alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority is irreparable harm." *Id.* at 1362 (quoting *Miller*, 19 F.3d at 460). When evaluating whether irreparable harm is likely absent an interim bargaining order, the court must consider whether, absent the relief, "the union is likely weakened in the interim, and [if] it will be difficult to recreate the original status quo with the same relative position of

---

[8] Red Rock highlights Petitioner's additional requested remedies as evidence that the additional remedies are sufficient, and a bargaining order is not necessary. (RR Resp. 22:3–17). Requiring Red Rock to cease and desist from unfair labor practices and allowing for education about Red Rock's unfair labor practices will not be alone sufficient to restore the Union to its status before the unfair labor practices. Given employees' likely fear of supporting the Union, as demonstrated by the Union's cratering support following the unfair labor practices, a bargaining order is essential.

the bargaining parties." *Id.* at 1363. The court should also consider whether Petitioner's delay in seeking a bargaining order would render the interim relief ineffective in preventing irreparable harm. *Id.* at 1363–65 (citing *McDermott*, 593 F.3d at 965).

Demonstrating irreparable harm from a § 8(a)(5) violation is not a heavy burden. While courts will not adopt a mandatory presumption of irreparable harm following a likelihood of success on the merits, demonstrating a likely § 8(a)(5) violation simultaneously demonstrates that irreparable harm will likely occur absent an injunction.[9] *Frankl*, 650 F.3d at 1362 ("while a district court may not presume irreparable injury with regard to likely unfair labor practices generally, irreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief."); *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191–1194 (9th Cir. 2011) (taxonomizing reasons failing to bargain in good faith contrary to § 8(a)(5) is likely to cause irreparable harm). The Circuit has explained that likely successful failure to bargain claims likely cause irreparable harm absent an injunction because of non-compensable benefits intrinsic to union representation. *Id.* For example, "a failure to bargain eliminates the possibility that the union and employer will negotiate a collective bargaining agreement as long as that failure continues. Therefore, without bargaining, employees are denied the opportunity to achieve the economic benefits that a CBA can secure for workers." *Small*, 661 F.3d at 1191. "Second, unions provide a range of non-economic benefits to employees that are not realized when an employer refuses to bargain with the union." *Id.* at 1192. These intangible benefits "give laborers opportunity to deal on an equality [sic] with their employer." *Id.* (internal quotations omitted) (quoting *NLRB v. Jones & Laughlin*, 301 U.S. 1, 33 (1937)). "Third, a failure to bargain in good faith threatens industrial peace. [Which] [t]he Supreme Court has

---

[9] In particular, when the Regional Director seeks an interim *Gissel* order, showing a likelihood of success on the merits simultaneously demonstrates that the fairness of future elections has been undermined.

repeatedly recognized [as] the overriding policy of the NLRA." *Id.* "Fourth, a delay in bargaining weakens support for the union, and a Board order cannot remedy this diminished level of support." *Id.* These harms generally cannot be remedied by the Board through a "forward-looking order" as they are difficult to measure "in dollar terms" and, regardless, the Board "generally does not order retroactive relief." *Id.* at 1191–92 (citations omitted).

In the context of a § 8(a)(5) violation, given the loss of benefits of union representation during the pendency of an NLRB proceeding, a final bargaining order is not "likely to be as effective as interim relief." *McDermott ex rel. NLRB v. Ampersand Publ'g, LLC*, 593 F.3d 950, 963 (9th Cir. 2010). A defendant may overcome the likely irreparable harm of a § 8(a)(5) violation by showing "some unusual circumstance indicating that union support is not being affected or that bargaining could resume without detriment as easily later as now." *Frankl*, 650 F.3d at 1363.

Petitioner contends that an interim bargaining order is essential to preserve the Board's remedial authority, because the longer employees go without the Union's representation, the less support the Union will have if the Board issues a final bargaining order. (Pet. Temp. Inj. 24:12–25:2). He explains that irreparable harm is likely absent the issuance of a temporary injunction because employees will not be made whole by the Board for the benefits they could have received in the interim had Red Rock bargained with the Union in good faith. (Pet. Temp. Inj. 25:3–5). He argues that the bargaining unit is currently suffering the loss of economic and noneconomic benefits of Union representation. (*Id.* 25:5–6). Among the lost benefits is a collective representative who could negotiate COVID-19 protections for employees in the terms and conditions of their employment. (*Id.* 25:9–11).[10]

[10] Petitioner also argues that employees will fear loss of their jobs for engaging in Union activity, but Petitioner has not shown a sufficient likelihood of success on his § 8(a)(3) claim, or even serious questions regarding the merits of the claim, for the Court to consider whether the claim supports an irreparable harm finding.

In response, Red Rock contends that Petitioner's delay in filing the Petition undermines his claim of irreparable harm, especially given the other remedies available to the Board. (RR Resp. 20:3–22:26). It further argues that another Station Casino, Texas Station, has filed a petition for election since its employees received the same benefits, indicating that the Union's bargaining position has not been substantially undermined. (*Id.* 22:27–23:8). And, given that Station Casinos offered the benefits at union properties, Red Rock believes employees have not connected the benefits it offered with Red Rock's antipathy toward the Union and its supporters. (*Id.* 23:8–17).

The Court finds that Petitioner has demonstrated a likelihood of irreparable harm. Petitioner has shown a likelihood of success on its claim that Red Rock's unfair labor practices have tainted both the past election and the prospect of future elections. Necessarily, that finding demonstrates Red Rock employees' collective bargaining rights have been irreparably harmed because they lack union representation they should have previously attained. And, without Union representation, employees have remained without the intangible benefits of union representation that the Circuit has acknowledged comprise irreparable harm. Employees have been deprived of the opportunities of a collective bargaining agreement could secure. Employees in the bargaining unit have not had the opportunity to have a collective bargaining agent represent them when attempting to negotiate with Red Rock on equal footing. Red Rock's employees have been deprived of the gains made in furtherance of industrial peace that unions are able to achieve by collectively pursuing shared goals of employees. And, most importantly, the Union's support has likely continued to decline as employees' benefits have continued to improve without Union representation, undermining the Union's ability to bargain effectively in the future absent interim relief.

Red Rock has not shown peculiar circumstances in this case that would indicate the Union could begin bargaining after a Board order without detriment if an injunction does not

issue. Even though Texas Station has a pending petition for election, there is no indication the election will be successful. Even if it were, Petitioner has demonstrated that Red Rock's employees connected the new benefits to a necessity to reject the Union, and there is no indication they are aware of the conditions at Texas Station. Petitioner's delay in bringing the Petition does not substantially undermine his claim of irreparable harm, as the Circuit has not found problem with similar delays. *See Frankl*, 650 F.3d at 1363–64 (explaining that interim relief, despite delay, can remedy harm that would otherwise be non-compensable by allowing for a union to bargain on employees' behalf during the pendency of an ALJ decision). Therefore, the Court finds that Petitioner has shown a likelihood of irreparable harm if an injunction does not issue.

**C. Balance of Equities**

After a petitioner has shown some likelihood of success on the merits and irreparable harm, "then the court must balance the hardships resulting from the issuance of the requested relief." *Scott*, 241 F.3d at 667. "Where the Board and the respondent each make a showing of hardship, the district court must exercise its sound discretion to determine whether the balance tips in the Board's favor." *Miller*, 19 F.3d at 460. When balancing the equities, a "district court must take into account the probability that declining to issue the injunction will permit the alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority." *Avanti*, 661 F.3d at 1196 (citing *Frankl*, 650 F.3d at 1365).

Petitioner argues that the balance of hardships tips in his favor because the requested remedies will preserve the employees' collective bargaining rights and pose only an incidental burden to Red Rock. (*See* Pet. Temp. Inj. 30:3–32:2). Red Rock responds that its equities are substantial given the hardship an injunction would pose to its employees and an injunction's effect on its free speech rights. (RR Resp. 37:23–38:15).

The Court finds that the equities favor the Board. For the reasons described above, an injunction is essential to safeguarding employees' statutorily protected rights under the NLRA. The Court can fashion relief that provides Red Rock's employees the benefits of union representation while the NLRB case proceeds, which respects and restores the preference of the employees prior to Red Rock's unfair labor practices. The burdens on Red Rock's speech rights are minimal, as the Court is not restraining Red Rock from engaging in protected speech.

**D. Public Interest**

"In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Miller*, 19 F.3d at 460. When a petitioner "makes a strong showing of likelihood of success and of likelihood of irreparable harm, [he] will have established that preliminary relief is in the public interest." *Frankl*, 650 F.3d at 1366. Here, as Petitioner has shown a strong likelihood of success on the merits and irreparable harm, the Court finds that the public interest favors the issuance of preliminary relief.

As Red Rock has only contested the propriety of Petitioner's Proposed Order with respect to Chavez and Powers, (RR Resp. 38:16–39:17), but the Court has not found a likelihood of success on Petitioners § 8(a)(3) claim, the Court denies the requested relief arising from the § 8(a)(3) allegations. In all other respects, the Court grants Petitioner the relief requested.

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that the Petition for Temporary Injunction, (ECF No. 1), is **GRANTED in part** and **DENIED in part** consistent with the foregoing.

**IT IS FURTHER ORDERED** that the Motion to Try the Petition on the Basis of the Administrative Record, (ECF No. 3), is **GRANTED**.

**IT IS FURTHER ORDERED** that Red Rock's Motion for Leave to File Excess Pages, (ECF No. 17), is **GRANTED *nunc pro tunc***.

**IT IS FURTHER ORDERED** that Red Rock, its officers, agents, servants, representatives, successors, and assigns, and all persons acting in concert or participation with them, pending the final disposition of the matters herein now pending before the Board, shall:

(a) Cease and desist from:

(1) interrogating employees about their union support and activities, and the sympathies of other employees;

(2) soliciting employee complaints and grievances and implying increased benefits and improved terms and conditions of employment to discourage employees from supporting the Union or any other union;

(3) promising employees increased wages or benefits or other improved terms and conditions of employment to discourage them from supporting the LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS, CULINARY WORKERS LOCAL 226, AND BARTENDERS LOCAL 165, affiliated with UNITE HERE INTERNATIONAL UNION (the Union) or any other union;

(4) granting employees benefits to discourage employees from supporting the Union or any other union, including, but not limited to, elimination of the TCCA program and no longer relying on TCCA program disciplines for future disciplinary purposes, lowering employees' deductibles from $500 to $0, providing free healthcare plans to employees, their spouses and their children, and providing employees with employer-paid retirement programs;

(5) threatening employees that a strike is inevitable if they choose the Union or any other labor organization as their collective-bargaining representative;

(6) threatening employees with loss of benefits, including lower wages or withholding of benefits they otherwise would have received, unspecified reprisals, or other negative consequences if they select the Union or any other labor organization as their collective-bargaining representative;

(7) threatening employees that it will engage in dilatory bargaining tactics if its employees select the Union or any other labor organization as their collective-bargaining representative;

(8) informing employees that it is futile for them to select the Union or any other labor organization as their bargaining representative;

(9) promulgating and maintaining overly-broad and discriminatory rules or directives prohibiting employees from talking about the Union or any other labor organization;

(10) assigning employees more onerous terms and conditions of employment because of their membership in or support for the Union or any other union;

(11) changing employees' schedules or lowering their seniority because of their membership or support for the Union or any other union or because they violate directives about bringing concerns about supervisors or managers directly to human resources;

(12) disciplining employees because of their membership or support for the Union or any other union or because they violate directives about bringing concerns about supervisors or managers directly to human resources;

(13) making changes to terms and conditions of employment without providing the Union with notice and an opportunity to bargain with regard to those changes;

(14) failing and refusing to recognize and bargain in good faith with the Union as the exclusive representative of employees in the aforesaid Unit.

(15) in any other manner interfering with, restraining or coercing its employees in the exercise of their right to self-organization, to form labor organizations, to join or assist the Union or any other labor organization, to bargain collectively through representatives of their own choosing and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, or to refrain from any and all such activities;

(b) Take the following affirmative actions to effectuate the policies of the Act:

(1) Within five (5) days of the Court's issuance of the Injunction Order, post copies of the Injunction Order at Respondent's Las Vegas, Nevada facility, as well as translations of such an Order in Spanish and in other languages as necessary to ensure effective communication to Respondent's employees as determined by the Regional Director, said translations to be provided by Respondent at Respondent's expense and approved by the Regional Director, in all places where notices to its employees are normally posted; maintain these postings during the pendency of the Board's administrative proceeding free from all obstructions and defacements; and grant all employees free and unrestricted access to said postings;

(2) Within fourteen (14) days of the Court's issuance of the Injunction Order: (i) hold one or more mandatory employee meetings, on working time and at times when the Employer customarily holds employee meetings, and scheduled to ensure the widest possible employee attendance, at which the Order directing Red Rock to cease and desist from engaging in unfair labor practices, beginning on page 30 and concluding on page 34, will be read in English and in Spanish translation approved by the Regional Director to all bargaining unit employees, supervisors, and managers—including Nelson,

Fortino, and Hernandez—by a responsible, senior Employer official in the presence of a Board agent or, at the Employer's option, by a Board agent in the presence of a responsible Employer official;

(ii) announce the meeting(s) for the order reading in the same manner it would customarily announce a meeting of employees; and

(iii) require that all employees of the unit attend the meeting(s).

(3) Immediately recognize, and upon request, bargain in good faith with the Union as the exclusive representative of employees in the following appropriate unit concerning terms and conditions of employment and, if any understanding is reached, embody the understanding in a signed agreement:

All full-time and regular part-time assistant food servers, bakers (I, II, III), banquet bartenders, banquet porters, banquets setup, bar porters, bartenders, bell persons, bell starters, beverage porters, beverage servers, beverage (Race/Sports), banquet servers, bus persons/bussers, cake decorators (I, II), captains, coffee breakers, concession workers, cooks, cook's helpers, counter attendants, food servers, gourmet hostperson/cashiers, host/cashiers, housekeeping utility porters, ice cream concession workers, kitchen runners, kitchen workers, lead banquet porters, lead counter attendants, lead servers, mini bar attendants, pantry, porters, resort guest room attendants, resort housepersons, resort suite guest room attendants, resort steakhouse cooks, room runners, room service captains, runners, service bartenders, specialty cooks, servers, sprinters, status board, stove persons, team member dining room (TDR) attendants, turndown guest room attendants, utility porters, VIP attendants, VIP bartenders, and VIP lounge attendants employed by the Employer at its facility located at 11011 West Charleston Boulevard, Las Vegas, Nevada; excluding all other employees, front desk employees, valet parkers, retail cashier/clerks, gaming employees (dealers, slot attendants, cage cashiers), inspectresses, engineering and maintenance employees, office clerical employees, guards, managers, and supervisors as defined by the Act.

(4) Rescind, if the Union requests they be rescinded, Respondent's changes to represented employees' benefits, including those to Respondent's matching contributions on deferrals to the Station Casinos

LLC & Affiliates 401(k) Plan, and Respondent's table assignment agreements.

(5) Within (twenty-one) 21 days of the Court's issuance of the Injunction Order, submit to the Court and the Regional Director for Region 28 of the Board a sworn affidavit from a responsible agent of Respondent stating, with specificity, the manner in which Respondent has complied with the terms of the Injunction Order.

Dated this 20 day of July, 2021.

Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT