Kyler A. Scheid (NY#4984258)
Sara S. Demirok (AZ#031970)
National Labor Relations Board, Region 28
2600 N. Central Avenue, Suite 1400
Phoenix, Arizona 85004
Tel:  (602) 416-4769
Fax:  (602) 640-2178
Email: sara.demirok@nlrb.gov
Email: kyler.scheid@nlrb.gov
Attorneys for Petitioner

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

CORNELE A. OVERSTREET,  Regional
Director of the Twenty-Eighth Region of
the National Labor Relations Board, for
and on behalf of the  National Labor
Relations Board,

            Petitioner

     v.

NP RED ROCK LLC D/B/A RED ROCK
CASINO RESORT & SPA,


            Respondent

Case No. 2:20-cv-2351-CDS-MDC

**STIPULATION AND ORDER OF
DISMISSAL OF PETITION FOR
TEMPORARY INJUNCTION UNDER
SECTION 10(j) OF THE NATIONAL
LABOR RELATIONS ACT, AS
AMENDED [29 U.S.C. § 160(j)]**

       Petitioner, together with Respondent (the Parties), hereby stipulate and agree that this

action be dismissed, based upon the following:

       On July 20, 2021, the Court issued an Order Granting, in part, injunctive relief under

Section 10(j) of the National Labor Relations Act, pending final disposition of the matters

before the Board (the "Court Order").

On June 17, 2024, the Board issued its Order in the underlying Board cases (28-CA-244484 et al.). Copies of the Board's Order and the Administrative Law Judge's Decision are attached hereto as Exhibit A.

As the Board's Order constitutes a final disposition of the matters encompassed by the injunctive relief order issued by the Court, Petitioner and Respondent, by and through their respective counsel of record, hereby move this Court to vacate its July 20, 2021, Order and dismiss the Petitioner's petition with prejudice.

**RESPECTFULLY SUBMITTED** this 31st day of July, 2024.

Petitioner

*/s/ Kyler Scheid*

Kyler A. Scheid, Attorney
Sara S. Demirok, Supervisory Attorney
National Labor Relations Board,
Region 28
2600 N. Central Avenue, Suite 1400
Phoenix, Arizona 85004
Email: kyler.scheid@nlrb.gov
Email: sara.demirok@nlrb.gov
Attorneys for Petitioner, Cornele A. Overstreet

Respondent

*/s/ David Dornak*

David Dornak, Attorney at Law
Mark Ricciardi, Attorney at Law
Fisher & Phillips LLP
300 S. Fourth Street, Suite 1500
Las Vegas, NV 89101
Email: ddornak@fisherphillips.com
Email: mricciardi@fisherphillips.com
Attorneys for Respondent, NP Red Rock d/b/a Red Rock Casino Resort & Spa

### Order

Based on the parties' stipulation, the court's July 20, 2021 order (ECF No. 26) is vacated; and the petition for temporary injunction is dismissed with prejudice. The Clerk of Court is kindly instructed to close this case.

_____
CRISTINA D. SILVA
UNITED STATES DISTRICT JUDGE

DATED:   August 5, 2024

# EX A

# Board Decision
# In Cases No.
# 28-CA-244484 et al.

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**NP Red Rock LLC d/b/a Red Rock Casino Resort Spa *and* Claudia Montano and Local Joint Executive Board of Las Vegas a/w UNITE HERE International Union**

**NP Boulder LLC d/b/a Boulder Station Hotel & Casino *and* Local Joint Executive Board of Las Vegas a/w UNITE HERE International Union**

**NP Palace LLC d/b/a Palace Station Hotel & Casino *and* Local Joint Executive Board of Las Vegas a/w Unite Here International Union. Cases** 28–CA–244484, 28–CA–250950, 28–CA–250229, 28–CA–250282, 28–CA–250873, 28–CA–252591, 28–CA–253276, 28-CA–254470, 28–CA–254510, 28–CA–254514, 28-CA–260640, 28–CA–260641, 28–CA–262187, 28–CA–262803, 28–CA–264605, 28–RC–252280, and 28–CA–254155

June 17, 2024

DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS PROUTY AND WILCOX

On April 12, 2022, Administrative Law Judge Jeffrey D. Wedekind issued the attached decision. The Respondents[1] filed exceptions and a supporting brief, the General Counsel and the Charging Party filed answering briefs, and the Respondents filed reply briefs. The General Counsel filed cross-exceptions and a supporting brief, the Respondents filed an answering brief, and the General Counsel filed a reply brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.[2]

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[3] and conclusions[4] and to

---

[1] The involvement of Respondents NP Boulder LLC d/b/a Boulder Station Hotel & Casino (Boulder Station) and NP Palace LLC d/b/a Palace Station Hotel & Casino (Palace Station) in this case is limited to the allegation that they, along with Respondent NP Red Rock LLC d/b/a Red Rock Casino Resort Spa (Red Rock), violated Sec. 8(a)(1) by posting photographs of employees on an antiunion campaign website without the employees' consent and without a disclaimer stating that the website was not intended to reflect the views of the employees appearing on it. Unless otherwise specified, "Respondent" below refers to Respondent Red Rock, the sole Respondent with respect to the other allegations.

[2] On January 9, 2024, the Respondents filed a motion requesting that Chairman McFerran and Member Kaplan recuse themselves from ruling on the exceptions and cross-exceptions to the judge's decision in this case. They contend that Chairman McFerran and Member Kaplan's November 2020 vote to authorize the General Counsel to seek an injunction against the Respondent in Federal district court under Sec. 10(j) of the Act was an exercise of a prosecutorial function that gives rise to an unconstitutional potential for bias if they later serve to adjudicate the exceptions and cross-exceptions. However, the Supreme Court has long held that "the combination of investigative and adjudicative functions does not, without more, constitute a due process violation." *Withrow v. Larkin*, 421 U.S. 35, 58 (1975). To the contrary, the Court observed, "[i]t is . . . very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law." Id. at 56. Federal courts of appeals evaluating arguments like the Respondents' have uniformly applied the Supreme Court's decision in *Withrow v. Larkin* to hold that "the [National Labor Relations] Board's authority under the Act to seek preliminary injunctive relief against an employer in the district court does not deprive the employer of a neutral decisionmaker in subsequent proceedings before the Board." *Flamingo Hilton-Laughlin v. NLRB*, 148 F.3d 1166, 1174 (D.C. Cir. 1998), enfg. in relevant part 324 NLRB 72 (1997); see also *Kessel Food Markets, Inc. v. NLRB*, 868 F.2d 881, 887–888 (6th Cir. 1989), enfg. 287 NLRB 426 (1987), cert. denied 493 U.S. 820 (1989); *NLRB v. Sanford Home for Adults*, 669 F.2d 35, 37 (2d Cir. 1981), enfg. 253 NLRB 1132 (1981); *Eisenberg v. Holland Rantos*, 583 F.2d 100, 104 fn. 8 (3d Cir. 1978), enfg. 234 NLRB 726 (1978); *Hogan Transports, Inc.*, 363 NLRB 1980, 1980 fn. 1 (2016) ("The Board's [Sec.] 10(j) procedures do not deny a respondent due process."). The Respondents' motion is accordingly denied.

[3] The Respondent has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

[4] In the absence of exceptions, we adopt the judge's dismissal of the allegations that the Respondent violated Sec. 8(a)(1) by threatening to reduce the pay of employee Balmore Orellana, promising retroactive funding of employees' 401(k) plans, and distributing antiunion door hangers and violated Sec. 8(a)(3) and (1) by threatening, changing the schedule, and reducing the seniority of Charging Party Claudia Montano and by failing to recall or reinstate employee Yaneth Chavez.

The Respondent has excepted to the judge's conclusion that it violated Sec. 8(a)(5) and (1) by failing to offer the Union notice and an opportunity to bargain prior to cancelling table-swap agreements. However, the Respondent does not state, either in its exceptions or supporting brief, any grounds on which the judge's purportedly erroneous conclusion should be disregarded. Therefore, we find, in accordance with Sec. 102.46(a)(1)(i) and (ii) of the Board's Rules and Regulations that this exception should be disregarded. See, e.g., *Security Walls, LLC*, 371 NLRB No. 74, slip op. at 3 fn. 15 (2022), enfd. 80 F.4th 1277 (11th Cir. 2023); *Holsum de Puerto, Inc.*, 344 NLRB 694, 694 fn. 1 (2005), enfd. 456 F.3d 265 (1st Cir. 2006). In any event, we agree with and affirm the judge's conclusion that the Respondent violated the Act as alleged on the merits.

We agree with the judge that the Respondent violated Sec. 8(a)(1) of the Act by serving free steaks branded with the words "Vote No" in the Red Rock employee dining room on December 17, 2019. While the Board has held that an employer does not violate the Act by "providing meals to employees or holding cocktail parties or dinners," *Waste Management of Palm Beach*, 329 NLRB 198, 198 (1999), this principle does not encompass a situation where, as here, an employer has identified the quality of food served to employees as a top employee concern, promised employees to make everything better, and then directed that a higher quality of food be served immediately before an election. The issue here does not turn on the relative extravagance of the Respondent's conduct, but on the fact that the steaks clearly linked the Respondent's plea for employees to oppose the Union with a concrete improvement of, and implied promise to continue to improve, an important condition of employment. Cf., e.g., *State Plaza Hotel*, 347 NLRB 755, 762–764 (2006) (employer violated Sec. 8(a)(1) by soliciting and remedying employee grievances about food quality).

adopt the recommended Order as modified and set forth in full below.[5]

As found by the judge and discussed in more detail below, the Respondent violated Section 8(a)(1) of the Act by many separate instances of three categories of coercive conduct: (1) promises, announcements, or grants of benefits to its employees made during the Local Joint Executive Board of Las Vegas a/w UNITE HERE International Union's (the Union) organizing campaign in order to discourage employees from selecting the Union; (2) threats to withhold or withdraw benefits if employees selected the Union; and (3) implied threats that selecting the Union would be futile because the Respondent would not agree to improve employees' working conditions through bargaining with the Union. The Respondent further violated Section 8(a)(1) by threatening employees with job loss as a result of strikes, interrogating an employee about her union sympathies, and posting photographs of employees on an antiunion website without their consent. In addition, it violated Section 8(a)(3) and (1) by issuing discriminatory disciplines and a discriminatory work assignment to union supporters and by failing to recall an employee from layoff status because of her union activity. As explained below, we agree with the judge that the Respondent's egregious and pervasive unlawful conduct requires a remedial affirmative bargaining order under *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969). We further conclude that a remedial bargaining order is separately warranted under the standard set forth in the Board's recent decision in *Cemex Construction Materials Pacific, LLC*, 372 NLRB No. 130

(2023). Finally, we agree with the General Counsel that the Respondent's whole course of unlawful conduct manifests an attitude of opposition to the purposes of the Act that requires certain additional remedies, as described below, in order to safeguard the fundamental statutory rights of the Respondent's employees.

## Promises, Announcements, and Implementation of Benefits

We agree with the judge, for the reasons set forth in his decision and as explained below, that Respondent Red Rock violated Section 8(a)(1) of the Act by, on many separate occasions, promising, announcing, and/or implementing improved benefits or other terms and conditions of employment for Red Rock employees in order to dissuade them from supporting the Union.[6]

It is well established that an employer violates Section 8(a)(1) by promising or granting benefits during a union campaign in order to dissuade its employees from supporting the union.[7] The lawfulness of a grant of benefits during an organizing campaign depends upon its motive, and "the Board infers improper motive and interference with employees' Sec[tion] 7 rights when an employer grants benefits during an organizing campaign without showing a legitimate business reason."[8] To rebut this inference, the employer has the burden to show that it would have taken the same action, at the same time, even if there had been no union activity.[9]

The Respondent here has clearly failed to meet its burden. First, we agree with the judge's rejection of the Respondent's contention that it was unaware of the Union's

---

In affirming the judge's conclusion that the Respondents violated Sec. 8(a)(1) by posting employee photographs on an antiunion campaign website without their consent, we reject the Respondent's suggestion that the safeguards governing employer use of employee images in campaign materials set forth in *Allegheny Ludlum Corp.*, 333 NLRB 734, 742-745 (2001), enfd. on other grounds 301 F.3d 167 (3d Cir. 2002), might not apply to campaign websites.

[5] We have amended the judge's conclusions of law and recommended remedy consistent with our findings herein. We shall modify the judge's recommended Order to conform to our findings and to the Board's standard remedial language, and we shall substitute a new notice to conform to the Order as modified.

[6] The judge correctly considered both the Respondent's implied promises of benefits prior to the Union's petition for a Board election and its postelection implementation of its earlier unlawful promises. See, e.g., *Hampton Inn NY—JFK Airport*, 348 NLRB 16, 17 (2006) ("[T]he rule set out in *Exchange Parts* is also applicable to promises or conferral of benefits during an organizational campaign but before a representation petition has been filed."); *Westminster Community Hospital, Inc.*, 221 NLRB 185, 185–186 (1975) (finding postelection wage increase unlawful as "both a reward to the employees for having rejected the Union and a fulfillment of earlier unlawful promises"), enfd. mem. 566 F.2d 1186 (9th Cir. 1977).

In affirming the judge's conclusion that Supervisor Malgozata Wrzask's remarks to employee Blanca Herrera on December 14, 2019, violated Sec. 8(a)(1) as an instance of the Respondent's unlawful announcements of new benefits in order to persuade employees not to support the Union, we find it unnecessary to pass on whether those remarks also constituted an unlawful interrogation.

[7] *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409 (1964) (Sec. 8(a)(1) prohibits "conduct immediately favorable to employees which is

undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect."); see also, e.g., *Shamrock Foods Co.*, 366 NLRB No. 117, slip op. at 1 & fn. 6, 13 (2018), enfd. 779 Fed.Appx. 752, 756 (D.C. Cir. 2019).

[8] *Vista Del Sol Health Services, Inc.*, 363 NLRB 1193, 1193 fn. 2 (2016).

[9] See, e.g., *CVS Pharmacy*, 372 NLRB No. 91, slip op. at 1 fn. 2, 6 (2023) ("[I]t is the employer's burden to show that the announcement would have been made at the same time even if there had been no union activity."); *SBM Management Services*, 362 NLRB 1207, 1207 (2015) ("'As a general rule, an employer's legal duty in deciding whether to grant benefits while a representation proceeding is pending is to decide that question precisely as it would if the union were not on the scene.'") (quoting *United Airlines Services Corp.*, 290 NLRB 954, 954 (1988)); accord *Care One at Madison Avenue, LLC v. NLRB*, 832 F.3d 351, 357 (D.C. Cir. 2016) ("What the Act requires is that the employer make its benefits decisions 'precisely as it would if the union were not on the scene.'") (quoting *Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 927 (D.C. Cir. 2005)), enfg. 361 NLRB 1462 (2014); *Perdue Farms Inc., Cookin' Good Division v. NLRB*, 144 F.3d 830, 836 (D.C. Cir. 1998) ("Granting benefits does not violate the Act if it occurs 'in the normal course of business of an employer, without any motive of inducing employees to vote against the union.' . . .. Both the decision to confer benefits and the timing of the announcement of such benefits are subject to 'in the normal course of business' analysis[.]") (quoting *Pedro's Inc. v. NLRB*, 652 F.2d. 1005, 1008 (D.C. Cir. 1981)), enfg. in relevant part 323 NLRB 345 (1997); *NLRB v. Anchorage Times Publishing Co.*, 637 F.2d 1359, 1367 (9th Cir. 1981) ("[T]he law is well established that there is a presumption of illegal motive adhering to wage increases granted prior to an election."), enfg. 237 NLRB 544 (1978).

campaign when it lawfully initiated the benefit changes, but rather made the changes because of legitimate business concerns about employee turnover and labor-market competition. The record establishes that the Union was actively organizing across all Station Casinos properties by July 2018, when the Respondent asserts that it took its first steps towards reviewing and revising its human resources policies by interviewing Phil Fortino (a senior human-resources official then employed by a different casino group). And even in the 2018 interview, Station Casinos' union issues were central to the discussion of potentially hiring Fortino to evaluate and improve the Respondent's human resources policies. Moreover, by the time Station Casinos actually hired Fortino around July 2019,[10] the Respondent was specifically aware of the Union's campaign at Red Rock and actively opposing that campaign, including by posting antiunion messaging throughout the Red Rock facility that emphasized years of fruitless bargaining at Boulder and Palace Stations. Finally, the judge discredited testimony presented by the Respondent to show that its benefits changes were motivated by legitimate concerns about employee turnover and labor-market competition. We specifically affirm the judge's credibility resolutions in this respect and accordingly conclude that the Respondent did not establish that it decided to improve employee benefits for legitimate business reasons unrelated to the Union's campaign.[11]

Next, even if the Respondent had established that it initiated a plan to review and improve employee benefits for legitimate reasons before it was aware of the Union's campaign, it would nevertheless have the burden to show that its subsequent implementation "represented a logical working out" of that plan that "would have been the same whether or not there was a [union] campaign afoot."[12] But the unprecedented benefits the Respondent announced at the December 10 and 11 meetings cannot plausibly be

characterized as a logical unfolding of any general prior plan to improve benefits. Moreover, affirmative record evidence independently establishes that the Respondent deliberately and intentionally conducted the whole process leading to its specific benefits decisions in order to combat the Union's campaign. Thus, the record supports the judge's credibility-based determinations that Fortino was hired to counteract the Union and that his extremely expedited review of Station Casinos' human resources policies was prompted at least in part by the Respondent's expectation of an imminent union petition for a representation election at Red Rock. Fortino and his staff expressly formulated policy proposals by comparison to the Union's contracts at other properties and the Union's specific bargaining proposals at Station Casinos' other unionized properties.[13] The proposals presented to Station Casinos' senior leadership for approval on November 19 themselves document their purpose of counteracting the Union's campaign.[14] And Fortino's communications about the benefits further confirm their antiunion purpose: after the benefits proposals were approved, Fortino emailed a copy to an acquaintance not employed by Station Casinos and responded to a complimentary reply by writing: "You believe that???? The free health care and company paid 401(k) is going to devastate the union."

Finally, even if the Respondent had established that its specific benefits decisions were not themselves unlawfully motivated, it would still have the burden to establish that it would have announced the benefits at Red Rock on December 10 and 11 even if there had been no union election scheduled there the following week.[15] But the judge expressly discredited testimony about purported union-neutral reasons for the time and place of the announcements, and affirmative record evidence establishes that the decision to announce the benefits at Red Rock on December 10 and 11 related to the impending election.[16] Because

---

[10] Dates below are in 2019 unless otherwise specified.

[11] Our careful review of the entire record reveals that many of the Respondent's witnesses, including Red Rock General Manager Scott Nelson, Station Casinos Chief Operating Officer Robert Finch, Executive Vice President and Chief Legal Officer Jeffrey Welch, Chief Financial Officer Stephen Cootey, and Senior Vice President for Human Resources Phil Fortino testified with such an unusual degree of evasiveness and wholly implausible forgetfulness that the judge was fully warranted in discounting their testimony as generally unreliable except where independently corroborated or against the Respondent's interest.

Because the record does not otherwise support overturning the judge's determinations to discredit testimony about the Respondent's motives for reviewing its benefits packages, we find it unnecessary to rely on the judge's consideration of public news reporting relating to the Las Vegas labor market at the relevant time.

[12] *Churchill's Supermarkets*, 285 NLRB 138, 140 (1987), enfd. 857 F.2d 1474 (6th Cir. 1988) (per curiam); see also *Perdue Farms*, above, 144 F.3d at 836 (applying D.C. Circuit's "normal course of business" standard).

[13] For example, Fortino wrote to an outside benefits advisor that he wanted a 401(k) benefit designed to "kill" discussion of the Union's pension plan.

[14] For example, the proposals document states that the 401(k) proposal "*would help incentivize Team Members . . . to not vote for a union*"

(emphasis in original), and that the health-insurance proposal would "[take] away union power and major emotional draw to Team Members." The plan document also includes an overall comparison of the costs of Station Casinos' current benefits with estimated costs under a typical Culinary Union contract, to create an estimated "Cost Exposure With Union Contract." Chief Financial Officer Cootey testified that this comparison was a benchmark for evaluating whether Fortino's proposals were financially efficient for the company and that one of the goals of implementing these proposals was to avoid financial exposure associated with employees' selection of the Union.

[15] See, e.g., *CVS Pharmacy*, above, 372 NLRB No. 91, slip op. at 6.

[16] For example, Fortino texted Finch on November 22 and 23 that Red Rock had received a petition and that "[w]e need to announce ASAP the new programs." And on December 10, Fortino emailed a copy of the PowerPoint used at the December 10 and 11 meetings to an acquaintance not employed by Station Casinos with the message: "Starting employee meetings today. I know of one group who won't be happy when they hear about this. LOL." On December 11, the acquaintance replied: "Well done, Dude! Yes, Culinary will not like this. . . ." Fortino responded: "We got petitioned at [Red Rock] just after we approved this plan. We've had an amazing amount of employees throw away their union buttons. Election is next Thursday/Friday so we'll see what happens." Similarly, on December 10, Welch texted a group of Station

the record establishes that the timing of the announcements was motivated to undermine the Union's support in the Red Rock election, the announcements would be unlawful and objectionable as alleged under controlling Board and court precedent even if the Respondent had otherwise established that the benefits changes were motivated by legitimate business concerns unrelated to the Union's campaign.[17]

### Threats to Withhold or Withdraw Benefits

We agree with the judge, for the reasons set forth in his decision and as explained below, that the Respondent violated Section 8(a)(1) of the Act by, on many separate occasions, stating or implying to employees that they would not receive the newly announced benefits package if they selected the Union. While the Board has held that an employer may lawfully tell employees that their existing benefits are negotiable and that certain benefits might be reduced or eliminated through collective bargaining,[18] the Board has also observed that such communications are "dangerous" in that they "carry with them 'the seed of a threat that the employer will become punitively intransigent in the event the union wins the election.'"[19] Accordingly, such statements are lawful only where "the employer's other communications make it clear that any reduction in wages or benefits will occur only as a result of the normal give and take of negotiations."[20] An employer violates Section 8(a)(1), however, if, "in context, [its statements] reasonably could be understood by employees as a threat of loss of existing benefits and leave employees

with the impression that what they may ultimately receive depends upon what the union can induce the employer to restore."[21] The Respondent's statements at issue in this case fail to meet this standard. Rather than making clear that any loss of existing benefits would occur only as the result of negotiations, the Respondent repeatedly made statements that reasonably communicated that if employees selected the Union they would begin with nothing and end with only what the Union could achieve in bargaining.[22] Particularly in the context of the Respondent's pervasive references to bargaining failure at Boulder and Palace Stations, discussed further below, these messages unlawfully threatened to withhold or withdraw the newly announced benefits package if employees selected the Union.

### Threats of Futility

We agree with the judge, for the reasons set forth in his decision and as explained below, that the Respondent violated Section 8(a)(1) of the Act by, on many separate occasions, implicitly threatening that employees' selection of the Union would be futile because the Respondent would adopt a bargaining strategy that would prevent any agreement with the Union. The Board has held, with court approval, that an employer's discussion during a union campaign of extended unproductive bargaining at its own other unionized facilities violates Section 8(a)(1) where, in context, it conveys to employees the impression that bargaining would be similarly fruitless at their facility if

---

Casinos executive officers: "Very very positive reaction to meetings so far this morning at Red Rock. Buttons coming off."

[17] See, e.g., *Waste Management of Palm Beach*, above, 329 NLRB at 198–199 & fn. 3 (employer's showing that plan to increase its matching contribution to employees' 401(k) plans was conceived before the election campaign and was to be implemented corporatewide did not satisfy its burden to show it would have announced the benefit only to employees at facility that was organizing, shortly before election, even if there had been no union activity); *Perdue Farms*, above, 144 F.3d at 836 ("The timing of the announcement of a wage increase may violate [Sec.] 8(a)(1), even though the employer's initial decision to raise wages was perfectly legitimate.") (internal quotation, modification, and citation omitted).

[18] E.g., *National Micronetics*, 277 NLRB 993, 994 fn. 11 (1985).

[19] *BP Amoco Chemical–Chocolate Bayou*, 351 NLRB 614, 617 (2007) (quoting *Federated Logistics & Operations*, 340 NLRB 255, 255 (2003), enfd. 400 F.3d 920 (D.C. Cir. 2005)).

[20] *Boar's Head Provisions Co.*, 370 NLRB No. 124, slip op. at 1 fn. 2, 17 (2021) (citing *Taylor-Dunn Mfg. Co.*, 252 NLRB 799, 800 (1980), enfd. mem. 679 F.2d 900 (9th Cir. 1982)).

[21] *Taylor-Dunn*, above, 252 NLRB at 800; see also *Boar's Head Provisions*, above, 370 NLRB No. 124, slip op. at 17; *TRW-United Greenfield Division*, 245 NLRB 1135, 1141–1142 (1979) ("[W]here a bargaining-from-scratch statement can reasonably be read in context as a threat by the employer to unilaterally discontinue existing benefits prior to negotiations, or to adopt a regressive bargaining posture designed to force a reduction of existing benefits for the purpose of penalizing the employees for choosing collective representation, the Board will find a violation.") (quoting *Coach & Equipment Sales Corp.*, 228 NLRB 440, 440–441 (1977)), enfd. 637 F.2d 410, 420–421 (5th Cir. 1981); *Stumpf Motor Co.*, 208 NLRB 431, 431–432 (1974)

(holding *unlawful* manager's unqualified statement that he "would hate to lose the profit-sharing plan" because it "implied that unionization would *ipso facto* result in the loss of an important benefit," but holding *lawful* other statements about probable loss of profit sharing "*as a result of negotiations*") (emphasis added).

[22] To give just a few examples, Internal Maintenance Director Hernan Andrade responded to an employee question about whether Red Rock would "take back everything that they just gave us" if employees selected the Union by suggesting that, in that case, the new benefits would be subject to negotiation, and employees would be in the same position as employees at Boulder Station who, as the Respondent had been emphasizing for months, had achieved no improvements to terms and conditions of employment through bargaining. Fortino urged employees not to let the Union "put bargaining back in *instead of what you already have*," and explained that if employees select the Union, "[e]verything goes back to bargaining. Everything. Which means you could end up with more. You could end up with less. Maybe you end up with the same. People don't understand that. Think, well, *if we have it, we're gonna start from there. And it doesn't work that way*." (emphasis added). And Red Rock Hotel Manager Joshua Leiserowitz, when asked whether employees would still be eligible for the new benefits if they voted for the Union, replied, "no . . . if you vote yes to the Union then you won't be eligible for these new benefits." When challenged, Leiserowitz replied that "he was sure that he was right because he had verified that information earlier." The Respondent implicitly excepts to the judge's determination to credit testimony establishing Leiserowitz's remarks, but the record does not support overturning the judge's credibility resolution. The Respondent also contests the judge's ruling permitting the General Counsel to amend the complaint to allege that these remarks were unlawful. We affirm the judge's ruling for the reasons, and with the safeguards, the judge set forth on the hearing record.

they selected the Union.[23] Here, the Respondent's pervasive emphasis on years of fruitless bargaining at Boulder and Palace Stations formed a centerpiece of its antiunion campaign at Red Rock from at least July 2019 all the way through the election.[24] Because Fortino's corporate human resources department controlled both bargaining at Boulder and Palace Stations and any potential bargaining at Red Rock, employees could not miss the message that Respondent could and would ensure that employees' selection of the Union at Red Rock would bring them nothing more than it had brought employees at Boulder and Palace Stations.[25] Because the Respondent's pervasive discussion of fruitless bargaining at Boulder and Palace Stations clearly implied that it would adopt a bargaining strategy designed to prevent agreement if employees selected the Union, we agree with the judge that these statements were coercive threats in violation of Section 8(a)(1) of the Act.

Implicit Threats of Job Loss as a Result of a Strike

We agree with the judge, for the reasons set forth in his decision and as explained below, that the Respondent violated Section 8(a)(1) of the Act by implicitly threatening that employees' selection of the Union would result in an increased chance of job loss as a result of a strike. The Board has held that Section 8(c) of the Act protects an employer's statement truthfully informing employees that they are subject to permanent replacement in the event of an economic strike, "[u]nless the statement may be fairly understood as a threat of reprisal against employees or is explicitly coupled with such threats."[26] Here, the Respondent repeatedly warned employees that if they selected the Union and the Union was unsatisfied with bargaining progress, it could call an economic strike and the Respondent could permanently replace striking employees. The Respondent framed these warning within pervasive references to the years of fruitless bargaining at Boulder and Palace Stations and repeated statements that the Respondent was never required to reach any agreement with the Union, which, as discussed above, we have found unlawfully threatened that selecting the Union would be futile. In this context, the Respondent's warnings clearly imply that employees' selection of the Union would substantially increase their risk of being permanently replaced. The Board has long held that similar

---

[23] *Libertyville Toyota*, 360 NLRB 1298, 1298 (2014) (respondent's statements unlawfully threatened futility based in part on reference to employees at different unionized facility who had "been living that nightmare for almost 3 years now"), enfd. sub nom. *Auto Nation, Inc. v. NLRB*, 801 F.3d 767, 772 (7th Cir. 2015); *Overnite Transportation Co.*, 329 NLRB 990, 992 (1999) (respondent unlawfully gave employees the impression that bargaining would be futile where it "gave a special meaning" to statement pay raises "will have to wait for negotiations" by repeatedly citing example of years of unproductive bargaining at its own separate unionized facility), enfd. in relevant part 280 F.3d 417, 430 (4th Cir. 2002).

[24] To give just a few examples, transcripts of the December 16 and 17 captive audience meetings include the following statements:

Fortino: "Let's start with the obvious. How long have Boulder and Palace been in negotiations? Another word would be bargaining. Over three years. How is that going? It's going nowhere. Here's what the law says. . . . The government does not require us to make a deal with the union ever. I think that's made obvious when you look at Boulder and Palace. 1,110 days as of today."

Fortino: "The law states clearly the parties are not compelled to ever reach an agreement. Boulder, Palace, 1,100 days, no contract no nothing. There is no law that says we ever have to agree."

Nelson: "Again, Boulder and Palace, as Phil had mentioned, there have been multiple meetings, multiple meetings. But there's no contract. There's 180 plus articles that have been thrown out on the table between the two parties and it's my understanding that there's been four things that have been agreed upon. The people that have been promising all of these things, whether it's Boulder team members, Palace team members, or even you, one of the first—one of the first things that they wanted to get settled was resolution of dues. Wow. Thank you. No agreements. No pension that was promised 3 1/2 years ago. But, wait. You already have a paid retirement plan here that was put together. No free Culinary healthcare for those Palace and Boulder team members. But, wait. You already have that here now. . . . These brand new company-wide benefit changes apply to you now. . . . And unfortunately we can't implement these changes at your sister properties, Boulder, Palace, and Fiesta Rancho, without continuing to discuss them with the union. And again 1,100 days and counting since Boulder, Palace, and Rancho were promised free union health insurance and union pension plan."

Nelson: "Take a look at this. These are some of the promises here that were given to the Palace and Boulder teams. They were promised

. . . Culinary healthcare, Culinary pension, that they couldn't be disciplined. Have they gotten any of these things? Right after the election, they were told they were going to get it right after the election. They got nothing. They got none of it. After 1 year, nada. After 2 years, nada. After 3 years, nada. . . . And we're right here doing what we're doing and there's none of that bargaining stuff and 3 years with nada. I'm hoping I can count on every one of you, it's about us. Let's keep it us, please."

The General Counsel requests that we overrule *Babcock & Wilcox*, 77 NLRB 577 (1948), which upholds the legality of employer-mandated campaign meetings. We decline the General Counsel's request that we address that issue in this case.

[25] The Respondent stipulated in its answer to the General Counsel's complaint that several Station Casinos officers, including Fortino, are statutory supervisors or agents of Respondent Red Rock and does not contend that bargaining at Boulder and Palace Stations was separately controlled from potential bargaining at Red Rock. We reject the Respondent's contention that the judge's conclusions on this record run contrary to the Board's decisions in *Winkle Bus Co.*, 347 NLRB 1203 (2006), and *Mercy-Memorial Hospital Corp.*, 231 NLRB 1108 (1977). In *Winkle Bus Co.*, the Board held that a respondent's "offhand comment" about a newspaper article discussing bargaining outcomes at "an unrelated employer in the area," did not unlawfully threaten that union representation would be futile. 347 NLRB at 1204–1206. In *Mercy-Memorial Hospital*, the Board affirmed, without comment, an administrative law judge's dismissal of an allegation that a respondent unlawfully threatened futility by distributing a single leaflet reminding employees of the union's failure to secure a contract at another respondent facility at which the respondent claimed that it had no bargaining obligation and no bargaining had taken place for several years. 231 NLRB at 1122. The employer conduct in those cases is not comparable to the present Respondent's pervasive campaign references to ongoing fruitless bargaining at Boulder and Palace Stations. Moreover, the Board's decision in *Mercy-Memorial Hospital* gives no indication that the judge's analysis and dismissal of the relevant allegation was presented to the Board by any party's exceptions, while the Board's subsequently issued decisions in *Libertyville Toyota*, above, and *Overnite Transportation Co.*, above, clearly support the judge's findings of violations on this record.

[26] *Eagle Comtronics, Inc.*, 263 NLRB 515, 515–516 (1982).

communications, especially in the context of further unfair labor practice conduct, violate the Act even absent an explicit threat that selecting a union would inevitably lead to a strike.[27]

October 13 Final Written Warning to Claudia Montano

We agree with the judge, for the reasons set forth in his decision and as explained below, that the Respondent violated Section 8(a)(3) and (1) of the Act by issuing a disciplinary final written warning to employee Claudia Montano on October 13. First, we agree with the judge that the General Counsel made her initial showing under *Wright Line*[28] that the warning was motivated, at least in part, by Montano's ongoing union activity. Next, the Respondent's decision to issue the final written warning was made pursuant to its progressive discipline policy based in part on a separate written warning issued to Montano less than 2 weeks earlier. But, as the judge found, the earlier warning was itself unlawful. The judge correctly concluded that the Respondent's reliance on the prior unlawful warning suffices to establish that the final written warning was also unlawful.[29]

We further find that, even if the Respondent had not relied upon the earlier unlawful discipline, it failed to meet its *Wright Line* defense burden to establish that it would have issued a final written warning to Montano absent her union activity. The Respondent contends that it disciplined Montano for failing to complete assigned work preparing salads, failing to label roasted cashews in violation of the health code, and falsely indicating that she had completed the work by highlighting the item on a prep list. But Montano claimed—both in writing on the disciplinary notice and in testimony—that she had been prevented from completing the assignment by other assigned work, had appropriately labeled her product, and had informed her immediate supervisor, Chef Cecilia Magat, that the assignment was not complete. Montano further testified that

labels sometimes fell off hot pans, that she did not highlight the prep list indicating that the work was complete, and that Magat told her that she had correctly prioritized the other assignment and not to worry about not completing the salad prep. The judge found that Chef Danielle Tydingco, who directed Magat to discipline Montano, provided significantly inconsistent testimony about the matter and was not generally a convincing witness.[30] Because Magat was not available to testify, and Tydingco was undisputedly not present at the time of Montano's alleged infractions, Montano's denial that she committed the infractions—supported by her contemporaneous written comment on the disciplinary document—is not controverted by any direct credible evidence in this record. We accordingly conclude that the Respondent has failed to establish, as a factual matter, that Montano committed the alleged infractions for which she was disciplined.

Moreover, even if the Respondent had established that Montano committed the alleged infractions, we find that the Respondent's proffered disciplinary comparators fall short of meeting its burden to persuade that it would have issued progressive discipline to Montano for the conduct alleged. Montano allegedly failed to label roasted nuts that were being placed on a sheet pan for cooling in the kitchen refrigerator. This alleged failure, while a violation of the health code, did not pose an immediate health risk to any customer. Unlike Montano's purported conduct here, most of the Respondent's proffered disciplinary comparators involved health code infractions that could directly result in danger to customers because they involved improper heating, cooking, cooling, storage, or sanitation technique that risked the growth or transfer of foodborne illness. The Respondent did present one example of a "counseling/coaching" for failure to properly label prep work, without more, but the record establishes that "counseling/coaching" does not count as "progressive

---

[27] *Rankin & Rankin, Inc.*, 330 NLRB 1026, 1026, 1038 (2000) (holding unlawful employer's statement "if the union demanded higher wages and the company disagreed, the union could call a strike and the employees could be replaced by new employees, hired for less money" in context of further unlawful conduct); *Mediplex of Danbury*, 314 NLRB 470, 470-471 (1994) (holding unlawful employer's discussion of termination and permanent replacement of strikers at an unrelated facility); *Mack's Supermarkets*, 288 NLRB 1082, 1082 fn. 3, 1091-1092 (1988) (holding unlawful employer's statement that employees "could be replaced in the event of a strike," in context of further unlawful conduct).

While the Respondent framed its discussion as involving "economic" strikes, a strike in response to alleged bad-faith bargaining would, of course, be an unfair-labor-practice strike, in which case the Respondent would *not* have the right to permanently replace strikers. And an employer's misrepresentation of the unqualified reinstatement rights of unfair-labor-practice strikers itself constitutes an unprotected threat of job loss for engaging in protected strike activity that violates Sec. 8(a)(1). See, e.g., *Cemex Construction Materials*, above, 372 NLRB No. 130, slip op. at 5 & fns. 30, 31. The Board has held that remarks about economic-striker replacement are not protected speech under *Eagle Comtronics* when accompanied by an employer's suggestion that it would bargain so as to cause a strike, because "[a]ny strike caused by an employer's bad-faith bargaining in retaliation for a union election victory is not an

economic strike." *Unifirst Corp.*, 335 NLRB 706, 707–708 (2001); see also *H.A. Kuhle Co.*, 205 NLRB 88, 103 (1973) ("The natural inference from [employer's implication that its bargaining strategy would leave union no choice but to strike, and risk striker replacement] was that the [employees] stood an excellent chance of losing their jobs even if they struck to protest an unlawful refusal to bargain, a further unlawful misrepresentation of the law.").

[28] 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982).

[29] See, e.g., *Kitsap Tenant Support Services*, 366 NLRB No. 98, slip op. at 20 (2018) ("'It is well settled that, where a respondent disciplines an employee based on prior discipline that was unlawful, any further and progressive discipline based in whole or in part thereon must itself be unlawful.'") (quoting *Hays Corp.*, 334 NLRB 48, 50 (2001)), enfd. 2019 WL 12276113 (D.C. Cir. 2019); *NLRB v. Relco Locomotives, Inc.*, 734 F.3d 764, 787 (8th Cir. 2013) ("An adverse employment decision is unlawful if it relies upon and results from a previous unlawful action.").

[30] As with other Respondent witnesses noted above, Tydingco testified with such evasiveness and implausible forgetfulness that we agree with the judge that she was not generally a reliable witness, and we specifically affirm the judge's determination to discredit her testimony about her own lack of knowledge of Montano's union activity and about the Respondent's purported reasons for issuing disciplines to Montano.

discipline" within the Respondent's system. Moreover, that coaching was issued after the same employee had received two prior coachings, a verbal warning, and a written warning. Finally, that coaching was issued on October 12, only 1 day before Montano's final warning, which clearly undermines its weight as evidence that Montano's discipline was consistent with the Respondent's established prior practice. We accordingly conclude that the Respondent failed to establish that it would have disciplined Montano as it did absent her union activity even if it had established that she committed the infractions alleged and even if the prior warning had been lawful.

The Gissel Bargaining Order

We agree with the judge, for the reasons set forth in his decision and as explained below, that the Respondent's pervasive and egregious misconduct warrants a remedial affirmative bargaining order under *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969).[31] The Supreme Court held in *Gissel* that, where a union has at some point achieved majority support and a respondent has engaged in unfair labor practices which "have the tendency to undermine majority strength and impede the election processes," the Board "should issue" an order for the respondent to bargain with the union without an election if "the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that the employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order."[32] The Court emphasized that a bargaining order in this circumstance serves the two equally important goals of "effectuating ascertainable employee free choice" and "deterring employer misbehavior."[33] The Court further observed that the Board "can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future."[34] The Board accordingly considers a respondent's entire course of conduct, both before and after the election, in determining whether a bargaining order is warranted.[35] The Board considers "the seriousness of the violations and their pervasive nature, as well as such factors as the number of employees directly affected, the identity and position of the individuals committing the unfair labor practices, and the size of the unit and extent of dissemination of knowledge of the Respondent's coercive conduct among unit employees."[36]

Here, as the judge found, at least 810 of the Respondent's 1343 unit employees—approximately 60 percent— had signed authorization cards designating the Union as their exclusive representative for the purpose of collective bargaining by October 16, 2019.[37] The Respondent engaged in serious pervasive unlawful misconduct beginning in September 2019, well before the Union filed its petition, and the unlawful misconduct continued at least through June 2020, well after the December 2019 election.[38] As discussed in detail above, the whole record reflects that the Respondent's extensive coercive and unlawful misconduct stemmed from a carefully crafted corporate strategy intentionally designed at every step to interfere with employees' free choice whether or not to select the Union as their collective-bargaining representative. The centerpiece of the Respondent's unlawful campaign was its tripart message promising and granting employees

---

[31] In finding a bargaining order appropriate under *Gissel*, the judge did not expressly address the General Counsel's complaint allegation that the Respondent violated Sec. 8(a)(5) and (1) of the Act by refusing to recognize and bargain with the Union while engaging in unlawful conduct such that there was only a slight possibility that the application of the Board's traditional remedies could allow a free and fair rerun election. We conclude that the Respondent's refusal to bargain under these circumstances violated Sec. 8(a)(5) and (1) as alleged, and we shall amend the judge's conclusions of law accordingly.

[32] *Gissel*, above, 395 U.S. at 614–615.

[33] Id. at 614; see also *Seattle-First National Bank v. NLRB*, 892 F.2d 792, 796 (9th Cir. 1989) ("[A] long line of cases . . . stands for the proposition that the purpose of an order to bargain is not simply to effectuate majority rule in a particular case but also to deter wrongful refusals by employers to recognize majorities promptly."). This is the *Gissel* "Category II" standard, under which the parties and the judge have analyzed this case.

[34] *Gissel*, above, 395 U.S. at 614.

[35] See, e.g., *Aldworth Co.*, 338 NLRB 137, 150 (2002) (finding "pernicious effects of the Respondent's preelection unfair labor practices were exacerbated and renewed by independent unlawful postelection conduct"), enfd. sub nom. *Dunkin' Donuts Mid-Atlantic Distribution Center v. NLRB*, 363 F.3d 437 (D.C. Cir. 2004); *General Fabrications Corp.*, 328 NLRB 1114, 1115 (1999) ("An employer's continuing hostility toward employee rights in its postelection conduct 'evidences a strong likelihood of a recurrence of unlawful conduct in the event of another organizing effort.'") (quoting *Garney Morris, Inc.*, 313 NLRB 101, 103 (1993)), enfd. 222 F.3d 218 (6th Cir. 2000).

[36] See, e.g., *Cemex Construction Materials*, above, 372 NLRB No. 130, slip op. at 12; *Garvey Marine, Inc.*, 328 NLRB 991, 993 (1999), enfd. 245 F.3d 819 (D.C. Cir. 2001).

[37] The parties extensively litigated the legitimacy of the authorization cards before ultimately stipulating that the Union obtained a majority by October 2019, and the Respondent does not contest before the Board the validity of the Union's October majority.

[38] The General Counsel excepts to the judge's finding that the Respondent committed "approximately 20 unfair labor practices" during the critical period between the Union's petition and the election, arguing that this finding significantly undercounts the number and pervasiveness of the Respondent's unfair labor practices, including those before the critical period and after the election. The General Counsel's complaint alleged approximately 160 distinct violations, in many cases by repeated separate communications of similar unlawful messages by different managers or to different employees. The judge in some instances found the violations "as alleged" without addressing distinct allegations separately, and in others found it unnecessary to pass on cumulative allegations. We agree with the General Counsel that the record and the judge's decision support finding far more than 20 distinct unfair labor practice violations. We find it unnecessary to determine precisely how many times the Respondent violated the Act by distinct repetitive communications because finding additional instances of violations found by the judge would be cumulative and would not affect the remedy. It is clear, however, that the Respondent pervasively conveyed its various unlawful messages to all or nearly all of its bargaining unit employees through many channels on many occasions prior to the election.

8                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

tremendous new benefits without the Union, threatening to withhold or withdraw these benefits if employees selected the Union, and implicitly threatening that selecting the Union could only lead to years of fruitless bargaining without any improvement to working conditions.  This highly coercive combination of promises and threats was accompanied by a barrage of further unlawful conduct, including additional threats that selecting the Union would lead to withdrawal of "favors," "extras," or "help" that employees could otherwise expect from management, implicit threats of job loss related to strikes, and interrogation and discriminatory treatment of Union supporters.  The coercive impact of these unfair labor practices was magnified because they were committed by the Respondent's highest-ranking executives, including Red Rock General Manager Nelson and Station Casinos Senior Vice President for Human Resources Fortino, as well as other managers and supervisors at all levels.  While the unit is large, the Respondent's unlawful conduct directly affected and was extensively disseminated to all or nearly all unit employees.[39]  The Respondent's unlawful campaign clearly had the tendency to undermine majority strength and impede the election process, and the record establishes that it worked as intended in inducing many unit employees to visibly and publicly renounce the Union before the election by discarding their union buttons.

The Respondent's grants of benefits, in particular, fall within a category of conduct that the Board and the courts have recognized as "hallmark" violations, which tend to have such a coercive and long-lasting effect on employees' free choice in a potential rerun election that, absent "some significant mitigating circumstance," they generally warrant a bargaining order "without extensive explication."[40]  The extraordinary healthcare and retirement benefits conferred on unit employees by the Respondent are likely to have a particularly strong coercive effect on

employee freedom of choice because, as the Board has previously observed and the Respondent repeatedly emphasized to employees in this case, the grant of such economic benefits eliminates primary reasons for organization.[41]  As the judge discussed, the implemented benefits will also serve as "a continuing reminder that 'the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged.'"[42]  Moreover, as the Board has previously observed, unlawfully granted benefits "have a particularly longlasting effect on employees and are difficult to remedy by traditional means not only because of their significance to the employees, but also because the Board's traditional remedies do not require a respondent to withdraw the benefits from employees."[43]

Finally, the purposefulness of the Respondent's coordinated unlawful campaign and its continued unlawful conduct even after the Union lost the election, including its unlawful failure to recall or reinstate union supporter Teresa Powers,[44] confirms that it remained intent on avoiding a collective-bargaining obligation even at the cost of continuing to violate the law and "evidences a strong likelihood of a recurrence of unlawful conduct in the event of another organizing effort."[45]

We agree with the judge, for these reasons and the reasons given in his opinion, that the whole record of this case clearly supports concluding that the possibility of erasing the effects of the Respondent's highly coercive misconduct and ensuring a fair rerun election by the use of the Board's traditional remedies is slight, and we conclude that it remains slight even with the addition of certain enhanced remedies as discussed further below.  The judge's recommended bargaining order on this record is supported by a long line of Board and court precedent stretching back to *Gissel* itself.[46]  We accordingly find that the majority of employees' prior free choice of the Union as their

---

[39] The Board has held that the impact of isolated unlawful misconduct involving few employees carries greater weight in small units but may be more diluted and more easily dissipated in larger units. See, e.g., *Garvey Marine*, above, 328 NLRB at 994; *Beverly California Corp.*, 326 NLRB 232, 235 (1998), enfd. in part, vacated in part, on other grounds 227 F.3d 817 (7th Cir. 2000).  This principle does not weigh against a bargaining order where, as here, severe and pervasive unlawful misconduct directly affects all or nearly all employees in a large unit.  See, e.g., *NLRB v. Anchorage Times*, above, 637 F.2d at 1370 (9th Circuit enforcing Board bargaining order where large percentage of employees in large unit received wage increases in close proximity to election); cf. *Scott v. Stephen Dunn & Associates*, 241 F.3d 652, 665 (9th Cir. 2001) ("Bargaining orders are not limited to small units . . . . [Where the] most serious alleged violation is the grant of benefits to the entire bargaining unit . . . there is no basis to contend that this violation will not continue to impact the deliberations of all of the eligible voters. The size of the bargaining unit did not lessen the impact of the unfair labor practices here.").

[40] *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 212–213 (2d Cir. 1980).

[41] See, e.g., *Holly Farms Corp.*, 311 NLRB 273, 281–282 (1993), enfd. 48 F.3d 1360 (4th Cir. 1995), affd. on other grounds 517 U.S. 392 (1996).

[42] Id. at 282 (quoting *Exchange Parts*, above, 375 U.S. at 409).

[43] *Evergreen America Corp.*, 348 NLRB 178, 180 (2006), enfd. 531 F.3d 321 (4th Cir. 2008); see also *Parts Depot, Inc.*, 332 NLRB 670, 675 (2000), enfd. 24 Fed.Appx. 1 (D.C. Cir. 2001); *Gerig's Dump Trucking, Inc.*, 320 NLRB 1017, 1017–1018 (1996), enfd. 137 F.3d 936 (7th Cir. 1998).

[44] We agree with the judge that the overwhelming weight of record evidence indicates that the Respondent's purported reasons for not recalling Powers were a pretext devised or directed by senior executives to ensure that there would be fewer union leaders in the voting unit in the event that a new election was ordered.

[45] *Garney Morris, Inc.*, 313 NLRB 101, 103 (1993), enfd. mem. 47 F.3d 1161 (3d Cir. 1995); see also, e.g., *MJ Metal Products*, 328 NLRB 1184, 1185 (1999), affd. 267 F.3d 1059 (10th Cir. 2001); *Eddyleon Chocolate*, 301 NLRB 887, 891 (1991) ("The likelihood of the Respondent's misconduct recurring in a rerun election is high, as the Respondent's postelection conduct reveals continued hostility to employee rights."); *Chromalloy Mining & Minerals v. NLRB*, 620 F.2d 1120, 1131 fn. 8 (5th Cir. 1980) ("Unfair labor practices occurring after the election . . . are always relevant because they demonstrate that the employer is still opposed to unionization."), enfg. in relevant part 238 NLRB 688 (1978).

[46] See, e.g., *Evergreen America*, above, 348 NLRB at 180; *Parts Depot*, above, 332 NLRB at 675; *Heck's Inc.*, 180 NLRB 530, 531 (1970) (reaffirming bargaining order for grants of benefits and other violations,

representative, as designated by authorization cards, would be better protected by the issuance of a bargaining order "unless some significant mitigating circumstance exists."[46]

The Respondent has not argued to the Board that changed circumstances including the passage of time since its unlawful conduct should preclude a bargaining order. The Board's traditional policy is to consider the appropriateness of a bargaining order as of the time of the unfair labor practices, because taking into account subsequent changes incentivizes prolonged litigation, undermining the deterrence goal identified by the Supreme Court in *Gissel* as of coequal importance with the purpose of implementing ascertainable employee free choice. [47] Some courts of appeals, including the Court of Appeals for the Ninth Circuit (in which this case arises) have

similarly held that the Board may decline to consider changed circumstances during intervals of litigation because this rule "prevent[s] employers from intentionally prolonging Board proceedings in order to frustrate the issuance of bargaining orders."[48] Other courts of appeals, however, including the Court of Appeals for the District of Columbia Circuit, have required, as a condition of enforcing a *Gissel* bargaining order, that the Board determine the appropriateness of the order in light of the circumstances existing at the time it is entered.[49]

Here, as discussed in detail above, it is undisputed that the Union had clear majority support by October 16, 2019. We have found that the Respondent's pervasive unlawful misconduct had a strong tendency to undermine, and did undermine, the Union's majority support and impede the election process. We have also found that, absent

---

after remand by *Gissel*, above, 395 U.S. at 615–616); *Gissel Packing Co.*, 180 NLRB 54, 54–55 (1969) (reaffirming bargaining order for promises of benefits and other violations after remand by 395 U.S. at 615–616), enfd. in the absence of an appearance by respondent No. 14404, 76 L.R.R.M. (BNA) 2175 (4th Cir. Nov. 9, 1970); *NLRB v. Anchorage Times*, above, 637 F.2d at 1369–1370 (9th Cir. enforcing *Gissel* order where wage increases were "most significant among the many unfair labor practices").

The Respondent argues on exceptions that the Board has rarely issued an affirmative bargaining order based solely on an unlawful grant of benefit and that the Court of Appeals for the District of Columbia Circuit questioned whether the Board could properly do so in *Skyline Distributors v. NLRB*, 99 F.3d 403 (D.C. Cir. 1996). But our determination that a bargaining order is warranted on this record rests not only on the Respondent's extraordinary grants of economic benefits, but also on its pervasive coercive threats and other unlawful conduct. Our remedial decision today is fully consistent with the summary of Board case law endorsed by the court in *Skyline Distributors*. See id. at 410–411 (citing Julius G. Getman & Bertrand B. Pogrebin, *Labor Relations: The Basic Processes, Law and Practice* 76 (1988)). Thus, the Respondent's unfair labor practices were demonstrably deliberate and calculated. Its promises of benefits and threats to withhold those benefits implicated very substantial employee economic interests, and were expressly designed to interfere with, and did interfere with, employees' fundamental statutory right to choose whether or not to be represented by the Union. The Respondent's unlawful conduct included reprisals against union adherents in violation of Sec. 8(a)(3). Its promised benefits were specifically designed to address employee concerns the Respondent had identified as underlying the Union's successful organizing activity. Finally, the Respondent's conduct involved not a single act of illegality, but scores of interrelated unfair labor practices beginning before the Union's petition and continuing well after the election. Cf. *Traction Wholesale Center Co. v. NLRB*, 216 F.3d 92, 105–107 (D.C. Cir. 2000) (enforcing Board's bargaining order after consideration of factors set forth in *Skyline Distributors*), enfg. in relevant part 328 NLRB 1058 (1999).

[46] *Jamaica Towing*, above, 632 F.2d at 212.

[47] See, e.g., *Gissel*, above, 395 U.S. at 614 (emphasizing that, where a union has shown past majority support, bargaining order serves dual goals of effectuating ascertainable employee free choice and deterring employer misbehavior); *Garvey Marine*, above, 328 NLRB at 995 (explaining deterrence purpose of Board's traditional practice); see also *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 705 (1944) (affirming Board's affirmative bargaining order over employer's argument employee turnover had removed union's card majority: "The Board might well think that, were it not to [order bargaining], but, instead order elections upon every claim that a shift in union membership had occurred during proceedings occasioned by an employer's wrongful refusal to bargain, recalcitrant employers might be able by continued opposition to union

membership indefinitely to postpone performance of their statutory obligation. In the Board's view, procedural delays necessary fairly to determine charges of unfair labor practices might in this way be made the occasion for further procedural delays in connection with repeated requests for elections, thus providing employers a chance to profit from a stubborn refusal to abide by the law. That the Board was within its statutory authority in adopting the remedy which it has adopted to foreclose the probability of such frustrations of the Act seems too plain for anything but statement.").

[48] *NLRB v. Bakers of Paris*, 929 F.2d 1427, 1448 (9th Cir. 1991) (citing cases), enfg. 288 NLRB 991 (1988). See also, e.g., *East Bay Automotive Council v. NLRB*, 483 F.3d 628, 635 (9th Cir. 2007) (enforcing non-*Gissel* bargaining order despite 8-year litigation delay: "it would be inappropriate to upset the Board's order in light of a loss of employee support that was brought about by the very wrongs being remedied," and "changed circumstances during intervals of adjudication 'have been held irrelevant to the adjudication of enforcement proceedings.'") (quoting *Bakers of Paris*, above, 929 F.2d at 1448)), enfg. 342 NLRB 1244 (2004); *United Dairy Farmers Cooperative Assn. v. NLRB*, 633 F.2d 1054, 1069 (3d Cir. 1980) (remanding for reconsideration of *Gissel* order 6 to 7 years after last unfair labor practice; holding Board may "ignore a possible dissipation of majority support through employee turnover after the unfair labor practice [because] '[t]o require the Board to determine whether a continuing majority supports unionization . . . would be to put a premium upon continued litigation by the employer' and allow the employer 'to avoid any bargaining obligation indefinitely.'") (quoting *Hedstrom Co. v. NLRB*, 629 F.2d 305, 312 (3d Cir. 1980) (en banc)), remanding in relevant part 242 NLRB 1026 (1979).

[49] See, e.g., *Flamingo Hilton-Laughlin*, above, 148 F.3d at 1171 & fn. 4 (citing precedent from other courts of appeals considering changed circumstances, including passage of time and employee and management turnover). More specifically, the District of Columbia Circuit has held that, absent "outrageous and pervasive ULP's," the Board must find, based on substantial evidence, that: (1) the union, at some time, had majority support within the bargaining unit; (2) the employer's unfair labor practices had the tendency to undermine majority strength and impede the election process; and (3) the possibility of erasing the effects of past practices and of ensuring a fair rerun election by the use of traditional remedies is slight and that employee sentiment once expressed in favor of the union would be better protected by a bargaining order. *Traction Wholesale Center*, above, 216 F.3d at 104. The court additionally requires the Board to explicitly balance three considerations, as considered at the time the Board issues its order: (1) the employees' Sec. 7 rights; (2) whether other purposes of the Act override the rights of employees to choose their bargaining representatives; and (3) whether alternative remedies are adequate to remedy the violations of the Act. Id. at 107–108.

mitigating circumstances, the possibility of erasing the effects of the Respondent's highly coercive misconduct and ensuring a fair rerun election by the use of the Board's traditional remedies is slight and that the majority of employees' prior free designation of the Union as their representative by authorization cards would be better protected by the issuance of a bargaining order.

After examining the appropriateness of a bargaining order under the circumstances existing at the present time, we find that the passage of time since the Respondent's unfair labor practices does not constitute a mitigating circumstance warranting withholding a bargaining order in this case. In so finding, we have duly considered the Section 7 rights of all employees involved. Consistent with the careful balancing of employee rights described by the Court in *Gissel*, we find that issuing a bargaining order in this case protects the rights of the majority of the Respondent's employees who previously designated the Union as their representative for the purpose of collective bargaining, while the rights of those employees who may be opposed to representation are safeguarded by their access to the Board's decertification procedure under Section 9(c)(1) of the Act, following a reasonable period of time to allow the collective-bargaining relationship a fair chance to succeed.[50] We have also considered whether other purposes of the Act override employees' Section 7 right to choose their bargaining representative. We find, again consistent with *Gissel*, that, because a majority of the Respondent's employees in an appropriate unit have designated the Union as their representative for the

purpose of collective bargaining, the Act's dual purposes of effectuating ascertainable employee free choice and of deterring employer misbehavior are aligned, so that, absent the likelihood of a fair rerun election, a bargaining order simultaneously serves both purposes without subordinating either to the other.[51]

It has now been four years since the Respondent unlawfully failed to recall or reinstate Teresa Powers around June 4, 2020. We cannot conclude, under the circumstances of this case, that this passage of time since the Respondent's last unfair labor practices has made it likely that the Board's traditional remedies could ensure that a fair election could be held today.[52] As we have discussed in detail above, the Board and the courts have long and broadly recognized that unfair labor practices such as the Respondent's here, especially its unlawful promises and grants of extraordinary benefits to unit employees, tend to impede the possibility of a fair rerun election for extended periods of time after their commission. Accordingly, courts that require consideration of changed circumstances as a condition of enforcing Board bargaining orders have regularly enforced such orders after comparable or longer periods of time where other circumstances have not determinatively weighed against enforcement.[53] Here, we find that the passage of time, considered either by itself or in combination with other circumstances that may have changed during the intervening period, does not warrant concluding that the impact of the Respondent's coercive misconduct has been sufficiently dissipated to permit a fair rerun election.[54]

---

[50] Cf. *Orland Park Motor Cars, Inc.*, 333 NLRB 1017, 1018–1019 (2001) (citing *Gissel*, above, 395 U.S. at 612–613 & fn. 33), enfd. 309 F.3d 452, 456–458 (7th Cir. 2002); *Stevens Creek Chrysler Jeep Dodge*, 357 NLRB 633, 639 (2011), enfd. sub nom *Mathew Enterprise, Inc. v. NLRB*, 498 Fed.Appx. 45 (D.C. Cir. 2012).

[51] *Gissel*, above, 395 U.S. at 614.

[52] In considering the potential impact of changed circumstances on a rerun election as required by the Court of Appeals for the District of Columbia Circuit and other courts of appeals, we note that the General Counsel issued a new consolidated complaint on April 12, 2021, alleging scores of additional violations of Sec. 8(a)(1), (3), (4), and (5) by Station Casinos and various other entities including the Respondent as a single employer and single integrated enterprise. On the same day, the General Counsel moved to consolidate the new complaint with this proceeding, and the motion and new consolidated complaint were admitted into the record. As noted in the judge's decision, the judge denied the General Counsel's motion. Under current Board policy, a Regional Director's determination to issue a complaint based on certain kinds of charges could support a decision to dismiss a newly filed election petition, and a party to a representation proceeding may seek to block a pending election until the final disposition of outstanding unfair labor practice charges and a determination of their effect, if any, on the election procedure. See *Rieth-Riley Construction Co.*, 371 NLRB No. 109, slip op. at 1 (2022); Sec. 103.20 of the Board's Rules and Regulations (29 C.F.R. § 103.20 (2020)). Without respect to the merits of the allegations in the April 2021 complaint, the record in this case accordingly at least suggests that changed circumstances after the last unfair labor practices at issue here might prevent, rather than enable, a timely and fair rerun election. Cf. *Chromalloy Mining*, above, 620 F.2d 1131 & fn. 8 (considering subsequent unfair labor practices, along with employee and management turnover, as relevant to propriety of bargaining order).

[53] See, e.g., *Evergreen America Corp. v. NLRB*, 531 F.3d 321, 332–333 (4th Cir. 2008) (affirming Board's conclusion that passage of 4 years between respondent's unfair labor practices and Board order did not make *Gissel* order unacceptable), enfg. 348 NLRB 178 (2006); *NLRB v. Goya Foods of Florida*, 525 F.3d 1117, 1138 (11th Cir. 2008) (rejecting respondent's argument that enforcement of non-*Gissel* bargaining order—evaluated under *Gissel* standard—should be denied based solely on passage of 6 to 7 years between unfair labor practice conduct and Board order), enfg. 347 NLRB 1118 (2006); *Dunkin' Donuts*, above, 363 F.3d at 441–442 (enforcing Board order issued 4 years after unfair labor practices); *NLRB v. U.S.A. Polymer Corp.*, 272 F.3d 289, 293–299 (5th Cir. 2001) (enforcing Board order issued more than 4 years after unfair labor practices), enfg. 328 NLRB 1242 (1999), cert. denied 536 U.S. 939 (2002); *Garvey Marine, Inc. v. NLRB*, 245 F.3d 819, 826–830 (D.C. Cir. 2001) (enforcing Board order issued more than 4 years after unfair labor practices), enfg. 328 NLRB 991 (1999); *Parts Depot*, above, 332 NLRB at 674–676 (entering *Gissel* order more than 4 years after postelection unfair labor practice), enfd. 24 Fed.Appx. 1 (D.C. Cir. 2001); but cf. *Cogburn Health Center, Inc. v. NLRB*, 437 F.3d 1266, 1272–1276 (denying enforcement to Board order on finding Board failed to consider respondent's proffered evidence of changed circumstances during 5 years between unfair labor practices and Board order), denying enf. in relevant part to 335 NLRB 1397 (2001); *Flamingo Hilton-Laughlin*, above, 148 F.3d at 1170–1173 (remanding for reconsideration on finding Board failed to explain necessity of order at time of issuance 4 years after unfair labor practices).

[54] See *Flamingo Hilton-Laughlin*, above, 148 F.3d at 1178 (Rogers, J., concurring) (explaining that "while the passage of time, in and of itself, should not be dispositive," Board must consider "whether the intervening years, in conjunction with the changed circumstances, have

Finally, apart from our conclusions about the continuing impact of the Respondent's past misconduct, we have found, as discussed above, that the whole record in this case—from the inception of the Respondent's carefully calculated unlawful antiunion campaign to its postelection attempt to minimize the presence of union adherents in the unit before a possible rerun election—suggests that the Respondent would likely meet a renewed union campaign, even at the present date, with further misconduct.[55]

For all these reasons, we conclude that a bargaining order under *Gissel* is warranted, necessary, and appropriate to effectuate the purposes and policies of the Act under presently existing circumstances.[56]

### Application of Cemex

After the judge issued his decision in this case, the Board issued a decision in *Cemex Construction Materials Pacific, LLC*,[57] in which it set forth a new standard for evaluating employers' statutory obligations when faced with a union's claim to represent its employees. Under the new standard, an employer violates Section 8(a)(5) and (1) of the Act by refusing to recognize, upon request, a representative designated for the purposes of collective bargaining, within the meaning of Section 9(a), by a majority of employees in an appropriate unit, unless the employer promptly files a petition pursuant to Section 9(c)(1)(B) (an RM petition), or unless the union files a petition pursuant to Section 9(c)(1)(A) (an RC petition). An employer may lawfully test the union's claim of majority support and/or challenge the appropriateness of the unit by filing its own

RM petition or may await the processing of an RC petition filed by the union. However, if, during the pendency of such a petition, the employer commits an unfair labor practice that requires setting aside the election under the Board's extant standards, the petition (whether filed by the employer or the union) will be dismissed. In that situation, the Board will instead rely on the prior designation of a representative by the majority of employees by nonelection means, as expressly permitted by Section 9(a), and will issue an order requiring the employer to recognize and bargain with the union from the date that the union requested recognition from the employer.[58] The Board followed its usual practice to apply the new standard retroactively to all pending cases in whatever stage.[59]

Here, the General Counsel alleged that the Respondent violated Section 8(a)(5) and (1) by failing and refusing to bargain with the Union after the Union requested, by filing the November 22, 2019 petition, that the Respondent recognize it as the exclusive collective-bargaining representative of its unit employees. As discussed above, the parties extensively litigated the question of the Union's card majority, and it is currently undisputed that a majority of unit employees had designated the Union as their bargaining representative by October 16, 2019. On the last day of the hearing, the parties entered a joint stipulation agreeing to the appropriate unit in this case. Finally, the Respondent's extensive unfair labor practices detailed above and in the judge's decision required that the election in this case be set aside. Based on the complaint

---

helped dissipate the remaining effects of [the respondent's] unfair labor practices.").

Courts reviewing Board *Gissel* orders have required the Board "to explain its own delay," and to address the impact of "extraordinary delays" upon the propriety of a bargaining order, as conditions of enforcing the Board's order. See *NLRB v. Intersweet, Inc.*, 125 F.3d 1064, 1069 (7th Cir. 1997) (reviewing 7th Circuit cases), enfg. 321 NLRB 1 (1996); *Cogburn Health Center*, above, 437 F.3d at 1275. While the Board strives for expeditious adjudication, it is impossible entirely to eliminate "procedural delays necessary fairly to determine charges of unfair labor practices." *Franks Bros. Co.*, above, 321 U.S. at 705; see also *Intersweet*, above, 125 F.3d at 1068–1069 (characterizing a 3- to 4-year period between unfair labor practices and Board order as "an ordinary institutional time lapse inherent in the legal process."). Here, the Board's fair consideration of charges and election objections has required unavoidable delays at various stages of litigation. Factors contributing to these delays include: the large number of unfair labor practice allegations tried by the judge (more than 160, including cumulative allegations) and the consequentially lengthy record (7295 transcript pages), the number of issues contested before the Board (the Respondent filed 279 numbered exceptions to the judge's decision, and the General Counsel filed 24 cross-exceptions), and extensive briefing to the Board pursuant to requests to exceed ordinary page and time limits (the parties filed 545 pages of exceptions and briefs over about 5 months following the judge's decision). The onset of COVID-19 during the pendency of this case also impacted the pace of both regional proceedings and the hearing, which ultimately extended to 58 days of fully remote video proceedings between October 2020 and June 2021.

[55] See *Gissel*, above, 395 U.S. at 614 ("In fashioning a remedy in the exercise of its discretion . . . the Board can properly take into consideration . . . the likelihood of [misconduct's] recurrence in the future.").

[56] The General Counsel requests that the Board overrule *Sysco Grand Rapids, LLC*, in which the Board concluded that—despite the prospect of severe unfair labor practices that would otherwise warrant the issuance of a bargaining order—employees' rights would be better served by proceeding directly to a second election, however flawed, because entering a bargaining order would likely engender further delay in litigation over the propriety of that order, and litigation delays might ultimately result in changed circumstances rendering a bargaining order unenforceable in some courts of appeals. 367 NLRB No. 111, slip op. at 2 (2019), enfd. in part 825 Fed.Appx. 348 (6th Cir. 2020). The Respondent answers that *Sysco Grand Rapids* has no application in this case because, while it contends that no bargaining order is warranted, it has not argued either to the judge or to the Board that changed circumstances since its alleged unfair labor practices should preclude such an order. In any case, we do not read *Sysco Grand Rapids* and other cases where the Board has declined to issue a bargaining order on similar pragmatic grounds as binding on our remedial determination in cases that present different facts. Cf., e.g., *Parts Depot*, above, 332 NLRB at 676 & fn. 35 (entering *Gissel* order more than 4 years after unfair labor practice, distinguishing cases in which Board declined to enter bargaining order based on enforceability considerations); *Garvey Marine*, above, 328 NLRB at 997–998 (same). Additionally, as discussed above, our order in this case rests not only on the continuing impact of the Respondent's extensive preelection misconduct, but also on our conclusion that its continuing hostility to employee rights after the election shows a likelihood that our direction of a second election would be met by further misconduct. See, e.g., *Garney Morris*, above, 313 NLRB at 103. We accordingly conclude, for the reasons discussed above, that a *Gissel* bargaining order is appropriate at this time and enforceable under current circuit court precedent.

[57] 372 NLRB No. 130 (2023).

[58] 372 NLRB No. 130, slip op. at 25–26.

[59] Id., slip op. at 29–30.

allegations and the record, we conclude that: (1) the Respondent refused the Union's request to bargain;[60] (2) at a time when the Union had in fact been designated representative by a majority of employees; (3) in an appropriate unit; and then (4) committed unfair labor practices requiring the election to be set aside, violating Section 8(a)(5) under the standard announced in *Cemex*.

We accordingly conclude that, in addition to the *Gissel* rationale discussed above, a bargaining order in this case is alternatively warranted, necessary, and appropriate to remedy the Respondent's refusal to bargain with the Union in violation of Section 8(a)(5) and to effectuate the policies of the Act for the reasons set forth in the Board's decision in *Cemex*.

AMENDED CONCLUSIONS OF LAW

Substitute the following for paragraph 4.

"4.  Respondent Red Rock engaged in unfair labor practices in violation of Section 8(a)(5) and (1) of the Act by the following conduct:

a.  By refusing to recognize and bargain collectively with the Union as the exclusive bargaining representative of the employees in the following appropriate unit, while engaging in the conduct described above that undermined the Union's support, required setting aside the election, and prevented a fair rerun election:

> All full-time and regular part-time assistant food servers, bakers, banquet bartenders, banquet porters, banquets setup, bar porters, bartenders, bell persons, bell starters, beverage porters, beverage servers, beverage (Race/Sports), banquet servers, bus persons/bussers, cake decorators, captains, coffee breakers, concession workers, cooks, cook's helpers, counter attendants, exterior ground porters, food servers, gourmet hostperson/cashiers, gourmet VIP attendants, host/cashiers, housekeeping utility porters, ice cream concession workers, interior ground porters, kitchen runners, kitchen workers, lead banquet porters, lead counter attendants, lead servers, mini bar attendants, pantry, porters, resort guest room attendants, resort housepersons, resort suite guest room attendants, resort steakhouse cooks, room runners, room service captains, runners, service bartenders, specialty cooks, servers, sprinters, status board, stove persons, team member dining room (TDR) attendants, utility porters, VIP attendants, VIP bartenders, VIP hosts, and VIP lounge attendants employed by the employer at its facility located at 11011 West Charleston Boulevard, Las Vegas, Nevada; excluding all other employees, front desk employees, valet parkers, retail cashier/clerks, gaming employees (dealers, slot attendants, cage cashiers), inspectresses,

engineering and maintenance employees, office clerical employees, guards, managers, and supervisors as defined by the Act.

b.  By failing to provide the Union with prior notice and an opportunity to bargain over its June 4, 2020 termination of its 2015 and 2016 table-swap agreements and the effects of that decision."

AMENDED REMEDY

Having found that the Respondents engaged in certain unfair labor practices, we shall order them to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act.  Specifically, we amend the judge's remedy in the following respects.

In addition to the provisions set forth in the judge's recommended remedy, in accordance with our decision in *Thryv, Inc.*, 372 NLRB No. 22 (2022), enf. denied on other grounds __ F.4th __ (5th Cir. May 24, 2024), Respondent Red Rock shall also compensate Teresa Powers for any other direct or foreseeable pecuniary harms incurred as a result of the unlawful failure to recall her from layoff status, including reasonable search-for-work and interim employment expenses, if any, regardless of whether these expenses exceed interim earnings.  Respondent Red Rock shall likewise compensate employees affected by its unlawful termination of the table-swap agreements for any other direct or foreseeable pecuniary harms incurred as a result of the unlawful termination.  Compensation for these harms shall be calculated separately from taxable net backpay, with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010).

The General Counsel contends on cross-exceptions to the judge's decision that the Respondent's conduct in this case warrants several additional remedial provisions beyond those ordered by the judge.  We agree.

First, the General Counsel requests that the Board modify the judge's recommended order to include a broad cease-and-desist provision, which, in addition to the cease-and-desist provisions directed at specific violations of the Act, prohibits the Respondent from "in any other manner interfering with, restraining or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act."  The Board has held that a broad order is warranted when a respondent: (1) "is shown to have a proclivity to violate the Act" *or* (2) "has engaged in such egregious or widespread misconduct as to demonstrate a general disregard for the employees' fundamental statutory rights."[61]  In either situation, the Board asks whether a respondent's specific unlawful conduct, in the totality of

---

[60] The Respondent and the Union entered a stipulation in Case 28–RC–252280 on December 5, 2019, that provides, inter alia: "The Petitioner claims to represent the employees in the unit . . . and the Employer declines to recognize the Petitioner."  The Board in *Cemex* found that the

respondent there had refused the union's request to bargain based on a relevantly identical posture.  372 NLRB No. 130, slip op. at 13 & fn. 71, 29 & fns. 154, 155.

[61] *Hickmott Foods*, 242 NLRB 1357, 1357 (1979).

NP RED ROCK LLC D/B/A RED ROCK CASINO RESORT SPA

13

circumstances, "manifests 'an attitude of opposition to the purposes of the Act to protect the rights of employees generally,' which would provide an objective basis for enjoining a reasonably anticipated future threat to any of those Section 7 rights."[62] Where the respondent's "egregious or widespread misconduct" otherwise warrants a broad order, the absence of evidence of prior unfair labor practices does not undermine the necessity for such an order.[63]

For the following reasons, we find that the Respondent's conduct in this case warrants a broad order under the "egregious or widespread misconduct" prong of the *Hickmott* test.[64] First, as discussed in detail above, the Respondent engaged in pervasive and varied unlawful conduct for an extended period of time with a clear widespread coercive effect upon all or nearly all unit employees. The unprecedented character of the benefits promised and threatened to be withheld supports characterizing this conduct as "egregious." The Board has issued broad orders for conduct of comparable severity even absent evidence of recidivism.[65] Moreover, the most important unfair labor practices here were planned and executed by the Respondent's and Station Casinos' top management and owners, for the express purpose of interfering with employees' Section 7 rights.[66] The unusually direct evidence of top management's unlawful motivation in this case plainly provides "an objective basis for enjoining a reasonably anticipated future threat to" the Section 7 rights

of employees generally.[67] We accordingly amend the judge's recommended remedy to include a broad cease-and-desist order.[68]

Next, the General Counsel requests that the Board include remedial provisions requiring the Respondent: (1) to post an explanation of employee rights in addition to the Board's notice; (2) to provide employees with copies of the notice and explanation of rights prior to the required public reading of these documents; and (3) to mail copies of these documents to employees' homes. After the judge issued his decision in this case, the Board issued a decision in *Noah's Ark Processors, LLC d/b/a WR Reserve*, in which it discussed a number of potential remedies that the Board will consider, alone or in combination, when a respondent has shown a proclivity to violate the Act or has engaged in egregious or widespread misconduct warranting a broad cease-and-desist order.[69]

The Board explained in *Noah's Ark* that broad order cases will often warrant ordering a respondent to post, read, and/or mail to employees an explanation of rights because they "involve respondents that have been found to violate and disregard employees' rights in numerous, egregious, or repeated ways," producing a more severe chilling effect that makes appropriate a more comprehensive explanation of rights than the usual notice.[70] The Board has found an explanation of rights, "coupled with clear general examples that are specifically relevant to the

---

[62] *Five Star Mfg., Inc.*, 348 NLRB 1301, 1302 (2006) (quoting *Postal Service*, 345 NLRB 409, 410 (2005)), enfd. 278 Fed.Appx. 697 (8th Cir. 2008).

[63] See, e.g., *Five Star Mfg.*, above, 348 NLRB at 1302-1303; *Trailmobile Trailer, LLC*, 343 NLRB 95, 95 fn. 2 (2004); *Federated Logistics*, above, 340 NLRB at 257-258 & fn. 9; accord *NLRB v. Blake Construction Co.*, 663 F.2d 272, 285–286 (D.C. Cir 1981) (enforcing broad order based on *Hickmott* "egregious or widespread misconduct" prong: "The mere fact that the Company has no prior record of NLRB violations does not, in itself, dissipate the egregiousness of the conduct involved in this proceeding."), enfg. in relevant part 245 NLRB 630 (1979).

[64] We agree with the judge that the General Counsel has not shown prior unlawful conduct by the Respondent establishing a proclivity to violate the Act within the meaning of *Hickmott*'s first prong. We specifically decline to rely on the Board's decision in *Station Casinos, LLC*, 358 NLRB 1556 (2012), because, as the judge correctly noted, that decision was invalidated by the Supreme Court's decision in *Noel v. Noel Canning*, 573 U.S. 513 (2014). See, e.g., *Boar's Head Provisions*, above, 370 NLRB No. 124, slip op. at 2 fn. 2.

[65] Cf., e.g., *Stern Produce Co.*, 368 NLRB No. 31, slip op. at 5-6 (2019) (entering broad order for interrogations, impression of surveillance, and various threats and promises of benefits); *Federated Logistics*, above, 340 NLRB at 257 (entering broad order for unlawful no-solicitation policy; interrogation; surveillance and solicitation of employees to conduct surveillance; solicitation of grievances; promises of benefits; various threats; and discriminatory warnings and suspensions).

[66] Cf. *Sysco Grand Rapids*, above, 367 NLRB No. 111, slip op. at 1–2 (adopting judge's recommended broad order where "much of [the respondent's pervasive unlawful conduct] was perpetrated by high-level management officials, including the [respondent's] president and a high-ranking official of the [respondent's] corporate parent"); *Federated Logistics*, above, 340 NLRB at 257 (participation of high-level management officials contributed to pervasive and chilling effect of violations, supporting remedies including broad order).

[67] *Five Star Mfg.*, above, 348 NLRB at 1302.

[68] In finding that a broad cease-and-desist order is warranted, we reject the General Counsel's suggestion that our inclusion of such a provision is supported by a Federal district court's entry of a broad order as part of a temporary injunction under Sec. 10(j) of the Act. See *Overstreet v. NP Red Rock*, No. 2:20-cv-02351-GMN-VCF, 2021 WL 3064120 (D. Nevada, July 20, 2021). It is well established that district courts' Sec. 10(j) determinations are not binding on the Board. See, e.g., *Electro-Voice, Inc.*, 320 NLRB 1094, 1094 fn. 2 (1996). Moreover, "[i]n seeking an injunction under [Sec.] 10(j) . . . the Board does not decide the ultimate merits of a labor dispute, but need show only that there is a reasonable cause to believe that unfair labor practices have been committed." *Sanford Home for Adults*, above, 669 F.2d at 37 (internal quotation omitted). "The initial charge or determination of probable cause and the ultimate adjudication have different bases or purposes," and our determination of an appropriate remedy after full consideration of the case does not rely on the district court's determination pursuant to a Sec. 10(j) proceeding. *Kessel Food Markets*, above, 868 F.2d at 888.

We further reject the Respondent's contention that our entry of a *Gissel* order precludes a broad cease-and-desist order. These two remedial provisions serve different purposes: the affirmative bargaining order effectuates and deters interference with "ascertainable employee free choice," *Gissel*, above, 395 U.S. at 614, while the broad order deters reasonably anticipated employer conduct in "opposition to the purposes of the Act to protect the rights of employees generally." *Five Star Mfg.*, above, 348 NLRB at 1302. Consistent with this distinction, the Board has previously entered both a *Gissel* order and a broad cease-and-desist order in the same case where it has found both separately warranted. See, e.g., *Aldworth Co.*, above, 338 NLRB at 153–154.

[69] 372 NLRB No. 80, slip op. at 4–9 (2023), enfd. 98 F.4th 896 (8th Cir. 2024). Having considered the full range of remedies discussed in *Noah's Ark*, we decline to enter those not discussed herein.

[70] Id., slip op. at 5–6 (citing *David Saxe Productions*, 370 NLRB No. 103 (2021); *HTH Corp. d/b/a Pacific Beach Hotel*, 361 NLRB 709 (2014), enfd. in relevant part 823 F.3d 668 (D.C. Cir. 2016)).

unfair labor practices found" especially appropriate where the rights of "many employees have been broadly suppressed for an extended period of time and in numerous ways."[71]

Here, we find that the character of the Respondent's most important misconduct particularly warrants an explanation of rights to help employees understand: (1) that the Respondent's promises and grants of benefits were unlawful not in and of themselves but because they were designed to interfere with employees' free choice in the representation election; (2) that it would be illegal for the Respondent to withhold or withdraw benefits in retaliation for employees' selection of the Union as their collective-bargaining representative; and (3) that legal rules governing the Respondent's bargaining conduct would require it to bargain "with a sincere intent to reach an agreement," rather than with a purpose to draw bargaining out for years, as at Palace and Boulder Stations.[72] In order to help employees both to understand their own rights under the Act and to police the Respondent's bargaining conduct pursuant to the affirmative bargaining order, we accordingly shall order the Respondent to post the explanation of rights attached to this decision as "Appendix B" for the same period and under the same conditions as the notice, and as discussed below, to read and mail the explanation of rights to its employees.

The Board held in *Noah's Ark* that, in cases where a reading of the notice and/or explanation of rights is required, copies of these documents should be distributed to employees at the meetings before the readings to facilitate employee comprehension.[73] And the Board explained that, in broad-order cases involving violations that pervade the workplace, requiring that these documents be mailed to employees reaches current and former employees who were affected by the employer's misconduct but would not see a posted document or be able to attend the

readings.[74] The Board further observed that in such cases notice mailing will "help to rebuild employees' confidence in and understanding of their rights without fear of retaliation or calling attention to their choice to accept and view the notice and explanation of rights (or refrain from doing so).[75] Here, in addition to these considerations, the Respondent's use of home mailings in its unlawful anti-union campaign confirms that it considers mailings among the best available means to reach all unit employees. We accordingly find that it is appropriate in this case to require the Respondent to distribute copies of the notice and explanation of rights to employees at the required notice-reading meetings and to mail copies of these documents to employees' homes. The Respondent shall mail copies of the signed notice and explanation of rights to each employee who was employed in the unit at any time since September 19, 2019 (the date of the Respondent's first unlawful conduct in this case), within the time set forth in our Order. The Respondent must maintain and make available for inspection proofs of mailings and receipts in connection with this mailing obligation.

The General Counsel has also requested that the Board amend the judge's remedy to specifically require that Human Resources Senior Vice President Phil Fortino (or a Board agent in Fortino's presence) read the notice in General Manager Scott Nelson's presence at every meeting, that Chief Operating Officer Robert Finch attend at least one meeting, and that meetings be scheduled so that employees attend alongside their supervisors and managers in their respective departments. Given Fortino's direct responsibility for—and Nelson, Finch, and many supervisors' direct involvement in—the unfair labor practice conduct here, the General Counsel's request is clearly appropriate and supported by extant Board and court precedent, and we shall modify the judge's recommended Order accordingly.[76]

---

[71] *Pacific Beach Hotel*, above, 361 NLRB at 714.

[72] Cf. id. at 739 (ordering explanation of rights stating it is illegal to promise benefits to discourage union support and describing rules governing employer's conduct during collective bargaining).

[73] *Noah's Ark*, above, 372 NLRB No. 80, slip op. at 6–7.

Member Prouty would make the reading aloud of the notice at a group meeting—in the employees' own language or languages, accompanied by the distribution of the notice to employees at the start of the meeting—part of the standard remedy for all unfair labor practices found by the Board. See *United Scrap Metal*, 372 NLRB No. 49, slip op. at 1 fn. 3 (2023); *CP Anchorage Hotel 2 d/b/a Hilton Anchorage*, 371 NLRB No. 151, slip op. at 9–10 (2022) (Member Prouty, concurring), enfd. 98 F.4th 314 (D.C. Cir. 2024).

[74] The Board has recently ordered a mailing remedy where, as here, the record established that employees were laid off during the COVID-19 pandemic but did not establish that all laid-off employees had returned to work. *Amerinox Processing, Inc.*, 371 NLRB No. 105, slip op. at 4 (2022).

[75] *Noah's Ark*, above, 372 NLRB No. 80, slip op. at 7.

[76] See, e.g., id., slip op. at 6 (Board should consider requiring reading by or presence of official directly responsible for violations), 7 (Board may consider requiring documented attendance by supervisors and managers); *Pacific Beach Hotel*, above, 361 NLRB at 716 & fn. 27 (specifying distribution of attendance of supervisors/managers among multiple

meetings); accord *Shamrock Foods Co. v. NLRB*, 779 Fed.Appx. 752, 756 (D.C. Cir. 2019) (affirming Board's order requiring reading or attendance by specific officials).

The General Counsel further requests that the Board clarify the judge's recommended electronic notice-posting remedy to expressly require the Respondent to display the notice and explanation of rights on the same back-of-house televisions where it displayed antiunion messaging during the campaign and on its campaign website. Such a requirement appears consistent with ordinary procedure as outlined in the General Counsel's casehandling manuals applied to this record. See, e.g., NLRB Casehandling Manual (Part One) Unfair Labor Practice Proceedings Sec. 10132.4(b) (*Electronic Notice Posting*) ("Electronic posting should . . . be required if the charged party utilized electronic means to commit an unfair labor practice."); see also *Public Service Co. of Oklahoma (PSO)*, 334 NLRB 487, 490–491 (2001) (ordering email distribution of notice where unfair labor practice conduct involved email), enfd. 318 F.3d 1173 (10th Cir. 2003). However, in adopting the current standard electronic-notice-posting requirement, the Board held that "questions as to whether a particular type of electronic notice is appropriate should be resolved at the compliance stage." *J. Picini Flooring*, 356 NLRB 11, 13–14 (2010). We accordingly leave any questions about the details of the notice-posting requirement ordered herein to resolution during a subsequent compliance proceeding.

ORDER

The National Labor Relations Board orders that the Respondent NP Red Rock LLC d/b/a Red Rock Casino Resort Spa, Las Vegas, Nevada, its officers, agents, successors, and assigns, shall

1.  Cease and desist from

(a)  Coercively interrogating employees about their union membership, activities, sympathies, and/or support for Local Joint Executive Board of Las Vegas a/w Unite Here International Union (the Union).

(b)  Promising, announcing, or granting benefits to employees in order to discourage them from selecting union representation.

(c)  Threatening employees with the loss, withholding, or withdrawal of benefits if they select union representation.

(d)  Threatening employees with job loss as a result of a strike if they select union representation.

(e)  Threatening employees with unspecified reprisals if they select union representation.

(f)  Threatening employees that selecting a union representative would be futile.

(g)  Displaying campaign material during a representation election campaign containing employees' images without their consent and without a disclaimer stating that the campaign material is not intended to reflect the views of the employees appearing in it.

(h)  Issuing disciplinary warnings to employees because of their support for and activities on behalf of the Union.

(i)  Issuing discriminatory work assignments to employees because of their support for and activities on behalf of the Union.

(j)  Failing to recall or reinstate laid-off employees because of their support for and activities on behalf of the Union.

(k)  Failing and refusing to recognize and bargain with the Union as the exclusive collective-bargaining representative of the employees in the bargaining unit.

(l)  Changing the terms and conditions of employment of its unit employees without first notifying the Union and giving it an opportunity to bargain.

(j)  In any other manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2.  Take the following affirmative action necessary to effectuate the policies of the Act.

(a)  To the extent it has not already done so, remove, or request Station Casinos to remove, images of employees that were posted on Station Casinos' antiunion website beginning in late November 2019 without the employees' consent.

(b)  Within 14 days from the date of this Order, offer Teresa Powers full reinstatement to her former job, or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

(c)  Make Teresa Powers whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the discrimination against her, in the manner set forth in the remedy section of the judge's decision as amended in this decision.

(d)  Compensate Teresa Powers for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed, either by agreement of Board order, a report allocating the backpay award to the appropriate calendar year(s).

(e)  File with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of Teresa Powers's corresponding W-2 form(s) reflecting the backpay award.

(f)  Within 14 days from the date of this Order, remove from its files any reference to the unlawful disciplinary warnings issued to Claudia Montano, and within 3 days thereafter, notify her that this has been done and that the disciplinary warnings will not be used against her in any way.

(g)  On request, bargain with the Union as the exclusive collective-bargaining representative of the employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement:

> All full-time and regular part-time assistant food servers, bakers, banquet bartenders, banquet porters, banquets setup, bar porters, bartenders, bell persons, bell starters, beverage porters, beverage servers, beverage (Race/Sports), banquet servers, bus persons/bussers, cake decorators, captains, coffee breakers, concession workers, cooks, cook's helpers, counter attendants, exterior ground porters, food servers, gourmet hostperson/cashiers, gourmet VIP attendants, host/cashiers, housekeeping utility porters, ice cream concession workers, interior ground porters, kitchen runners, kitchen workers, lead banquet porters, lead counter attendants, lead servers, mini bar attendants, pantry, porters, resort guest room attendants, resort housepersons, resort suite guest room attendants, resort steakhouse cooks, room runners, room service captains, runners, service bartenders, specialty cooks, servers, sprinters, status board, stove persons, team member dining room

---

Finally, in light of the affirmative bargaining order, we find it unnecessary to order certain additional remedial provisions requested by the General Counsel that are designed to enhance the Union's access to unit employees prior to a second election.  Absent a bargaining order, we

would find these remedies necessary and appropriate to effectuate the policies of the Act.  See, e.g., *Haddon House Food Products*, 242 NLRB 1057, 1058–1059 (1979), enfd. in relevant part sub nom. *Teamsters Local 115 v. NLRB*, 640 F.2d 392, 399–400 (D.C. Cir. 1981).

(TDR) attendants, utility porters, VIP attendants, VIP bartenders, VIP hosts, and VIP lounge attendants employed by the employer at its facility located at 11011 West Charleston Boulevard, Las Vegas, Nevada; excluding all other employees, front desk employees, valet parkers, retail cashier/clerks, gaming employees (dealers, slot attendants, cage cashiers), inspectresses, engineering and maintenance employees, office clerical employees, guards, managers, and supervisors as defined by the Act.

(h)  Before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of employees in the bargaining unit.

(i)  Rescind the change in terms and conditions of employment for its unit employees that was unilaterally implemented on June 4, 2020.

(j)  Make employees whole for any loss of earnings and benefits, and for any other direct or foreseeable pecuniary harms, suffered as a result of its unlawful termination of the table-swap agreements in the manner set forth in the remedy section of the judge's decision as amended in this decision.

(k)  Compensate affected employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

(l)  File with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each backpay recipient's corresponding W-2 form(s) reflecting the backpay award.

(m)  Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(n)  Post at its Las Vegas, Nevada, facility copies of the attached notice marked "Appendix A" and explanation of rights marked "Appendix B" in both English and Spanish. Copies of the notice and explanation of rights, on forms provided by the Regional Director for Region 28, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material.[77]

(o)  Within 14 days after service by the Region, duplicate and mail, at its own expense, copies of the attached notice marked "Appendix A" and the attached explanation of rights marked "Appendix B" in both English and Spanish, after being signed by the Respondent's authorized representative, to all current and former unit employees employed by the Respondent at its Las Vegas, Nevada facility at any time since September 19, 2019, at their home addresses. The Respondent shall maintain proofs of mailings as set forth in the Amended Remedy section of this decision.

(p)  Hold a meeting or meetings during working hours at its facility in Las Vegas, Nevada, scheduled to ensure the widest possible attendance of bargaining unit employees, at which the attached Notice to Employees marked "Appendix A" and the attached explanation of rights marked "Appendix B" will be read to employees in English and Spanish by human resources senior vice president Phil Fortino (or his successor), in the presence of General Manager Scott Nelson (or his successor), a Board agent, and, if the Union so desires, a union representative, or, at the Respondent's option, by a Board agent in the presence of Fortino (or his successor), Nelson (or his successor) and, if the Union so desires, a union representative. Chief Operating Officer Robert Finch must attend at least one meeting, and the meetings must be scheduled so that supervisors and managers of the Respondent's respective departments attend alongside the unit employees they

---

[77] If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notice and explanation of rights must be posted and read within 14 days after service by the Region. If the facility involved in these proceedings is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice and explanation of rights must be posted and read within 14 days after the facility reopens and a substantial complement of employees has returned to work. If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice and explanation of rights must also be posted by such electronic means within 14 days after service by the Region. If the notice and explanation of rights to be physically posted were posted electronically more than 60 days before physical posting of the notice and explanation of rights, the notice shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]," and the explanation of rights shall state at the bottom that "This explanation of rights is the same explanation of rights previously [sent or posted] electronically on [date]." If this Order is enforced by a judgment of a United States court of appeals, the words in the notice and explanation of rights reading "Posted and Mailed by Order of the National Labor Relations Board" shall read "Posted and Mailed Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

supervise and manage.  Copies of the notice and explanation of rights, in English and Spanish, after being signed by the Respondent's authorized representative, will be distributed by a Board agent during this meeting or meetings to each unit employee in attendance before the notice and explanation of rights are read.

(q)  Within 21 days after service by the Region, file with the Regional Director for Region 28 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

It is further ordered that Respondent NP Boulder LLC d/b/a Boulder Station Hotel & Casino, Las Vegas, Nevada, its officers, agents, successors, and assigns, shall

1.  Cease and desist from

(a)  Displaying campaign material during a representation election campaign containing employees' images without their consent and without a disclaimer stating that the campaign material is not intended to reflect the views of the employees appearing in it.

(b)  In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2.  Take the following affirmative action necessary to effectuate the policies of the Act.

(a)  To the extent it has not already done so, remove, or request Station Casinos to remove, images of employees that were posted on Station Casinos' antiunion website beginning in late November 2019 without the employees' consent.

(b)  Post at its Las Vegas, Nevada, facility copies of the attached notice marked "Appendix C" in both English and Spanish.  Copies of the notice, on forms provided by the Regional Director for Region 28, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted.  In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means.  Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material.  If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and

mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since November 2019.[78]

(c)  Within 21 days after service by the Region, file with the Regional Director for Region 28 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

It is further ordered that Respondent NP Palace LLC d/b/a Palace Station Hotel & Casino, Las Vegas, Nevada, its officers, agents, successors, and assigns, shall

1.  Cease and desist from

(a)  Displaying campaign material during a representation election campaign containing employees' images without their consent and without a disclaimer stating that the campaign material is not intended to reflect the views of the employees appearing in it.

(b)  In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2.  Take the following affirmative action necessary to effectuate the policies of the Act.

(a)  To the extent it has not already done so, remove, or request Station Casinos to remove, images of employees that were posted on Station Casinos' antiunion website beginning in late November 2019 without the employees' consent.

(b)  Post at its Las Vegas, Nevada, facility copies of the attached notice marked "Appendix D" in both English and Spanish.  Copies of the notice, on forms provided by the Regional Director for Region 28, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted.  In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means.  Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material.  If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current

[78] If the facility involved in this proceeding is open and staffed by a substantial complement of employees, the notice must be posted within 14 days after service by the Region.  If the facility involved in this proceeding is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice must be posted and read within 14 days after the facility reopens and a substantial complement of employees have returned to work.  If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region.  If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]."  If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

employees and former employees employed by the Respondent at any time since November 2019.[79]

(c) Within 21 days after service by the Region, file with the Regional Director for Region 28 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that the election in Case 28–RC–252280 is set aside.

Dated, Washington, D.C.  June 17, 2024

_____

Lauren McFerran,                      Chairman

_____

David M. Prouty,                       Member

_____

Gwynne A. Wilcox,                    Member

(SEAL)        NATIONAL LABOR RELATIONS BOARD

APPENDIX A

NOTICE TO EMPLOYEES

POSTED AND MAILED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post, mail, and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT coercively question you about your union membership, activities, sympathies, and/or support for Local Joint Executive Board of Las Vegas affiliated with Unite Here International Union (the Union).

WE WILL NOT promise, announce, or grant benefits to you in order to discourage you from selecting union representation.

WE WILL NOT threaten you with the loss, withholding, or withdrawal of benefits if you select union representation.

WE WILL NOT threaten you with job loss as a result of a strike if you select union representation.

WE WILL NOT threaten you with unspecified reprisals if you select union representation.

WE WILL NOT threaten you that selecting a union representative would be futile.

WE WILL NOT display campaign material during a representation election containing photographs of you without your consent and without a disclaimer stating that the campaign material is not intended to reflect the views of the employees appearing in it.

WE WILL NOT discipline you because of your support for and activities on behalf of the Union.

WE WILL NOT discriminatorily assign you work because of your support for and activities on behalf of the Union.

WE WILL NOT fail to recall or reinstate you from laid-off status because of your support for and activities on behalf of the Union.

WE WILL NOT fail and refuse to recognize and bargain with the Union as the exclusive collective-bargaining representative of our employees in the bargaining unit.

WE WILL NOT change your terms and conditions of employment without first notifying the Union and giving it an opportunity to bargain.

WE WILL NOT in any other manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, to the extent we have not already done so, remove, or request Station Casinos to remove, images of employees that were posted on Station Casinos' antiunion website beginning in late November 2019 without the employees' consent.

WE WILL, within 14 days from the date of the Board's Order, offer Teresa Powers full reinstatement to her former job, or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

WE WILL make Teresa Powers whole for any loss of earnings and other benefits resulting from our unlawful failure to recall her from layoff, less any net interim earnings, plus interest, and WE WILL also make her whole for

---

[79] If the facility involved in this proceeding is open and staffed by a substantial complement of employees, the notice must be posted within 14 days after service by the Region. If the facility involved in this proceeding is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice must be posted and read within 14 days after the facility reopens and a substantial complement of employees have returned to work. If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region. If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]." If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

any other direct or foreseeable pecuniary harms suffered as a result of our unlawful failure to recall her, including reasonable search-for-work and interim employment expenses, plus interest.

WE WILL compensate Teresa Powers for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

WE WILL file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of Teresa Powers's corresponding W-2 form(s) reflecting the backpay award.

WE WILL, within 14 days from the date of the Board's order, remove from our files any reference to the unlawful warnings issued to Claudia Montano, and WE WILL, within 3 days thereafter, notify her in writing that we have done so and that we will not use the warnings against her in any way.

WE WILL, on request, bargain with the Union as the exclusive collective-bargaining representative of our employees in the following appropriate unit concerning terms and conditions of employment, and, if an understanding is reached, embody the understanding in a signed agreement:

> All full-time and regular part-time assistant food servers, bakers, banquet bartenders, banquet porters, banquets setup, bar porters, bartenders, bell persons, bell starters, beverage porters, beverage servers, beverage (Race/Sports), banquet servers, bus persons/bussers, cake decorators, captains, coffee breakers, concession workers, cooks, cook's helpers, counter attendants, exterior ground porters, food servers, gourmet hostperson/cashiers, gourmet VIP attendants, host/cashiers, housekeeping utility porters, ice cream concession workers, interior ground porters, kitchen runners, kitchen workers, lead banquet porters, lead counter attendants, lead servers, mini bar attendants, pantry, porters, resort guest room attendants, resort housepersons, resort suite guest room attendants, resort steakhouse cooks, room runners, room service captains, runners, service bartenders, specialty cooks, servers, sprinters, status board, stove persons, team member dining room (TDR) attendants, utility porters, VIP attendants, VIP bartenders, VIP hosts, and VIP lounge attendants employed by the employer at its facility located at 11011 West Charleston Boulevard, Las Vegas, Nevada; excluding all other employees, front desk employees, valet parkers, retail cashier/clerks, gaming employees (dealers, slot attendants, cage cashiers), inspectresses, engineering and maintenance employees, office clerical

employees, guards, managers, and supervisors as defined by the Act.

WE WILL, before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of our employees in the bargaining unit.

WE WILL rescind the changes in the terms and conditions of employment for our unit employees that were unilaterally implemented on June 4, 2020.

WE WILL make employees whole for any loss of earnings and benefits suffered as a result of our unlawful termination of table-swap agreements, with interest.

WE WILL compensate employees affected by our termination of the table-swap agreements for the adverse tax consequences, if any, of receiving lump-sum backpay awards, and WE WILL file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay awards to the appropriate calendar year(s) for each employee.

WE WILL file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each backpay recipient's corresponding W-2 form(s) reflecting the backpay award.

NP RED ROCK LLC D/B/A RED ROCK CASINO RESORT SPA

The Board's decision can be found at https://www.nlrb.gov/case/28-CA-244484 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



APPENDIX B

EXPLANATION OF RIGHTS
POSTED AND MAILED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

Employees covered by the National Labor Relations Act have the right to join together to improve their wages and working conditions, including by organizing a union and bargaining collectively with their employer, and also

the right to choose not to do so. The Explanation of Rights contains important information about your rights under this Federal law. The National Labor Relations Board has ordered Red Rock Casino Resort Spa to provide you with the Explanation of Rights to describe your rights and to provide examples of illegal behavior.

Under the National Labor Relations Act, you have the right to:

- Organize a union to negotiate with your employer concerning your wages, hours, and working conditions.
- Support your union in negotiations.
- Discuss your wages, benefits, other terms and conditions of employment, and collective-bargaining negotiations with your coworkers or your union.
- Take action with one or more coworkers to improve your working conditions.
- Strike and picket, depending on the purpose or means used.
- Choose not to do any of these activities.

It is illegal for your employer to:

- Question you about your union sympathies or activities, or the sympathies or activities of other employees, in circumstances where that questioning tends to interfere with, restrain, or coerce you in the exercise of the rights listed above.
- Promise or grant you benefits, such as a free retirement plan, free health care, and free onsite clinics, in order to discourage your support for the union or for collective bargaining.
- Threaten to withhold or withdraw benefits if you select union representation.
- Threaten that selecting the union would be futile because your employer will not agree with the union to improve your terms and conditions of employment.
- Threaten you with job loss, loss of other benefits, or other unspecified reprisals if you select union representation.
- Include photographs of you in antiunion campaign material without your consent and without a disclaimer stating that the campaign material is not intended to reflect the views of employees appearing in it.
- Discipline you, discriminatorily assign you work, or refuse to recall you from layoff because of your support for or activities on behalf of the union.
- Discharge or otherwise discriminate against you because you file charges or give testimony under the National Labor Relations Act.
- Refuse to recognize and bargain with your union as your exclusive collective-bargaining representative.

- Change your terms and conditions of employment without first notifying your union and giving it an opportunity to bargain.

There are rules that govern your employer's conduct during collective bargaining with your union.

- Your employer must meet with your union at reasonable times to bargain in good faith about wages, hours, vacation time, insurance and other benefits, safety practices, and other mandatory subjects.
- Your employer must participate actively in the negotiations with a sincere intent to reach an agreement.
- Your employer must not change existing working terms and conditions while bargaining is ongoing.
- Your employer must honor any collective-bargaining agreement that it reaches with your union.
- Your employer cannot retaliate against you if you participate or assist your union in collective bargaining.

*Illegal conduct will not be permitted.* The National Labor Relations Board enforces the Act by prosecuting violations. If you believe your rights or the rights of others have been violated, you should contact the NLRB promptly to protect your rights, generally within 6 months of the unlawful activity. You may ask about a possible violation without your employer or anyone else being informed that you have done so. The NLRB will conduct an investigation of possible violations if a charge is filed. Charges may be filed by any person and need not be filed by the employee directly affected by the violation.

You can contact the NLRB's resident office, located at 300 Las Vegas Boulevard South, Suite 2-901, Las Vegas, Nevada 89101.

Or you can contact the NLRB by calling 702-388-6416.

For more information about your rights and about the National Labor Relations Board and the National Labor Relations Act, visit the Agency's website: https://www.nlrb.gov.

The Board's decision can be found at https://www.nlrb.gov/case/28-CA-244484 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



## APPENDIX C

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT display campaign material during a representation election containing photographs of you without your consent and without a disclaimer stating that the campaign material is not intended to reflect the views of the employees appearing in it.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, to the extent we have not already done so, remove, or request Station Casinos to remove, images of employees that were posted on Station Casinos' antiunion website beginning in late November 2019 without the employees' consent.

NP BOULDER LLC D/B/A BOULDER STATION HOTEL & CASINO

The Board's decision can be found at https://www.nlrb.gov/case/28-CA-244484 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



## APPENDIX D

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT display campaign material during a representation election containing photographs of you without your consent and without a disclaimer stating that the campaign material is not intended to reflect the views of the employees appearing in it.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, to the extent we have not already done so, remove, or request Station Casinos to remove, images of employees that were posted on Station Casinos' antiunion website beginning in late November 2019 without the employees' consent.

NP PALACE LLC D/B/A PALACE STATION HOTEL & CASINO

The Board's decision can be found at https://www.nlrb.gov/case/28-CA-244484 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



*Sara Demirok, Esq., Kyler Scheid, Esq.,* and *Carmen Leon, Esq.,* for the General Counsel.
*Reyburn W. Lominack, III, Esq.* and *Michael Carrouth, Esq. (Fisher Phillips, LLP),* for the Respondent Employers.
*Kimberley C. Weber, Esq.* and *(on brief only) Eric B. Myers, Esq. (McCracken, Stemerman & Holsberry, LLP),* for the Charging Party Union.

## DECISION

JEFFREY D. WEDEKIND, Administrative Law Judge. In November 2019, the Local   Joint Executive Board of Las Vegas (aka "the Culinary Union") filed a petition with the NLRB to conduct a representation election at the Red Rock Casino Resort Spa. At the time, the Union had received signed authorization

cards from at least 60 percent of the 1343 unit employees within the previous 12 months indicating that they wanted the Union to represent them. However, when the election was held the following month, the Union received only 46 percent of the votes, with the other 54 percent voting against union representation.

The present litigation followed. The Union filed numerous election objections and unfair labor practice (ULP) charges with the NLRB. And the Agency's Regional Director, on behalf of the General Counsel, subsequently issued a complaint on these and several previous charges alleging that Red Rock's supervisors or agents at the casino and its corporate parent Station Casinos committed approximately 50 violations of the National Labor Relations Act both before and after the union petition and the election.[1] The complaint further alleges that many of these violations—in particular Red Rock's preelection announcement that the Company would give the employees three "huge" and "incredible" new healthcare and retirement benefits in the coming year and subsequent warning that the employees risked losing those benefits by voting for the Union—were so serious that they rendered a fair rerun election impossible. The complaint therefore requests that, among other remedies, Red Rock be ordered to recognize and bargain with the Union based on its preelection card majority under *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969).

A hearing to litigate all of the alleged unfair labor practices and related election objections was held over 58 days between October 27, 2020 and June 16, 2021.[2] A total of 77 witnesses were called to testify—17 of them twice, initially by the General Counsel as adverse witnesses and then again by Red Rock.[3] And over 400 exhibits were introduced, including numerous emails, text messages, and audio recordings. Thereafter, on September 15, each of the parties, the General Counsel, the Union, and Red Rock, also filed lengthy posthearing briefs.

As discussed below, the record evidence supports all of the Union's postelection objections in whole or in part and most of the General Counsel's unfair labor practice allegations. The election will therefore be set aside. In addition, Red Rock will

be ordered to recognize and bargain with the Culinary Union based on its preelection card majority and to take various other appropriate actions to remedy its unlawful conduct.[4]

I. ALLEGED PREPETITION ULPS

*A. Factual Background*

It was mid-June 2019 and Station Casinos had a union problem. The Company owned and operated 10 casino hotels and resorts in and around Las Vegas, and the Union had successfully organized several thousand culinary and other nongaming employees at six of them over the previous 3 years, including two that very week. Worse yet, despite the Company's vigorous antiunion campaigns at the properties, the Union had won all but one of the six elections by large margins, garnering 67 to 85 percent of the votes cast.[5]

Further, it was clear that the Union wasn't done; that it intended to continue organizing and to petition for elections at the remaining four properties, including the Red Rock Casino Resort Spa. The Red Rock opened in 2006 and was the newest and largest of the 10 Station Casinos properties, with approximately 800 hotel rooms, 2700 slots, 64 gaming tables, 9 full-service restaurants, a 16-screen movie theatre, a 72-lane bowling alley, and 94,000 square feet of meeting and convention space. It also had the largest number of Culinary employees, i.e., employees in departments typically represented by the Culinary Union (food and beverage, banquet/catering, bell, housekeeping, sanitation, and internal maintenance ). It had over 1300 such employees, far more than at each of the other facilities. And it was directly across the street from the Station Casinos corporate headquarters. Thus, it was frequented by the top corporate executives—including Chairman and CEO Frank J. Fertitta III and Chief Operating Officer Robert Finch—for meals or a Starbucks coffee.[6]

Finch and Jeffrey Welch, Station Casinos' executive vice president and chief legal officer, therefore took a number of steps to prepare for such a petition.[7] First, Finch directed Red Rock's general manager, Scott Nelson, to provide him with a list of what

---

[1] As discussed infra, one of the allegations also involves two other Station Casinos' facilities, Boulder Station and Palace Station.

[2] Due to the COVID-19 pandemic, by order dated October 1, 2020, the hearing was held remotely via the Zoom for Government online platform. Jurisdiction is undisputed and established by the record. Unless otherwise indicated, Red Rock also does not dispute that any of the individuals who allegedly committed the objectionable and unlawful conduct—including those employed by Station Casinos LLC, and/or Red Rock Resorts, Inc., the holding company that owns an indirect equity interest in and manages Station Casinos—are its supervisors and/or agents within the meaning of the Act.

[3] At the request of the General Counsel, all witnesses except certain designated representatives were sequestered (Tr. 18–20). An order correcting errors in the hearing transcript has been added to the record as ALJ Exh. 1.

[4] Citations to the record are included to aid review and are not necessarily exclusive or exhaustive. In making credibility findings, all relevant factors have been considered, including the interests and demeanor of the witnesses; whether their testimony is corroborated or consistent with the documentary evidence and/or the established or admitted facts; inherent probabilities; and reasonable inferences that may be drawn from the record as a whole. Language and translation difficulties have also been taken into account (several General Counsel witnesses testified through a Spanish-language interpreter). See, e.g., *Daikichi Corp.*, 335 NLRB 622, 623 (2001), enfd. 56 Fed.Appx. 516 (D.C. Cir. 2003); and *New Breed Leasing Corp. v. NLRB*, 111 F.3d 1460, 1465 (9th Cir.), cert. denied 522 U.S. 948 (1997).

[5] See Jt. Exh. 6; GC Exhs. 47, 48, and 116 (pp. 3, 21); and documents related to the election petitions attached to the Union's unopposed (and hereby granted) Sept. 15, 2021 posthearing request for administrative notice. See also Tr. 124, 153–155, 555–556 (Nelson), 2060 (Johnson), 3032–3041, 3076, (Murzl); and R. Br. 3. The Union's winning percentages of the votes cast were as follows: Sept. 2–3, 2016 election at Boulder Station (67 percent), Nov. 8–9, 2017 election at Green Valley Ranch (GVR) (79 percent), April 27–28, 2018 election at Palms (84 percent), June 13, 2019 election at Sunset Station (83 percent), and June 14, 2019 election at Fiesta Rancho (85 percent). The Union narrowly lost one of the elections, the Oct. 15–16, 2016 election at Palace Station (49.6 percent). However, the Union filed postelection objections and unfair labor practice charges and Palace Station subsequently settled the case and recognized the Union there in March 2017 (presumably based on the Union's card majority).

[6] GC Exh. 116, p. 7; Jt. Exh. 6; Tr. 155–158, 6340–6341 (Nelson), 1417–1418, 5981, 6050–6052 (Finch). Finch is a member of the Fertitta family by marriage. He is COO of Red Rock Resorts, Inc., which as noted above is the holding company that owns an indirect equity interest in and manages Station Casinos. His office is also located at the Station Casinos' corporate headquarters. See GC Exh. 116 (FY 2019 10-K report), p. 41; and Tr. 124 (Nelson), 1414, 6080 (Finch). The other three Station Casinos properties that had not yet had a Culinary Union election at that time were Fiesta Henderson, Santa Fe Station, and Texas Station.

[7] See Tr. 7196–7198, 7206–7207, 7211, 7225–7226 (Welch).

he and his team were doing about a potential union petition.[8] Nelson had previous experience with a Culinary Union election campaign, having served as GM at the Palace Station property during the October 2016 election there (which, as noted above, is the only election the Union failed to win by a large majority).[9] Nelson emailed his response to Finch on Saturday, June 15, listing various existing initiatives that were being implemented in the current "pre-petition environment," as well as additional strategies he and the corporate HR team were working on for the "post-petition/pre-election" period.

A week later, on June 22, following a meeting with the HR team, Nelson also emailed Finch an updated version, which included a longer and more-detailed list of post-petition/pre-election strategies. The list included activating "Voices," select company managers who would be sent to the property to speak to employees about unions and urge them to vote no; posting updated "sound bytes," antiunion messages prepared by the corporate HR team that had been used during previous campaigns and urged employees to vote no; and holding mandatory meetings with employees to communicate how little progress had been made in union contract negotiations at the other properties and urge them to give Nelson a chance and vote no.[10]

Second, Finch and Welch decided to replace and retire Station Casinos' longtime senior/vice president of HR, Valerie Murzl, who was responsible for and had directed the Company's response to the union organizing and election campaigns at the facilities. In or after early July, Finch therefore contacted and scheduled an interview with Phil Fortino, who held a similar position with Eldorado Resorts in Reno and had previously worked with Nelson at another company. Nelson recommended Fortino to Finch's predecessor in 2018, and he was subsequently interviewed by Fertitta and Welch in July 2018, a few months after the Union's third overwhelming election victory. Nelson also again recommended Fortino to Finch shortly after Finch became COO in February 2019. Welch suggested that Fortino be

interviewed again as well. Finch and Welch subsequently met with Fortino on July 6 and discussed the ongoing union campaign and their desire to change the Company's campaign playbook or strategy. Welch officially offered Fortino the position shortly after and began negotiating his employment contract.[11]

Third, Welch decided to also replace the law firm that had developed the Company's campaign playbook with Murzl. Welch selected the law firm Fortino recommended during his 2019 interview, which he had consulted at Eldorado regarding union avoidance and decertification strategies.[12]

In the meantime, at Nelson's request, on June 21 the Station Casinos director of labor relations, Jennifer Johnson, emailed him and Red Rock's HR director, Mari Jackson, two batches of new/updated "vote no" sound bytes for possible use when the Union filed a petition at the facility. The following week, on July 1, Johnson also emailed Jackson a batch of pre-petition sound bytes, which contained similar antiunion messages to discourage employees from otherwise supporting the Union or signing authorization cards. Jackson sent several of these pre-petition sound bytes to her communications specialist the same day and instructed her to start running them on the Red Rock's back-of-the-house TV "asap" in both English and Spanish.[13]

As it turned out, on July 25 the Union filed its next (seventh) election petition at one of the other Station Casinos facilities, the Fiesta Henderson Casino Hotel. By that time the new legal team had been hired, but not Fortino, who would not start until September 9. As for Murzl, she was still unaware that Station Casinos intended to replace and retire her (indeed, she would not be told until Fortino arrived). And she normally would have moved into the Fiesta Henderson at that time to personally conduct and direct the Company's antiunion campaign there. But Finch sidelined her, saying the new legal team would spearhead the campaign instead.[14]

Finch, Welch, and the new legal team thereafter went to the Fiesta Henderson to meet with and prepare the managers and

---

[8] There is no evidence Finch issued a similar direction at that time to any of the GMs at the other three properties that had not yet received a union election petition.

[9] See fn. 5, above, and Tr. 125, 151–152, 590–593 (Nelson). Nelson personally participated in the Company's antiunion election campaign at Palace Station by conducting preelection captive audience meetings with the employees. And his statements at those meetings were among the unlawful and objectionable preelection actions the Union charged and the Company settled after the election by agreeing to recognize the Union.

[10] GC Exhs. 109, 110; Tr. 3032–3034, 3041, 3045–3046 (Murzl), 6344–49, 6376–6387, 6411 (Nelson). Finch testified that he did not remember or know anything about Nelson's emails to him. Indeed, even after being shown the emails by the General Counsel, Finch testified that he didn't know whether they related to the union campaign or what Nelson was referring to. Tr. 1419–1431. As indicated in the GC's posthearing brief (p. 13), Finch's testimony in this respect was obviously incredible and served to undermine his credibility generally.

[11] Tr. 129–131, 503, 505–508, 6358–6364 (Nelson), 763–764, 897–901, 6985–6987, 6991–6993, 7170 (Fortino), 1442–1443, 5980, 5983–5987 (Finch), 7195, 7198–7199, 7206 (Welch). To the extent the record includes testimony contrary to or inconsistent with these findings, it is discredited. For example, Finch testified that he was unhappy with Murzl because she "was not being responsive to the properties in the operations piece of things that I wanted to accomplish" (Tr. 1437–39), in particular her desire to conduct training at the individual properties rather than at the Station Casinos headquarters (Tr. 1446, 5990–5993). And Welch and Stephen Cootey, the Company's chief financial officer, testified that Murzl failed to communicate with them or seek their input about

employee benefits, and poorly implemented a new HCM (human capital management) system in 2019. (Tr. 7194–7197, 7206 (Welch), 6445, 6449, 6457–6460, 6522–6524, 6551–6553 (Cootey).) However, as noted above, Finch was not a credible or reliable witness generally. And to the extent his testimony suggested that Murzl was replaced and retired after 20-plus years solely or primarily because of a disagreement about where and how to conduct employee training, it is contrary to the weight of the evidence and the record as a whole. As for Welch's and Cootey's testimony regarding the employee-benefits process under Murzl, it was contradicted by the Company's director of benefits, Paula Tilley. Tilley testified that Murzl kept Welch and Cootey in the loop, provided them with information, and invited them to quarterly meetings (Tr. 6927–6931, 6934). Finally, Welch acknowledged that he began seriously considering replacing Murzl in 2018, before the new HCM system was implemented; that the prior union election wins were the primary reason; and that the only reason Fortino was not hired to replace her following his July 2018 interview was because the focus shifted to splitting up and selling most of the Company to one or more prospective buyers (Tr. 7201–7202, 7206–7207, 7221–7222).

[12] Tr. 1339, 6956, 6991–6992, 7151, 7170–7171 (Fortino), 7195–7197, 7211 (Welch).

[13] GC Exhs. 8, 163, 164; Tr. 1897 (Jackson), 6112–6113 (Johnson), 6351 (Nelson). Johnson testified that she sent the antiunion sound bytes to all of the properties that had not yet had a union election, not just the Red Rock (Tr. 6131–6132). However, her June 21 email was addressed only to Nelson and Jackson at the Red Rock. And Respondent never introduced any similar emails from Johnson to any of the other properties during that time.

[14] Tr. 1451–1452 (Finch), 3037–3039 (Murzl).

supervisors for the election campaign. They told the managers and supervisors to disregard what Murzl had previously taught them; that the Company had a new playbook for the campaign and that all of them, not just select company "voices," were allowed and expected to engage with and respond to questions by employees about the Union and the upcoming election. Finch, who had previously worked as a general manager at Fiesta Henderson, also met directly with the employees to address the Union's election petition. As did Nelson, who was likewise a former general manager at the facility. However, none of these efforts ultimately changed the result. The Union still won the September 13 election there by a comfortable 57 percent of the votes cast.[15]

In the meantime, it became increasingly likely to Murzl and other Station Casinos managers that the Red Rock would also be getting a union election petition in the near future.[16] As at other Station Casinos properties, the Union had been conducting an open organizing campaign at the Red Rock for many years.[17] And by mid-August, Murzl concluded that the Union was now sure to win an election there. Specifically, she concluded that the housekeeping, kitchen, sanitation, and internal maintenance employees were all close to 100 percent for the Union; that numerous banquet employees who also worked at unionized facilities on the Strip would likewise vote for the Union; that about half the bells would do so as well; and that the Union would therefore win even if the restaurant and beverage employees voted no. Murzl shared this "gloomy" assessment with Nelson and Jackson both in person and by email on August 16. And Nelson, in turn, privately shared Murzl's assessment with Fortino.[18]

The Union apparently believed it would win at the Red Rock as well. Just a week later, on August 22, the Union began "buttoning up" the property—having its committee leaders there

distribute small brown prounion buttons for its supporters to wear on their uniforms—a strategy it had used at the other Station Casinos facilities to build excitement before filing an election petition.[19] And it got management's attention. The very next day, Erika Hernandez, the Red Rock's team member relations manager, texted Jackson that she "just saw" two employees in housekeeping and the team member dining room wearing the brown buttons.[20] Both Jackson and Nelson also subsequently reported seeing employees wearing the brown buttons to Murzl.[21] And so many employees donned them over the next few weeks that even Finch and Station Casinos' vice president of communications, Michael Britt, texted each other about it on September 14:

> Britt: Lots of union buttons.
>
> Finch: They have been popping up more every day at [Red Rock].
>
> Britt: Looked like almost half the ballroom [banquet/catering] staff.
>
> Finch: They are always the leaders. They work on the [S]trip properties.
>
> Britt: That makes sense. Are you seeing it on the hotel side?
>
> Finch: Yes. Bells.[22]

A couple days later, on September 18, Fortino and Nelson—who both report to Finch[23]—met for an hour in the early morning with the legal team to discuss the union situation at the Red Rock.[24] Later the same day, they also held a "union

---

[15] Jt. Exh. 6; GC Exh. 49; Tr. 126, 509–511, 6280–6281 (Nelson); 5987–89, 6050 (Finch). Fiesta Henderson filed objections to the election. However, the Regional Director overruled them and certified the Union as representative on Nov. 19, 2020, and the Board subsequently denied Fiesta Henderson's request for review by unpublished order dated Feb. 12, 2021 (2021 WL 1815077).

[16] Tr. 3046–3048, 3083 (Murzl), 2064–2065 (Johnson).

[17] Tr. 1648–1649 (Hernandez), 4598–4599 (Herrera), 4653, 4711, 4716, (Washington), 5998–6000 (Finch), 6340–6344 (Nelson). Employees who served as union committee leaders at the properties wore red and white committee leader buttons on their uniforms. Tr. 1904–1906 (Jackson), 2067 (Johnson), 2776 (Gonzalez), 3051–3052, 3084 (Murzl), 3427, 3433, 3471, 3475, 3487 (Gomez).

[18] GC Exh. 9; Tr. 129–131, 503–508, 1899 (Jackson), 752–758, 763–764 (Fortino), 3046–3048, 3051, 3083–3085 (Murzl), 195–196, 6372 (Nelson). Nelson spoke with Fortino regularly and, unlike Murzl, was aware around that time that Fortino would soon replace her. Tr. 211–212, 507.

[19] GC Exhs. 283, 290, 293; Tr. 3495–3496 (Gomez); Tr. 3908–3909, 4086 (Montano), 4446–4450, 4465–4469, 4501–4502, 4505–4508 (Christian), 4656–4670, 4698, 4715, 4723–4726, 4730–4731, 4765–4769 (Washington). See also Tr. 3085–3086 (Murzl), and 6341, 6399–6400 (Nelson).

[20] GC Exh. 165; Tr. 6841–6842 (Hernandez). The General Counsel's posthearing brief (p. 15 fn. 12) requests an adverse inference against Red Rock because Jackson admitted during her testimony on December 16, 2020 that she deleted Hernandez's text from her personal phone (which she used for work as well) sometime in November, after the hearing opened, notwithstanding that the GC's October 9 subpoena duces tecum required Red Rock to produce any such text messages at the hearing. See GC Exh. 35(a), par. 17; and Tr. 906–908, 1912–1923, 2045. I agree with the GC that the matter is troubling. Although Jackson testified that she

rarely texts, routinely deletes old texts, and didn't remember receiving Hernandez's text, Hernandez testified that she also spoke with Jackson after sending the text, and that Jackson acknowledged seeing the text and confirmed that the brown buttons were Culinary Union buttons. Further, Red Rock was on notice well before November that it was required to ensure that its managers, supervisors, and agents took steps to preserve any such evidence. Thus, Jackson's deletion of Hernandez's text was, at the very least, grossly negligent. See, e.g., *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 221 (S.D. N.Y. 2003), which the Board recently cited with approval in *National Assn. of Broadcast Employees and Technicians*, 371 NLRB No. 15, slip op. at 5 (2021). However, the text was preserved on Hernandez's phone, produced by Red Rock, and used by the GC in examining Jackson. The GC's brief does not specify how the government's case was prejudiced or what the adverse inference should be in these circumstances. Nor does it address the requirements set forth in FRCP 37(e) for issuing sanctions against a party for failing to preserve such electronically stored information. The request is therefore denied.

[21] Tr. 3086 (Murzl).

[22] GC Exh. 113. See also Tr. 6003 ("the ballroom staff" referred to the banquet/catering staff, who typically work events in the resort's ballrooms). Finch initially testified that he didn't remember seeing a lot of union buttons in September. And while he subsequently admitted (after the General Counsel showed him the September text messages with Britt) that he noticed more buttons, he testified that the increase didn't mean anything to him. (Tr. 1455–61, 6002, 6052.) Again, I discredit this testimony, both because it is contrary to the record as a whole and because of Finch's poor credibility generally.

[23] Tr. 503 (Nelson), 745 (Fortino), 1412, 1416 (Finch). For the same reasons noted above, I discredit Finch's testimony that he never spoke to Fortino or Nelson about the increase in union buttons (Tr. 6003–04).

[24] See GC Exhs. 24 and 50, Nelson's and Fortino's calendars for that week, which indicate that they were scheduled to meet at 8:30 am that

avoidance"/"right to manage strategy" meeting, which had been scheduled the previous week, with Red Rock managers and supervisors who supervised Culinary employees.[25] Using prepared slides, Fortino explained the reasons why the Company opposed unions and told the managers and supervisors to use their "Right To Free Speech!" and share those and other reasons not to support unions with the employees. He also directed them to immediately ("NOW") prepare so-called "MUD lists" indicating which employees under them were pro-management (M), pro-union (U), or don't know (D).[26]

### B. The Alleged ULPs

1. Nelson's and Fortino's statements at employee Meetings (Sept. 19 & 20)

Over the following two days, Nelson and Fortino also held mandatory meetings with the Culinary employees at the Red Rock . The meetings were relatively short, lasting only about 20 minutes, and several were held each day to ensure that as many of the employees attended as possible.[27]

Each of the meetings was conducted in essentially the same manner. Nelson began the meetings by explaining why they were being held. For example, at a meeting on September 19 (which was recorded by an employee), he told the employees that the meetings were being held to "give a quick introduction to somebody that's joined the Station's family" and to "kind of talk about what's going on and what we're hearing . . . about some of the stuff I'm hearing that potentially is going on." He said, "[T]here's no beating around the bush, there's a lot of union conversations going on," and he wanted to make sure they "had all the facts" before making a decision that could "truly affect or impact our livelihood." Similarly, at a meeting on September 20 (which was likewise recorded by an employee), he told the employees he had brought them together because "there's a lot of activity going on . . . a lot of Union conversation going on, not just at this property, but at other properties as well," and he wanted to "share some facts" with them.

Nelson then spoke about the first two union elections that were held at Station Casinos properties in 2016 (Boulder Station and

---

morning for a "RR Union discussion." At the hearing, both Nelson and Fortino initially denied, on direct examination by the General Counsel early in the hearing, any recollection of this morning meeting, what it was about, or who attended, even after being shown the calendar entry (Tr. 315–317, 793–795). Indeed, Fortino testified that there were no meetings whatsoever about the union campaign at Red Rock during that time period, either with management personnel or employees, insisting that there wasn't even a union organizing campaign at the Red Rock during that time (Tr. 789–790). However, their memory improved somewhat when Respondent recalled them 6–7 months later. At that time, they both admitted that the meeting occurred, that the legal team was also present, and that it was related, at least generally, to the Union. See Nelson's testimony, Tr. 6365–66 (meeting was held to prepare for the previously scheduled meetings with the Red Rock managers and supervisors that afternoon and with Red Rock employees the following day), and Fortino's testimony, Tr. 7042 (meeting was a "general" union discussion about "the entire enterprise"). Based on the record as a whole, I find that the morning meeting was scheduled and held for the same reason the later meetings with Red Rock Culinary managers and supervisors and Culinary employees were held: in anticipation that the Culinary Union would soon be filing an election petition at the Red Rock. See the discussion of those meetings, infra. And I discredit Fortino's and Nelson's testimony to the extent it indicates otherwise.

[25] GC Exhs. 10, 50, 129; Tr. 215–219, 330–333 (Nelson), 796–797, 800–804, 819 (Fortino), 1658–60 (Hernandez). This was the first and only meeting Fortino and Nelson held with Red Rock managers and supervisors around that time. Tr. 498–499 (Nelson). And there is no substantial credible evidence that Fortino held similar meetings at that time with supervisors and managers at the other two properties that had not yet received a union petition, Texas Station and Santa Fe Station. Although Finch testified on direct examination by the General Counsel that Fortino held similar meetings at all the properties, and that he attended some of them, he could not remember if he attended the one at the Red Rock or identify which ones or where he did attend (Tr. 1463–67). As for Fortino himself, he initially testified on direct examination by the GC that he planned to hold similar meetings with managers and supervisors at every property, but he could not recall if he ever did, or even one property other than the Red Rock where he held such a meeting (Tr. 785–789, 1351–52). His memory seemed to improve when Red Rock recalled him seven months later, near the end of the hearing, and showed him emails he sent to the HR directors at Texas Station and Santa Fe Station on October 4 and 14, respectively, which attached slightly modified versions of the slides (R. Exhs. 90, 91). Fortino testified that he personally presented the modified slides at both properties right after he sent them (Tr. 7018–21). (He also testified, contrary to Finch's prior testimony, that he did not make the presentation at any other properties except Texas and Santa Fe Stations. Tr. 7031.) However, Fortino's belated testimony

that he presented the slides there was not corroborated by Fortino's calendars (which Respondent never introduced), the emails themselves (which said nothing but "Updated"), or any other evidence. Nor was it specifically corroborated by Finch when he was likewise recalled by Respondent (he was asked no further questions about the matter). Thus, I give no weight to either Finch's or Fortino's testimony. See also fn. 26, below.

[26] See R. Exh. 89 (the PowerPoint presentation); and Tr. 7118–19 (Fortino). See also Nelson's testimony, Tr. 488–489, 492–493. (To the extent Nelson's other testimony conflicts with the above findings, it is discredited as contrary to the weight of the evidence.) As noted above, on October 4 and 14, Fortino emailed a modified version of the PowerPoint presentation to the HR directors at Texas Station and Santa Fe Station, which also had not yet received an election petition. Among other things, unlike the Red Rock version, the modified version did not say managers and supervisors should "prepare a MUD list NOW"; rather, it simply stated that they should "work with [their] team to develop a MUD list." R. Exh. 90, p. 26 of 46. When asked by the General Counsel on cross-examination why this change was made, Fortino said it was because he had already told the HR directors in mid-September to put together MUD lists. He also subsequently added (after the GC pointed out that the managers and supervisors, not the HR directors, put together the MUD lists), that he had also asked all the general managers to "think about it" very shortly after he arrived, and that it was also "already discussed" with the supervisors (Tr. 7119–20). However, none of this testimony was ever corroborated. Moreover, on further examination, Fortino acknowledged that he wasn't sure why he made the change; that his explanation was just "probably" the reason (Tr. 7121). Accordingly, I discredit Fortino's proffered explanation and find that the reason was instead the most obvious one: that the Red Rock version said "NOW" because the Company expected a union election petition to be filed in the near future, whereas the Company did not have the same expectation at Texas Station and Santa Fe Station.

[27] GC Exhs. 24, 50, 166, 167; Tr. 221–222, 235 (Nelson). The meetings were held only at the Red Rock and not at any other facility and only Culinary employees were invited and required to attend the meetings. GC Exh. 12; Tr. 610 (Nelson), 793, 803, 834–835, 878, 1350 (Fortino). When asked why he and Nelson held the meetings at the Red Rock, and why only Culinary employees were invited, Fortino testified that he didn't know or recall because he didn't set up the meetings (Tr. 1350–51). However, Nelson testified that he, Fortino, and Finch collectively put together the meetings (Tr. 236). Further, the record as a whole indicates that the meetings were clearly held for the same reason the "union avoidance"/"right to manage strategy" meeting was held with Culinary managers and supervisors at that time: because the Company anticipated that the Culinary Union would soon be filing an election petition there.

Palace Station), and how little the employees there had achieved since. For example, at the recorded meeting on September 19, he told the employees that the negotiations there "have been going on for 3 1/2 years, and to this day . . . there is no contract . . . Three and a half years into negotiations, and they're still divided . . . 3 1/2 years later, [the employees] still hadn't gotten what they were promised" by the Union. He said, "Legally the Union can promise you anything." But,

> [i]t doesn't mean you're going to get it. At the end of the day, you might get more. You might get the same. You might get less. On this particular instance 3 1/2 years into it they got nothing . . .

Similarly, at the recorded meeting on September 20, he told the employees that Boulder and Palace were "on 3 1/2 years and in 3 1/2 years, there's no contract. There still isn't a contract." He said there had been 100–150 articles exchanged back and forth, but "They've agreed upon four things, 3 1/2 years later. . . [T]he team members . . . don't have any of the things that have been promised to them . . . 3 1/2 years later." He told the employees to "educate yourself" and "remember, here we are, 3 1/2 years later."

Nelson then introduced Fortino, the "new senior vice president of human resources." He told the employees at the recorded meeting on September 19 that Fortino would talk to them about "some change, change that is taking place right now." Similarly, at the recorded meeting on September 20, he said Fortino would discuss with the employees "something more positive . . . some great stuff that he's going to stand up here and tell you about."

Fortino told the employees that he would be looking to improve everything Station Casinos was doing. Specifically, at the recorded meeting on September 19, he told the employees he was "kind of a change guy" and that his "role" at Station Casinos was to "take a look at everything" it was doing and "then make recommendations to make things better." He told them that at Eldorado, where he came from, the company "built a medical center, a full-time medical center for our team members only, [and] [i]t was a big success." He said,

> That's something that we have to look at. Maybe that's something we look at. Maybe that's something we look at I don't know. There's no promises because we can't do that. We can never make a promise and we never will. I can promise you one thing, we're going to look at everything we're doing. We're going to be looking at how we compensate team members. We're going to be looking at our benefit plans. We're going to look at everything.

Similarly, at the recorded meeting on September 20, Fortino told the employees that he was

> here to help to make changes. I am here to help. Will I make things better? I don't know, but you guys will have to decide in time, right? But the things I want to look at are our compensation program, I'm going to take a hard look at benefits programs, et cetera et cetera. I'm going to take a hard look at our employee programs. I will tell you this, my philosophy is, if

we're not having fun, we shouldn't be doing it. . . . So my role now and in the future is to continue this idea of family and fun. Doing that, we have to look at everything we're doing, A to Z, I mean everything, and that's what I'm going to do.

Fortino then closed by asking the employees to have patience. Specifically, on September 19 he said,

> Please have patience with us. Please take a look at the history. All companies go through a difficult time. Anybody who was here in 2007, and I was in Vegas in 2007, economy went crap. Every company had to adjust. We are coming out of that fairly strongly now. It's time to catch up. That's our goal, right. You good with that?

Similarly, on September 20, he said,

> I hope you have a little patience . . . I came here to help move the needle a little bit and I hope I can do (indiscernible) . . . Nothing's not on the table to look at. Is that fair? Have a little patience with me. . . . Stay with us, alright?[28]

The General Counsel alleges that, by the foregoing statements, Nelson gave the impression that it would be futile for the Red Rock employees to support the Union and Fortino promised them benefits if they did not support the Union, in violation of Section 8(a)(1) of the Act (GC Exh. 1(bk), pars. 5(b)–(e), 8).

The allegations are well supported. As indicated above, although Nelson told the employees he was going to give them "the facts," he actually gave them only one: that 3-1/2 years after the union elections at Boulder and Palace Stations the employees had achieved nothing in collective-bargaining negotiations with the Company.[29] And he repeated this single fact several times. Cf. *Overnite Transportation* Co., 329 NLRB 990, 992 (1999), enfd. in relevant part 280 F.3d 417, 430 (4th Cir. 2002) (en banc) (employer's repeated references to one of its facilities where the union had failed to get a contract despite 13 years of bargaining and a lengthy strike unlawfully gave employees the impression that supporting the union would be futile).

Respondent argues that, by doing so, Nelson just "truthfully informed employees about existing facts" to convey "the realities of good-faith bargaining" (Br. 174). However, Nelson never said anything about "good faith" bargaining at the meetings. And he certainly didn't say anything to assure employees that the Company had negotiated in good faith at Boulder and Palace, or that it would negotiate in good faith at the Red Rock if the employees voted for the Union. Although he stated at the recorded meeting on September 19 that employees generally could get more, the same, or less with a union—a statement the Board has held can save what might otherwise be a threat of futility[30]—he then immediately again repeated that the Company's employees at Boulder and Palace had got nothing from the Union. Further, he did not include any such statement in his remarks during the recorded meeting on September 20. Cf. *AutoNation, Inc. v. NLRB,* 801 F.3d 767, 771–772 (7th Cir. 2015) (affirming the Board's finding that the company's vice president threatened futility because, although he told employees that the bargaining process would eventually begin if they were to unionize, "he

---

[28] GC Exhs. 51(a) and (b); and 52(a) and (b). See also Tr. 221–222 (Nelson); and 3436–39 (Gomez).

[29] Station Casinos was a party to and participant in the contact negotiations at both properties. See GC Exh. 116, at p. 18; and Tr. 2057 (Johnson). Thus, if the employees were to achieve anything through collective bargaining at those properties, the Company would have had to

agree to it. See *Equatorial Marine Fuel Mgt. Services PTE Ltd. v. MISC Berhad,* 591 F.3d 1208, 1211 (9th Cir. 2010) ("[C]ontracting, like dancing the tango, takes two").

[30] See, e.g., *Standard Products Co.,* 281 NLRB 141, 162–163 (1986). But not always. See, e.g., *Centre Engineering, Inc.,* 253 NLRB 419, 423 (1980).

promptly threw cold water on that thought" by saying the bargaining process is never automatic and they may never see any better benefits, citing as an example—"the only example he offered"—that no negotiations had been held with a unionized group of the company's employees at another facility for almost 3 years).

Moreover, Nelson did not emphasize his negative Boulder and Palace example solely through repetition.  He also contrasted it with the "changes" and "more positive" and "great stuff" Fortino would tell them could happen without the Union.  Cf. *Airtex, Inc*., 308 NLRB 1135 fn. 2 (1992) (employer's statement to employee that it only needed to negotiate with the Union, not sign a contract, and negotiations could last a year constituted a threat of futility in context of employer's other statements, including that "things could be better" if the employee did not support the union).

As for Fortino, he delivered as Nelson advertised, painting a very different and positive picture of the employees' future without the Union.  Although he stated that he couldn't make promises at the recorded meeting on September 19, and that he didn't know for sure if he would make things better at the recorded meeting on September 20, everything else he said indicated or implied he was promising to do just that, particularly with respect to healthcare and other benefits (which as discussed infra he subsequently did). Cf. *California Gas Transport, Inc*., 347 NLRB 1314, 1318 (2006) (manager's statements impliedly promised to grant employees the same wage increase granted at other locations if they rejected the union, notwithstanding that he told them he could not make promises regarding their wages and benefits), enfd. 507 F.3d 847 (5th Cir. 2007).  See also *Wake Electric Membership Corp*., 338 NLRB 298, 306–307 (2002) (manager's statement that he was not making any promises "was mere verbiage, in light of his request that the employees give the [c]ompany 'another chance,' and averment that the [c]ompany would 'work with' the employees" on their grievances); *Noah's New York Bagels, Inc*., 324 NLRB 266, 270–271 (1997) (employer's president unlawfully made implied promises to a prounion employee by asking what her problems were with the company and saying he would think about them and do his best to try and solve them, notwithstanding that he also said he couldn't make any promises); and *Raley's, Inc*., 236 NLRB 971, 972

---

[31] See *Phillips 66*, 369 NLRB No. 13, slip op. at 3 (2020) (finding no violation where the incoming site manager told employees during a preelection meeting that he looked forward to "working with" them "to repair their relationship with management" and that he would "work toward mending fences with them" if they voted against the union); and *Hyatt Regency Memphis*, 296 NLRB 259, 269 (1989) (finding no violation where the new general manager told employees at a preelection meeting that the company wanted "the opportunity to continue to progress" with respect to "all [employee] personnel practices and policies," and asked for "a chance to work with" them).  But compare *Valerie Manor, Inc*., 351 NLRB 1306, 1315–1316 (2007) (employer's pleas at preelection meetings that the employees give the new administrator and other managers a chance to "work with" them "to resolve our issues and concerns" constituted an unlawful implied promise of benefits), and cases cited there.

[32] See *Mid Island Textile Industries*, 214 NLRB 484, 489 (1974) (finding no violation where the owner of the new company told employees during the union organizing campaign that he could not make any promises but he might be able to give them fringe benefits depending on how well the company did in the future).

[33] See also Fortino's remarks about the September meetings at a later preelection captive audience meeting with Red Rock Culinary

---

(1978) (employer's "oft-repeated stock phrase of 'no promises' was a mere formality, serving only as an all-too-transparent gloss on what is otherwise a clearly implied promise of benefit"), enfd. mem. 608 F.2d 1374 (9th Cir. 1979), cert. denied 449 U.S. 871 (1980).

Red Rock argues that Fortino's remarks should nevertheless be found lawful because he had just started as the "new senior HR leader" and it was "reasonable and unsurprising" that he would talk about what he planned to do in that position (Br. 111).  However, as indicated above, these were not general introductory meetings for Fortino to explain his goals and expectations to all employees as the new senior HR leader at Station Casinos.  Rather, they were meetings specifically to discourage Red Rock employees in Culinary Union-type positions from supporting the Union's anticipated petition for an election at the facility.  This is clear, not only because the meetings were held on the heels of the Union's "button-up" campaign at the Red Rock, but also because Nelson told the employees the meetings were being held to address the increase in union activity; because only Red Rock employees in positions typically represented by the Culinary Union were invited to attend the meetings; and because no similar meetings were held at any of the other nine Station Casinos properties, either to introduce Fortino or to discuss his plans (see fn. 27, supra).

Further, unlike in the cases cited by Red Rock, Fortino did not merely ask for a chance to work with the employees to improve the labor-management relationship without reference to any general or specific improvements.[31]  Nor did Nelson or Fortino indicate that any improvements would be contingent on factors other than the outcome of the election.[32]  Rather, as discussed above, Nelson told the employees that Fortino would tell them about "some change . . . taking place right now," "something more positive," and "some great stuff."   And Fortino "promise[d]" the employees that he would "take a hard look" at "everything,"—including specifically the employees' "compensation" and "benefit plans" and building them a "medical center"—and asked for their "patience" to give the Company a chance to "catch up" and "move the needle" now that it was "coming out" "fairly strongly" from the recession.[33]

In sum, their few cautious or equivocal statements notwithstanding, the overall message Nelson and Fortino conveyed to

---

employees, discussed at fn. 172, infra.  Fortino's suggestion that the Company was only "now" "coming out" of the recession actually appears to have been a mischaracterization and understatement of the Company's financial history and position. The record confirms that the Company went into Chapter 11 bankruptcy soon after the 2008 recession and rescinded or reduced many of its employee benefits and programs over the following two years.  However, it emerged from bankruptcy in 2011.  Further, according to the December 31, 2018 SEC Form 10-K report filed by Red Rock Resorts, Inc., the economy and Station Casinos' properties in Las Vegas began coming out of the recession fairly strongly in or about 2013 or 2014.  And it continued to perform well thereafter.  Indeed, the Company went public, from which it received over $500 million in additional net proceeds, in mid-2016. GC Exhs. 4, 117; Tr. 3042, 3069–71, 3086 (Murzl), 6440 (Cootey), 6722, 6727–6728, 6935–6936, 6946 (Tilley), 7181–7184 (Welch). In short, the record evidence does not support Fortino's suggestion at the meetings that the timing of his promise to look at improving everything was due to the Company's recent recovery from the recession (and Red Rock does not contend otherwise). Nevertheless, even as understated, Fortino's description of the Company's current economic health clearly implied that the money was in fact there to "catch up" and improve the employees' compensation and benefits from where they had been since the recession.

the employees at the September 19 and 20 meetings—and the message the employees would reasonably have taken from their remarks[34]—is that they would see improvements in nothing with the Union and everything without the Union. Accordingly, their remarks at those meetings violated Section 8(a)(1) of the Act as alleged.

### 2. Supervisor Cheney's statements to employee Gomez (Sept. 21)

Luz Gomez, a pantry worker in the Red Rock catering/banquets department, attended one of the mandatory meetings Nelson and Fortino conducted on September 20. The following day, as she was walking by the supervisors' office at the end of her shift, she saw banquets Assistant Executive Chef Brendon Cheney and Room Chef Danielle Tydingco and said goodbye. Cheney invited her into the office and asked if she had attended the meeting. She said yes. Cheney then asked for her opinion of what was said at the meeting. Gomez, who had been a union committee leader since about 2018, pointed to the two union buttons on her uniform (her red and white committee leader button and a brown union button) and said, "I think my opinion is very clear."

Cheney agreed, but said he wanted to hear it from her. Gomez replied that she didn't think she could talk about that with supervisors. Cheney said it was okay, they could talk about the Union. So Gomez answered that her husband was a union member and she wanted to have the benefits the Union offers and the pension and the insurance.

Cheney said he understood about the benefits but asked why she would want a third party to come and affect the relationship between the supervisors and team members. Gomez said that nothing had to change with the relationship between employees and the supervisors. Cheney replied that if the Union came in there would not be any more "favors" for the employees. Gomez said that it was fine with her; that if things have to change the Union would make sure everything is done the right way.[35]

The General Counsel alleges that during the foregoing

conversation Cheney interrogated Gomez and threatened her with loss of benefits in violation of section 8(a)(1) of the Act (GC Exh. 1(bk), pars. 5(f)(1), (3), 8).

Again, the allegations are well supported. Cheney's statement to Gomez that the managers and supervisors would no longer do any favors for employees if the Union got in was clearly coercive and unlawful. See *Remington Lodging & Hosp., LLC*, 363 NLRB No. 112, slip op. at 1 n. 1, 19 (2016) (employer's campaign literature unlawfully indicated that if the union was voted in managers would no longer have the flexibility to give employees extra chances or do "favors" for them), enfd. 847 F.3d 180 (5th Cir. 2017); *Mediplex of Wethersfield*, 320 NLRB 510, 517–518 (1995) (facility's administrator unlawfully told employees he could no longer grant them "favors" if a union came in, citing as an example when he gave a newly hired employee bereavement pay as a personal favor); and *Steve Aloi Ford, Inc.*, 179 NLRB 229, 233 (1969) (employer unlawfully told employees that a union would sever the employee to employer relationship and there would be "no more favors" for them). See also *Stern Produce Co.*, 368 NLRB No. 31, slip op. at 26 (2019) (employer's labor consultant unlawfully threatened loss of benefits by saying, "Look at all the stuff he has done for many of you in here. Many of you were given a second chance by him at one point or another—you've gone to him and asked for loans, asked for him to change your schedule . . . now he is going to be in a situation where he is going to bargain tough against you."). Although Cheney did not specify what he meant by "favors," banquet supervisors had granted employees favors in the past by allowing them to start their scheduled shifts an hour early or later for personal reasons,[36] and employees would reasonably have interpreted Cheney's statement as referring to such matters.

The Board decisions cited by Red Rock are distinguishable. In *Tri-Cast*, 274 NLRB 377 (1985), the employer distributed a letter to employees stating "We have been able to work on an informal and person-to-person basis. If the union comes in this will change. We will have to run things by the book, with a

---

[34] The Board applies an objective standard in evaluating whether such statements "interfere with, restrain, or coerce employees" in the exercise of their rights within the meaning of Sec. 8(a)(1) of the Act. See *Tesla, Inc.*, 370 NLRB No. 101, slip op. at 7 (2021); and *Reno Hilton Resorts Corp.*, 319 NLRB 1154, 1156 (1995), and cases cited there.

[35] The foregoing summary is based on Gomez's testimony, Tr. 3427, 3433, 3439–3444, 3471, 3475, 3487, 3497–3502, 3517–3518. I reject Red Rock's argument that Gomez's testimony should be discredited because it was not corroborated by either Cheney or Tydingco. First, there are other good reasons to believe Gomez's testimony. As discussed above, just three days earlier, at the September 18 "union avoidance"/"right to manage strategy" meeting, Fortino had strongly encouraged all managers and supervisors in Culinary Union-type departments to start talking to and sharing their opinions with employees about the Union. Indeed, Fortino specifically suggested during his slide presentation that they tell employees Station Casinos opposes unions because it wants to maintain a "family environment" with "a strong supervisor–team member relationship," "without the need for someone in between"; because "unions drive a wedge between you as leaders and your Team Members"; because "your flexibility goes away when dealing with them as individuals"; and because "the personal relationships that come from working together will end." (GC Exh. 89, pp. 10, 14, 32, and 34). Second, neither Cheney, who denied having any such conversation with Gomez (Tr. 5443–5445), nor Tydingco, who testified she could not recall or remember such a conversation (Tr. 2912), were particularly impressive or convincing witnesses generally. For example, although another banquets supervisor, Room Chef Matt Martin, corroborated Gomez's testimony that she wore union buttons (Tr. 2948), both Cheney and

Tydingco denied any recollection of Gomez doing so (Tr. 2912, 5444). Both also professed poor recollection of the September 18 "union avoidance" meeting (which it is undisputed they both attended) where Fortino directed them to immediately create MUD lists identifying whether employees were union supporters. Indeed, Tydingco testified that she couldn't even remember if the meeting related to avoiding unions, and that she has never heard of a MUD list (Tr. 2907–2912). Similarly, although Cheney recalled that the meeting was about unions, he testified that he did not recall Fortino using slides or anything Fortino said except that the supervisors could now answer employee questions about the Union (Tr. 5449–5456). Finally, while Cheney left Red Rock in December 2019 to work for another employer in Kentucky (Tr. 5438–5440), and therefore arguably had no reason to testify falsely at the hearing, given all the other circumstances above this is insufficient by itself to credit him over Gomez. I also reject Red Rock's argument that Gomez, whose primary language is Spanish, should be discredited because she admitted that the conversation was in English and that a later conversation she had with Nelson after another mandatory meeting in December was translated by Hernandez. Gomez testified that she understands English better than she speaks it (Tr. 3505). And she appeared to have little difficulty testifying about the conversation with Cheney in English. See Tr. 3440. Further, Hernandez attended the December mandatory meeting to translate, and Gomez was not the only employee who was present during the conversation with Nelson (Tr. 3452–3453).

[36] See Tr. 2746–2748 (Paniagua); 3442–3444 (Gomez); and 5388 (Martin), and the discussion below regarding the changes in Claudia Montano's schedule.

stranger, and will not be able to handle personal requests as we have been doing." And in *Office Depot*, 330 NLRB 640, 642 (2000), the employer told employees that they "wouldn't be able to communicate with management in the same way . . . because there would be a representative from the union that would be the middle person." The Board in both cases found the statements lawful because they simply explained that the relationship that existed between the employees and the employer and the manner in which they deal with each other would not be as before. Here, Cheney did not say that requests for favors would have to be handled in a different manner, he stated that there would not be any more favors, if the Union came in.

Cheney's prior questions to Gomez were also coercive under the circumstances. Although Gomez was an open and active union supporter, Cheney questioned her on the heels of the September 20 mandatory antiunion meeting where Nelson and Fortino unlawfully told Gomez and other employees that supporting the Union would be futile and promised them benefits if they declined to do so. Further, Cheney pressed Gomez to voice her opinion of that meeting even after she expressed a reluctance to do so. And he unlawfully threatened that managers and supervisors would no longer do employees favors when she explained why she supported the Union. Finally, the questioning occurred in a formal setting (Cheney's office) and in the presence of Gomez's immediate supervisor (Tydingco). Cf. *Bannum Place of Saginaw, LLC*, 370 NLRB No. 117, slip op. at 2 (2021) (finding that the facility director's questioning of an open and active union supporter in the director's office about what was discussed at a union organizing meeting was coercive under all the circumstances, including the director's concomitant unlawful statement that the company's president would shut the facility down before agreeing to all the things the employees wanted); and *Network Dynamics Cabling, Inc.*, 351 NLRB 1423, 1424 fn. 8, 1434 (2007) (finding that operation director's questioning of an employee, who openly distributed union handbills, about why he was joining the union was coercive under the circumstances because the employer unlawfully removed him from the jobsite for distributing the handbills shortly after).

The General Counsel also alleges that Cheney's questions to Gomez constituted unlawful solicitation of grievances (par. 5(f)(2)). However, Cheney began by asking, not what her complaints against the Company were, but what she thought of what was said at the mandatory meeting. And Cheney did not ask why she would want a third party to come into the relationship between employees and supervisors until after she had already stated that she wanted the Union's benefits and the pension and the insurance. In these circumstances, Cheney's questions to Gomez did not solicit or implicitly promise to remedy any grievances. Accordingly, this additional allegation will be dismissed.

### 3. ULPs against employee Claudia Montano (Jan.–Oct. 2019)

Like Gomez, Claudia Montano was a pantry worker in the Red Rock banquets department and a union committee leader.

However, while she had supported the Union since being hired in 2011, she did not become a committee leader and wear a red and white union button identifying her as such until early January 2019.[37] The General Counsel alleges that shortly after that, and continuing through October, Red Rock committed a number of unfair labor practices against her in violation of sections 8(a)(1) and 8(a)(3) of the Act, including threatening her with loss of benefits and other unspecified reprisals, changing her work schedule, reducing her seniority, and disciplining her because of her union or other protected concerted activities.

#### a. Alleged threats and change in Montano's work schedule

Prior to 2018, Montano normally worked a 5 am to 1 pm day shift like other banquet pantry workers. However, in late January 2018 Montano asked her direct supervisor, Matt Martin, if he would let her work 4 a.m. to 12 pm. instead. Martin initially said no, as there was no real need to have her start the day shift early and he preferred to have the entire team start at the same time. But, after Montano explained that the schedule change would help her with some family issues she was having with her spouse and children, he agreed to the change on a temporary basis. Accordingly, over the next several months, Martin scheduled Montano to work a 4 a.m. to 12 p.m. day shift. The only exceptions were during a 3-day period in late March when he scheduled Montano to work two 5 a.m.–1 p.m. day shifts and a 12–8 p.m. swing shift due to an increase in lunch or evening business.[38]

Eventually, in July, Martin told Montano that he wanted to put her back on a regular 5 a.m.–1 p.m. schedule like the other day shift pantry workers. But Montano protested, saying she was still going through a divorce and needed more time. So Martin relented and continued to schedule her from 4 am–12 pm.[39]

The issue arose again in late August, however, when Martin posted a schedule requiring Montano to work 6 of 7 days in a row (August 24–30) on either a 5 a.m.–1 p.m. day shift or the later swing shift. Montano complained loudly to both Martin and the other chefs when she saw it. Martin responded that if she had any problems or questions about the schedule, she should go to the Red Rock HR office. Montano did so on August 24 and spoke to Samuel Flores, a team member relations manager there. Flores said he would look into it, and he emailed Martin later that day. Martin responded shortly after, explaining the business reasons for the schedule.[40]

Unfortunately, that wasn't the end of the matter. The following day, August 25, Martin asked Montano to see him in his office. Martin told Montano that she had gotten him into trouble with HR and that he wouldn't want to do any more favors for her in the future. Montano protested that he had told her to go to HR if she had any problems or questions about her schedule. Martin replied, "Yeah, yeah, but starting today I won't want to do any more favors for you." Montano again protested, saying that wasn't fair. But Martin said that was the way it would be. Montano said, "So if I have problems with you . . . I can never go to HR again?" Martin replied, "Do whatever you want" and left.[41]

---

[37] T. 3871–3872, 4000–4004 (Montano). See also Tr. 1839 (Hernandez), and 2740 (Paniagua).

[38] R. Exh. 12; Tr. 2746–2748 (Paniagua), 2916 (Tydingco), 2949–2952, 5388, 5394–97 (Montano), 3870 (Montano). Montano would typically clock-in around 5 minutes before her scheduled start time, i.e., around 3:55 for the 4 a.m. day shift, 4:55 for the 5 a.m. day shift, and 11:55 for the 12 p.m. swing shift.

[39] Tr. 2951 (Martin).

[40] R. Exhs. 13, 14; Tr. 5394, 5394–5406 (Martin).

[41] See R. Exh. 10; Tr. 3878–3880, 4011–4012 (Montano), 5262–5263, 5273–5276 (Paniagua), 5421 (Martin). I have credited Montano testimony regarding the content of this conversation as it is corroborated in substantial part by other evidence. To the extent Martin testified otherwise (Tr. 5406), his testimony is therefore discredited. However, I have not credited Montano's testimony about when the conversation occurred. Montano testified that the conversation occurred several months later

Later that day, on her next break, Montano returned to the HR office and told Flores what Martin had said about not wanting to do any more favors for her because she had gotten him in trouble with HR. Flores said Martin shouldn't have said that and told Montano he would fix it.[42]

It is not clear precisely what Flores did next. However, Montano's schedule for August 26–30 was changed back to her preferred 4 am start time.[43] And on August 27, Martin informed Flores' colleague in the HR office that he and Montano had talked things over, apologized to each other, and put their "misunderstanding" behind them. He also stated that he assured Montano that employees should always be able to go to HR when they feel they need to and that is their right.[44]

Over next several months, with rare exceptions (once in September and twice in October), Montano continued to work her preferred day shift from 4 am to 12 pm. However, in December she was again scheduled for the 5 am–1 pm day shift several days in a row (Dec. 21–22 and her next workday Jan. 6). And in mid-January, within a few weeks after Montano began wearing a union committee leader button, Martin informed her that, because of the way business was going in banquets, he would be moving her to a 5 am start time on a regular basis.[45]

Again, like the previous August, Montano objected. And again, Martin told her to go to the Red Rock HR office. Montano did so and spoke to Flores. Flores subsequently spoke to Martin, and Martin spoke again with Montano. Unlike in August, however, Martin did not return Montano to a regular 4 am–12 pm day shift thereafter. Instead, he tried to give Montano a 4 am start whenever business permitted it. The result for the next few months, through mid-April, was that Martin continued to schedule her from 4 am to 12 pm most (about 83 percent) of the time.[46]

The complaint alleges a number of section 8(a)(1) and section 8(a)(3) violations related to the foregoing facts. First, it alleges that Martin unlawfully threatened Montano with loss of benefits because she engaged in protected concerted activities and supported the Union, directed Montano not to take concerns about him or her schedule to HR, and threatened Montano with unspecified reprisals if she did so. Second, it alleges that Martin unlawfully changed Montano's schedule because she complained to HR in violation of his directive. Third, it alleges that Martin also unlawfully changed Montano's schedule because of her union activity. See GC Exh. 1(bk), pars. 5(a)(1)–(3), 6(a), (g), (h), 8, 10. As discussed below, however, there are significant problems with all of the allegations.

### Alleged 8(a)(1) Statements and Threats to Montano

There are at least two critical problems with these allegations. First, Montano did not file her first ULP charge until July 18, 2019 (GC Exh. 1(a)), approximately 11 months after the August

2018 conversation in which the alleged statements and threats occurred (see fn. 41, supra). Thus, the allegations are barred by the 6-month statute of limitations in Sec. 10(b) of the Act. Second, Montano's complaint to HR at that time related solely to her own schedule and did not in any recognized sense constitute "concerted" activity "for the purpose of mutual aid and protection" within the meaning of the Act. Thus, as Montano was not engaged in activity protected by the Act when she made the complaint to HR, it was not a violation of the Act for Martin to threaten her with adverse consequences of it. See *Al-state Maintenance, LLC*, 367 NLRB No. 68 (2019).

### Alleged 8(a)(1) Change in Montano's Schedule Because of her HR Complaints

This allegation fails for essentially the same reason: neither Montano's complaint to HR about her schedule, nor her complaint to HR about Martin's statements that he would not do her any more personal favors because she complained to HR about her schedule, constituted protected concerted activity. Thus, even assuming arguendo Martin changed her schedule in January 2019 because of those prior complaints, there was no violation of the Act. Ibid.

In an apparent attempt to get around this problem, the complaint (par. 6(h)) and the General Counsel's posthearing brief (p. 151 fn. 150) assert that Martin's prior statements to Montano constituted an "overly broad" "rule or directive" prohibiting employees from taking any concerns about their supervisors or schedules to HR, and that Martin's subsequent change to Montano's schedule was therefore unlawful because it was done pursuant to that overly broad rule or directive.[47] However, "the Board has repeatedly held that a statement to a single employee is not the promulgation of a rule for the entire workforce." *Shamrock Foods Co.*, 369 NLRB No. 5, slip op. at 4 (2020)). Further, Martin did not say or imply to Montano that she and/or her coworkers could never go to HR with any concerns. Rather, he expressed unhappiness only with the particular circumstance at hand; that Montano had complained to HR about a situation (not being allowed to continue working 4 a.m.–12 p.m.) that only existed because he had previously granted her a personal favor (allowing her to temporarily work 4 a.m.–12 p.m. because of family issues). Moreover, when Montano specifically asked if his statements meant she could "never go to HR again," Martin responded, "Do whatever you want." Thus, contrary to the GC, Martin clearly did not issue a broad rule or directive prohibiting Montano and/or her coworkers from taking any group complaints about their supervisors or schedules to HR.

### Alleged 8(a)(3) Change in Montano's Schedule Because of her Union Activity

Unlike Montano's complaints to HR, her open support for the

---

[42] Tr. 3880–3882 (Montano). Again, I credit Montano's testimony that she spoke to Flores about what Martin said, but not about when it occurred. With respect to the latter, see also Montano's testimony, Tr. 3882, 4012–4013, 4019 (after speaking to Flores, Chef Keith Mygan told her to look at the new schedule to see the changes); and Mygan's testimony, Tr. 4963, 4966–4968 (he only worked in banquets until October 2018, when he transferred to the buffet on the floor below banquets, and he did not talk to Montano about her schedule after).

[43] Apparently due to the increased lunch and dinner business, however, she ended her shift later or worked multiple shifts on August 27–30. See R. Exh. 12.

[44] R. Exh. 14; Tr. 5420–5421 (Martin). Montano testified she did not remember any such conversation with Martin (Tr. 4013). However, a preponderance of the evidence indicates it occurred as summarized above.

[45] R. Exh. 12; Tr. 2950–2952, 5407 (Martin), 3874–3875, 4009 (Montano).

[46] R. Exh. 12; Tr. 2953–2954, 5414–5415 (Martin), 2661–2662 (Flores).

[47] See *Continental Group, Inc.*, 357 NLRB 409 (2011), clarifying *Double Eagle Hotel & Casino*, 341 NLRB 112 (2004).

---

after her schedule was again changed in mid-January 2019. However, as indicated above, the preponderance of the evidence indicates that the conversation occurred several months earlier in August 2018.

[42] Tr. 3880–3882 (Montano). Again, I credit Montano's testimony that she spoke to Flores about what Martin said, but not about when it occurred. With respect to the latter, see also Montano's testimony, Tr. 3882, 4012–4013, 4019 (after speaking to Flores, Chef Keith Mygan told her to look at the new schedule to see the changes); and Mygan's testimony, Tr. 4963, 4966–4968 (he only worked in banquets until October 2018, when he transferred to the buffet on the floor below banquets, and he did not talk to Montano about her schedule after).

Union was clearly protected concerted activity under the Act. Nevertheless, for the following reasons, this allegation also fails.

All parties agree that the allegation is properly analyzed under the framework set forth in *Wright Line*, 251 NLRB 1083, 1089 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982). Under that framework, the General Counsel must prove by a preponderance of the direct and/or circumstantial evidence that the employee's union activity was a substantial or motivating factor for the adverse employment action, i.e., that a causal relationship existed between the employee's union activity and the employer's adverse action against the employee. To prove such a causal relationship, the GC must show, at a minimum, that the employee engaged in union activity and the employer knew or suspected it, and that the employer had animus against such activity. If the General Counsel makes a sufficient showing of causation, the burden shifts to the employer to establish by a preponderance of the evidence that it would have taken the same adverse action against the employee even absent the union activity. See *Smyrna Ready Mix Concrete, LLC*, 371 NLRB No. 73, slip op. at 3 (2022), and cases cited there.

Here, Montano had begun wearing a union committee leader button shortly before the January 2019 schedule change. And there is sufficient circumstantial evidence that Martin knew it. As indicated above, Martin was Montano's direct supervisor. Further, at the time of the schedule change, Montano had been wearing the button every day for a few weeks and had worked with Martin at least some of those days during that time. Thus, it is likely he would have noticed it. Cf. *Vision of Elk River, Inc.*, 361 NLRB 1395 fn. 1 (2014), reaffirming 359 NLRB 69, 72–73 (2012) (finding employer knowledge where the alleged discriminatee wore a union button during the company's day-long annual meeting); and *Metropolitan Transportation Services*, 351 NLRB 657, 658, 710 (2007) (finding employer knowledge where the alleged discriminatee wore a union button and sat in the front row at a company meeting). Finally, although Martin testified that he did not recall if Montano wore a union button—either then or after—he admitted that he designated her as a "U" (union) supporter on his MUD list prior to the election. (Tr. 2948, 2958–2959, 2968, 5416.)[48]

However, there is insufficient evidence that union animus was a substantial or motivating factor for the schedule change. Although the General Counsel's posthearing brief cites various facts and circumstances as evidence of Red Rock's union animus and unlawful motive, all fail to withstand scrutiny.

*History of unfair labor practices.* The General Counsel first argues that animus and an unlawful motive are evidenced by "Respondent's . . . long history of unfair labor practices" before the January 2019 schedule change (Br.147). In support, the GC cites a 2012 Board decision which found that Red Rock's

corporate parent, Station Casinos, committed numerous Section 8(a)(1) and (3) violations in response to the Union's initial drive to organize its properties in 2010 (*Station Casinos, LLC*, 358 NLRB 1556). However, that decision was invalidated for lack of a valid quorum by the Supreme Court's decision in *NLRB v. Noel Canning*, 573 U.S. 513 (2014), and was never affirmed by a properly constituted Board. Thus, the Board's findings there do not constitute background evidence of animus in this case. See *Boars Head Provisions Co.*, 370 NLRB No. 124, slip op. at 1 fn. 2 (2021); and *Healthbridge Mgt., LLC*, 362 NLRB 310 fn. 3 (2015).[49]

The General Counsel also cites several cases where the Board found that Red Rock and other Station Casinos properties violated Section 8(a)(5) of the Act by refusing to recognize, bargain with, and provide information to unions after their 2018 election victories were certified; specifically *NP Red Rock, LLC*, 368 NLRB No. 52 (2019) (finding that Red Rock violated 8(a)(5) by its post-certification refusal to bargain with the Operating Engineers as bargaining representative of its slot and utility techs), enfd. by consent judgment, No. 19-1172 (D.C. Cir. May 11, 2020); *Palms Casino Resort*, 367 NLRB No. 127 (2019) (finding that the Palms violated Section 8(a)(5) by its postcertification refusal to bargain with the Culinary Union), enfd. by consent judgment, No. 19-1105 (D.C. Cir. May 19, 2020); and *NP Palace, LLC*, 367 NLRB No. 129 (2019), and 368 NLRB No. 148 (2019) (finding that Palace Station violated 8(a)(5) by its post-certification refusal to bargain with and provide information to the Operating Engineers), enfd. in relevant part by consent judgment, No. 19-1107 (D.C. Cir. May 12, 2020). See GC Br. at 185, 219. However, such 8(a)(5) violations are considered "technical" in nature because they are a prerequisite to testing a union's certification in court. Thus, they do not constitute evidence of animus. See *U.S. Rubber Co.*, 160 NLRB 661, 669 (1966) (employer's "technical" 8(a)(5) refusal to bargain following the union's certification was insufficient to establish that employee's subsequent suspension was motivated by union animus in violation of 8(a)(3)).[50]

*Subsequent unfair labor practices.* The General Counsel argues that animus and an unlawful motive are also evidenced by the numerous unfair labor practices committed by Red Rock's supervisors and agents at the property and at Station Casinos after the January 2019 schedule change, including the 8(a)(1) violations by Nelson, Fortino, and Cheney found above. However, none of these subsequent unfair labor practices were committed until eight or more months later, after Red Rock changed its

---

[48] Montano testified that Martin actually commented on her button while they were working together with other employees in the banquets kitchen a few weeks after she started wearing it, saying he saw "something weird" on her (Tr. 3872–3873, 4007–4008.) Although Martin denied doing so (Tr. 5416), as indicated above he also claimed he could not recall her ever wearing a union button. All things considered, I credit Montano on the subject.

[49] As previously noted (fn. 5), the Union also filed unfair labor practice charges after its narrow election loss at Palace Station in October 2016, which the Company settled by agreeing to recognize and bargain with the Union there. However, the settlement was informal, without any Board findings or order, and did not contain an admission. Thus, it may not be relied on here as evidence of animus or an unlawful motive. See *Sheet Metal Workers Local 28 (Astoria Mechanical Corp.)*, 323 NLRB

204 (1997) (such settlements "have no probative value in establishing violations of the Act").

[50] See also *Newport News Shipbuilding & Dry Dock Co.*, 254 NLRB 375 fn. 2 (1981) (evidence was sufficient to establish the employer's animus "independent of any reliance on the Board's finding of a 'technical' 8(a)(5) violation" by the employer a few years earlier), enfd. mem. 673 F.2d 1314 (4th Cir. 1982). The General Counsel does not cite or allege any prior history of bad faith bargaining, unilateral changes, or other 8(a)(5) violations by Station Casinos or Red Rock of the kind the Board has relied on in other cases as evidence of an employer's animus and discriminatory motive. See, e.g., *Mondelez Global, LLC*, 369 NLRB No. 46, slip op. at 3 n. 6 (2020), enfd. 5 F.4th 759 (7th Cir. 2021); and *Kitsap Tenant Support Services, Inc.*, 366 NLRB No. 98, slip op. at 12 (2018), enfd. mem. per curiam 2019 WL 12276113 (D.C. Cir. April 30, 2019).

antiunion playbook and hired Fortino.[51] Thus, the circumstances here are distinguishable from those in other cases where the Board has relied on post-conduct violations as substantial evidence of animus and an unlawful motive. See, e.g., *Con-Way Freight, Inc.*, 366 NLRB No. 183, slip op. at 3 fn. 10 (2018) (employer's post-conduct violations began the following month); and *Dresser-Rand Co.*, 362 NLRB 1100 (2015) (employer's post-conduct violations occurred "just days later" and were "all of a piece" with the prior conduct), enf. denied in part 838 F.3d 512 (5th Cir. 2016).

*Timing of the schedule change.* The General Counsel argues that animus and an unlawful motive are also evidenced by the timing of the schedule change, just a couple weeks after she began wearing the union committee leader button. However, Martin had made it clear from the beginning, when Montano initially asked for a 4 am–12 pm schedule in January 2018, that he would agree to that schedule only on a temporary basis to help her deal with her family issues. Further, Martin attempted to return Montano to a regular 5 a.m.–1 p.m. or later schedule the following August, long before she began wearing the button. And he again assigned her to a regular schedule several workdays in a row beginning in late December, likewise before she began wearing the button. Finally, although Martin told Montano he was officially returning her to a regular schedule in January 2019, in practice he continued to accommodate her over the next several months by scheduling her to work 4 a.m.–12 p.m. more than 80 percent of the time. Given all of these circumstances, the timing of Martin's January 2019 decision is insufficient to infer animus and a discriminatory motive. See generally *Queen of the Valley Medical Center*, 368 NLRB No. 116, slip op. at 3 (2019) (all the surrounding facts must be weighed in evaluating whether the timing of an employer's alleged discriminatory adverse action is sufficient to infer animus).

*Reasons offered for the schedule change.* The General Counsel also argues that animus and an unlawful motive are evidenced by the shifting reasons Martin gave for the schedule change. Specifically, the GC argues that the reason Martin offered at the hearing (because the opening chef, Cecilia Magat, told him some of the other banquet pantry workers were complaining about Montano taking her breaks during her last hour and leaving before the lunch business began, and he needed her back to help cover that business rather than early in the morning when nothing was going on),[52] was different than the reason he had told Montano (because of the way business was going in banquets). However, Martin's testimony about his reason was not fundamentally different than what he told Montano, it was just more specific than what he told Montano. Cf. *National Security Technologies, LLC*, 356 NLRB 1438, 1446 (2011) (fact that manager's affidavit may have elaborated on the justification for the refusal to hire the charging party did not equate with a shifting of defenses). And there are obvious reasons why Martin might not have wanted to share the specifics with Montano.

The General Counsel additionally argues that Martin's

testimony about the reason for the change should be discredited because it was unsupported by documentary evidence. However, Martin testified that Magat "told" him about the employees' complaints; he did not say she did it in writing. And while Magat was not called to testify to corroborate Martin's testimony, the record indicates, and it is undisputed, that she suffered a stroke and retired following her medical leave several months before the hearing opened.[53] Further, Red Rock could reasonably conclude that it was unnecessary to subpoena Magat to testify as a corroborating witness. It was the GC's burden to establish animus and an unlawful motive. And Montano admitted, consistent with Martin's testimony, that she often took her breaks at the end of her shift so that she could leave an hour earlier, and that her fellow pantry workers had to continue preparing for and working on the banquets lunch business after she left (Tr. 4100, 4010). Accordingly, no adverse inference is warranted. See *Heart and Weight Institute*, 366 NLRB No. 53, slip op. at 1 fn. 1 (2018), enfd. 827 Fed.Appx. 724 (9th Cir. 2020); and *Reno Hilton Resorts*, 326 NLRB 1421 fn. 1 (1998), affd. 196 F.3d 1275, 1284 (D.C. Cir. 1999) (declining to draw an adverse inference from employer's failure to call a former manager or supervisor); *Roosevelt Memorial Medical Center*, 348 NLRB 1016, 1022 (2006) (finding an adverse inference improper where the circumstances indicated that manager was not called because his testimony was unnecessary, not because it would have been adverse); and *Auto Workers v. NLRB*, 459 F.2d 1329, 1338 (D.C. Cir. 1972) (noting that an adverse inference for failing to present evidence is unwarranted if the party has good reason to believe the opponent has failed to meet the burden of proof).

Finally, as indicated above, there is no evidence that Martin ever took any similar or other retaliatory actions against Gomez or any other union committee leaders or supporters. See *Electrolux*, 368 NLRB No. 34, slip op. at 5 n. 16 (2019), and *National Security Technologies*, above, 356 NLRB at 1438 n. 1 (where animus and a discriminatory motive are not otherwise established, the absence of similar actions against other union supporters may provide additional support for dismissing the allegation).

Accordingly, all the foregoing 8(a)(1) and 8(a)(3) allegations will be dismissed.

### b. Alleged reduction in Montano's seniority (May 2019)

Sometime around mid-April 2019, Montano informed Martin that the reason she still wanted to continue working from 4 am–12 pm was because she had a second job that began at 1 pm. Martin responded that she had to decide which job had priority. And he thereafter began scheduling her to work 5 am–1 pm virtually every day.[54]

Again, Montano went to the Red Rock HR office to complain. However, Flores had left Red Rock in February to take an HR position at one of the other Station Casinos properties. So Montano instead spoke to Stephanie Paniagua, who had transferred to the Red Rock HR office from another Station Casinos property about the same time Flores left.[55]

---

[51] As discussed below, the evidence fails to support the General Counsel's allegations that Red Rock unlawfully reduced Montano's seniority in May 2019.

[52] Tr. 2952, 5426–5427. See also Tr. 2915 (Tydingco).

[53] Tr. 5695–5696 (Tydingco). See also Tr. 5657, 5663–5665.

[54] R. Exh. 12; Tr. 2747 (Paniagua); 4047–4048 (Montano). See also R. Exh. 1 (Montano's audio recording of Nelson's June 14 "focus group" meeting with the banquets pantry workers), at 58–59 minutes.

[55] R. Exh. 12; Tr. 2657 (Flores); 2736, 2741–2742, 2762 (Paniagua), 3883 (Montano). There are more than the usual inconsistencies and gaps in the cited testimony of the witnesses regarding this allegation. All have been carefully considered, evaluated, and resolved to the extent reasonably possible applying all relevant credibility factors (see fn. 4, supra). For example, Paniagua, who was terminated by Red Rock in February 2020 based on job performance, was called as a witness by both the General Counsel (on Dec. 29, 2020) and Red Rock (on May 3, 2021). She

Paniagua thereafter spoke to Martin, who explained that he needed Montano to work later because there were fewer early events. Because scheduling was based on both business and seniority, and Montano had raised seniority concerns during their meeting, Paniagua decided to also review the personnel files of all the current pantry workers in banquets to verify their seniority dates and rankings. Based on that review, she determined that Montano actually had the least seniority among the full-time banquet pantry workers because their seniority was based on their classification dates and Montano was the last to have been promoted to full-time. Accordingly, as Montano had been listed second to last on the previously posted schedules, Paniagua created a new seniority list and provided it to the banquet managers and supervisors to follow in preparing the future schedules.[56]

Consistent with the new seniority list, on the next posted banquets schedule for May 6–12, Martin listed Montano last rather than second to last in seniority among the full-time pantry workers. This change, of course, caught Montano's attention, and she immediately went to ask Martin about it. Martin was not there, however, so she spoke to Chef Tydingco instead. Tydingco told Montano that the posted schedule was not an error; that it was based on a new seniority list they had received from HR.[57]

So Montano went back to the HR office to speak with Paniagua. Paniagua explained to Montano why the change had been made. Montano, however, explained to Paniagua that there was some history behind the prior seniority rankings that she was apparently unaware of. Montano told Paniagua that several years earlier, in 2015, shortly before she went on maternity leave, she became concerned that a full-time employee from the café, Marta Montecino, had been moved into banquets after the café closed. Montano was concerned because she was the most senior on-call employee in banquets and had been waiting a long time for a full-time position to open there. So she spoke to Executive Chef Chris Garcia about it. Garcia told her not to worry, that Montecino would be placed in an on-call position in banquets.

However, when Montano returned from maternity leave in 2016, she discovered that Montecino was listed on the schedule as a full-time employee. Montano complained to HR about it, but HR said Montecino had been made full-time in banquets because she was full-time when her position in the Café was eliminated. Montano also subsequently raised the matter with the HR director and Garcia when she was eventually given a full-time position in banquets later that year. Montano asked the HR director who should have more seniority, her or Montecino. The HR director said Montano should have more seniority because she had more years in the banquets department than Montecino. Garcia agreed and said he would make sure Montano was listed above Montecino on the full-time schedule after that.[58]

Paniagua subsequently asked Garcia about what Montano told her. Montano also separately spoke with Garcia about the matter. But Garcia told both of them he had no recollection of how or why Montano had previously been listed above Montecino in seniority. So Paniagua forwarded the matter to

Jackson. Jackson reviewed the personnel files and confirmed what Paniagua had previously determined; that, although Montano had more outlet seniority (she had worked in the banquets pantry longer), Montecino was more senior in terms of both company seniority (when she was hired by Red Rock) and classification seniority (when she was made full-time in the banquets pantry). After consulting the corporate (Station Casinos) HR department, Jackson therefore concluded that Paniagua had properly listed Montecino as more senior than Montano on the new seniority list. And Paniagua subsequently informed Montano of that conclusion.[59]

As with the previous January change in Montano's schedule, the complaint alleges that the May reduction in Montano's seniority ranking was unlawful both because it was motivated by her complaints to HR about Martin and her schedule and because it was motivated by her union activity (GC Exh. 1(bk), pars. 6(b), (g), (h), 10). Again, however, neither allegation is supported by the evidence.

First, as discussed above, Montano's complaints to HR did not constitute "concerted" activity "for the purpose of mutual aid and protection" within the meaning of the Act. Thus, even assuming arguendo Paniagua and Jackson reduced Montano's seniority because of those complaints, there was no violation of the Act.

Second, there is insufficient evidence that union animus was a substantial or motivating factor for reducing Montano's seniority. As previously discussed, there is no evidence that Red Rock supervisors or agents at the property or its corporate parent Station Casinos had committed any significant unfair labor practices prior to that time. Nor is there evidence that they committed any subsequent unfair labor practices until four months later, after Station Casinos changed its antiunion playbook and hired Fortino. Further, none of the subsequent unfair labor practices were committed by Paniagua or Jackson. Finally, the timing of the decision to review and reduce Montano's seniority is not particularly suspicious given that she was the one who raised seniority when she complained to Paniagua about her schedule and Paniagua had only recently transferred to the Red Rock and was unfamiliar with the seniority history there.

Accordingly, these 8(a)(1) and 8(a)(3) allegations will likewise be dismissed.

### c. Disciplinary warnings to Montano (Oct. 1 and 13)

Montano continued over the following month to complain about her seniority and schedule. Shortly after Paniagua informed her of Jackson's decision, she asked to see Red Rock's vice president of catering services, Kasha Mackelprang, and eventually met with her and Chef Cheney in the second week of June. However, they assured Montano that her seniority and schedule were determined fairly and consistently with the rules. Montano also mentioned her scheduling issues during a discussion of overtime at a so-called "focus group" meeting Nelson held with the banquets pantry workers on June 14 to hear about any problems they were having in their jobs, and Nelson said he

---

initially testified that Montano came to see her twice, the first time "about March" to complain about being scheduled to work from 5 am–1 pm, and the second time to complain about her seniority ranking being lowered on the May 6–12 posted schedule. But, on later examination by Red Rock, she appeared to testify that Montano first came to see her about her seniority ranking being lowered. As indicated here and below, I generally credit Paniagua's initial testimony, but find that Montano likely first came to see her about the 5 am–1 pm schedule in mid-April rather than in March.

[56] Tr. 2743–2744, 2747 (Paniagua); 5388 (Martin). See also Montano's testimony about her conversation with Chef Danielle Tydingco below.

[57] Tr. 3890–3891 (Montano); 5415–5416, 5432–433 (Martin).

[58] R. Exh. 10; Tr. 3900–03, 4024–26 (Montano), 5260–67, 5272–79 (Paniagua).

[59] R. Exhs. 11, 54, 55; Tr. 3893–3894 (Montano) 5268–5271, 5275 (Paniagua), 6243–6245, 6255–6258, 6266–6268 (Jackson).

would look into it. However, she continued to be scheduled to work 5 a.m.–1 p.m. thereafter.[60]

Montano also continued during this time to openly promote the Union. She continued to wear a red and white union committee leader button at work every day. She also spoke up about the Union at Nelson's June 14 focus group meeting with the banquets pantry workers. She asked Nelson if the focus group meeting was being held "because we win yesterday at Sunset" (referring to the Union's election victory at Sunset Station on June 13) and "maybe because [the Union's] coming [to Red Rock]?" She also asked Nelson what he would do "about the pay." Nelson responded that he didn't even know the Union had won at Sunset; that the meeting had been scheduled previously; that he had been holding similar focus group meetings with other Red Rock employees for the past 2 weeks; and that he had held similar meetings back in October 2018. As for the pay, Nelson said he had no control over pay raises; that they were decided by "people bigger than us across the street." He said the focus group meeting was only to discuss things the Red Rock had "the ability to do to here at the property to help you do your jobs."[61]

Over the next several months, Montano also continued to openly promote the Union in various other ways. She met with her fellow union committee leaders, handed out brown union buttons to employees during the Union's button-up campaign, and collected updated authorization cards from the Union's supporters. She typically did all of these things during her breaks in the team member dining room (TDR), which is located across from the HR office and used by both employees and managers.[62]

As for Montano's work performance, there were no reported problems with it during this period. Montano was considered a "great" and "very productive" employee. And the only recent discipline she had received was a verbal warning on April 20, 2019 for failing to wash her hands as required by the health code.[63]

However, things took a turn in October. On October 1, Montano was issued a written warning, the next step in progressive discipline, for putting too much horseradish in some Yukon potato salad she had made for the lunch buffet on September 30. And less than two weeks later, on October 13, she was issued a final written warning for failing to properly complete and label some mixed Asian greens and toasted cashews she prepped for an evening event on October 11 and inaccurately reporting otherwise before she left for the day.

As with the allegations regarding the prior changes in Montano's schedule and seniority, the complaint alleges that the October 1 and 13 disciplinary warnings were unlawful both because they were motivated by Montano's complaints to HR about

Martin and her schedule and because they were motivated by her union activity (GC Exh. 1(bk), pars. 6(c), (e), (g), (h), 10).

For the same reasons discussed above, the allegations that the warnings were unlawfully motivated by Montano's HR complaints are without merit and will be dismissed. However, the allegations that Montano's ongoing union activity was a motivating factor for the warnings are a different matter. As discussed below, unlike the previous allegations involving her schedule and seniority, these allegations are well supported by a preponderance of the evidence.

The October 1 Written Warning

On September 30, the client for the lunch buffet told the front house manager that she thought the potato salad was "heavy" on horseradish. The house manager asked the client if she wanted an alternative, but she declined. Nevertheless, the house manager reported the client's "feedback" to Magat, who tasted the potato salad and agreed that it had too much horseradish. The house manager also mentioned it to Tydingco, who was Magat's superior, when she arrived for her evening shift.

It is unclear what occurred next or who made the decision to discipline Montano. However, it appears that Magat and Tydingco spoke about it. It also appears that the initial plan was to simply counsel/coach Montano to carefully follow the standard recipe in the future,[64] which was an available option notwithstanding Montano's prior verbal warning for the health code violation.[65] However, it was ultimately decided that Magat would issue Montano a progressive written warning instead.

Upon receiving the written warning from Magat, Montano admitted making the potato salad for the lunch event, and she signed the disciplinary form. However, in the comment section, she wrote, "I had a pain in my kidneys and perhaps it didn't seem like too much for me, but I ask for forgiveness for what happened."[66]

Again, all parties agree that the October 1 written warning is properly analyzed under the *Wright Line* framework. As discussed below, applying that framework, the General Counsel established by a preponderance of the evidence that the warning was motivated at least in part by Montano's ongoing union activity.

First, as indicated above, Red Rock clearly had knowledge of Montano's ongoing support of the Union. Although there is no direct evidence that Magat and Tydingco themselves had such knowledge,[67] it may reasonably be inferred that they did. Montano wore a union committee leader button every day, and Magat and Tydingco had been directed by Fortino at the "union avoidance"/"right to manage strategy" meeting on September 18 to

---

[60] R. Exhs. 1, 12, 68–70; Tr. 3872, 3897–3900, 4032, 4038–39, 4047–48 (Montano), 6592–6601, 6607–10 (Mackelprang). Montano testified that she specifically told Nelson she believed management's refusal to allow her to work 4 am–12 pm was because she was a union leader (Tr. 3897–3900). However, this is not corroborated by Montano's audio recording of the meeting. See R. Exh. 1 at 58–61 minutes.

[61] R. Exh. 1 at 8–14 minutes; GC Exh. 7; Tr. 179–180 (Nelson), 3905–07, 4029–34, 4047–48 (Montano). There was also some awkward banter between Montano and Nelson after their discussion about the timing of the meeting and again at the end of the meeting. However, neither was questioned about it at the hearing and the parties' posthearing briefs do not contend that it has any relevance.

[62] Tr. 3299 (Chavez), 3871–7382, 3907–3909, 4084–4086 (Montano), 4672–4674, 4730–4731, 4734–4740, 4756 (Washington). As indicated above, in July Montano also filed an unfair labor practice charge with the NLRB alleging that Red Rock had unlawfully changed her schedule and

seniority due to her union activity, a copy of which was served on Red Rock (GC Exh. 1(a), (b)).

[63] R. Exh. 17; Tr. 6599 (Mackelprang).

[64] The banquets garde manger recipe for the Yukon potato salad includes 1–3 cups of Atomic Horseradish depending on the amount of potato salad being prepared (R. Exh. 2).

[65] Tr. 5708 (Tydingco). A counseling/coaching is considered discipline, but no disciplinary action form is issued to the employee for it; rather, it is simply noted on the employee's work history card (aka "attendance/record profile") that the employee received a "coaching" rather "progressive discipline." See R. Exh. 19; Tr. 5684–5686 (Tydingco).

[66] GC Exh. 259; R. Exh. 17; Tr. 2927–2929, 5624–5638, 5705–5708 (Tydingco), 3909–3910, 3914–3915 (Montano).

[67] Tydingco testified that she could not remember if Montano ever wore a button (Tr. 2917–2918). As previously discussed, Magat did not testify.

identify which banquet workers were union supporters, and their fellow supervisors and managers Martin, Paniagua, Hernandez, and Nelson knew that Montano was a union supporter.[68]  See *G4S Secure Solutions (USA), Inc.*, 364 NLRB No. 92, slip op. at 4 (2016) ("[I]it is well established that the Board imputes a manager's or supervisor's knowledge of an employee's protected concerted activities to the decisionmaker, unless the employer affirmatively establishes a basis for negating such imputation."), enfd. 707 Fed.Appx. 610 (11th Cir. 2017).

Second, unlike with the earlier changes in Montano's schedule and seniority, the record establishes that Red Rock had animus against union activity during this period.  As discussed above, less than two weeks earlier, on September 19 and 20, Nelson and Fortino had held mandatory meetings with the Red Rock pantry workers and other employees eligible to vote in a Culinary Union election and unlawfully told them that supporting the Union would be futile and promised them benefits if they declined to do so.  And the next day, on September 21, Banquets Assistant Executive Chef Cheney, in Tydingco's presence, unlawfully interrogated Montano's fellow pantry worker Gomez and threatened her and other employees with loss of benefits if they supported the Union.  Further, as discussed below, Red Rock also committed several additional, post-petition 8(a)(1) violations in November and December, including granting the employees new healthcare and retirement benefits and threatening them with loss of those benefits if they voted for the Union. Cf. *Lucky Cab Co.*, 360 NLRB 271, 274 (2014) (employer's union animus was demonstrated by its contemporaneous 8(a)(1) statements threatening employees with loss of benefits and job security if they chose union representation and the futility of seeking such representation), enfd. mem. 621 Fed. Appx. 9 (D.C. Cir. 2015).

Third, there is also other circumstantial evidence that union animus was a motivating factor for the written warning. As indicated above, the written warning was issued to Montano just a few weeks after the Red Rock employees began "buttoning up" in anticipation of a union election petition being filed.  Further, as shown by COO Finch's September 14 text message about the buttons, Red Rock knew or suspected that the banquet workers, who often worked other jobs at unionized properties on the Strip, were the leaders of the union campaign.[69]  Thus, as an active and outspoken union committee leader in banquets, Montano stood out as a leader among the leaders of the campaign.  Cf. *Lucky Cab Co.*, above, 360 NLRB at 274 (employer's discharge of union organizing committee member just two weeks after the organizing campaign intensified with the solicitation of authorization cards supported an inference of animus and an unlawful motive).

Moreover, the record indicates that it is not uncommon for prepared food not to taste like it should. Tydingco testified that

employees occasionally make mistakes and sometimes measure wrong. And sometimes there may be a problem with the quality of the product. Indeed, Tydingco testified that, for these reasons, she tries to taste "everything" before it goes out.[70]  Yet, there is no substantial or credible evidence that any employee in banquets (or any other department, restaurant, kitchen, or outlet) had ever previously been issued either a verbal or a written disciplinary warning in similar circumstances.  Montano herself testified that she had never heard of any coworkers getting disciplined for incorrectly following a recipe.  And Tydingco testified that she could not remember any incidents where she had issued such discipline.  Nor were any such disciplinary warnings by Tydingco or Magat (or any other supervisor or manager) offered into evidence.  The only prior comparators offered by Red Rock were the following:

> 1) A work history report indicating that a banquets cook was coached by a supervisor (unidentified) in August 2019 for "improper cooling," "unlabeled sauce," and "not NP correctly."

> 2) A work history report indicating that a banquets pantry worker was coached by a supervisor (unidentified) in October 2019 for not properly labeling her prep cart in violation of health department rules.

> 3) A June 2018 verbal warning issued by Tydingco to a cook helper in the main kitchen (where Tydingco worked at the time) for improperly cooling smoked prime ribs and putting them on a speed rack in violation of the health code and covering them with body bag and wheeling them into the walk in.

> 4) A June 2018 verbal warning issued by Tydingco to a cook helper in the feast buffet (where Tydingco also worked at the time) for failing to label product on the line and in the hotbox warmer and failing to properly maintain sanitation buckets on the station in violation of the health code.

> 5) A final written warning issued by a different supervisor in October 2018 to a cook helper in the main kitchen who had been issued a verbal warning and a written warning in June 2018.  The final written warning was issued for, among other things (an attached page appears to be missing), leaving raw meats in a produce cooler with an improper label, falsifying documents by signing over someone else's prep saying that it was his own, and changing the prep amount written without prior authorization.[71]

Cf. *Shamrock Foods Co.*, 366 NLRB No. 107, slip op. at 1 n. 1 (2018) (employer's failure to provide any examples where it had disciplined other employees who had made mistakes similar to the discriminatee supported an inference that animus against the discriminatee was a motivating factor for issuing him a verbal warning), enfd. 779 Fed.Appx. 792 (D.C. Cir. 2019).

---

[68] As noted above, Montano had filed a ULP charge in July alleging that Martin had changed her schedule because of her union activities. And Martin admitted that he designated Martin as a union supporter on a MUD list he subsequently made (Tr. 2959).  Paniagua and Hernandez also admitted that they knew Montano was a union supporter and wore a union button (Tr. 2740, 1688–1692).  Moreover, there is good reason to doubt Tydingco's professed lack of memory. For example, Tydingco testified that she never worked the morning shift, and that her shift "very rarely" overlapped with Montano's (Tr. 2917–2918).  However, as discussed above, Montano was no longer exclusively working the morning shift by this time.  Indeed, the record indicates that, in the three months preceding the October 1 written warning, Montano worked 18 shifts (30 percent of her total) that went later than 1 pm: three shifts until 2–3 pm,

three shifts until 4 pm, two shifts until 5 pm, two shifts until 7 pm, seven shifts until 8 pm, and one shift until 9 pm.  R. Exh. 12. See also fn. 35, above, regarding Tydingco's poor credibility generally.

[69] GC Exh. 113.  See also GC Exh. 9, Murzl's Aug. 16 "gloomy facts" email to Nelson, Jackson, and Johnson, and Tr. 1018–19 (Fortino).

[70] Tr. 2928–2932.  See also Montano's testimony, Tr. 3911 (she was once directed by Martin to add more salt to a dish, but was not disciplined for failing to include enough salt in the first place).

[71] R. Exh. 19; Tr. 4096 (Montano), 2903, 2932–2933, 2937, 5671–5677, 5684–5690 (Tydingco).  I have therefore discounted Tydingco's and Paniagua's testimony to the extent it indicates that supervisors have disciplined banquet employees or other employees for not properly following recipes.

Red Rock also offered the following two comparators that occurred after Montano's October 1 verbal warning and her subsequent October 31 unfair labor practice charge:

1) A January 10, 2020 written warning issued by another supervisor to a cook in the T-Bones Chophouse (one of the Red Rock restaurants) who had been issued a prior verbal warning in November 2019. The written warning was for failing to properly cook fried chicken and serving raw chicken to guest.

2) A January 23, 2020 verbal warning issued by the same supervisor to another T-Bones cook for serving chicken raw and cooked improperly for an aviation (private jet) to-go order. [R. Exh. 19.]

However, such post-hoc examples are generally given less weight in determining whether there has been disparate treatment. See *Professional Medical Transport, Inc.,* 362 NLRB 144, 159f fn. 22 (2015) (evidence that the employer had not previously suspended two other employees for a similar offense supported inference that its suspension of a union bargaining team member constituted unlawful disparate treatment, notwithstanding that the employer did not suspend another union official after the ULP charge was filed); and *Rockwell Automation/Dodge,* 330 NLRB 547, 550 fn. 12 (2000) (employer's failure to discharge four employees after the alleged discriminatee's discharge for a similar offense did not establish disparate treatment as the employer had discharged two other employees for a similar offense before the alleged discriminatee's discharge).

In any event, neither example is substantially similar to Montano's situation. Although they also involved food preparation generally, the specific conduct involved, serving chicken raw, was obviously more severe than serving potato salad with too much horseradish.[72] See generally *CSC Holdings, LLC,* 368 NLRB No. 106, slip op. at 4 (2019) (comparators are not similarly situated where their conduct, although similar in general, was substantially different in severity).

Further, in both examples the warnings were issued by a different supervisor in a different outlet (T-Bones). See *New Otani Hotel & Garden,* 325 NLRB 928, 941 (1998) (finding no disparate treatment in part because the comparators offered by the General Counsel involved different supervisors). See also *Knox v. Roper Pump Co.,* 957 F.3d 1237, 1248 (11th Cir. 2020) (fact that different supervisors were involved in comparators is a meaningful distinction because different supervisors may have different management styles); and *Snipes v. Illinois Dept. of Corrections,* 291 F.3d 460 (7th Cir. 2002) (relevant factors to consider in determining whether comparators are similar include whether the employees dealt with the same supervisor and were subject to the same standards). There is no record evidence that the T-Bones supervisor (who did not testify) applied the same standards or exercised discretion in the same manner as banquet supervisors Magat and Tydingco. Nor is there any evidence that a common HR manager or other manager was involved in the decision to issue the warnings to both Montano and the two T-Bones employees.

In sum, as indicated by the General Counsel, the record strongly supports an inference that Red Rock seized upon the potato salad incident as a pretext to issue a progressive written warning to Montano and thereby create the foundation to eventually rid itself of an active and outspoken union committee leader. See *Wright Line,* 251 NLRB at 1090–1091, 1097; and *RAV Truck and Trailer Repairs, Inc. v. NLRB,* 997 F.3d 314, 324–326 (D.C. Cir. 2021).

Finally, Red Rock has failed to satisfy its burden under *Wright Line* to show that it would have issued the written warning to Montano even absent her union activity. As discussed above, Magat and Tydingco were not required to issue a written warning to Montano under the progressive discipline policy for preparing the potato salad with too much horseradish; they could have simply coached/counseled her instead. And the reasons offered for issuing the written warning to her have been discredited and found to be pretextual. See *Aston Waikiki Beach Hotel,* 367 NLRB No. 27, slip op. at 8 (2018), and cases cited there (where the General Counsel establishes that the employer's cited reason for the adverse action was pretextual, the employer by definition cannot meet its burden of showing that it would have taken the same action even absent the employee's union or protected activity).

Accordingly, the October 1 written warning violated Section 8(a)(3) of the Act, as alleged.

### The October 13 Final Written Warning

As indicated above, less than two weeks later, Montano was issued a final written warning, this time for her prep of some Asian greens and roasted cashews. Tydingco had assigned Montano to prep the greens and cashews during her morning shift on October 11 for an evening event later that day. And Montano did so. However, Tydingco subsequently decided that Montano should be disciplined for not fully completing the prep (failing to plate the greens), not placing a label on the cart indicating that she had prepared the roasted cashews (a health code rule), and incorrectly indicating that she had completed her prep (by highlighting in yellow her portion of the banquet event order).

As Tydingco was going to be out for a few days, she asked Magat, the opening chef in the mornings, to issue the discipline to Montano. And Magat subsequently issued the final written warning to Montano on October 13. The disciplinary notice listed Montano's prior verbal and written warnings on April 20 and October 1 and stated that the final written warning was being issued for the above deficiencies in her prep for the October 11 evening event.

Again, Montano signed the disciplinary notice. However, in the comment section she wrote,

> I don't agree with this job performance for not putting the label on the cashews, because I did put it on. I did not put in the mixed greens on the prep cart. That's why I did not finish it, because I was working on a lunch that day. And I didn't do it because I was working on another pie before I left. And I told Chef Cecilia [Magat] that it wasn't finished. That my preparation was not finished for dinner, because I was working for the lunch. But I gave notice that it wasn't finished. That we needed people. And that I had to do it. This is for me false because it wasn't really that way.[73]

---

[72] According to the CDC, "Raw and undercooked meat and poultry can make you sick. Most raw poultry contains Campylobacter. It also may contain Salmonella, Clostridium perfringens, and other bacteria." https://www.cdc.gov/foodsafety/foods-linked-illness.html#poultry .

[73] GC Exhs. 240, 259; R. Exh. 18; Tr. 3920, 3926–3927, 3980–3982 (Montano). See also Tr. 2915, 5623 (Tydingco). Montano explained at the hearing that the label can slide off when the tray is hot. She also specifically denied that she highlighted the banquet event order to indicate that the work was finished. (Tr. 4096–97, 4100–4101, 4104–4106.)

Montano also went to HR the next morning and complained to Paniagua about it. Paniagua emailed Tydingco later that day, asking if Montano had been given the option of staying to finish her work and requesting a detailed account of what happened that night. Tydingco responded by email the following day, saying that she gives every team member the option to stay for a reasonable amount of time necessary to finish assigned tasks; that she was sure Montano had enough time to finish her prep for the Friday evening event because Montano had assured her the day before that she was done with her other assignments up until the weekend; and that she asked the swing shift if they received any communication from anyone, a chef or other team member, about the prep not being finished, but was told there was none.

Paniagua emailed Tydingco back shortly after, asking again if Montano had been given the option to stay and finish her tasks. Paniagua also specifically asked Tydingco if Montano had checked out with a manager before she left. In response to the first question, Tydingco said that she normally didn't ask Montano to stay after her shift because she always said no. As for the second question whether Montano had checked out with a manager, the record is unclear if or how Tydingco responded. No further emails in the chain were offered into evidence and neither Paniagua nor Tydingco were asked about it during their testimony. Nor is there any evidence that Paniagua ever directly asked Magat about it.[74] However, Paniagua thereafter informed Montano that the final written warning would stand solely because she should have asked for overtime to finish her prep work.[75]

As with the October 1 written warning, a preponderance of the evidence establishes that the October 13 final written warning was motivated at least in part by Montano's union activity. As discussed above, the record well establishes both knowledge of and animus toward that activity. Further, the timing of the final written warning, shortly after the significant increase in union activity and the prior unlawful written warning, provides additional circumstantial evidence of an unlawful motive.

Moreover, there are significant inconsistencies in Tydingco's accounts of the matter. For example, Tydingco testified that she did not have any involvement in the evening event; that Magat is the one who informed her about Montano's incomplete and unlabeled prep; and that she "recommended" to Magat that Montano be disciplined (Tr. 2918–2919, 2922, 5640, 5667–7561, 5680–5681). However, Tydingco's email to Paniagua describing the incident made no mention of this. Nor did it indicate that Tydingco had even spoken to Magat about the matter before asking her to issue the discipline to Montano. Rather, it indicated only that Tydingco had asked the swing shift team if they had

heard anything from the morning shift about the matter. Further, as indicated above, the email clearly indicated that Tydingco would have issued the discipline to Montano herself except that she was going to be gone for a few days. And Magat specifically told Montano that Tydingco "directed" the discipline, and that she "had to" give it to Montano.[76] Cf. *Excel Container, Inc*., 325 NLRB 17, 29 (1997) (inferring a discriminatory motive for employee's discharge based in part on inconsistencies in the employer's account of the surrounding circumstances, including who made the discharge decision)[77]

In any event, as discussed above, the record indicates that Montano's final written warning was based in part on her prior written warning under the Company's progressive discipline policy. And Red Rock's posthearing brief does not argue otherwise. Thus, as the prior written warning was unlawful, so necessarily was the final written warning. See *DH Long Point Mgt.*, 369 NLRB No. 18, slip op. at 16 (2020), enfd. 958 Fed. Appx. 366 (D.C. Cir. 2021), and cases cited there.[78]

Accordingly, the October 13 final written warning violated Section 8(a)(3) of the Act, as alleged.

4. Alleged discriminatory work assignments to Maria Gutierrez (Oct. 10)

Maria Gutierrez was a stove person in the Red Rock sanitation department, i.e., her primary job was to clean stoves and ovens. She was initially hired as a sanitation kitchen worker in late 2008 but became a stove person three years later and continued in that position for the next 9 years until she retired in September 2020. Like Gomez and Montano, she was also a union committee leader, but for much longer, since 2009. She wore a red and white committee leader button to work every day the entire 11 years and also handed out flyers in the team member dining room (TDR).[79]

In addition to cleaning stoves and ovens, Gutierrez typically spent a few hours each shift washing dishes and pots and mopping the floor. On October 3, 2019, she was doing the latter during her usual overnight/"graveyard" shift in the TDR kitchen when her hands froze up while squeezing a mop. She reported this to her supervisor, Jose Lozano, who per the usual procedure took her to the security office, which then immediately sent her to a local 24-hour clinic. The clinic diagnosed her with a strain in both hands and placed her on modified duty. Specifically, she was restricted to work that did not require her to lift/push/pull more than 15 lbs. constantly for 8 or more hours per day, or to grip/squeeze/pinch with her right upper extremity more than occasionally up to 3 hours per day.[80]

After receiving the clinic's report, Lozano completed a "light duty assignment" form setting forth what Gutierrez's duties would be going forward based on the restrictions. He listed only

---

[74] Indeed, Paniagua testified that she could not even remember if Magat was supervising that day (Tr. 2759–2760). Thus, contrary to Red Rock's posthearing brief (p. 237), the record evidence does not show that Paniagua "confirmed that Magat had not given Montano permission to leave." Nor, contrary to the brief, does the record show that Montano left "early."

[75] GC Exh. 240, Tr. 2760–2761 (Paniagua), 3990–3993 (Montano). Beginning a few days later, Montano took an extended (7-month) disability leave of absence. She testified that she has since remained employed by Red Rock but was not working because of the limited number of banquet events during the COVID-19 pandemic. (R. Exh. 12; Tr. 3993–3994, 3999–4000.). As previously noted (fn. 55), Paniagua was terminated in February 2020.

[76] Tr. 3926–27, 3980–3982 (Montano).

[77] There is also no evidence that Tydingco or any other manager asked Montano for an explanation before the final written warning was issued. However, there is no evidence that it was the standard practice to do so, and the General Counsel's posthearing brief does not argue that Tydingco's failure to question Montano supports an inference of unlawful motivation.

[78] It is therefore unnecessary to address whether the previously described comparators offered by Red Rock would otherwise be sufficient to establish that it would have issued progressive discipline to Montano regardless of her union activity.

[79] Tr. 4527–4535, 4553 (Gutierrez).

[80] GC Exhs. 230, 285; Tr. 2695–2698 (Lozano), 4529, 4535–4536 (Gutierrez).

two: "polish" and "fold napkins," both of which were common light duty assignments. Lozano at that time also emailed his supervisor, Troy Baer, the executive steward, to let him know that Gutierrez had been placed on light duty.[81]

Consistent with the assignment form, over the next several days, through October 8, Gutierrez only folded napkins and polish pots. In the meantime, on October 7, she returned to the clinic for a follow-up and re-check. However, the clinic's diagnosis and work restrictions remained the same. Accordingly, on October 8, Lozano completed another light duty assignment form that continued to list the same two duties: "folding napkins" and "polishing."[82]

Nevertheless, the following day, October 9, Baer instructed Lozano to assign Gutierrez to do something entirely different; specifically, to clean the nine floor drains in the TDR kitchen.[83] Lozano, however, had never assigned Gutierrez to clean floor drains in the past, and he asked Gutierrez if she knew how. Gutierrez, who had previously cleaned drains when she was a kitchen worker, assured Lozano that she did. However, she told Lozano that it was not light duty. Lozano responded that it was within her work restrictions and that she should be able to do it in an hour. Gutierrez replied that she didn't think she could clean all nine drains that quickly, but she would try.[84]

Gutierrez then began cleaning one of the floor drains. However, it was very dirty, required her to get down on her hands and knees to scrub it out with chemicals, and took over 30 minutes to finish. When she was done with it, she went back to see Lozano. Gutierrez told him that she believed she was being assigned to clean the TDR floor drains because of the union activity at the Red Rock, and that she didn't want to be on light duty anymore if she had to continue cleaning them. Lozano did not respond to Gutierrez's accusation but took her back to the security office. Gutierrez showed the security office pictures a coworker had taken of her on the floor scrubbing the drain and asked to be taken off light duty. The security office, however, said Gutierrez could not be taken off light duty without the clinic's approval. So, Lozano at that point contacted Baer about the matter. Baer told Lozano not to assign Gutierrez to clean any more floor drains until further notice.[85]

The following day, October 10, Baer emailed Shawna Stock, Red Rock's risk manager, and Paniagau to make sure he could continue assigning Gutierrez such work. Baer summarized what had occurred and said the "only thing that . . . might cause an issue" was that the only assigned duties on the form were folding napkins and polishing. Stock responded by email the same day, stating that Baer could continue to assign Gutierrez to clean the floor drains or anything else so long as it was within her restrictions. As for the assignment form, Stock said the Company had "cover[ed] itself" by including a preprinted line on it stating that an employee's duties could include "[a]ny duties that are assigned via the department's Management team that also complies with the Team Member's identified restriction(s)." Nevertheless, Gutierrez was not thereafter assigned to clean any more floor drains while on light duty.[86]

The General Counsel alleges that Gutierrez was assigned to the more onerous and rigorous duty of cleaning the TDR floor drains because of her union activities in violation of Section 8(a)(3) of the Act (GC Exh. 1(bk), pars. 6(d), (i), 10).

Again, all parties agree that this allegation is properly analyzed under the *Wright Line* framework. Applying that framework, the General Counsel established by a preponderance of the evidence that the work assignment was motivated at least in part by Gutierrez's support of the union. First, as indicated above, Gutierrez was a longtime union supporter and committee leader. Second, both Lozano and Baer admittedly knew she supported the union.[87] Third, Nelson's and Fortino's coercive and unlawful statements to the Red Rock sanitation and other Culinary-type employees a few weeks earlier clearly establish Respondent's animus against union activity during this period.

Moreover, there is also other circumstantial evidence that union animus was a motivating factor for the work assignment. For example, the record indicates that at least one stove cleaner and/or kitchen worker in the sanitation department has been placed on light duty each year. Yet, Baer, Lozano, and Stock could not cite any other example where one was assigned to clean floor drains. Aside from folding napkins and polishing, the only light duty jobs Baer recalled previously being assigned to sanitation employees were cleaning the buffet line and sneeze guards with Windex.[88] And Red Rock did not produce any light duty assignment forms or other documentary evidence showing otherwise, i.e., that Baer, Lozano, or other current or former sanitation supervisors had assigned employees on light duty to clean floor drains over the previous 13 years. Nor did it produce any evidence that the previous employees on light duty had more severe restrictions that would have prevented them from performing such work.

---

[81] GC Exhs. 230, 286; Tr. 2697–2698 (Lozano), 4538 (Gutierrez), 5110–5114 (Stock).

[82] GC Exhs. 231, 287; Tr. 2700 (Lozano), 4537, 4540 (Gutierrez).

[83] Both Lozano and Baer initially testified on direct examination by the General Counsel that there are six to eight floor drains in the TDR (Tr. 2702, 2722). However, Baer later admitted that there are actually nine (Tr. 5038).

[84] GC Exh. 235; Tr. 2696, 2701–03 (Lozano), 2722, 2726, 5061–5062 (Baer), 4541–4543, 4554 (Gutierrez). Baer, who had been executive steward since 2017, testified that Gutierrez cleaned floor drains on a regular basis (Tr. 2710, 2731). However, Gutierrez testified that she had never cleaned floor drains as a stove person (Tr. 4548–49, 4552–53). Further, Baer's testimony was not corroborated by Lozano, who had been a sanitation supervisor during the same two-year period as Baer, worked mainly the graveyard shift with Gutierrez during 2019, and was responsible for assigning duties to her. On the contrary, as indicated above, Lozano testified that he asked Gutierrez if she knew how to clean floor drains when he assigned the job to her. (Tr. 2690–2691, 2695, 2702, 2708.) Finally, although Red Rock presented assignment sheets which, according to Baer, showed that sanitation supervisors had previously assigned other stove persons (and kitchen workers) on normal duty to clean floor drains in other outlets on a rotational basis in mid-September (R. Exh. 6; Tr. 5048–5055), it did not submit any similar documentary evidence that Gutierrez had been assigned to clean any floor drains in that or any other month or year.

[85] GC Exh. 288; Tr. 2701–2705 (Lozano), 4546 (Gutierrez). See also Baer's testimony, Tr. 5043–5047, 5086–87 (cleaning a floor drain requires the employee to sit or squat or kneel on the floor and use a brush or scrub pad and chemicals to clean it out, physical requirements that are not required when a stove person just sweeps or mops the floor), and his October 10 email to Stock and Paniagua about the matter, GC Exh. 233, discussed infra.

[86] GC Exh. 233–234; Tr. 4566 (Gutierrez), 2723, 5072–5073 (Baer). The Union filed the ULP charge over Gutierrez's work assignment on October 18, 2019 (GC Exh. 1(e)).

[87] Tr. 2707 (Lozano), 2713–2714, 2717, 5060–5061 (Baer). Hernandez, the Red Rock team member relations manager, also knew Gutierrez supported the Union (Tr. 1821).

[88] Tr. 2702 (Lozano), 2724, 5058, 5062–5063, 5088–5090 (Baer), 5104–5105 (Stock).

Further, Baer could not provide any particular reason why he assigned the job to Gutierrez other than the drains needed to be cleaned. He admitted that there are always napkins to fold and silverware to polish, and that there were other employees who could have cleaned the TDR floor drains that day. He also admitted that Lozano and other supervisors on duty are responsible for assigning job tasks to the employees, and that while he frequently adds tasks to the daily schedule, he does not typically specify which employees must perform the tasks.[89] Cf. *Success Village Apartments, Inc.*, 347 NLRB 1065, 1097–1098 (2006) (employer's failure to offer any credible reason why it assigned the union's shop chair to perform certain physically demanding tasks with only one rather than three partners as in the past supported inference of unlawful motive); *Extendicare of Kentucky, Inc.*, 199 NLRB 395, 399–400 (1972) (employer's failure to deny or explain why it assigned additional tasks to two union supporters that, according to their testimony, were not assigned to other employees supported inference of unlawful motive), enfd. in relevant part mem. 478 F.2d 701 (6th Cir. 1973).

Finally, Baer admittedly knew what Gutierrez's work restrictions were and that cleaning the drains would require her to grip and squeeze the scrub pads throughout the process. But he did not know or inquire whether she was right-handed before assigning her the job or consider how long it would take her to clean all of the floor drains with her physical impairments.[90]

Red Rock nevertheless argues (Br. 240) that the General Counsel failed to establish a prima facie case because no direct evidence was presented that Baer himself had union animus. However, given that Nelson's and Fortino's prior coercive and unlawful statements were clearly sufficient to establish Respondent's union animus, there was no need to present direct evidence that Baer himself had union animus. See *DH Long Point Mgt.*, above, 369 NLRB No. 18, slip op. at 13, and cases cited there. Moreover, the Board has long held that animus and an unlawful motive may also be established by circumstantial evidence. See *Constellium Rolled Products Ravenswood, LLC*, 371 NLRB No. 16, slip op. at 2 (2021) and cases cited there. So have the courts. See, e.g., *Big Ridge, Inc. v. NLRB*, 808 F.3d 705, 714 (7th Cir. 2015); and *Healthcare Employees Local 399 v. NLRB*, 463 F.3d 909, 919–920 (9th Cir. 2006). See also *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 939 (D.C. Cir. 2011) ("most evidence of motive is circumstantial").

Red Rock also argues that Baer's decision to immediately relieve Gutierrez of the drain cleaning assignment after she complained about it indicates that the assignment was not unlawfully motivated. But the situation was not that simple or straightforward. Gutierrez not only complained about the work but asserted

that she believed it was assigned because of her union activity, presented pictures of her on hands and knees doing it, and asked to be taken off light duty entirely to avoid doing any more of it. Further, Baer only relieved Gutierrez of the assignment "until further notice" while he consulted Stock and Paniagua by email to make sure he could require her to finish it. And Stock's email in response indicated that he could do so if the work was within Gutierrez's restrictions. Finally, no evidence was presented explaining why Gutierrez was not thereafter required to finish it. Cf. *Advancepierre Foods,Inc.*, 366 NLRB No. 133, slip op. at 16–17 (2018) (finding that employee's discipline was motivated by union animus even though the employer rescinded it the next day), enfd. 966 F.3d 813 (D.C. Cir. 2020); and *Airborne Freight Corp.*, 343 NLRB 580, 594, 621 (2004) (finding that warning letter issued to employee was motivated by union animus notwithstanding that the employer rescinded it after further investigation).

Accordingly, as there is no evidence that Gutierrez would have been assigned to clean the floor drains even absent her union activity, the assignment violated Section 8(a)(3) of the Act as alleged.

## II. ALLEGED POST-PETITION/PRE-ELECTION ULPS AND OBJECTIONABLE CONDUCT

### A. Factual Background

During this same time period, in conjunction with its button-up campaign, the Union began soliciting and collecting additional or updated authorization cards from Red Rock employees indicating they wished the Union to represent them.[91] And the effort was successful. The Union obtained hundreds of such cards from employees during September, October, and November, increasing its total of signed cards within the previous 12 months to at least 810, or 60 percent of the 1343 eligible employees.[92]

Accordingly, on November 22, the Union filed a petition with the NLRB regional office to conduct an election at the property. The same day, the Union also served a copy of the petition on Nelson, who immediately notified Fortino, who immediately notified Finch.[93]

Pursuant to a December 6 stipulated election agreement (Jt. Exh. 5), the election was subsequently scheduled to be held at the property on December 19 and 20 among the following employees (the voting unit):

All full-time and regular part-time assistant food servers, bakers (I, II, III), banquet bartenders, banquet porters, banquets setup, bar porters, bartenders, bell persons, bell starters,

---

[89] Tr. 2724–25, 5047, 5057, 5083–5085, 5092. Baer testified that one time, "probably years ago," he was involved in assigning a specific employee on light duty to clean sneeze guards and the buffet line. However, he subsequently admitted that he wasn't sure how the jobs were assigned or if he or the supervisor on duty assigned the jobs. (Tr. 5088–5090.)

[90] Tr. 2729, 5067, 5086–5087, 5094–5095. See also Baer's October 10 email to Stock and Paniagua ("I didn't care how long it took" for her to clean the drains).

[91] The cards were in English and Spanish and stated, "I, the undersigned, hereby authorize the Local Joint Executive Board of Las Vegas, composed of Culinary Workers Union, Local 226 and Bartenders Union, Local 165, as my exclusive representative in collective bargaining, and apply for membership in Local 226 or Local 165 in accordance with my craft . . ."

[92] The parties have stipulated that all but 13 of 816 card signatures were authentic (Jt. Exh. 1). The signatures on 6 of the 13 disputed cards

(voter list nos. 12, 433, 671, 761, 1153, 1319) were authenticated by witnesses (Tr. 3535 (Ortiz), 3697, 3722, 3730 (Flores), 4174 (Franz), 4361 (Canales)), who I have credited notwithstanding some differences between the signatures on the cards and prior personnel documents (which could be explained by the passage of time, differences in formal and informal signature styles, or because the employee printed rather than signed his name on the personnel record). Regarding the remaining seven disputed cards, I find that the signature on one of them (voter list no. 433) is sufficiently similar to the signature in the personnel records to be authenticated by that exemplar alone. I also find that all 810 cards were valid under the standards or principles set forth by the Board. See *Cumberland Shoe Corp.*, 144 NLRB 1268 (1963), enfd. 351 F.2d 917 (6th Cir. 1965); and *Levi Stauss & Co.*, 172 NLRB 732, 733 (1968), approved in *NLRB v. Gissel Packing Co.*, supra, 395 U.S. at 606–608.

[93] GC Exhs. 15, 16, 80; Tr. 166–168 (Nelson), 1060 (Fortino), 1552 (Finch).

beverage porters, beverage servers, beverage (Race/Sports), banquet servers, bus persons/bussers, cake decorators (I, II), captains, coffee breakers, concession workers, cooks, cook's helpers, counter attendants, food servers, gourmet hostperson/cashiers, host/cashiers, housekeeping utility porters, ice cream concession workers, kitchen runners, kitchen workers, lead banquet porters, lead counter attendants, lead servers, mini bar attendants, pantry, porters, resort guest room attendants, resort housepersons, resort suite guest room attendants, resort steakhouse cooks, room runners, room service captains, runners, service bartenders, specialty cooks, servers, sprinters, status board, stove persons, team member dining room (TDR) attendants, turndown guest room attendants, utility porters, VIP attendants, VIP bartenders, and VIP lounge attendants.

### B. The Alleged ULPs and Objectional Conduct

#### 1. Posting employee images on company antiunion website (Nov. and Dec.)

In mid-September, around the same time Fortino and Nelson conducted their "union-avoidance" meetings at the Red Rock, Fortino directed the corporate HR team to develop a public website where Station Casinos could publish similar information and educate employees at the Red Rock and other properties why they should not join or support the Culinary Union or other unions. The HR team did so and, with the help of an outside contractor, finalized and launched the website, www.myscfacts.com, in late November, around the same time the Union filed its petition for an election at the Red Rock. Red Rock managers and supervisors were instructed to post the website URL on the back-of-the-house walls and TV screens and to tell employees about the website during their regular preshift meetings (aka "huddles").[94]

At the time it was launched, the first thing employees would see when visiting the website was a banner on the homepage displaying the Station Casinos name/logo and stating, "Welcome to My SC FACTS," "YOUR SOURCE FOR FACTS ABOUT THE UNION & ITS ORGANIZING ATTEMPT." Immediately below this, on the right third of the page, they would see a brief statement about the purpose of the website: "to share information with you about our workplace, to highlight many of the great benefits of being part of the Station Casinos team and to make sure you have full information about contact from outside groups."

Further down, on the left two-thirds of the page, employees would see the headline, "1,000 Days and Counting," followed by, "Bargaining can take weeks, months and even years, before Team Members even see a contract—if they see one at all," along with a digital timeclock showing the number of days, hours, minutes, and seconds that had passed without a collective-bargaining agreement since the first negotiating sessions at Boulder Station and Palace Station. Below that, they would see a few

links to click on, including "the bargaining process," "Calculate the Risks: Dues/Strike" and "Can you afford a union? Your Money/Your Benefits."

Sandwiched between all of this—just below the banner, to the left of the purpose statement, and above the countdown headline and timeclock—employees would see large pictures of their smiling colleagues (or themselves) at a number of the Station Casino properties. The pictures automatically scrolled like a slideshow so that only one appeared at a time. Each picture also included a caption, such as "Great Place to Work . . ." or "Our commitment to You . . ." If employees clicked on the links, they would also see similar pictures on other pages of the website.[95]

Some of these pictures on the home and/or linked pages were of employees at Red Rock, Boulder Station, and Palace station during previous company events such as holiday parties and service anniversary awards. However, none of the employees in those pictures were notified that they would appear on Station Casinos' new antiunion website. Nor did they give the Company permission to display the pictures on the website. There was also no posted disclaimer stating that the website did not reflect the views of the pictured employees. At least some of the employees therefore complained to the Company. And at some point thereafter, around mid-December, Johnson, who originally provided the pictures to the contractor for posting, had those pictures removed.[96]

The General Counsel alleges that by posting the foregoing pictures on Station Casinos' antiunion website in November and December without the employees' consent and a disclaimer, **Red Rock, Boulder Station, and Palace Station violated Section 8(a)(1) of the Act** (GC Exh. 1(bk), pars. 5(h), 9).[97]

The allegation is well supported. The Board has held that an employer may show or distribute an antiunion campaign video that includes images of employees who had not volunteered to participate in it only if: 1) the employees "were not affirmatively misled about the use of their images at the time of the filming"; 2) the video "contains a prominent disclaimer stating that the video is not intended to reflect the views of the employees appearing in it"; and 3) "[n]othing in the video contradicts the disclaimer." *Allegheny Ludlum Corp.*, 333 NLRB 734,745 (2001), enfd. 301 F.3d 167 (3d Cir. 2002). Here, it is undisputed that the employees had not volunteered or given permission to have their images included on the Company's antiunion website. Nor is there any evidence that a disclaimer was included on the website stating that it was not intended to reflect the views of the pictured employees. No such disclaimer appears on the website pages introduced into the record.

Respondents nevertheless argue that no violation should be found because "the content surrounding the pictures makes clear the employees shown are not expressing their support for or

---

[94] GC Exhs. 59, 146, 179, 181, 190, 193, 194, 205, 206; Tr. 960–963, 1099, 7111–7112 (Fortino), 1754–1756, 6943 (Hernandez), 1961–1962 (Jackson), 2071, 2079, 2139–2144, 2157–2158, 6115 (Johnson), 2310, 6163 (Striano). See also R. Br. 225. As indicated above, the website was public; anyone could visit and view it.

[95] GC Exhs. 190, 191; Tr. 2141, 2144–2147 (Johnson).

[96] GC Exhs. 190 (pp. 1, 2), 192 (pp. 1, 2, 3, 7); Tr. 1100–03 (Fortino); 2143–2153 (Johnson), 4573–74 (Porras). See also Tr. 4575–4579 (counsel for the GC and Red Rock); and R. Br. 225.

[97] This is the only complaint allegation that involves other Station Casinos properties in addition to the Red Rock. The Union's posthearing

brief (pp. 84–86) argues that posting the pictures on the website was also objectionable conduct to the extent it occurred during the critical period between the filing of the petition and the election at the Red Rock. However, this is neither an alleged postelection objection nor related to any of the alleged postelection objections that were consolidated with the complaint's unfair labor practice allegations for hearing and decision. See GC Exh. 1(bo). Further, unfair labor practices may support setting aside an election even if they were not alleged objectionable conduct. See *White Plains Lincoln Mercury*, 288 NLRB 1133 (1988). Thus, it is unnecessary to address whether the conduct was objectionable as well as unlawful.

against unionization" (Br. 226).[98]  By this, Respondents apparently are referring to the fact that the background and added captions under the employees' smiling images in the pictures did not convey an explicit antiunion message.  However, the website itself and the material displayed with the pictures clearly did.  Cf. *Care One at Madison Ave., LLC*, 361 NLRB 1462, 1476–1477 (2014) (applying *Allegheny* and finding that the employer unlawfully presented a slideshow entitled "We Are Family" during a preelection antiunion meeting that included photos of numerous smiling employees taken during previous company events, even though there was no explicit antiunion message in the slideshow itself), enfd. in relevant part 832 F.3d 351, 361–362 (D.C. Cir. 2016).

Accordingly, Red Rock, Boulder Station, and Palace Station violated Section 8(a)(1) of the Act, as alleged.

2.  Supervisor Park's statements to employees (early Dec.)

During this same time, consistent with Fortino's instructions at the September 18 "union avoidance" meeting, the Company also encouraged Red Rock managers and supervisors who supervised voting-unit employees to personally speak to them about the Union's election petition.[99]

One such supervisor was Donnalee Park, an assistant manager in the buffet.  Among other things, Park was responsible for doing the employee payroll, checking attendance on a daily basis, granting or denying short-notice requests for an extra day off (EDO), and otherwise assisting the general manager of the buffet wherever needed.  She also conducted daily preshift huddles with the buffet employees to inform them about upcoming events, work assignments, any changes they needed to know about, and other business-related information or subjects the Company asked her to relay or address.[100]

In early December, one of the subjects the Company asked Park to address in her huddles was the Union's election petition.  The subject was included on a written list of topics Park was given.  Park's general manager, Sheri Orner, also discussed with her in person what to say.  Orner told Park to encourage the employees to vote and to provide them with information about the consequences if they voted yes.  As an example of such a consequence, Orner said that, if the Union was voted in, the EDOs would go away; that Park would have to call everyone with more seniority first to see if they wanted the day off.[101]

So that is what Park talked about at her next huddle.  She began by encouraging the employees to vote, saying, "I recommend that all of you vote whether you're prounion or not because any absentee vote is a yes vote for the Union."[102]  She then turned to the consequences of voting yes, saying:

> I mean because if you go union, you know, all the extras that we do, like giving you an extra day off [be]cause you need to go take your kids to the doctors, other than FMLA, I'm saying,

you know, we're still, can I have that day off?  Those kind of things will go away.

One of the employees interjected at that point, saying, "No, it's not true.  I joined at MGM and it's not true."  Park replied, "Okay, well I did it at the Sahara and I was like, oh, no, no, no.  It's like they're telling me what I can and cannot do.  But again, that's my personal opinion."[103]

The General Counsel alleges that, like Cheney's previous statement to Gomez that there would be no more "favors" if the Union got in, Park's statement that there would be no more "extras" such as an extra day off to take kids to the doctor threatened the employees with loss of benefits in violation of Section 8(a)(1) of the Act (GC Exh. 1(bk), pars. 5(g), 8).  For the same reason, the Union alleges that Park's statement was also objectionable conduct that would reasonably tend to interfere with the employees' free choice in the election (GC Exh. 1(bo), Obj. 4).  Red Rock, on the other hand, argues that Park's statement was neither unlawful nor objectionable as Park explained that it was her opinion based on her own experience at Sahara (R. Br. 203–204).

The General Counsel and the Union have the better argument.  As discussed above regarding Cheney's statement to Gomez, the Board has found similar statements unlawful in a number of cases.  See also *Sysco Grand Rapids, LLC*, 367 NLRB No. 111, slip op. at 18, 25 (2019) (plant manager unlawfully stated that if the union came in employees would no longer get away with taking sick days without a doctor's note), enfd. in part 825 Fed. Appx. 348 (6th Cir. 2020); and *American Girl Place New York*, 355 NLRB 479, 487–488 (2010) (supervisor unlawfully told employee-actors that there would be a lack of flexibility in granting them extra time off to rest their voices and to work second jobs if the union came in).

In arguing to the contrary, Red Rock relies on the Supreme Court's statement in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969), that an employer "may make a prediction as to the precise effects [it] believes unionization will have on [the] company [if] the prediction [is] carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond [its] control . . ."  However, *Gissel Packing* provides Red Rock no help in the circumstances here.

First, Park's initial statement was anything but carefully phrased based on objective fact.  Park flatly stated that "all the extras that we do . . . will go away" if the employees voted for the Union without any elaboration or explanation whatsoever.  And her subsequent response when an employee disagreed with that statement wasn't much better.  In context, her response seemed to indicate that she had joined the Union when she was at the Sahara, and that she didn't like it because it seemed like they were telling her what she could and couldn't do.  But her

---

[98] There does not appear to be any real dispute that the website was a "campaign website."  Indeed, Johnson referred to it as one at the time.  See GC Exh. 181.  Moreover, Respondents do not concede that *Allegheny* applies to "campaign websites" as well as videos.  See R. Br. 225–226.

[99] Tr. 334 (Nelson), 1148 (Fortino), 5170 (Sabajan).

[100] Tr. 2521–2524, 2527–2530 (Park).  See also Tr. 163, 6346 (Nelson), 5285 (Ramirez).

[101] Tr. 2524–2530, 2540–2542 (Park).  Although the complaint alleges that the relevant events occurred on November 25, the record as a whole indicates they likely occurred sometime between December 1 and 10.

[102] As noted by the General Counsel (Br. 56), this was actually a misrepresentation or mischaracterization of the election process.  An

employee's failure to vote is neither a yes vote nor a no vote.  Only votes cast are counted.  NLRB Casehandling Manual (Part Two), sec. 11340.4.  However, the Board's general policy is not to police false or misleading campaign statements that do not contain a threat or promise.  See *Midland National Life Insurance Co.* 263 NLRB 127, 130 (1982).  And the statement is not alleged as either unlawful or objectionable.

[103] GC Exh. 212(a) and (b) (audio recording and transcript of the huddle); Tr. 2523–2542 (Park).  The record is unclear how many employees attended the huddle, but Park testified that the number was typically between 8 and 15 depending on the day of the week (Tr. 2542).

42                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

initial statement was not about what the Union would do; it was about what the Red Rock would do (no longer give them EDOs and other extras). And she did not offer any explanation why this would occur as a result of the collective-bargaining process or otherwise.

Second, "under *Gissel Packing*, lawful predictions of the effects of unionization must be based on objective fact *and* address consequences beyond an employer's control." *DHL Express, Inc.*, 355 NLRB 1399, 1400 (2010) (finding that supervisor's statement that he would not be able to be as flexible in excusing an employee's tardiness if the union won was unlawful because it was neither). See also *Miller Industries Towing Equipment, Inc.*, 342 NLRB 1074, 1084, 1091 (2004) (general manager's statement to employees that the employer would have to enforce the lunch and other break times more strictly if the union came in was both unlawful and objectionable, notwithstanding that he said this was based on his experience in union environments). Here, like the statements in *DHL*, *Miller*, and the other cases cited above, Park's statement that all the extras Red Rock currently did for the employees would go away if the Union was elected did not concern a matter beyond Red Rock's control. Thus, even assuming arguendo the statement was carefully phrased based on objective fact, it was still not a lawful prediction under *Gissel Packing*.

Finally, Park's initial statement is not saved by her closing remark that it was her "personal opinion." As the Board long ago recognized, an employer cannot immunize its statements "simply by characterizing" [them], however coercive, as expressions of opinion"; rather, an employer's statements must be evaluated "in light of all the surrounding circumstances," including the "substance and context of the statement, and the position of the speaker in relation to [the] audience." *Abercrombie, J. S., Co.,* 83 NLRB 524, 530 (1949). Here, Park's statement was not an off-hand remark during a casual conversation, but a planned statement made at the direction of her superiors during a regular preshift meeting with employees. Further, the statement specifically addressed a matter—short-notice requests for an extra day off—that Red Rock had given Park authority and discretion over to grant or deny. In these circumstances, notwithstanding Park's assertion that her statement about the EDOs going away was her "personal opinion," the employees would reasonably believe that the statement was based at least in part on her authority to speak and act for or on behalf of Red Rock with respect to the EDOs.

Accordingly, Park's statement is both unlawful and objectionable as alleged.

### 3. Supervisor Sabajan's statement to employee Orellana (early Dec.)

Another supervisor who was instructed to address the union election petition during his huddles in early December was Walter Sabajan, a sous chef who supervised cooks, attendants, and food runners in the TDR.[104] The General Counsel alleges that at one such huddle in early December, Sabajan told Balmore Orellana, a longtime union committee leader and TDR runner who

also frequently performed cook duties, that if the Union was voted in he would no longer be paid at the higher cook rate. As with Park's statement, the GC alleges that this statement violated Section 8(a)(1) of the Act (GC Exh. 1(bk), pars. 5(i), 8). The Union alleges that it was also objectionable conduct that interfered with the election (GC Exh. 1(bo), Obj. 7; U. Br. 79–80).

Unlike with Park's statement, however, there is insufficient credible evidence that Sabajan made the alleged statement. Orellana himself gave inconsistent accounts of the conversation. He initially testified that the conversation began when he asked Sabajan a question at the huddle about another runner he worked with on the morning shift, Armineh Der Grigorian. Grigorian had previously been a pantry worker, a higher paid position, but she lost that position when it was eliminated in 2008. Orellana testified that he asked Sabajan if and when Red Rock would give the pantry position back to Grigorian, because while Red Rock was paying him (Orellana) more when he performed cook work, Grigorian was performing pantry work but was never given the position back. Orellana testified that Sabajan replied that if the Union was voted in Orellana would no longer be paid like a cook; he would go back to being a runner. However, on cross-examination, Orellana testified that he actually began the conversation by asking what would happen to his own job if the Union came in. And after being shown his pretrial NLRB affidavit, he testified that Sabajan initially responded, "I don't know," and then said, "but I do know if the Union wins, you are not going to receive your money as a cook. You're going to be a runner." (Tr. 4621–4624, 4628–4629.)

These inconsistencies might reasonably be discounted given that the conversation occurred over a year before Orellana testified. The record indicates that Orellana repeatedly raised concerns, both in and out of huddles, about Grigorian's former pantry position and/or his own cook pay. Thus, Orellana might have just jumbled these incidents together in his mind when he testified. Further, Orellana's accounts were very consistent regarding how the conversation ended, i.e., that Sabajan said Orellana would no longer be paid as a cook if the Union won the election. However, there is no evidence corroborating Orellana's accounts in this critical respect. Sabajan himself denied that he ever made such a statement. He testified that, whenever Orellana raised the issue with him, he always told Orellana he didn't know. And while Orellana identified several other employees who attended the particular huddle in question, only one, Grigorian, testified—as a witness for Red Rock—and she denied ever hearing Sabajan make the alleged statement.[105]

As indicated by the General Counsel and the Union, Grigorian did not present as a particularly credible or reliable witness. She seemed annoyed that Orellana had repeatedly mixed together his concerns about continuing to be paid as a cook with her concerns about getting her pantry position back. And she seemed intent on distancing herself from him. Indeed, she would not even admit that they worked the same early-morning shift together in 2019.[106]

---

[104] Tr. 5161–5162, 5169–5172 (Sabajan).

[105] Tr. 4621 (Orellana), 5164–65, 5178 (Sabajan), 5584–5585, 5590, 5608–5609 (Grigorian). Although the General Counsel's unexplained failure to call identified bystander employees as witnesses does not warrant an adverse inference, it is properly considered in evaluating whether the GC has proven the allegation by a preponderance of the evidence. See *C & S Distributors*, 321 NLRB 404 fn. 2 (1996), citing *Queen of the*

*Valley Hospital*, 316 NLRB 721 fn. 1 (1995). Accord: *Stabilus, Inc*, 355 NLRB 836, 840 fn. 19 (2010).

[106] Tr. 5582, 5608–5609 (Grigorian). However, contrary to the General Counsel's brief

(p. 61), Grigorian did not testify only that she did not remember "whether" the alleged incident happened. Nor, contrary to the Union's brief (p. 79), did she testify that she "tried not to listen" when Orellana raised questions about his pay. In fact, she testified that Orellana was

However, Sabajan himself presented as a much more credible witness. In contrast to Grigorian, who was still working at the Red Rock (now as a TDR cook helper), Sabajan no longer worked there (or at any of the Company's other properties) at the time of the hearing. Thus, he did not appear to have any immediate or compelling interest in testifying favorably for the Respondent. In fact, he readily admitted various things that tended to support the General Counsel's case, both generally and specifically. For example, he admitted that he was instructed to note which employees were wearing union buttons or otherwise supporting the Union. As indicated above, he also admitted that he was instructed to discuss the Union during his huddles, and that he did so. Further, he admitted that he had a couple conversations with Orellana about the Union; that Orellana was particularly concerned about whether Red Rock would continue to use and pay him as a cook if the Union won the election; and that Orellana once questioned him about both that and Grigorian's former pantry position during a huddle (Tr. 5169–70, 5177–80).

The General Counsel argues (Br. 60–61) that Sabajan's latter admissions actually bolster Orellana's credibility, as they essentially confirm his testimony except for the alleged unlawful statement. And this has been considered and weighed. However, credibility is evaluated based on many factors (see fn. 4, supra). Having considered and weighed those factors as well, I am unable to conclude that Orellana's testimony is more credible and worthy of belief than Sabajan's. At best, the opposing evidence is in equipoise.

Accordingly, as the allegation has not been proven by a preponderance of the evidence, it will be dismissed. See *El Paso Electric Co.*, 350 NLRB 151, 152 (2007).

4. Announcement of new benefits and programs
(Dec. 10–11)

In mid-September, around the same time Fortino met with Red Rock's Culinary employees and promised to look at improving everything for them, Fortino directed the Station Casinos' HR staff to begin doing so. Specifically, he directed Paula Tilley, the director of employee benefits, Jennifer Johnson, the director of labor relations, and Marsha Striano, the executive director of HR, and their teams to put together reports or analyses comparing Station Casinos' current compensation, healthcare and retirement benefits, and employment policies and practices at its properties to those under the Union's contract at casino hotels on the Strip. He also directed them to draft an "STP" for each item—an analysis identifying the situation, target, and proposal—for him to include in an overall "strategic plan" for the properties and present to the senior leadership for approval.[107]

Because of the Union's recent "button-up" campaign and anticipated election petition at the Red Rock, Fortino also made clear that he was in a rush; that he wanted "all hands on deck" to get the project done quickly. And the corporate HR staff responded, working "nonstop" like a "whirlwind," as Tilley described it, to gather the relevant and necessary information, prepare the comparative analyses, and draft, discuss, and edit the STPs. The HR teams at the individual properties were also asked to assist and participate. For example, Tilley asked Hernandez, Red Rock's team member relations manager, to help gather and provide information about dental benefits provided under the Culinary Union contract. And Johnson asked Jackson, Red Rock's HR director, to help draft an attendance policy proposal that would "get us as close to [the Union's proposed attendance policy in negotiations at Boulder Station] as possible." Striano also asked Jackson to provide information about the current employee recognition programs at the property.[108]

Fortino himself likewise participated in the process. He personally consulted with an outside corporate retirement plan specialist, Jim Lyday, about improving the Company 401(k) plan. Fortino emailed Lyday that the Union was telling employees about the union pension plan, and he wanted to "kill that by

---

"all the time" arguing about getting paid as a cook when he was doing cook work. He simply acknowledged that she wasn't always sure if a conversation happened because she was working the cold side rather than the cook station and Orellana's pay was not her business. (Tr. 5597.)

[107] GC Exhs. 50, 53; Tr. 790, 918–919, 930–935, 984 (Fortino), 2074–75, 2082, 6116–18 (Johnson), 2289 (Striano), 6924 (Tilley). Fortino later also directed Deborah Ferris, the head of training, to begin working on the strategic plan after she was hired and started at Station Casinos on November 4 (Tr. 2174, 2180, 2194).

[108] Tr. 947–949, 965, 979–980, 1011, 1021, 1024, 1379–1380 (Fortino), 1666–67 (Hernandez), 1939–1941 (Jackson), 2082–2086, 2095–2096, 2101–2106, 2118, 2120, 2127, 2198 (Johnson), 2292–2293, 2296, 2302–03, 6155–6158 (Striano), 6923–6924 (Tilley). See also GC Exhs. 55, 56, 58, 60, 63–67, 70–76, 131, 168, 180, 182, 183, 185–188. Fortino denied that the increased union activity and expected union election petition at the Red Rock was a reason for developing the strategic plan or doing it so quickly. Rather, he testified that Station Casinos was concerned about increased competition in the Las Vegas market, particularly from Resorts World, a new $4 billion development on the Strip that was scheduled to open in 2019, which would make it more difficult to recruit and retain employees (Tr. 918–920, 946, 951–952, 1014–1016, 1025–1026, 1067–1068). Finch, too, testified that expected competition from new or expanded properties such as Resorts World, not the union campaign, was the reason (Tr. 1508). See also Tr. 2090–2091 (Johnson). However, the Las Vegas Review-Journal had reported in August 2018 that the development company's target opening date for Resorts World was "the end of 2020." See https://www.reviewjournal.com/business/casinos-gaming/resorts-world-on-target-for-opening-by-end-of-2020-1460194/. (Although not introduced into the record, I take judicial notice of this article under FRE 201 as evidence of "what information

was in the public realm at the time." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010), cert. denied 564 U.S. 1037 (2011).) And in July 2019, the Review-Journal reported that Resorts World would not open until 2021. See Bailey Shultz, "These projects will change the look of Las Vegas in 2020," Las Vegas Review-Journal, July 7, 2019 (R. Exh. 47). Although Fortino testified that he was not aware of such news reports, I discredit that testimony. Fortino admitted that "[t]here was press all over the place about [Resorts World opening]"; that he likely read about Resorts World opening in the Review-Journal; and that he also got emails about it. See also Finch's testimony, Tr. 5933 ("[E]very time you turn on the news or read anything, you were made aware of all the things that were coming to Las Vegas in the next few years."). Fortino also admitted that he knew people who were working on the Resorts World project at the time. (Tr. 1376–1377.) Further, if, as Fortino testified, "the number one issue [Station Casinos] had moving forward was Resorts World opening" (Tr. 946), it is probable that the expected later opening dates would have come to the attention of Finch and other senior corporate leaders through the press reports and/or emails. Indeed, Finch indicated that he read the July 2019 Review-Journal article. See Tr. 5933–5935 ("I recognize the article from Bailey Shultz, yes. . . . She's a reporter in Las Vegas that we work with."). It is also probable that Fortino would have at least mentioned Resorts World when he presented the strategic plan to the entire senior leadership for approval in November. However, as discussed infra, he instead emphasized the negative impact the major retirement and healthcare initiatives in the plan would have on the Union, and he mentioned only generally that the retirement initiative would also significantly help with recruitment and retention. See also the emails he sent before and after the new benefits were announced at the Red Rock and after the Red Rock election results were received, discussed infra.

perhaps doing the contribution"; that is, he wanted to counter what the Union was promising employees at the Red Rock and other unrepresented properties. Lyday responded by providing some options.[109] Fortino and Stephen Cootey, Station Casinos' chief financial officer, also personally met with Activate, a company that operates and manages medical clinics for employers.[110]

Fortino also reviewed the drafts prepared by the HR staff and proposed changes or additions.[111] And he kept Finch, Welch, and Cootey informed of the project's overall progress and had them review the proposals and drafts as well.[112]

Ultimately, the project took about two months, until mid-November, to complete. The result was a 30-page document, entitled "Corporate Human Resources Strategic Plan 2020," outlining numerous initiatives to improve existing benefits, policies, and practices at the properties.[113] Three of the most significant of these were employee retirement benefits, health insurance, and medical care.

*Retirement benefits.* The Strategic Plan stated that the "situation" with respect to retirement benefits was that "[t]he union has consistently used H&W and the Pension as the main emotional drivers to sign cards and vote Yes for unionization." The stated "proposal" was "[t]o increase 401(k) contributions at the lower hourly pay levels while also assisting these Team Members to start saving for their retirement." Specifically, the Company would make a "100% contribution" (without any required employee contributions) to the 401(k) beginning January 1, 2020, for each employee making under $40,000 with at least 1 year of service, with the contribution amounts ranging from $.25 to $2.50 per hour based the employee's total years of service (1–5 years, 6–10 years, etc.).

The Strategic Plan emphasized that "this would help incentivize Team Members in these positions to not vote for a union and thus off-setting potential Pension Payments the Company could potentially incur if unionized. (Underlining in original.) It also subsequently added, as the second and fourth of five bullet points, that it would "put Station Casinos on the MAP!" and "significantly impact Recruitment and Retention."

*Health insurance.* The Strategic Plan set forth two "situations" and "proposals" regarding employee health insurance. The first "situation" was that "[t]he Union promises Team Members a much better medical plan . . ." The "proposal" was, "Creating a No Deductible Plan that more closely matches union plan"; to "Change [the] Plan [to] Zero Deductible." The Strategic Plan stated that the projected extra cost of this "zero deductible" proposal as compared to the current HMO plan was over $3 million in the first year, but that this was approximately $8.5 million less than the projected cost of moving to a Culinary Union-like plan.

The second "situation" was that "[a]ll salary levels pay the same in employee paid contributions," so that "a Team Member making $12 per hour is paying the same monthly contributions for benefits as a Team member making over $125k a year." The

"proposal" contained two parts. The first was "creating salaried medical tiers in which higher paid Team Members would pay more for their medical premiums than lower paid Team Members," which would "allow . . . us to significantly reduce costs to lower paid Team Members, most of whom reside in 'union' type positions."[114] The second was to **"[o]ffer free HMO for all Team Members making less than $40,000,"** which would **"[t]ake away union power and [be a] major emotional draw to Team Members."** (Bolded material was in red in original.)

*Medical care.* The Strategic Plan also proposed to build new "Fertitta Team Member Medical Centers" at three of the properties where employees and their spouses and children could receive medical care. It projected that the initial startup costs of the three onsite clinics would be over $1 million, and that the annual operating and financing costs would be over $2 million. However, it projected a net savings for the Company over 5 years based on the projected reduction in medical, drug, and worker compensation claims without them.

The Strategic Plan also included several other items or initiatives. For example, it proposed a "direct hire" streamlined recruitment and hiring process to, among other things, "relieve stress in Departments with high turnover." It proposed creating new guest-service and leadership training programs "to support our culture" and "focus on the family," and moving the trainers from headquarters to the properties. It proposed changing current attendance policies, including eliminating an unpopular time clock audit and discipline (TCCA) program. It proposed revising and simplifying the current progressive discipline policy to make it easier to follow and more consistent. It proposed increasing guest room attendant pay by raising resort fees. And it proposed budgeting $384,000 for employee recognition programs.

Finally, the Strategic Plan also included certain initiatives to reduce current costs and help pay for the proposed improvements in benefits. These included modifying paid time-off policies for both hourly and salaried team members; making various administrative changes to the employee-assistance, short-term disability, and FMLA leave programs; and managing employee schedules and hours more carefully to ensure that ACA medical benefits were not paid to ineligible employees.

As planned, Fortino presented the completed Strategic Plan to the Station Casinos senior leadership for their review and approval. The "HR Strategy Review" meeting was held on November 19 (a few days before the Union filed its Red Rock election petition) and lasted about 3–4 hours. CEO Frank Fertitta III, Vice President Lorenzo Fertitta, and the rest of the senior executive team were present, including Finch, Welch, and Cootey. Fortino provided each of them a binder containing a copy of the 30-page Strategic Plan document. He then went through the binder and discussed each the initiatives with them in detail and answered any questions they had. By the end of the meeting, he received approval to move forward with all but one of the initiatives (increasing GRA pay by raising resort fees).[115]

[109] GC Exh. 57; Tr. 7066 (Fortino). See also R. Exhs. 20–38.

[110] R. Exhs. 60–65; Tr. 3141, 6478–79 (Cootey); 6911–6912 (Tilley).

[111] See, e.g., Tr. 1379–80 (Fortino), 6919–2690 (Tilley).

[112] Tr. 916, 933–934, 938, 1021 (Fortino), 1488–1489, 1536 (Finch), 3139–3144, 3147, 3170, 6468–6474, 6478–6496 (Cootey), 7232 (Welch). See also, e.g., GC Exh. 115; R. Exh. 66.

[113] GC Exh. 69; Tr. 1011 (Fortino), 1840 (Finch).

[114] Creating salaried medical tiers was listed under "situation," but appears on its face to be a proposal and the record as a whole indicates that it was a proposal.

[115] GC Exh. 68; Tr. 1005–06, 1379, 7093–94 (Fortino), 1481, 1494–96 (Finch), 3146–3147, 3163 (Cootey), 6159, 6198 (Striano), 6631–6633, 6667 (Ferris); 6749–6750, 6769–6772, 6872 (Tilley). (The Fertittas did not testify.) To the extent certain testimony conflicts with these findings, it is discredited. For example, Fortino and Welch testified that the meeting lasted under an hour, as little as 35–45 minutes, suggesting that the oral presentation and discussion was not as thorough or detailed as the Strategic Plan document. Tr. 1036 (Fortino), 7228–30 (Welch). However, as set forth in the record cites above, a preponderance of the evidence indicates otherwise, including the scheduling calendar, which

Immediately after the meeting, Fortino went down to the corporate HR conference room to inform everyone there of the "good news." Later that evening and the following morning, he also emailed Lyday, the outside retirement plan specialist, and Activate, the proposed management contractor for the medical centers, to notify them that the 401(k) and medical center proposals had been approved.[116]

A few days later, on November 25, Fortino also emailed a copy of the approved proposals to Michael Tierce, a Philadelphia labor attorney he knew. Fortino told him to "take a look." Tierce responded,

> Impressive. You have been busy. Looks like lots of opportunities for simplification and cost savings. . . .

Fortino replied,

> You believe that???? The free health care and company paid 401k is going to devastate the union.[117]

However, there were numerous significant aspects of the initiatives that remained unaddressed or undecided following the November 19 meeting. For example, although the proposal for a 100-percent employer-contribution to the 401(k) plan was approved as a general concept at the meeting, the specific amount of the contribution, how it would be broken down by years of service, and the income ceiling for eligibility were not. The proposal also had not been reviewed by the Company's ERISA attorneys before the meeting. Fortino, Finch, Cootey, and the HR team therefore continued to discuss and address these issues over the next few weeks. And, contrary to the initial proposal in the Strategic Plan, it was eventually decided that the contribution would be either $.50 or $1.00 per hour based on years of service and that all employees making under $100,000 would be included. Based on the ERISA legal review, it was also decided to create a separate plan rather than make the contribution to the existing plan as initially proposed in the Strategic Plan. It was also decided not to begin making the contributions/funding the 401(k) plan in 2020 as initially proposed, but to begin doing so in 2021 based on hours worked in 2020.[118]

Similarly, there were certain aspects of the proposed no-deductible HMO plan that were not addressed or approved at the November 19 meeting. For example, it appeared unclear whether the HMO proposal was to replace the current plan with a new plan or to change/modify the current plan. Also, unlike with the 401(k) proposal, the effective date of the HMO proposal was not specifically mentioned in the Strategic Plan. A January 1, 2020 effective date was problematic because, by the time the new HMO proposal was approved, the open enrollment period, November 4–17, had already begun and ended, and employees had already made their selections under the existing plan for the upcoming year. Further, there were various legal and administrative steps that had to be taken to fully implement the no-deductible proposal, such as conducting a new open enrollment period and providing employees with new medical ID cards, which might not be completed by January 1. All of these issues were considered and addressed by Fortino and the HR staff during the 2–3 weeks following the meeting. Ultimately, the HMO benefits administrator was informed that the no-deductible proposal would be a new plan rather than a change in the current plan. And the HR directors and benefits managers at the properties were advised that a "special" open enrollment would be conducted for the new plan from January 1–31; that the employees' enrollment changes would be retroactive to January 1; and that employees could continue to use their current medical ID cards in the interim.[119]

There were also certain aspects of the proposal for the three onsite employee medical centers/clinics that were not decided at the November 19 meeting. For example, the Red Rock was always designated as one of the three sites in the drafts of the proposal, and it was approved by the senior leadership as one of the three sites on November 19. However, the second site (Sunset

---

shows that the meeting was scheduled for 3 1/2 hours, from 1:30 to 5 pm; Cootey's testimony that the meeting lasted several hours; and Ferris's testimony that it was "later in the day" and "dark outside" when Fortino came down and told her and others in the HR office "immediately" after the meeting that the strategic plan had been approved. See also Striano's and Tilley's testimony (Fortino came down to the HR conference room "right after" or "shortly after" the meeting to tell them that just about all the proposals had been approved). (I take official notice that sunset in Las Vegas on November 19, 2019 occurred at 4:30 pm. See https://sunrise-sunset.org/us/las-vegas-nv/2019/11; and https://dateandtime.info/city sunrisesunset.php?id=5506956 &month=11&year=2019.) All four—Fortino, Finch, Welch, and Cootey—also specifically refused to admit that that there was any discussion at the meeting regarding the underlined and bolded red points in the health insurance and retirement proposals about incentivizing employees not to vote for a union and taking away union power. See Tr.1029–30 (Fortino), 1503, 1508, 1510 (Finch), 3153, 3155, 3177 (Cootey), 7228–7230, 7256–7257 (Welch). However, the record indicates that it was Fortino himself who added the bolded red "takes away union power" point to the health insurance proposal (Tr. 1017, 7055). And he told his HR staff and Lyday, the outside retirement plan specialist, that he wanted to include the 401(k) proposal to "kill" the talk about the Union's pension plan and make the employees less likely to support the Union (GC Exh. 57; Tr. 6920–6923 (Tilley), 7066, 7125–7127 (Fortino)). See also Fortino's post-meeting November 25 and December 10 and 11 email exchanges with a Philadelphia labor lawyer and a retired former colleague about the approved proposals, discussed infra. It seems unlikely, therefore, that he would have ignored both points in his lengthy and otherwise detailed oral presentation to the senior leadership. Further, none of the four appeared to be a credible or reliable witness on the subject generally. For example, when asked about the underlined point in the 401(k) proposal about disincentivizing employees to vote for the union, Fortino refused to admit that the underlining denoted emphasis (Tr. 1027, 1032); Finch expressed incredulity that the General Counsel even questioned him whether the underlined point was discussed (Why would we have discussed that?") (Tr. 1509); and Cootey testified that he did not recall if the underlined point was discussed (Tr. 3177). As for Welch, he testified that Fortino did not discuss *anything* on the page outlining the 401(k) proposal except for when the Company's contributions would kick in (Tr. 7256–7257). Notwithstanding that the Strategic Plan also contained detailed comparisons between Culinary Union contract benefits and the proposed initiatives, Welch also testified that he could not recall any discussion whatsoever of such comparisons, or of unions generally, at the meeting (Tr. 7230–7231, 7235, 7239, 7243–7245, 7259).

[116] R. Exh. 39, 98. See also the testimony by Striano, Ferris, and Tilley cited in fn. 115, above.

[117] GC Exh. 81. Notwithstanding his November 25 email, Fortino denied at the hearing that he knew the healthcare and 401(k) proposals would be devastating to the Union (Tr. 1067–1068).

[118] GC Exhs. 78, 79, 295; R. Exhs. 40–43; Tr. 1039–1040, 1050–1051, 1054–1060, 1070, 1085–1087, 7069–7072, 7077–7078 (Fortino), 1556 (Finch), 2113, 2117–2119, 2130–2132 (Johnson), 2293, 2298–2300 (Striano), 3148–3151, 3152, 3173, 3193, 6526–6531, 6557–6650 (Cootey), 5893–5906 (Lyday). To the extent other testimony by Finch conflicts with these findings, it is discredited. Compare, for example, Tr. 1485 and 1530–1531.

[119] GC Exhs. 13, 82, 89, 284; Tr. 1804 (Hernandez), 1871 (Jackson), 4474–75 (Christian), 6747–6752, 6777–6787 (Tilley).

Station) was not decided until sometime after the meeting. And no decision was made about where the third clinic would be built.[120]

There were likewise various specifics of the other proposed programs that were not addressed or decided at the meeting. For example, the strategic plan document did not set forth any description whatsoever of the recognition programs that the proposed $384,000 would be used for. Indeed, a committee would not even be formed to work on many of the details, including the nomination and award process and criteria for the awards, until mid-December. And the new recognition programs were not among the initiatives that the Company implemented on January 1.[121] The new training programs were likewise still being worked on and were not implemented at that time.[122] The same is true of the new attendance policy.[123]

Another issue not decided at the November 19 meeting was when, where, and how to announce the new initiatives at the properties. And it was still undecided as of November 22, when the Union filed its petition for an election at the Red Rock. The plan or intention was to announce them at the properties sometime before January 1. But the precise announcement date in December, and where and how to make the announcement, had not yet been discussed.[124]

The Union's election petition, however, focused attention on the issue, as indicated by Fortino's following text messages with Finch on November 22 and 23:

(Nov. 22)

Fortino: [Red Rock] just got a petition.

(Nov. 23)

Fortino: Lots of union activity at Santa Fe [Station] today. FYI.

---

[120] GC Exh. 88; R. Exhs. 61–65; Tr. 6473–6479, 6487–6488, 6492–6494, 6545–6549 (Cootey), 7082–83 (Fortino).

[121] GC Exhs. 22, 65, 173, 199–201, 301; Tr. 992–995 (Fortino); 1982–1993 (Jackson), 2203–14, 2223–2224, 6661–6662, 6666, 6669–6671, 6689, 6700 (Ferris).

[122] GC Exh. 119; Tr. 2191–2192, 2196, 2201–2203, 6668, 6682–6685, 6692, 6703 (Ferris).

[123] GC Exhs. 103, 172; Tr. 1295–1297 (Fortino), 2106–2109, 2111 (Johnson), 6232 (Jackson).

[124] Tr. 1064, 1332, 7106 (Fortino), 1553 (Finch), 2106–2109, 2111 (Johnson).

[125] GC Exh. 80; Tr. 1559 (Finch), 7102–7103 (Fortino).

[126] GC Exhs. 17, 19, 85; R. Exh. 52; Tr. 1359, 1050–1051 (Fortino), 1670 (Hernandez), 6016 (Finch), 6120, 6141–6142 (Johnson), 6236–6238, 6269 (Jackson), 6368, 6414–6415 (Nelson). See also Jt. Exh. 6 (indicating that the previous seven union elections were held a median of 21 days after the Union's petition was filed). Fortino and Finch refused to admit and/or denied that they decided on November 23 to accelerate the announcement because of the Union's November 22 petition (Tr. 1063, 6054). Finch also denied that the Union's election petition had anything to do with the decision when to make the announcement at the Red Rock. However, I discredit this testimony. As noted above, Fortino and Finch were particularly poor witnesses. See fns. 10, 11, 22–27, 108, 115, 117, and 118. See also fns. 129 and 149, infra. Further, as indicated above, Fortino specifically told Finch on November 23 that they needed to announce the new programs "ASAP" in light of the November 22 election petition at the Red Rock and subsequent union activity at Santa Fe Station. Moreover, Finch gave inconsistent testimony about how the decision was made. He initially testified on direct examination by the General Counsel that the order of the "exciting news" meetings at the properties was "random" based on "whoever had space available on a given day," and that he wasn't even sure if

Finch: Damn. The games are beginning.

Fortino: Yeah. We need to announce ASAP new programs.[125]

Finch agreed and decided that they should accelerate the announcement date at the Red Rock; that is, they should announce the new benefits there first, before any of the other properties, and as much in advance of the petitioned-for election as possible so the new benefits could be incorporated into the Company's preelection antiunion campaign (which as discussed below they subsequently were). At the time, the Company's tentative expectation or estimate was that the election would be held on December 13. (As previously discussed, it was only later, on December 6, that the election was set by stipulation for December 19 and 20.) Fortino and Finch therefore immediately began working with Nelson and the Red Rock HR staff to schedule and plan a sufficient number of meetings at the property to make the announcement to all the employees there before that date.[126]

They succeeded; the so-called "Exciting News!" meetings to announce the new benefits and programs at the Red Rock were scheduled and held on December 10 and 11. The meetings were mandatory; employees were required to attend. Four meetings were held each day, each with about 150–200 Red Rock employees. The meetings each lasted about 20–30 minutes and followed the same format and PowerPoint presentation. And at least one of them was recorded by an employee.[127]

Nelson opened the meetings, telling the employees that he had some "great information, exciting news" to deliver to them. He then introduced Finch. Finch began by summarizing the history of the Company. He said that the Company's original "vision" was "about what we do for the team members, what we do for our guests." But he said that, as the Company grew, "we lost our

the first meetings were at the Red Rock (Tr. 1566, 1587–1588). However, when recalled by Respondent five months later, he testified that he decided to announce the new benefits at the Red Rock first because Nelson was the property general manager most proficient at making presentations, and he wanted other GMs and AGMs to come and observe him before making their presentations (Tr. 6016–6017). See also Jackson's testimony when she was likewise recalled by Respondent the day after Finch, Tr. 6236–6238, 6269 (Station Casinos "probably" decided to have Red Rock go first because Nelson had worked at three different properties and had a lot of experience speaking to employees, and because Finch at some point—which she "guess[ed] and "believe[d] was before December 4—had talked about what a great speaker Nelson is and how he wanted the other GMs to watch him), and Nelson's testimony when he was recalled by Respondent the following hearing day, Tr. 6369 (indicating that Finch told him he would go first because of his speaking ability and experience). Having listened to recordings of Nelson speaking, I do not doubt that he was considered a gifted speaker. I also do not doubt that holding meetings at the Red Rock and the other properties required available meeting space. Nor do I doubt that there may also have been other considerations, such as the Red Rock's large size and close location to the corporate headquarters. See Tr. 6120–6121 (Johnson); and 6236–6237 (Jackson). But, based on the record as a whole, including Station Casinos' actions following the announcement discussed infra, I have no doubt that the Union's election petition was also a significant factor, and likely the primary factor, why the new benefits were first announced at the Red Rock as soon as they were.

[127] GC Exhs. 21, 22, 25, 120(a) and (b); Tr. 275–277, 281–282 (Nelson), 1562, 1567 (Finch), 2385–86 (Andrade), 2466, 6616–18 (Mackelprang), 6642, 6653, 6662 (Ferris).

way . . . we messed up." He said, "Now it's time . . . to go back to where we were and make some changes that affect you guys. . . to make your life better at work and at home. It's time for us to pay back." He said, "We're listening and making changes for you. And so that is why we're here today. . . . We want you guys to understand. We know what we did, and now it's time for us to pay back and reward you for all the dedication and loyalty that you've given us all of these years to keep us where we are."

Finch then turned the meeting back over to Nelson. Nelson said he had some "fantastic news" for them; that Station Casinos was "pleased to announce its 2020 focus on the family program, which we believe will lead us back to being the employer of choice in Las Vegas." He then listed off several beneficial changes the employees should expect in the coming year as a "reward" for their hard work. They included "considerable enhancements" to training programs, "not only for your coworkers . . . , but . . . getting better supervisor and leadership training within your respective departments; "updated" policies and procedures regarding time and attendance and coaching and counseling; elimination of the TCCA program; new team member recognition and award programs ("team member of the month," "team member of the year," etc.); and a new "direct hire" program to hire the best available applicants faster.

Nelson then turned to medical benefits, which he said "seems to be a hot subject." He said there would be "salaried medical tiers," so that "those who make more, like me, [will] pay more for . . . medical insurance, which means those who make less, pay less." He also said that, with the HMO, there will be "no more deductible" beginning in January 2020. And that the "cost" of the HMO would be "free," not only for team members as in the past, but also "for a team member plus a spouse, "for a team member plus children," and "for family" in 2020 if a team member makes under $20/hour or $40,000/year, excluding tips.

And that wasn't all, said Nelson, following the applause. "Starting in January we'll be building [a] team member medical resort at Red Rock." That is "huge," he said, "Your very own team member medical center for you and your family right here in our building." And "there'll be two more facilities added at other locations later on." "That's a big deal, gang . . . a big deal," he said. But "[t]here's more." He said there will be "[f]ree medical provider visits, with no out-of-pocket costs for visits with an experienced medical professional to help guide and support your health and healthcare needs." There will also be "up to 50 high-quality free generic drugs when prescribed by the onsite physician"; "[f]ree lab work, high quality commonly ordered labs at no out-of-pocket costs"; and "fast appointments," within "24 to 48 hours." "That's phenomenal . . . phenomenal," he said, to more applause.

And there was one more "big one," which "I've never even seen . . . before," he said: a "new company-paid retirement plan."

He said Station Casinos "will open a 401(k) account and fund [it] for . . . team members after one year of employment" who make "under $100,000 in total pay." He said, "[S]tarting January 1st of 2020, all hours you work will be counted towards your company-paid retirement plan, with funding in the first quarter of 2021." Team members with 1 to 24 years of employment would get 50 cents for every hour worked, and those with over 24 years would get a dollar for every hour worked until retirement. "And if you contribute, the company will provide a match." "That is huge," he said, to more applause.

Nelson then summarized again all the new programs and benefits he had just announced and concluded, "That's it, ladies and gentlemen. We are family. We are team Red Rock. We're going to have one hell of a year. . . . Happy holidays."

As for Fortino, he testified that he attended at most a few of the exciting news meetings. And Nelson testified that Fortino didn't speak at any of them.[128] However, Fortino paid close attention to the impact of the Red Rock meetings on the Union and its supporters, as indicated by his following December 10 and 11 email exchange about the new benefits with Bill Noonan, a retired former Senior VP of HR at another gaming company:

> (Dec. 10)
>
> Fortino:  Starting employee meetings today. I know of one group who won't be happy when they hear about this. LOL.
>
> (Dec. 11)
>
> Noonan:  Well done, Dude! Yes, Culinary will not like this. . . .
>
> Fortino:  We got petitioned at [Red Rock] just after we approved this plan. We've had an amazing amount of employees throw away their union buttons. Election is next Thursday/Friday so we'll see what happens.[129]

Welch sent a similar text message to Frank and Lorenzo Fertitta and Cootey on December 10:

> Very very positive reaction to the meetings so far this morning at Red Rock. Buttons coming off.[130]

Beginning December 12 and continuing through the end of the month, similar "exciting news" meetings were held with unrepresented employees at the other properties. Santa Fe Station (where Fortino had reported "lots of union activity" the day after the Red Rock petition was filed) was the first property after Red Rock where such a meeting with unrepresented employees was held (on Dec. 12). And Palms was the last (on Dec. 28). Beginning December 16, following notice to the Culinary Union and/or other recognized unions, separate meetings were also held with represented employees at the properties.[131]

---

[128] Tr. 276 (Nelson), 1050, 1134 (Fortino).

[129] GC Exh. 92; Tr. 1135–40 (Fortino). Notwithstanding his December 11 email, Fortino initially testified at the hearing that he did not recall whether employees were removing their union buttons after the exciting news meetings. See Tr. 1136 ("I don't recall whether they were. I didn't see a lot of buttons in the first place.").

[130] GC Exh. 241; Tr. 7260 (Welch).

[131] GC Exhs. 100, 121–123; U. Exh. 7–12; Tr. 1581–1586, 1590 (Finch), 6119, 6138–6139 (Johnson), 7095, 7108, 7155–7163 (Fortino). At the time of the "exciting news" meetings, the Company had recognized the Culinary Union as representative of the voting-unit employees at only three of the properties: Boulder Station, Palace Station, and Fiesta

Rancho. The Company was still contesting the Culinary Union elections at the other four properties: Green Valley Ranch (GVR), Palms, Sunset Station, and Fiesta Henderson. See GC Exh. 116, pp. 21–22 (Red Rock Resorts, Inc.'s SEC Form 10-K, discussing which unions had been recognized at which properties as of Dec. 31, 2019); and Tr. 7159–60 (Fortino). See also *Green Valley Ranch Resort Spa Casino*, 367 NLRB No. 38 (2018), rev. denied 784 Fed. Appx. 795 (D.C. Cir. Oct. 29, 2019), reh'g en banc denied Jan. 3, 2020; *Palms Casino Resort*, 367 NLRB No. 127 (2019), enfd. by consent judgment, No. 19-1105 (D.C. Cir. May 19, 2020); *Sunset Station Hotel & Casino*, 28-RC-242249, unpub. Board order issued April 13, 2020 (2020 WL 1931410); and *Fiesta Henderson Casino Hotel*, 28-RC-245493, unpub. Board order issued Feb. 20, 2020

Based on the foregoing, the General Counsel alleges that the new benefits and programs were announced, promised, and/or granted at the Red Rock on December 10 and 11 to discourage employees from supporting the Union in violation of Section 8(a)(1) of the Act. (GC Exh. 1(bk), pars. 5(j), 8, and GC Exhs. 2, 3, par. 5(ll)).[132] The Union alleges that announcing or promising the new benefits and programs was also objectionable conduct that interfered with the election (GC Exh. 1(bo), Objs. 1–3, 5, 6).

The allegations are well supported. It has long been established that an employer violates Section 8(a)(1) of the Act by promising or granting benefits during a union campaign in order to dissuade its employees from supporting the union. See *NLRB v. Exchange Parts Co*., 375 U.S. 405 (1964); and *NLRB v. Curwood Inc.*, 397 F.3d 548, 553-554 (7th Cir. 2005). See also *Shamrock Foods Co.*, 366 NLRB No. 117, slip op. at 13 (June 22, 2018), enfd. 779 Fed. Appx. 752 (D.C. Cir. July 12, 2019), reh'g en banc denied Sept. 6, 2019. And if the employer does so during the critical period between the union's petition and the election, that conduct is also objectionable. See, e.g., *SBM Mgt. Services*, 362 NLRB 1207 (2015). In both situations, the relevant inquiry is the employer's motive. *Ibid* ("[T]he critical inquiry is whether the benefits were granted for the purpose of influencing the employees' vote in the election and were a type reasonably calculated to have that effect"). See also *Network Dynamics Cabling*, 351 NLRB 1423, 1424 (2007) ("[R]egardless of whether the union has filed a petition for an election," the "analysis is 'motive-based'"; the Board "must determine whether the record evidence as a whole, including any proffered legitimate reason for [granting the benefit], supports an inference that [it] was motivated by an unlawful purpose to coerce or interfere with . . . protected union activity").

Here, as fully discussed above, there is abundant evidence—both direct (e.g., the previous unlawful promise of such benefits, and other recorded statements, PowerPoints, emails, and text messages) and circumstantial (e.g., the suspicious and rushed timing and the false, evasive, and inconsistent testimony noted above regarding the relevant facts and circumstances) —that the Company's motive for developing, approving, and ultimately announcing the new benefits and programs at the Red Rock on December 10 and 11 was to undermine the Culinary Union campaign there. Indeed, it is hard to imagine a stronger evidentiary record supporting the General Counsel's and the Union's allegations. See also the discussion infra regarding the Company's publicizing and use of the newly announced benefits during its

preelection antiunion campaign at the Red Rock and its subsequent response to the Union's election loss.

Respondent's arguments to the contrary are unsupported or unpersuasive. For example, Respondent argues that the plan to make the benefit and program improvements was actually set into motion in July 2018, and revived again in July 2019, before the Union's late August "button-up" campaign. Respondent argues that the record fails to establish that the Union was actively organizing at the Red Rock at those times or that the Company knew it. Respondent asserts that the circumstances here are therefore similar to those in cases such as *Churchill's Supermarkets*, 285 NLRB 138 (1987) (finding that employer's grant of a new self-insured health care plan to employees after the union filed representation petitions at its stores was not unlawful because, among other things, the employer had asked a broker before the union organizing campaign to provide the costs/quotations for such a plan); *LRM Packaging*, 308 NLRB 829 (1992) (finding that company owner's grant of medical benefits and a wage raise to employees on the company's first anniversary, while the union's election objections were pending, was not unlawful where the owner had twice indicated to his insurance agent before the union organizing campaign that he would probably have a medical plan at the company, and had also promised employees before the union organizing campaign that he would grant them medical benefits when the company could afford it); and *Delchamps, Inc. v. NLRB*, 588 F.2d 476, 481 (5th Cir. 1979) (finding, contrary to the Board, that the employer did not unlawfully grant a wage increase where the record established only that it had a general awareness of union activity involving the company over the last 10–15 years and there was no evidence of any union activity at the time of the wage increase).[133]

However, there at least three fatal flaws in this argument. First, contrary to Respondent's contention and the circumstances in the cited cases, there is substantial record evidence here that the Union was actively organizing at the Red Rock in July 2018 and July 2019, and that the Company knew it. Numerous Red Rock employees were designated as union committee leaders prior to and during that time for the purpose of encouraging and soliciting their coworkers to support the Union and sign authorization cards; they regularly wore red and white union committee leader buttons on their uniforms to identify themselves as such; and Station Casinos' and Red Rock's managers observed or were aware of it.[134]

It is true, as indicated by Respondent, that such union

---

(2020 WL 1182446). As discussed infra, the Culinary Union notified the Company that it agreed to implementation of the new benefits and programs at Boulder Station, Palace Station, and Fiesta Rancho on December 14.

[132] Specifically, the General Counsel alleges that Respondent unlawfully announced, promised, and/or granted the following: (1) training programs for employees and leadership training for supervisors and managers; (2) elimination of TCCA, the time clock audit and discipline program; (3) employee recognition programs; (4) a direct hire program; (5) salaried medical tiers for health benefit payments; (6) no more HMO deductibles; (7) free healthcare for employees, their spouses, children, and families; (8) an employee medical center at the Red Rock facility with free medical provider visits with no out of pocket costs, free generic drugs prescribed by an onsite physician, free medical lab work, and fast medical appointments within 24 to 48 hours; and (9) a Company-paid retirement/401(k) account, to be funded after one year of employment starting January 1, 2020 by making $0.50 per-hour contributions for employees with between 1 and 24 years of employment

and $1.00 per-hour contributions for employees with 25 years or more of employment. See GC Br. 44–45.

[133] Respondent also cites *Jewell Smokeless Coal Corp*., 163 NLRB 651, 653 (1967). But no exceptions were filed to the relevant portion of the ALJ's decision in that case and the Board did not address it. Thus, it has no precedential weight. See, e.g., *Colorado Symphony Assoc.*, 366 NLRB No. 122, slip op. at 1 fn. 3 (2018), enfd. 798 Fed.Appx. 669 (D.C. Cir. 2020).

[134] See, e.g., Jt. Exh. 1; GC Exhs. 9, 117 (pp. 18, 22); and Tr. 1648–1649, 6840–6841 (Hernandez), 2715 (Baer), 3049–3051, 3084–3085 (Murzl), 4417 (Duhart), 4443, 4500–4504 (Christian), 1417–18, 5981–5982 (Finch), 6340–6346 (Nelson). Respondent relies heavily on the fact that the General Counsel and the Union did not introduce any evidence that any Red Rock employees signed authorization cards prior to October 2018. However, given all the other evidence of union activity there before that date (and the fact that the post-October 2018 cards were sufficient to establish the Union's majority support for purposes of the requested remedial *Gissel* bargaining order), it was unnecessary to prolong an already lengthy hearing to do so.

organizing activities had been going on at the Red Rock for many years. And there is insufficient evidence that the Company was aware of any significant increase in that activity prior to the July 2018 and July 2019 interviews. However, as discussed above, the record indicates that the Company anticipated an increase in union activity from both July 2018 and July 2019 in light of the Union's open campaign to organize all Station Casinos employees and its recent successes at several other Station Casinos properties in Las Vegas. Cf. *Shamrock Foods,* above, 366 NLRB No. 117, slip op. at 10 (finding that the employer unlawfully solicited grievances and promised to remedy them at its Phoenix warehouse as the union had tried to organize the warehouse in the past; the union had also recently tried to organize another warehouse in southern California; there was in fact a union campaign currently going on at the Phoenix warehouse; and although there was "no direct evidence the [c]ompany knew about it," there was "strong circumstantial evidence that the [c]ompany at least suspected it was going on.").

Second, even assuming otherwise, the sole evidence Respondent cites here that the new benefits and programs were "set in motion" in July 2018 and July 2019 is that Frank Fertitta, Welch, and Finch interviewed Fortino to replace Murzl as Senior HR VP at those times and told him they wanted to fix what they had done wrong and become a top employer again. Unlike the situations in *LRM* and *Churchill's*, there is no evidence they told Fortino at the interviews that they wanted or intended to implement the specific "huge" new benefits and programs later developed and announced following Fortino's arrival in September 2019, after the Union's "button-up" campaign began at the Red Rock. [135]

Third, even again assuming otherwise, as previously discussed in detail the record indicates that the Union's election wins and ongoing campaign at the Red Rock and other remaining properties were the primary reason Fertitta, Welch, and Finch interviewed Fortino to replace Murzl and fix things in July 2018 and July 2019. Although Fortino initially denied, during direct examination by the General Counsel, that there was any discussion during his 2019 interview about the ongoing union campaign at Station Casinos properties or changing the Company's response to that campaign, on later examination he acknowledged that the Union's campaign and election wins were mentioned at both interviews as the reason the Company wanted to fix things. [136]

Respondent also argues that the allegations must fail because the new benefits and programs applied to employees at all of the Station Casinos properties, not just at the Red Rock. Respondent argues that this shows the Company did not have an unlawful motive, citing, e.g., *Real Foods*, 350 NLRB 309, 311 fn. 11 (2007) (finding no violation where employer gave new service awards to 13 employees, only one of whom worked at the store where the union organizing campaign was being conducted); *Dynacor Plastics*, 218 NLRB 1404, 1404–1405 (1975) (finding no violation where employer granted holiday to employees at all

of its plants throughout the country rather than just at the plant where the union was organizing; and *FMC Corp.*, 216 NLRB 476, 478 (1975) (finding no violation where employer gave wage raises to 15,000 or more employees, not only the 200–300 employees who were eligible to vote in the union election).

However, the Culinary Union was also openly organizing or seeking to enforce its prior election victories at several of the other Station Casinos properties during the relevant period. The Operating Engineers Union and the Teamsters Union were too. Further, the Company had not yet reached a contract at the few properties where it had not contested the elections or agreed to recognize the unions over the previous 2–3 years. [137] Thus, there would have been no contract-bar to union decertification petitions and elections at those properties. [138] Cf. *Holly Farms Corp.*, 311 NLRB 273, 274 (1993) (finding employer's preelection wage increase unlawful, notwithstanding that it was given to all 11,000 employees, not just the 201 live haul employees in the petitioned-for unit, as its 2000 production workers were also organizing at the time and "the wage increase might have been reasonably calculated to discourage union activity throughout [the company]"), enfd. 48 F.3d 1360 (4th Cir. 1995), affd. 517 U.S. 392 (1996). See also *Hogan Transports, Inc.*, 363 NLRB 1980, 1983 (2016) (finding employer's wage increases unlawful under the circumstances even though they were granted to employees at three locations, not just the location where the union had filed an election petition). Moreover, unlike in the cases cited by Respondent, there is compelling direct evidence here that the Union's organizing campaign and the anticipated and scheduled election at the Red Rock were the primary impetus for developing, approving, and announcing the new benefits and programs.

Respondent also argues that it had a legitimate business reason for developing, approving, and announcing the new benefits and programs when it did. In support, Respondent cites Welch's and Cootey's testimony that Station Casinos experienced "extraordinarily high losses among employees" in 2019; that overall employee turnover increased from 27 percent to "the mid-30s" from 2018 to 2019; and that Fortino's November 19 presentation to the senior leadership "centered" or focused on the high turnover as justification for the proposed new benefits and proposals. [139] It also cites, as corroboration of this testimony, computer-generated company reports comparing the trailing 12-month companywide turnover percentages as of June 1, October 1, and December 1, 2018 and 2019 among employees (full-time, part-time, on-call, and total) in each gaming and nongaming job description in each department. [140]

However, there are substantial reasons to question Welch's and Cootey's testimony regarding the overall increase in turnover from 2018 to 2019. As noted above (fns. 11 and 115), both provided highly questionable, discredited testimony about other significant matters. See also their testimony, described and discredited below, about Fortino's discussion of turnover at his November 19 presentation of the "strategic plan." Further, the

---

[135] See Tr. 918–919 (Fortino); 1473–1474 (Finch), 7221 (Welch). Although Finch testified that he spoke with Fortino in July 2019 about his desire to move training from the company headquarters to the individual properties (Tr. 1446, 5984), this was not corroborated by Fortino or Welch.

[136] Tr. 771, 900–901, 6985–87, 6991–93. See also fn. 11, supra.

[137] See, e.g., GC Exhs. 116 (pp. 21–22), 117 (p. 22), 190; and Tr. 7252–7253 (Welch). See also fn. 131, above.

[138] A union usually is entitled to a conclusive presumption of continuing majority status for one year following Board certification as the

exclusive bargaining representative of a bargaining unit. In addition, under the contract bar doctrine, a union is entitled to a conclusive presumption of majority status during the term of the collective-bargaining agreement, up to 3 years. *Johnson Controls*, Inc., 368 NLRB No. 20, slip op. at 4 (2019).

[139] See Tr. 6522–6523 6536–6537 (Cootey), 7212–7213, 7267 (Welch).

[140] See R. Exhs. 48–50; and Tr. 5940–5944, 5975–5977, 6033–37 (Finch).

50                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

turnover reports introduced by Respondent indicate that employee turnover fluctuated and increased in some job descriptions, decreased in some, and remained the same in some between 2018 and 2019. And they do not corroborate Cootey's testimony that the overall turnover rate increased to "the mid-30s" during that time. Rather, they indicate (at the bottom of the last page of each report) that overall turnover among all job descriptions companywide increased from 27 percent in 2018 to 32 percent as of June 1, 2019, and then dropped back to 30 percent as of October 1 and December 1.[141] Moreover, the reports indicate that the increase in turnover was substantially less among just full-time and part-time employees, which Finch testified is what the Company pays more attention to. The reports show that turnover increased among full-time employees only 2–3 percent as of each date, and that it actually decreased 2–3 percent among part-time employees as of both October 1 and December 1. The larger percentage increases (11–16 percent) were among on-call employees, which Finch testified is of least concern to the Company.[142] Thus, it appears that Cootey and Welch exaggerated both the size and the significance of the overall increased turnover in 2019.

Moreover, there is no evidence that Welch, Cootey, Finch, or any other manager in the senior leadership considered the reports or conducted a separate statistical analysis of the reported data to determine the overall turnover rate at the time. Indeed, it is undisputed that Finch did not do so. He testified that he did not need to look at the reports to know if there was short-staffing and turnover; that he relied solely on "optics," such as what he heard from the GMs at the properties about not being able to open casino tables and games and having lines at the restaurants.[143]

There is also substantial reason to doubt Welch's and Cootey's testimony that the high overall turnover rate was the central focus of Fortino's November 19 presentation in support of the proposed new benefits and proposals. Indeed, Finch testified that he could not recall if turnover was even mentioned during the presentation. And, in fact, with one exception (the "direct hire" proposal), there was no mention in Fortino's 30-page "strategic plan" of increased turnover or related staffing and retention problems as a "situation" that warranted implementing any of the proposed new benefits and proposals. With one exception (the 401(k) proposal), there was likewise no mention of less turnover or staffing and retention problems as an expected positive result of any of the proposals. In contrast, as previously discussed, the Culinary Union and its promised contractual

benefits were cited as *the* "situation" in both the HMO and the 401(K) proposals. Further, the expected negative impact on the Union was not just mentioned, but highlighted or underlined, in both the Salaried Medical Tier and the 401(K) proposals. There were also numerous comparisons to the Culinary Union contract in the cost comparisons accompanying the proposals.[144]

Respondent asserts that these multiple references to the Culinary Union and its contract in Fortino's strategic plan indicate, not that the Company was trying to unlawfully interfere with its employees' support for the Union, but that it was trying to lawfully induce its employees not to leave and work at other casino hotels that have a contract with the Union. In support, it cites Cootey's, Welch's, and Murzl's testimony that the "great" benefits and programs provided under the Culinary Union contract at other Las Vegas casino hotels was "enticing" to employees and effectively made the Union itself Station Casinos' "biggest" competitor with respect to recruiting and retaining them.[145]

However, as previously discussed, the strategic plan's references to the Union focused specifically on the Union's organizing campaign and expected election petition. For example, it stated, "The union has consistently used H&W and the Pension as the main emotional drivers to sign cards and vote Yes for unionization," and improving the existing 401(k) plan "would help incentivize" employees "to not vote for a union."[146] Moreover, there is no substantial record evidence that the overall percentage of turnover among Station Casinos Culinary employees increased in 2019. The Company's above-described turnover reports do not include a separate overall turnover percentage among just Culinary employees in 2018 and 2018.[147] And Cootey testified that he could not recall if the Company had problems retaining Culinary food and beverage employees in 2019 (Tr. 3160, 3188–3190).

Finally, Respondent argues that it was also concerned about future competition from reported new developments in Las Vegas, citing Welch's, Cootey's, Finch's, and Fortino's testimony to this effect and a July 2019 article in the Las Vegas Review-Journal regarding the projects.[148] However, again, there was no specific mention of such future competition in Fortino's November 19 presentation to the senior leadership. And as previously noted (fn. 108), the cited July 2019 Review-Journal article reported that the new development the Company was most concerned about, Resorts World, was not scheduled to open until 2021.[149]

In sum, Respondent's evidence and arguments are far too

---

[141] See also R. Exh. 59 (Murzl's Feb. 2018 report confirming that the overall turnover rate was about 27 percent at that time).

[142] See Tr. 5943, 6019–21 (Finch). Compare also the testimony of Johnson (who had served as Station Casinos' labor relations director since January 2018 and was the HR director at Boulder Station for six years before that), Tr. 2090–2091 ("Our facilities were never fully staffed. We always had at least 3 to 400 openings in the company and very high turnover . . . between 35 and 40 percent," and "in October of 2019 . . . job openings were not much higher than they had been the year before").

[143] Tr. 6037–38, 6042–43, 6094 (Finch). See also Tr. 5870–71; and R. Br. 17 n. 19.

[144] See Tr. 6066–67 (Finch); and GC Exh. 69.

[145] Tr. 3125–3128, 3155–3156, 3177 (Cootey), 7239–40 (Welch), 3086–3088, 3096 (Murzl). See also Tr. 1013–1014 (Fortino) and 6943–6944 (Fernandez).

[146] Fortino acknowledged that references to "the union" or "a union" in the strategic plan referred to the Culinary Union (Tr. 1381–1383).

[147] I have not attempted such a statistical analysis on my own. "Few judges are statisticians" (*Conley v. U.S.*, 5 F.4th 781, 796 (7th Cir. 2021)), and I am not one of them. Further, for all the other reasons discussed, Respondent's argument would fail regardless.

[148] R. Exh. 47; Tr. 946, 1014–1015, 1376–78 (Fortino), 1470, 1510, 5933–5936, 6027, 6066 (Finch), 3133, 6434 (Cootey), 7191 (Welch).

[149] As noted in fn. 108, above, Fortino testified at length about Resorts World. And he made clear it was the Company's primary concern. See, e.g., Tr. 946 ("The number one issue we had moving forward was Resorts World opening . . . So we had to make sure to get ready for Resorts World, that we had a competitive compensation and benefits program."), 951 ("I wanted to create an environment that we became a great employer and we maintained our team members so that we didn't lose them when Resorts World opened"), and 1014 ("We could not maintain team members long term with Resorts World opening. We were going to probably lose, I would guess, half of those team members to Resorts World and then the fallout with MGM, Caesars and everybody else."). Nevertheless, as Fortino later acknowledged (Tr. 1385), there was no mention of Resorts World in his presentation

weak to rebut the wealth of other compelling direct and circumstantial evidence that the new benefits and programs were developed, approved, and announced when they were because of the anticipated Union petition and scheduled election at the Red Rock. Accordingly, the announcement was both unlawful and objectionable as alleged.

### 5. Pamphlet/mailer publicizing new benefits (Dec. 13)

During the same time period, between December 5 and the announcement on December 10 and 11, Fortino and his HR staff also began urgently preparing a trifold pamphlet to provide to Red Rock employees about the new benefits. The pamphlet was eventually completed and mailed to them on or about December 13.[150] Titled "A 2020 Focus on Family" and signed by "Your Leadership Team," the pamphlet stated that Station Casinos would "focus on our family and provide some new and incredible benefits just for you in 2020." It then highlighted, in English and Spanish, the new retirement and HMO plans and onsite Fertitta Team Member Medical Centers, emphasizing that the new retirement plan was "COMPANY PAID; that the new HMO plan was "$0 DEDUCTIBLE!" and "FREE FOR EVERYONE INCLUDING YOUR FAMILY!"; and that the new medical centers provided "FREE MEDICAL PROVIDER VISITS," "FREE GENERIC DRUGS," "FREE LAB WORK," and "FAST APPOINTMENTS."[151]

As with the Company's December 10 and 11 announcement, the General Counsel and the Union allege that the Company's mailing of the pamphlet to Red Rock employees on or about December 13 violated Section 8(a)(1) of the Act and constituted objectionable conduct, respectively (GC Exh. 1(bk), pars. 5(k), 8; and GC Exh. 1(bo), Objs. 1–3). Again, the allegations are well supported. Respondent concedes that "the pamphlet was sent out by expedited mail to Red Rock team members and not team members at other properties" (Br. 149). Although Respondent argues that this was because the new benefits had been announced at the Red Rock and not at the other properties, as discussed above that announcement was unlawful and objectionable. Accordingly, for essentially the same reasons, the mailing of the benefits pamphlet to Red Rock's employees was unlawful and objectionable as well.

### 6. Labor Consultant Cevallos's distribution of the benefits pamphlet (Dec. 13)

In early December, the Company retained several labor consultants to assist with its preelection antiunion campaign at the Red Rock. They immediately set up a "war room" in the HR training room and began meeting with Culinary department directors and managers to go over their MUD lists. They also began walking around and personally talking to Culinary

employees and distributing flyers in the back of the house and during huddles.[152]

On or about December 13, the same day the benefits pamphlet was mailed to Red Rock employees, one of the labor consultants, John Cevallos, personally distributed the same pamphlet to Red Rock employees in the internal maintenance (IM) office.[153] The General Counsel alleges that this likewise violated Section 8(a)(1) of the Act (GC Exh. 1(bk), pars. 5(n), 8). And the Union contends that it was also objectionable (GC Exh. 1(bo), Objs. 1–3).

Respondent argues that Cervallos was not definitively identified as the individual seen passing out the pamphlet. However, Renzo Valera, a porter in the IM department and union committee leader, testified that the person she saw passing out the benefits pamphlet to her coworkers on December 13 was in a wheelchair. And there is no dispute that Cevallos was the only person in the back of the house at the Red Rock using a wheelchair at the time. There is also no dispute that he was at the Red Rock engaging with employees that day.[154] Further, Respondent made no effort to impeach Valera's testimony about what she saw or present any evidence to contradict it. Accordingly, for essentially the same reasons discussed above, Cevallos's distribution of the benefits pamphlet was unlawful and objectionable as alleged.

### 7. Manager Andrade's huddle with employees about the new benefits and upcoming election (Dec. 13)

Red Rock's managers and supervisors also passed out copies of the benefits pamphlet to employees at huddles before or during each shift.[155] Hernan Andrade, the Red Rock internal maintenance director, was one of the managers who did so. Andrade was working closely with Hernandez at the time to help Cevallos and the other labor consultants with the preelection antiunion campaign. He met with them several times in the "war room," reviewed his MUD list with them, and suggested which employees they should talk to. He also introduced them to employees and translated for them.[156]

Like other managers and supervisors, Andrade was also encouraged to personally speak to employees about the new benefits and the scheduled election.[157] And on or about December 13, he conducted a huddle with about 30 IM employees for this purpose (which one of them recorded). He began by distributing the benefits pamphlet, saying the Company had created it to give them "all the information [they] needed." He then immediately turned to the upcoming election. He told them the dates and times to vote; that "[e]verybody, part-times, full-times, on-calls," were eligible to vote; and that it was important they all vote "for your future, for you—for your family." He also addressed various "rumors" and "lies" he said were "out there" about the

---

[150] See GC Exhs. 34, 86–88, 90; Tr. 1108, 1111 (Fortino), 2316–2317 (Striano), 4470–4471 (Christian), 4911–4912 (Ogorchock).

[151] GC Exh. 147.

[152] GC Exhs. 44, 144, 154, 155, 157; Tr. 540–544, 581–583 (Nelson), 1684–1688, 1692, 1697–1699, 1723–1728, 1782–1783 (Hernandez).

[153] Tr. 4307–4714 (Valera).

[154] See 264, 365–367 (Nelson), 1094–95, 1272 (Fortino), and 4308 (Valera). (Cevallos did not testify.)

[155] See Tr. 1756–1757 (Hernandez), 4307 (Valera), 4911–4912 (Ogorchock). The complaint does not allege that distributing the benefits pamphlet at huddles constituted a separate violation of the Act.

[156] Tr. 1738–1739 (Hernandez), 2378–2388, 2402–2403, 2406 (Andrade). Neither Andrade's nor any other manager's MUD list is in the record. It appears that managers and supervisors were instructed to

prepare them manually, by hand, and not to share them electronically or to retain them after the election. See Andrade's testimony, Tr. 2424 (he prepared and shared his MUD lists by hand because he was instructed not to email them). See also Respondent counsel's explanation for why no MUD lists were produced in response to the General Counsel's subpoena duces tecum, Tr. 452–453, 1631. But compare Nelson's testimony, Tr. 256–257 (he could "not recall" if any department heads sent him their MUD lists by email, or whether they were told how to keep them or what to do with them after making them), and 538 (he never told department heads or supervisors or managers to stop maintaining their MUD lists, and did "not recall" Fortino telling people to stop maintaining their MUD list, but he could "not recall" seeing a MUD list at the property after the election).

[157] Tr. 1147–1148 (Fortino), 2403, 2406 (Andrade).

election.

One of the employees then asked, "If I vote for the Union, I'm going to have two dollars more?" Interpreting this as a reference to another rumor that employees would get a $2 raise if the Union came in, Andrade responded,

> That's gonna—that's not guaranteed. That's not going to happen . . . that that's up to negotiation. We—you can get—you could get those two dollars. You could get those two dollars. You'll probably end up with less. You don't know, okay. That's going to be up to—for negotiations.

Shortly after, one of Andrade's supervisors at the huddle subsequently returned the discussion to the new benefits. She said,

> Somebody asked me today—["S]o if we vote for the union and the union wins, is Red Rock going to take back everything that they just gave us?"

Andrade responded,

> That's a good question. So, if that happens, we don't know. It's going to be—up to—for negotiations, okay? That's how it works.

The supervisor replied,

> But I told them, I say if you have everything you want, why are you going to vote for the union anyway?

Andrade said,

> So, it's the same thing that is happening at Boulder right now, okay. All of the benefits that are—are being offered to you guys, to everybody . . . it's now happening throughout all their properties right now, okay. So, Boulder, that's going to be up to—for negotiations. All of this stuff right here is going to be up for negotiations.[158]

The General Counsel alleges that Andrade's statements threatened employees with lower wages and loss of their new benefits if they voted for the Union, in violation of Section 8(a)(1) of the Act (GC Exh. 1(bk), pars. 5(l), 8). The Union alleges that Andrade's remarks were also objectionable conduct that interfered with the election (GC Exh. 1(bo), Objs. 4, 7).

The alleged threat of lower wages is not supported by the evidence. As indicated above, Andrade was asked by an employee if hourly wages would increase by $2 if the Union was elected. He initially responded, "That's not going to happen," but then said it was up to negotiations and it "could" happen, but employees would "probably end up with less," and then said "you don't know," repeating that it's up to negotiations. In short, Andrade appeared to give three or four different answers to the question. But all of them, including the alleged unlawful statement that employees would "probably end up with less" would reasonably have been construed by employees to relate to the topic of the question: whether employees would get a $2 raise if the Union was elected. Employees would not reasonably have construed the statement to mean that they would probably end up with lower wages than they currently had without the Union. Accordingly, this allegation will be dismissed.

The alleged threat of losing the new benefits is a different matter. It is well established that it is unlawful and objectionable for an employer to make preelection statements which, "in context, . . . effectively threaten employees with the loss of existing benefits and leave them with the impression that what they will ultimately receive depends in large measure upon what the Union can induce the Employer to restore." BPI Amoco, 351 NLRB 614, 617 (2007). See also Hertz Corp., 316 NLRB 672 fn. 2 (1995) (employer's explanation of the bargaining process was objectionable as it suggested employees would lose their current 401(K) plan immediately on choosing union representation, subject only to possible restoration on the completion of negotiations).

That is precisely what Andrade did. In response to the question whether Red Rock was "going to take back" all the new benefits if the Union won, Andrade said, "if that happens, we don't know," it would be up to or for negotiations "the same" as at Boulder Station where the Company had also "offered" employees represented by the Union there the new benefits. But the situation at Red Rock was not the same as at Boulder Station. As Nelson had previously explained at his mandatory meetings with Red Rock's Culinary employees in late September, the Union had been the employees' representative at Boulder Station since 2016 and was still attempting to reach a first contract with the Company there. Thus, the new benefits could not be granted to Boulder Station's Culinary employees without providing the Union notice and an opportunity to bargain over them along with their other terms and conditions of employment.

In contrast, Station Casinos did not "offer" the new benefits to Red Rock's Culinary employees, who were not represented by the Union, it announced and granted the new benefits to them. Thus, the new benefits at that point were an existing term and condition of employment of Red Rock's Culinary employees. And the Company would not have been able to unilaterally "take back" the new benefits pending negotiations over a first contract if the Union was elected. See Covanta Energy Corp., 356 NLRB 706, 719–720 (2011) (summarizing the law regarding an employer's legal obligations to a certified or recognized union before implementing changes in wages and benefits and other mandatory subjects of bargaining).

Accordingly, by indicating otherwise, Andrade's remarks were both unlawful and objectionable as alleged. Cf. Longview Fibre Paper & Packaging, Inc., 356 NLRB 796 (2011) (employer violated section 8(a)(1) of the Act and engaged in objectionable conduct by indicating to employees that previously announced improvements to the paid time off system would be implemented if the union lost the election but would become part of the bargaining process if the union won); and Advo System, Inc., 297 NLRB 926 fn. 3 (1990) (employer violated Sec. 8(a)(1) by stating, in response to a question whether employees would get their scheduled wage increase if the union got in, that "under those circumstances, everything would be negotiable").[159]

#### 8. Unnamed agent's huddle with on-call employees about the new benefits (Dec. 13)

Like other employees, on-call Culinary employees attended the mandatory meetings conducted by Finch and Nelson on December 10 and 11 to announce the new benefits at the Red Rock.

---

[158] U. Exh., 5(a), (b); Tr. 2366, 2436–1446, 5543–5546, 5555–5556 (Andrade).

[159] Technology Service Solutions, 332 NLRB 1096, 1108 (2000), cited by Respondent, is clearly distinguishable. Unlike here, the manager there twice assured the employee that his recent salary increase "won't be taken away from you" before stating, "whether you keep it or not; . . . that will be up to union negotiation." Moreover, no exceptions were filed to the ALJ's finding that the manager's statement was lawful. Thus, the case also lacks any precedential weight with respect to that finding. See fn. 133, supra

However, Red Rock also took extra steps to ensure that the on-call Culinary employees were informed about and understood their eligibility for the new benefits. For example, the record indicates that, on or about December 13, the same day as the benefits pamphlet was mailed and distributed, an individual (name unknown) held a huddle with at least 20 on-call Culinary employees in the banquets department. During the huddle (a portion of which was likewise recorded by an employee), he told the on-call employees that they were eligible for the new HMO plan if they qualified for medical insurance or ACA eligibility. He also told them that they were eligible like other employees for the "free money" the Company would be contributing to the new 401(k) accounts beginning the first quarter of 2021. Finally, he also indicated that they were eligible like other employees for the "free" healthcare services, generic drugs, and lab work, and fast appointments that would be offered at the new Fertitta Medical Center to be constructed on the property.[160]

The General Counsel alleges that, like the initial announcement and the pamphlet, the December 13 huddle with on-call Culinary employees about the benefits violated Section 8(a)(1) of the Act. (GC Exh. 1(bk), pars. 5(m), 8). The Union alleges that it was also objectionable (GC Exh. 1(bo), Objs. 1–3). Respondent, however, argues that the record fails to establish that the unnamed individual who conducted the huddle was a supervisor or agent, and even if he was, it is not unlawful to tell employees about existing benefits during a union campaign, citing, e.g., *Morse's Foodmart of New Bedford*, 230 NLRB 1092, 1098 (1977) ("Merely describing to employees existing benefits during an organizational campaign does not violate the Act.").

Respondent's arguments are without merit. As indicated above, the record indicates that huddles were normally conducted by managers, supervisors, and agents. Further, Robert Franz, an on-call employee who attended the huddle, credibly testified that he was referred by a receptionist to the same individual a week later when he went to the Red Rock HR department. Franz testified that he had a question about whether his tips would be counted in determining whether he earned too much to qualify for the new retirement plan, and the individual, who had an office in the HR department, said that only his base pay would be counted. (Tr. 4202–4203.) These circumstances are sufficient to establish that the individual had at least apparent authority to speak for Red Rock regarding such matters. See generally *Manor Health Services-Easton*, 356 NLRB 202 fn. 3, 218fn. 38 (2010), enfd. 661 F.3d 1139 (D.C. Cir. 2011). See also *Mid-State Distributing Co.*, 276 NLRB 1511, 1531 (1985) (finding two unnamed individuals to be the employer's agents where they conducted a survey of employees at meetings the employees had been instructed to attend in the president's office). As for *Morse's Foodmart*, it is plainly distinguishable because, unlike there, the benefits here were unlawfully granted in the first place.[161]

Accordingly, for essentially the same reasons previously

discussed, Respondent violated the Act and committed objectionable conduct by continuing to discuss the unlawfully announced benefits with Red Rock employees during the preelection period.

9. Supervisor Ogorchock's statement to employee Christian about the new 401(k) plan (Dec. 13)

The General Counsel also alleges that, on December 13, Nichole Ogorchock, an assistant manager at Red Rock's T-Bones restaurant, unlawfully told Adam Christian, a lead server and union committee leader, that the new Company-funded 401(k) plan was going to be retroactive to when employees began working at the Red Rock (GC Exh. 1(bk), pars. 5(o), 8). The Union contends that this conduct was also objectionable (GC Exh. 1(bo), Obj. 2).

There are several problems with this allegation, however. First, Christian admitted that it was just a casual conversation between him and Ogorchock, at the end of the evening shift, and that he started it by asking her about the new 401(k) plan. Second, he also admitted that he did not specifically ask Ogorchock if the Company would be paying into the new 401(k) plan for every hour employees had worked since they had been hired (which for him would be every hour for the previous 13 years); rather, he simply asked her if the new 401(k) plan "was going to be retroactive." Thus, his question could reasonably have been interpreted in several ways, including whether the Company would pay into the new 401(k) plan as of January 1, 2021 for every hour employees had worked over the previous 12 months—which is what Nelson had stated the Company would do at the mandatory "exciting news" meetings 2–3 days earlier. Third, it is unlikely Ogorchock would have told Christian something contrary to what Nelson had said at those meetings, and Ogorchock credibly denied that she did so.[162] Fourth, although Christian testified that Ogorchock answered "yes" to his question, his prehearing affidavit said she answered "something like yes," leaving some doubt as to exactly what she answered.[163]

Given all of these circumstances, I am unable to conclude that Ogorchock's answer, whatever it was, was unlawful or objectionable. Accordingly, the allegation will be dismissed.

10. Supervisors Andrade's and Gonzalez' statements about extending the open enrollment period for health insurance (Dec. 14)

As previously discussed, the open enrollment period for 2020 health insurance had already been held, between November 4 and 17, before the new HMO plan was announced at the Red Rock on December 10 and 11. Accordingly, following that announcement, the open enrollment period was reopened and extended. And the Red Rock employees were subsequently told so on multiple occasions. Two of those occasions were on or about December 14, when Andrade and supervisor Felix Gonzalez held huddles with internal maintenance employees to discuss the new benefits and the upcoming election.[164]

---

[160] GC Exh. 271(a), (b); Tr. 4189–4200, 4221, 4224–4225 (Franz).

[161] The Company also cites *Berk-Tek, Inc*, 285 NLRB 300, 303 (1987. However, no exceptions were filed to the relevant portion of the ALJ's decision in that case and it therefore has no precedential weight. See fn. 133, supra.

[162] I do not disbelieve Christian's testimony that he recalls asking Ogorchock at the end of the evening shift about whether the new 401(k) plan would be retroactive. But I also do not disbelieve Ogorchock's testimony that she doesn't recall the conversation and that, even if it occurred, she didn't tell Christian that the 401(k) plan would be funded

retroactively in the unsaid way Christian meant when he asked the question.

[163] See Tr. 4471–4472, 4509–4511 (Christian) and 4914–4920 (Ogorchuck).

[164] GC Exh. 210 (a), (b), 237(a), (b); Tr. 2404–2417, 2432–2434 (Andrade), 2781, 2792–2804 (Gonzalez). Both Andrade and Gonzalez told the employees at their huddles that the open enrollment was being extended to December 31. However, Hernandez was present at Andrade's huddle and corrected him, saying the extension would be to January 31. See also the discussion, infra, regarding the subsequent "captive

The General Counsel alleges that, like the initial announcement of the new HMO plan on December 10 and 11, advising employees several days later that the open enrollment period would be extended so they could sign up for it violated Section 8(a)(1) of the Act (GC Exh. 1(bk), pars. 5(p), (r), 8).[165] Respondent, on the other hand, argues that no violation should be found because Andrade and Gonzalez were "merely communicating with employees about something that had been previously announced" (Br. 154–156), citing, e.g., *Morse's Foodmart*, supra.

As previously discussed regarding the huddle with on-call employees about the new benefits, *Morse's Foodmart* is clearly distinguishable because, unlike here, the benefits there were not unlawfully announced in the first place. Accordingly, for essentially the same reasons discussed above, Respondent violated the Act as alleged.

### 11. Supervisor Wrzask's questioning of employee Herrera about supporting the Union (Dec. 14)

Blanca Herrera has worked at the Red Rock since 2006, most recently as a runner in housekeeping. She has also been a union committee leader for many years, since around 2010, and has worn a red and white button indicating so every day since then. On December 14, several days after the new benefits were announced, she was sitting in the housekeeping office after a huddle when the assistant housekeeper, Malgorzata ("Gosha") Wrzask came over and sat next to her. Wrzask asked Herrera why she needed the Union at the hotel since it already provided them many of the things she was looking for with the Union. Herrera answered, "I know what I believe," and that was the end of the conversation.[166]

The complaint alleges that Wrzask's question to Herrera violated Section 8(a)(1) of the Act as it constituted both an unlawful interrogation and an unlawful solicitation of grievances (GC Exh. 1(bk), pars. 5(q), 8).[167] Respondent, however, argues that Wrzask's question constituted neither.

As indicated by Respondent, the facts and circumstances do not fit well with the complaint's interrogation and solicitation theories. Herrera was an open union supporter and Wrzask obviously knew it; although the conversation occurred in the housekeeping office, it was both casual and brief; Wrzask's question was rhetorical in nature (why Herrera still supported the Union given all the new benefits the Company had recently granted)

rather than an interrogation or solicitation (what additional benefits the Company could grant to gain her vote against the Union); and Wrzask did not make any explicit or implicit threats during the conversation.[168]

However, as discussed above, Respondent had unlawfully developed, approved, and granted the new benefits to interfere with the union organizing campaign and election at the Red Rock. And, as indicated in the General Counsel's posthearing brief, by rhetorically asking Herrera why she would continue to support the Union in light of those new benefits, Wrzask reinforced that unlawful conduct.[169] Thus, regardless of whether Wrzask's question constituted an interrogation or solicitation of grievances, it clearly constituted interference, restraint, or coercion within the meaning of Section 8(a)(1) of the Act. Cf. *Space Needle, LLC*, 362 NLRB 35, 38–39 (2015) (supervisor's statements to an employee violated 8(a)(1) on the ground that they were coercive, regardless of whether they constituted an unlawful interrogation as alleged in the complaint, as the coercive-statement theory involved the same facts and the same inquiry as to whether the statement would reasonably tend to coerce employees, and was fully litigated), enfd. 692 Fed. Appx. 462 (9th Cir. 2017).

### 12. Captive audience meetings conducted by Fortino and Nelson (Dec. 16 & 17)

During this same period, Fortino and Nelson began preparing to hold mandatory "captive audience" meetings with the Red Rock Culinary employees to persuade them to vote no in the upcoming election. The meetings were eventually held on December 16 and 17. A total of seven meetings were held over the two days, with 150–200 employees at each meeting, to ensure that as many employees in the voting unit were able to attend as possible. Each of the seven meetings (five of which were recorded by employees) lasted about an hour and both Fortino and Nelson spoke at all of them. One or the other (or both) generally made the same points at each meeting using PowerPoint slides they had prepared beforehand. They also distributed a handout to the employees at each meeting.[170]

Based on the audio recordings, the PowerPoint slides, and the handout, the General Counsel alleges that numerous violations of Section 8(a)(1) of the Act were committed during the captive audience meetings (GC Exh. 1(bk), pars. 5(s), (t), (v), (w), (aa),

---

audience" meetings conducted by Nelson and Fortino regarding the new benefits and the election.

[165] The Union does not contend that this conduct was objectionable.

[166] Tr. 4595–4612 (Herrera). (Wrzask did not testify.) I have not given any weight to Herrara's subsequent testimony on redirect, after being shown her prehearing affidavit by the General Counsel, that Wrzask also said "having the Union there or supporting the Union there wouldn't be good." Counsel for the GC stated that she used the affidavit to question Herrera on redirect solely to "rehabilitate" her following Respondent's cross-examination (Tr. 4613). Under FRE 801(d)(1)(B), a prior statement may be used for that purpose only to the extent it "is consistent with the declarant's testimony," and Herrera in her previous testimony had denied that Gosha made any further comment after her question (Tr. 4601, 4604, 4607). However, contrary to Respondent, I do not find this inconsistency sufficient to discredit Herrera's initial testimony on direct about Wrzask's question, which was otherwise consistent with her affidavit, uncontroverted, and believable given that Station Casinos granted the new benefits to undermine the Union and encouraged Red Rock's supervisors to talk to employees about both the new benefits and the Union. Finally, contrary to Respondent, I also do not find that Herrera's testimony should be discredited because she admitted that English is not her primary language and that Wrzask spoke to her in English. Although

Herrera testified mostly in Spanish through an interpreter, she testified in English when she described what Wrzask said to her. See Tr. 4601.

[167] The Union does not contend that this conduct was objectionable.

[168] See generally *Rossmore House*, 269 NLRB 1176 (1984), affd. sub nom. *Hotel Employees Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985). And compare *Trinity Services Group, Inc*., 368 NLRB No. 115, slip op. at 1 (2019) (finding no violation where supervisor's remark was "a rhetorical question posed as part of a lawful expression of his opinion").

[169] See GC Br. at 42 ("As discussed in the following sections, Respondent played a dirty game by using the 2020 Focus on Family strategic plan to stack the deck and interfere with employees' free choice. Fortino, Finch, and Nelson were the key players, but they had all supervisors and managers off the bench and scoring points by reinforcing the promise of epic benefits . . .").

[170] See GC Exhs. 33 (final version of PowerPoint), 94–98 (a) and (b) (the audio recordings and transcripts), and 143 (final version of handout). See also GC Exhs. 26, 30, 32, 39(a), 93, 100, and 150; and Tr. 151–152, 330, 332, 345–352, 452, 502, 666–667 (Nelson), 1141, 1150–54, 1269–70 (Fortino), 1680–1681, 1761–1763, 1784–1787 (Hernandez), and 2386 (Andrade). Hernandez or Andrade translated at the meetings. The handout was in both English and Spanish.

8, as amended by GC Exh. 2).[171]  The Union alleges that the vi-
olations also constituted objectionable conduct that interfered
with the conduct of the election (GC Exh. 1(bo), Objs. 1–7, 9).
Each of these allegations is addressed below.

### a. Continuing to tout the new benefits

Nelson or Fortino began the captive audience meetings with a
"recap" of the "2020 focus on family" exciting news meetings a
week earlier.  Using the PowerPoint slides, they reminded the
Culinary employees of the "great stuff" and "drastic" changes
that had been announced, including the new training, recogni-
tion, and direct hire programs and "unheard of," and "exciting"
new "free" medical center, and "company-paid"
retirement benefits.[172]  They then immediately turned to the up-
coming union election, saying it was "maybe the most important
career decision" the employees were "going to be faced with."
They asked the employees why, given that they were now "al-
ready going to have for free" all of the new benefits, they would
want to pay dues to the Union, and urged them to "vote no."

Nelson and Fortino also repeatedly returned to the new bene-
fits during and at the end of the meetings.  They assured the em-
ployees that the Company was "ready to deliver" the new bene-
fits to them.  They said the Company had already extended the
open enrollment for the HMO plan until January 31 and would
begin construction on the new Red Rock medical center in three
weeks.  And they invited employees to bring them a copy of the
trifold benefits pamphlet for them to sign or "autograph" as a
"guarantee."  As discussed more fully below, they also con-
trasted the new benefits the Company had put together and
granted them "in just 3 months" with how little ("nothing") the
Union-represented employees at Boulder and Palace Stations
had gotten from the Company by bargaining "for 3 1/2 years."
And they followed this by again urging the employees to vote
against the Union.

The handout made the same or similar points.  It listed the new
"free" and "paid" healthcare, medical, and retirement benefits
employees had been granted by the Company "in writing" and
"without paying Dues Every Year."  It also contrasted the situa-
tion at Boulder and Palace Stations, indicating that the repre-
sented employees there had not gotten "anything" from the Com-
pany through collective bargaining.  And it asked why, since the
Red Rock employees now "already have the most important
things," they would want to also "take a chance" with the Union.

The General Counsel argues that this "continuous announce-
ment and promise of benefits . . . violated the Act just as the ini-
tial announcement of the benefits during the exciting news meet-
ings did" (Br. 93).  And the Union argues that it was also objec-
tionable.  The Respondent, on the other hand, again argues that
it is not unlawful or objectionable to remind employees of exist-
ing benefits prior to an election.  It also argues that Nelson and
Fortino talked about the new benefits at the captive audience
meetings only because the Union had distributed a flyer giving
credit for the new benefits to its organizing and button-up cam-
paigns.[173]

As previously discussed, Respondent's first argument is with-
out merit given that the new benefits were granted unlawfully.

As for the second, it is not supported by the evidence.  Fortino's
"first draft" of the PowerPoint, which he emailed to Nelson on
December 13 and likewise began by touting the new benefits,
made no mention of the union flyer.[174]  It was only later that
references to it were added to the presentation.  Further, it was
added primarily to ridicule the Union with statements like, "I
guess the union's going to take credit for creating the internet,"
"creating gambling," "landing on the moon," "inventing air con-
ditioning," and "inventing the wheel"; and, "Here's what the Un-
ion won't take credit for: over 1110 days . . . three plus years,
over three years, without a contract at Boulder Station or Palace
Station."  Finally, Nelson had made similar comparisons to Boul-
der and Sunset Stations at the mandatory meetings in September
where Fortino had initially promised to look at improving bene-
fits.  In short, it is clear from the record as a whole that Nelson
and Fortino would have discussed the new benefits at the captive
audience meetings in essentially the same way even absent the
union flyer.

Accordingly, Respondent's conduct was unlawful and objec-
tionable as alleged.

### b. Promising more benefits in the future

Fortino also stated or suggested that the new benefits and pro-
grams that had been announced, promised, and granted a few
days earlier were just the beginning.  For example, at a meeting
on December 16, he stated,

> So three short months ago I . . . stood in front of you . . . and I
> told you one thing.  I was hired to look at everything we are
> doing. The Fertitta family knew that I had a reputation for mak-
> ing changes and looking at things, because they were unhappy
> with the way things have recently been.  Starting the day I ar-
> rived, I've looked at every single thing we're doing. As a result,
> a couple of weeks ago, we walked you through the new plans.
> But we're not done yet.  We're going to continue to look at
> things.  This is kind of phase 1. [GC Exh. 95(b), at 5]

And at another meeting on December 17, he said,

> Remember me from three months ago?  I was hired by the
> Fertitta family to come in here and evaluate everything we do.
> And the only promise I made was that we would look at every-
> thing.  As a result of looking at everything, we've announced
> new programs.  The new programs you're gearing for is making
> us the best employer in Las Vegas.  I think we're on our way.
> [GC Exh. 96(b), at 3–5]

As previously discussed, both Fortino's promise to look at im-
proving everything three months earlier and the Company's re-
cent announcement of the new benefits and programs were un-
lawful.  In that context, Fortino's additional statements 2–3 days
before the election indicating that the Company was "not done
yet" and would "continue to look at things" to make it "the best
employer in Las Vegas" were also unlawful.  Cf. *Reno Hilton
Resorts Corp.*, 319 NLRB 1154, 1156 (1995) (company presi-
dent's series of speeches two days before the election reminding
employees of benefits it had already granted and asking them to
give the company and him "a chance" to "deliver" was unlawful

---

[171] The GC's posthearing brief (p. 95 fn. 93) withdraws the allegation
in complaint paragraph 5(v)(1)(O).

[172] Fortino also reminded the Culinary employees of his initial meet-
ing with them in September.  For example, at one meeting he said:

> [R]ecall what I said three months ago.  I promised one thing. That we
> would look at every single thing we're doing as a company, and that's

what I did.  As a result, we've made some significant changes that ben-
efit almost everybody in this room. And that was our goal [GC Exh.
97(b), at 4].

See also the additional examples quoted, infra.

[173] See GC Exh. 158 (the union flyer).

[174] See GC Exh. 30.

in the context of the employer's prior unlawful promises of benefits and the fact that the earlier bestowal of benefits was unlawful). As the unlawful statements occurred during the critical period before the election, they were also clearly objectionable. See *Aldworth Co.*, 338 NLRB 137, 184, 232 (2002), enfd. sub nom. *Dunkin' Donuts Mid-Atlantic Distribution Center v. NLRB*, 363 F.3d 437 (D.C. Cir. 2004).

### c. Threatening that it would be futile to support the Union

As at their mandatory meetings three months earlier, Nelson and Fortino also made various statements about the bargaining process and the history of negotiations at Boulder and Palace Stations. For example, at one of the meetings on December 16, Fortino and Nelson stated:

> FORTINO: Let's start with the obvious. How long have Boulder and Palace been in negotiations? Another word would be bargaining. Over three years. How is that going? It's going nowhere. Here's what the law says. . . .
>
> The employer and the union are required to meet at reasonable times to bargain in good faith about wages, hours, vacation time, insurance, safety practices, and other mandatory subjects. However, parties are not compelled to reach agreement or make concessions. What that means is there's no legal requirement to make a deal. As opposed to what we have done, which is to present you all of our new 2020 focus on family benefits without negotiating, without bargaining. It's all yours. The government does not require us to make a deal with the union ever. I think that's made obvious when you look at Boulder and Palace. 1,110 days as of today. Let's talk about Boulder Station one more time. Multiple, multiple meetings, no contract, no agreements, no pension—oh, but wait a minute you already have a retirement plan. And no free healthcare. Oh, wait a minute. You already have that now without bargaining, without negotiating. So if that doesn't show you the power of quote negotiating— we did this in three months while Boulder and Palace have been waiting over three years. These brand-new company-wide benefits apply to you now—well, as of January 1st. Sorry. Free health insurance for everyone, including your family, January 1, without negotiating, without bargaining for 1110 days and counting. . . .
>
> NELSON: Does the union or employer have to agree with the proposals they are given? The answer is no. Labor law does not require the union or the employer to agree to any bargaining proposal. The law only requires the parties to negotiate in good faith, with a sincere desire to reach an agreement.
>
> FORTINO: And the key phrase is "good faith," which only means reasonable time, reasonable location, which we have been doing with Boulder and Palace for over three years. [94(b), at 10–13]

Similarly, at another meeting on December 16, they stated:

> NELSON: Palace and Boulder have been negotiating and have gotten nowhere in 3, almost 3 1/2 years . . . – der or Palace. . . .
>
> . . . .
>
> FORTINO: Let's talk about negotiations and how negotiations work. It's run by the government. The government

oversees everything. Sometimes to the point it makes us uncomfortable, doesn't it? This is the law. The employer and the union are required to meet at a reasonable time, at a reasonable location. In theory, that's it. The law states clearly the parties are not compelled to ever reach an agreement. Boulder, Palace, 1100 days, no contract, nothing. There is no law that says we ever have to agree. And bargaining means one thing, more, less, or the same. . . .

> NELSON: Again, Boulder and Palace, as Phil had mentioned, there have been multiple meetings, multiple meetings. But there's no contract. There's 180 plus articles that have been thrown out on the table between the two parties and it's my understanding there's been four things that have been agreed upon. . . . No agreements. [GC Exh. 95(b), at 7–8, 14]

Nelson and Fortino made similar statements at the meetings the following day. For example, at one meeting on December 17, Nelson stated:

> The Board requires the Employer and the Union to meet at a reasonable time and reasonable locations and that's pretty much it. The law says we never have to agree. Would anybody like some proof? How about Boulder and Palace? Are they anywhere? The Board says we never have to agree. But we have to meet. Which we've been doing for over 3 years. . . . Multiple meetings. 3 1/2 years. No contract. No agreements. No pension, but you already have one here. You already have it now. Brand new companywide benefit changes apply to you now, free healthcare insurance for everyone. Three new medical centers coming now, one right here in our building. A new retirement plan. Sister properties, unfortunately 1100 days and counting. Does the union or employer have to agree to the proposals? No. [GC Exh. 96(b), at 19–21][175]

And at another meeting, they stated:

> FORTINO: Let's talk about negotiations. . . The law is very, very simple. The Employer and the Union are required to meet at a reasonable time and a reasonable location, to talk about wages, benefits and more. However, the parties are not compelled to reach an agreement or to make concessions, which means we never have to agree. Ever. We have to bargain in good faith. Apparently it's been happening at Boulder and Palace for over 3 years. It's been about 189 proposals in three years [and] 4 items have been agreed to in 3 1/2 years. And two of them are regarding collecting dues. Fact. So you have a right to bargain.
>
> NELSON: Ok, negotiation updates. Boulder and Palace again as he had mentioned. Still over 3 1/2 years: no contracts, no agreements, no pension. But wait, you already have a paid retirement plan here. No free healthcare. Wait, you're getting that here. [GC Exh. 97(b), at 16–17]

In several respects, these statements were similar to the unlawful statements made at the September meetings. As at those meetings, Nelson and Fortino repeatedly referenced the years of fruitless negotiations between the Company and the Union at Boulder and Palace Stations as the sole or primary example of what to expect from collective bargaining. And, as at those meetings, they compared and contrasted that negative example with the "great" new benefits they would be receiving without the Union.

---

[175] Similar statements were set forth on p. 18 and 19 of the PowerPoint.

There were also differences, the primary one being that, unlike at the September meetings, there was some discussion of the duty to bargain in good faith. For example, quoting the NLRB's website, the PowerPoint stated (p. 18), "After employees choose a union as a bargaining representative, the employer and union are required to meet at reasonable times to bargain in good faith about wages, hours, vacation time, insurance, safety practices and other mandatory subjects."[176] It also subsequently stated (p. 20), "The law only requires the parties to negotiate in good faith with a sincere desire to reach agreement"—which at least implied that good faith bargaining requires a sincere desire to reach agreement.

However, the PowerPoint did not state that the Company had in fact bargained in good faith at Boulder and Palace Stations or that it would do so at the Red Rock if the Union was elected. Nor did Nelson and Fortino. The closest Fortino came to this at one meeting was to say that the Company "apparently" had done so at Boulder and Palace Stations over the previous three years.

Moreover, Nelson and Fortino deviated from the PowerPoint regarding what the duty to bargain in good faith requires. Neither mentioned at several of the meetings that the duty requires a "sincere desire to reach agreement." And, as indicated above, in one meeting where Nelson did follow the PowerPoint and mention this, Fortino interjected saying, "the key phrase is 'good faith,' which only means reasonable time, reasonable location." Both Nelson and Fortino also made other, very similar statements at the meetings indicating that the duty to bargain in good faith only requires parties to meet at reasonable times and locations.

These statements were not only inconsistent with the PowerPoint, they were inconsistent with the law. Section 8(d) of the Act requires an employer to "meet at reasonable times *and* confer in good faith" (emphasis added). This obligation is "not fulfilled by 'purely formal meetings,'" but also requires "'a serious attempt to resolve differences and reach a common ground'" *Hilton Anchorage*, 370 NLRB No. 83 (2021), quoting *NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 485–486 (1960). See also *RBE Electronics of S.D., Inc.*, 320 NLRB 80, 88 (1995) ("Mere willingness to talk does not constitute a willingness to bargain collectively"); and *NLRB v. Herman Sausage Co,* 275 F.2d, 229, 231-232 (5th Cir 1960) ("[T]o sit at a bargaining table, or to sit almost forever, or to make concessions here and there, could be the very means by which to conceal a purposeful strategy to make bargaining futile or fail").

Further, given the Company's other related prior and contemporaneous unlawful and objectionable conduct, employees would reasonably construe Nelson's and Fortino's statements in their worst light, i.e., regardless of what the NLRB and the law says good faith requires, the Company would just go through the motions of meeting with the Union without any serious intent to reach an agreement. Cf *Shamrock Foods Co.*, supra, 366 NLRB No. 117, slip op. at 14 (finding that employees would reasonably construe manager's statement, "The company doesn't have to agree to anything, nothing . . . Bargaining can go on forever. It can never end . . . All you have to do is bargain in good faith," as unlawful threats of futility in the context of the employer's

other unfair labor practices); and *Federated Logistics*, 340 NLRB 255, 256 (2003) (finding that, notwithstanding any lawful messages in the employer's antiunion campaign leaflets and PowerPoint presentation, managers' statements to employees about the bargaining process constituted unlawful threats of futility in the context of the employer's numerous other unfair labor practices), rev. denied 400 F.3d 920 (D.C. Cir. 2005).

Accordingly, Respondent's above-described conduct was unlawful and objectionable as alleged.[177]

### d. Threatening loss of new benefits

Like Andrade a few days earlier, Fortino also made various statements about what would happen to the new benefits if they voted for the Union. For example, at one of the meetings on December 16, Fortino stated,

> Here's the key word. Bargain. They have to bargain. They have to bargain for what you already have. As of January 1st, you have free health plan, free retirement plan, and you already have job security.
>
> . . . .
>
> Don't let them put bargaining back in instead of what you already have. You already have everything that the union wants you to pay $600 a year for every year trying to bargain something else that you already have. [GC Exh. 94(b), at 7–8, 17]

Similarly, at another meeting the same day, Fortino stated:

> [I]f [a majority of those who show up] vote for the union, you are all union. And then what happens, we would all go back into negotiations and bargaining. Everything that you have goes into bargaining and negotiations where you can end up with more, less, or the same. That's called bargaining . . .
>
> . . . .
>
> In my previous employer, we built a full-time medical center for our team members in Reno, Nevada. 4,000 team members and their families. We had negotiations with one of the unions last year and they have 100 percent lost access to the medical center, because that's what can happen in negotiations. None of those team members or their families have access to that medical center. [GC Exh. 95(b), at 19]

And at a meeting on December 17, he stated,

> Somebody asked me, well, what happens if you vote the Union in? What happens to all this? Everything goes back to the bargaining. Everything. Which means you could end up with more. You could end up with less. Maybe you end up with the same. People don't understand that. Think, well, if we have it, we're gonna start from there. And it doesn't work that way. Everything becomes negotiable again. Our question to you is why worry about negotiations when you already have it? Think about it.
>
> . . . .
>
> Let me give you one more example. It's about bargaining and negotiating. About 2 1/2 years ago, I built a medical center in Reno, Nevada, for my past employer, for about 4,000 people. We entered union negotiations with one of the unions about a

---

[176] See https://www.nlrb. gov/about-nlrb/rights-we-protect/your-rights/employer-union-rights-and-obligations.

[177] The General Counsel also alleges or argues that various other statements by Fortino and Nelson at the meetings constituted threats of futility. However, given the above findings, it is unnecessary to address those other statements as no credibility resolutions are required and the additional violations would be cumulative and would not affect the remedy.

year ago. That union no longer has access to the medical center. That's what is called bargaining. Sometimes more. Sometimes less. Sometimes the same. Why bargain for something that you already have? [GC Exh. 97(b), at 17–19, 31]

The PowerPoint (p. 26), also addressed the subject, stating, "Your Livelihood Could Be Affected" by a simple majority of those voting; that, if a majority vote for the Union, "You are NOW UNION and EVERYTHING GOES INTO BARGAINING!!!"

Like Andrade's previous statements, Fortino's statements—that voting for the Union in the December 19 and 20 election would "put bargaining back in instead of what you already have," and that if the Union was elected it would "have to bargain for what you already have," "we would all go back into bargaining," and "everything goes back to the bargaining"—indicated that the new benefits would not be implemented for the Red Rock Culinary employees on January 1 as announced but would instead be subject to the bargaining process. And, like the repeated references he and Nelson made to the long and fruitless contract negotiations at Boulder and Palace Stations, Fortino's vague example about the Reno employees at his former employer losing access to a new medical center after negotiations began compounded and magnified the coercive nature of his statements. Cf. *Yuma Coca-Cola Bottling Co.*, 339 NLRB 67, 68 (2003) (employer's prepetition threat that employees would lose their 401(k) plan with the union was subsequently exacerbated and reinforced during the critical preelection period by its ambiguous and confusing statement about the matter, which failed to assure employees that they would not automatically lose their 401(k) plan, and by its other statements indicating that bargaining over such a plan would be futile because none of the hundreds of contracts between the company and the union across the country contained one).

Moreover, Fortino and Nelson did not stop there; they also made certain additional statements specifically about whether the new benefits would be implemented at Boulder and Palace Stations and Fiesta Rancho, where the Company had also recognized the Union as the employees' bargaining representative. The Company had notified the Union by email on December 12 of its plan to implement the new benefits companywide, including, "tentatively," for all employees the Union represented at those three properties, effective January 1, 2020 (or, with respect to the new medical centers, when construction was completed). And the Union notified by email two days later, on December 14. The Union requested certain information relating to the changes and "continued discussion' over them but stated that it "agrees that the Employer may implement those changes on the timeline proposed."[178]

However, at the captive-audience meetings on December 16 and 17, Fortino and Nelson made no mention of the Union's

agreement to implementing the benefits as planned at the three properties. Instead, following the PowerPoint (p. 19), they indicated that the Company could not implement the benefits as planned at those properties without continued discussion with the Union. For example, at a meeting on December 16, Fortino stated,

These brand-new companywide benefits apply to you now—well, as of January 1st. . . Free health insurance for everyone, including your family, January 1, without negotiating, without bargaining for 1110 days and counting. Coming soon: Access to three Station Casinos medical centers, which you can go to any three when they're done being built . . . One here in the building.

. . . .

We cannot implement these changes at your sister properties in Boulder, Palace, and Fiesta Rancho without continuing to discuss it with the union. . . [GC Exh. 94(b), at 11–12]

And at a meeting on December 17, he stated,

Let me add one more thing. If we had put this program in 3 1/2 years ago, wouldn't Boulder and Palace have already enjoyed it for 3 1/2 years? Here we are 3 1/2 years later, they've gained nothing. [GC Exh. 97(b), at 19]

Nelson made similar statements at other meetings. For example, at a meeting on December 16, he stated,

These brand-new company-wide benefit changes apply to you now. Free healthcare for everyone, including your family. Access to the three Station Casino medical centers, the one here at Red Rock Resort. A company paid retirement plan. And unfortunately, we can't implement these changes at your sister properties, Boulder, Palace, and Fiesta Rancho, without continuing to discuss them with the union. And again 1,100 days and counting since Boulder, Palace, and Rancho were promised free union health insurance. [GC Exh. 95(b), at 15]

Nelson also made virtually identical statements at other meetings that day and the next [GC Exh. 98(b), at 15–17, and 96(b), at 21].[179]

In sum, considered together and in the context of their other unlawful statements at the meetings, Fortino's and Nelson's foregoing statements and PowerPoint conveyed the message, and would reasonably have been interpreted as conveying the message, that the Red Rock employees would not receive the new benefits on January 1 if they voted for the Union and would likely never get them (or any future new companywide benefits) through the bargaining process, at least not without negotiating for years. Accordingly, Respondent's conduct was unlawful and objectionable as alleged. See *Federated Logistics*, above.[180]

---

[178] See U. Exhs. 7–12; and Tr. 1157–1158 (Fortino). As previously noted, the Company was still contesting the elections at the four properties and had not recognized the Union there. See fn. 131, above.

[179] Nelson and Fortino also assured the employees that they were telling them the truth. See, e.g., GC Exh. 96(b), at 11 ("NELSON: . . . My responsibility to you is to help you. And to do that, is to tell you the truth."). Indeed, Fortino stated that he and Nelson were required by law to tell them the truth. See GC Exh. 97(b), at 25 ("FORTINO: One more thing, believe what we're saying. I don't even know if you all know this. By law, the company cannot lie to you. To be clear, the company may not lie. . ."). But see *Didlake, Inc.*, 367 NLRB No. 125 (2019), and cases cited there (the Board will not probe the truth or falsity of an employer's

campaign statements or set aside elections on the basis of its misleading campaign statements unless it acted in such a deceptive manner that employees would be unable to recognize that the statements were campaign propaganda, or the statements exceeded mere misrepresentation and would reasonably be construed by employees as coercive threats).

[180] See also the cases previously cited in the discussion of Andrade's unlawful and objectionable threat on December 13. In reaching this conclusion, I have also reviewed and considered the numerous cases cited in the Respondent's posthearing brief but find them factually distinguishable and therefore neither controlling nor persuasive authority under the circumstances presented here.

*e. Threatening unspecified reprisals*

At one of the meetings on December 17, Nelson also made the following statements (which were not on the PowerPoint):

> I hope you make the [decision] that keeps, you know, our relationship the way that it is. . . . It does, it will affect the working relationship to the point where it makes it so difficult for us to do our jobs, I can't explain to you the challenges that we'll be faced with. At our sister property, Palace, when I wanted to be able to help, I couldn't. Now with this vote that you're about to make, it's not a vote for or against the union. It's a vote for me or not for me is the way I'm looking at it gang. What we've been able to do in over a year and a half that I've been here. See those binders up on that counter? All team member meetings and focus groups and when I've met with you and asked you what needed to be fixed. What we needed to work on. And what we've been able to accomplish as a team and as a family. That's it. This is it. I implore you, please think about it, and vote no. Please. [GC Exh. 97(b), at 32–33]

Like Cheney's and Park's previous statements to employees that there would be no more "favors" or "extras" for them, Nelson's statement indicating that he could not "help" the Red Rock employees anymore if they voted for the Union constituted a threat of unspecified reprisals. See *Abouris, Inc.*, 244 NLRB 980, 981–983 (1979) (supervisor's statement that, if the union won the election, she "couldn't help" the employees any further in meeting their production requirements violated Section 8(a)(1)). Further, the threat was aggravated and amplified by his subsequent statements and pleas indicating that he would consider a vote for the Union as a rejection and betrayal of him personally given all of the work he had put in for the "team" and "family" over the past year and a half. Cf. *Downtown Toyota*, 276 NLRB 999, 1019 (1985) (finding that manager unlawfully equated employees' protected concerted activities with disloyalty by telling them that he felt "personally hurt" that they had not approached him regarding their grievances before going to the union), enfd. 859 F.2d 924 (9th Cir. 1988). Accordingly, Respondent violated the Act as alleged.[181]

*f. Threatening that a strike was inevitable and striking employees would be permanently replaced*

The subject of strikes was also addressed at the captive audience meetings. The PowerPoint included a slide devoted to the subject (p. 21), which began, "What if the Culinary union wants us to strike over economic issues?" It then set forth the following definition of "economic striker" from the NLRB's website:

> If the object of a strike is to obtain from the employer some economic concession such as higher wages, shorter hours, or better working conditions, the striking employees are called economic strikers. **They retain their status as employees and cannot be discharged, but they can be replaced by their employer. If the employer has hired bona fide permanent replacements who are filling the jobs of the economic strikers when the strikers apply unconditionally to go back to work, the strikers are not entitled to reinstatement at that time.**

> However, if the strikers do not obtain regular and substantially equivalent employment, they are entitled to be recalled to jobs

for which they are qualified when openings in such jobs occur if they, or their bargaining representative, have made an unconditional request for their reinstatement." [Bolded in PowerPoint][182]

Nelson and Fortino also addressed the subject in their remarks. For example, at one of the meetings on December 16, they stated:

> NELSON: Does the union or employer have to agree with the proposals they are given? The answer is simple. No. Labor law does not require the union or the employer to agree to any bargaining proposal. The law only requires, as Phil had mentioned, the parties to negotiate in good faith.
>
> FORTINO: Let's talk about that part. The union comes in and they feel like they are not making progress with wages and other terms and conditions of employment, they can call you out on strike. That is called an economic strike. And the law is clear, the company may permanently replace any striker. That's a fact. It's important for everybody to understand we have the right to hire replacement workers. I don't think anybody here thinks we're going to shut down because of a strike. [GC Exh. 94(b), at 15–16]

They also stated:

> FORTINO: One of the longest strikes in U.S. history was the Frontier Casino.
>
> NELSON: There have been others I think that went on for even longer.
>
> FORTINO: Well, Santa Fe was in discussion for 7 years.
>
> NELSON: Right. That was prior to our purchasing. It's a long negotiation.

Similarly, at another meeting that day, they stated:

> NELSON: What if the Culinary Union wants us to strike over economic issues?
>
> FORTINO: This is labor law? If there's an economic strike, which basically means wages and things like that, and the Union asks you to strike, the company has the right to permanently replace those on strike. That is the law. You need to think about that as well. I hope you'll understand what the laws are. [GC Exh. 98(b), at 17–18]

They also made similar remarks at the meetings on December 17. See GC Exh. 96(b), at 21–23 and GC Exh. 97(b), at 19.

An employer may accurately inform employees, even in summary fashion, about the potential for an economic strike and the employer's right to permanently replace employees who engage in such a strike. *Eagle Comtronics*, 263 NLRB 515 (1983); and *Quirk Tire*, 330 NLRB 917, 926 (2000), enfd. in part 241 F.3d 41 (1st Cir. 2001). And, viewing their above statements in isolation, that is all Nelson and Fortino did. Their statements about these subjects were accurate and did not go beyond merely informing employees of such potentialities to explicitly threaten

---

[181] This allegation was added by the General Counsel at the outset of the hearing and is not included in the Union's postelection objections or addressed in its posthearing brief.

[182] See https://www.nlrb.gov/strikes.

that a strike was inevitable and they would be permanently replaced.

However, as indicated by the General Counsel, the statements were not made in isolation. They were accompanied by repeated unlawful threats of futility indicating that the Union would not make any progress in negotiations, as well as threats that employees would lose existing benefits and suffer other unspecified reprisals, if the Union was elected. Context matters.[183] And in this context, employees would not likely miss the implication that a strike would, in fact, be inevitable, and that they would be permanently replaced if they joined the strike, before any substantial progress would be made in negotiations. See, e.g., *Harbor Cruises, Ltd.*, 319 NLRB 822, 839–840 (1995); *Neo-Life Co. of America*, 273 NLRB 72 (1984); and *H. A. Kuhle Co.*, 205 NLRB 88, 104 (1973).[184]

Accordingly, Respondent violated the Act as alleged.[185]

### g. Excluding prounion employees from the meetings

As indicated above, the captive audience meetings were mandatory for all Red Rock Culinary employees. And, consistent with Red Rock's past practice, all employees who attended them were paid for doing so, regardless of whether the meeting occurred during or after their shift or they were on or off duty at the time of the meeting.[186]

However, some employees who openly supported the Union were not authorized or allowed to attend the meetings by their managers or supervisors. For example, Steven Bailey, a bellman and union committee leader, was initially told by the bell captain that he could attend. But when he arrived, Josh Leiserowitz, the hotel manager, told him he was not allowed in the meeting. So Bailey returned to work. Similarly, at least two guest room attendants and union committee leaders in housekeeping, Beatriz Mondeja and Yairelin Acosta, were not authorized or allowed by their supervisor to stop working during their shift to attend. And Adam Christian, a server at T-Bones and union committee leader, tried to attend on his day off but Lawrence Silva, the fine dining director, told him he was not welcome and to go home.[187]

The Union argues that excluding prounion employees from the meetings constituted objectionable conduct (GC Exh. 1(bo), Obj. 8).[188] And the argument is supported by Board precedent to the extent Red Rock paid employees to attend when, like Christian, they were not scheduled to work. The Board has long held that, while an employer may generally exclude prounion employees from its antiunion preelection captive audience meetings during working time, it may not do so where employees are

paid more than their regular pay to attend the meetings. See *Saisa Motor Freight*, 333 NLRB 929 fn. 2, 931 (2001) (employer's exclusion of prounion line-haul drivers from its mandatory preelection meetings was objectionable as the line-haul drivers who attended were paid an hourly rate for doing so in addition to their regular pay for making their runs that day); *Wimpey Minerals USA, Inc.*, 316 NLRB 803 fn. 1, 806 (1995) (employer's exclusion of prounion employees from its mandatory preelection meetings was objectionable and violated Section 8(a)(1) and (3) of the Act as employees were paid their regular hourly rate or overtime for attending after their shift was completed); and *Delchamp's, Inc.*, 244 NLRB 366, 366–367 (1979) (employer's exclusion of prounion employees from its voluntary preelection luncheon and dinner meetings violated Section 8(a)(1) as employees who were off duty those days were permitted to clock in and be paid for attending the meetings), enfd. 653 F.2d 225 (5th Cir. 1981).

Unlike in the cited cases, here neither Christian nor any of the other employees were specifically told they were being excluded because of their union activity. However, as discussed above, there is abundant evidence of Red Rock's antiunion animus. And there is substantial circumstantial evidence that Christian and the others were known or believed to be strong union supporters. As previously discussed, union committee leaders wore red and white buttons designating them as such; they also wore brown union buttons and passed them out to their coworkers; and managers and supervisors were directed to prepare MUD lists identifying who were union supporters prior to the election.[189]

Further, Red Rock's managers gave inconsistent testimony regarding the reasons for excluding Christian and the other employees. For example, Nelson testified that managers "were given guidance" that "anyone who potentially could have disrupted the meeting" should be excluded, and it was his "understanding" that employees who had stood up and "yelled" or "screamed" at one or two of the September mandatory meetings he and Fortino conducted were excluded for that reason. Nelson testified that he "believe[d]" Fortino communicated to the directors which employees to exclude. However, Paul Schillig, Red Rock's director of hotel operations, testified that he was the person who decided who to exclude from the meetings. He testified that, because he had only recently become hotel director in July, he based his decision on information he requested and received from other managers about who had a history of "outbursts" during huddles that were "loud," "disruptive," "combative,"

---

[183] *Sysco Grand Rapids, LLC v. NLRB*, 825 Fed.Appx. 348, 355 (6th Cir. 2020), denying rev. in part 367 NLRB No. 111 (2019).

[184] As indicated by the General Counsel, *Stern Produce Co.*, 368 NLRB No. 31 (2019), where the Board majority found no such violation, is distinguishable. Although the employer there also committed numerous other unfair labor practices, the Board majority emphasized that the employer's labor consultant told employees that they would have the "the option" whether or not to vote to strike.

[185] This allegation is not included in the Union's postelection objections or addressed in its posthearing brief.

[186] Tr. 614–615 (Nelson), 1784–1785, 1843 (Hernandez), 4497–4498 (Christian).

[187] Tr. 3579–3581, 3638–3641 (Bailey), 4793–4799 (Mondeja), 4804–4812 (Acosta), 4495–4498, 4515 (Christian), 4933–4934 (Leiserowitz).

[188] This conduct is not alleged by the General Counsel as an unfair labor practice.

[189] See also Tr. 3640 (Bailey), 4791–4792 (Mondeja), and 4803–4804 (Acosta). Jose Avila ("Chef Lupe"), the room chef for T-Bones in 2019, testified that he prepared a MUD list prior to the election and provided it to Silva (Tr. 2616–2618, 2646). And Paul Schillig, who was the hotel director of operations and testified that he made the decision who to exclude, admitted that he helped create and/or reviewed MUD lists as well (Tr. 4992, 5002). Further, there is direct evidence that Bailey was a well-known union supporter. See, e.g., GC Exh. 62 (Fortino's October 10, 2019 email to Jackson about a Nevada Current article published the same day quoting Bailey regarding his union activities at the Red Rock and the Company's response). Finally, while not all open union supporters were excluded from the meetings, the same was true in *Delchamp's*. See 244 NLRB at 367 fn. 11 ("We agree with the ALJ's finding that there was no 'general exclusion' of union supporters from the meetings. However, to the extent that Respondent discriminatorily denied benefits to even a single employee because of his or her union support, that is unlawful, regardless of whether Respondent treated other union adherents in the same fashion").

"unruly," and "argumentative."[190]

Moreover, neither Nelson's nor Schillig's testimony in this regard was corroborated by any other witness or evidence. Fortino was never even asked about the matter. And Hernandez testified that she didn't know anything about it. As for Leiserowitz, he testified that he couldn't recall who in upper management told him he could exclude employees, what the guidelines or ground rules were for doing so, or why he told Bailey he was not allowed to attend. And Silva did not testify.[191]

There is also no record evidence that Christian, Bailey, Mondeja, and Acosta had actually engaged in such disruptive conduct at the September meetings or in huddles. Christian denied that he had ever been disruptive at prior meetings. And Red Rock did not offer, and has not identified, any evidence indicating otherwise. Nor has it identified any substantial or credible evidence indicating that the others were disruptive at meetings or huddles. Although Schillig testified that Bailey was known to have "outbursts from time to time" and to "push back on management" in a "very vocal, loud and disruptive" manner, this testimony was uncorroborated hearsay. It is undisputed that the only specific incident in the record involving Bailey (an interaction with Leiserowitz earlier the same day about the new benefits, discussed infra) did not result in any disciplinary action and was not a basis for excluding him.[192]

Finally, as previously discussed, Nelson was not a particularly credible witness generally. Nor was Schillig. For example, he denied that Bailey's prior disruptive conduct related to discussions about the Union, testifying that managers and supervisors "never really discussed the Union in huddles" prior to the captive audience meetings (Tr. 5000). However, as indicated above, Red Rock managers and supervisors had been specifically directed to discuss the Union during huddles and they did so.

Accordingly, Red Rock's conduct was objectionable as alleged.

### 13. Hernandez' statement to Employee Gomez (Dec. 16)

Immediately after one of the captive audience meetings on December 16, employee Gomez asked Hernandez, who was present and had translated at the meeting, to clarify a few things, including whether or not the benefits would be available or whether or not employees would still get the benefits if the Union was elected. Hernandez responded, "For those who are in the unit, if the Union won then everything would be under negotiation."[193] The General Counsel alleges that this statement threatened loss of benefits in violation of Section 8(a)(1) of the Act (GC Exh. 1(bk), pars. 5(u), 8). And the Union alleges that it was also objectionable conduct that interfered with the election (GC Exh. 1(bo), Obj. 4).

For the same reasons discussed earlier, the allegation is well supported. Both by itself and in combination with Fortino's and Nelson's statements, Hernandez's response to Gomez's question indicated that the Red Rock employees would not receive the new benefits on January 1 as announced if the Union was elected but would have to bargain over them instead. Accordingly,

Hernandez's statement to Gomez was unlawful and objectionable as alleged.

### 14. Leiserowitz' statement to employee Shoup (Dec. 16)

The General Counsel and the Union also allege that Leiserowitz threatened loss of benefits during a conversation with bellman Wayne Shoup on December 16. See Tr. 3592–3625, 4975, adding par. 5(mm) to the complaint; and GC Exh. 1(bo), Obj. 4.

The relevant evidence supporting this particular allegation was provided by Bailey, who overheard the conversation. Bailey testified that, in the late morning or early afternoon, before he unsuccessfully attempted to attend one of the captive audience meetings, he went to the bell closet near the supervisor's office to get some work equipment out of his locker. When he arrived, Leiserowitz and Shoup were already in the area having a conversation. He initially didn't pay any attention to it but went directly to his locker, which was about 4–5 feet from them, and began looking for the item he wanted. However, he turned around when he heard Shoup ask Leiserowitz a question about the new benefits. Specifically, Shoup asked whether, if the employees voted for the Union, they would "still be eligible for the new benefits" that Red Rock had announced. Leiserowitz said no, they would not be eligible for them. Bailey immediately disputed this, telling Leiserowitz that the information he was giving Shoup was "incorrect" and "illegal." He said that Red Rock could not withhold benefits from employees because they choose to have a union; that until a contract is in place, every employee would be offered the same or same level of benefits as everybody else. Leiserowitz disagreed, saying he had "verified" the information earlier with other sources. Bailey replied that whoever gave him that information was also incorrect. Leiserowitz then turned and walked away.[194]

Leiserowitz gave a different account of the conversation. He testified that Shoup asked him, "What's going to happen to our benefits if the Union gets voted in." And he responded, "Well, I don't know, they could go up, could go down, [or] could remain the same." At that point, Bailey interjected and said something like, "that's not right, you can't say that." Bailey then took out his phone and started recording. So he immediately left and walked back to his office.[195]

Schillig also testified about the matter. He confirmed that Leiserowitz told him essentially the same thing shortly after the incident; that Shoup asked him a question about what would happen to their benefits if the Union was elected; he told Shoup he didn't know, they "could remain the same, could get better, [or]could get worse," as he was trained to say; and that Bailey got upset and started recording him.[196]

On balance, I find that Bailey's account is more credible. Although it was not corroborated by Shoup, who did not testify, there are a number of compelling circumstantial reasons to believe it. First, his description is more consistent with the context and background of the conversation. The new benefits were the main topic of discussion at that time, and other employees were likewise asking their managers and supervisors whether they

---

[190] Tr. 616–618, 648–650, 669 (Nelson), 4999–5000, 5003–04 (Schillig).

[191] Tr. 1843–1884 (Hernandez), 4933–4940 (Leiserowitz),

[192] Tr. 4498 (Christian), 4929–4930 (Leiserowitz), and 4981, 4996–4999 (Schillig).

[193] Like many of the other subject meetings and conversations between managers and employees, this conversation was recorded. However, the recording was not offered into evidence. Hernandez admitted

to the relevant facts after the General Counsel refreshed her memory with the recording. See Tr. 1797–1802 (Hernandez).

[194] Tr. 3581–3583, 4642–4649.

[195] Tr. 4926–4927, 4932.

[196] Tr. 4978–4981, 4994. Bailey denied trying to record the conversation at any point (Tr. 4647), and no recording was offered into evidence.

would get the new benefits if the Union was voted in.

Second, as previously discussed, both Andrade and Hernandez had likewise indicated that the employees would not get the new benefits on January 1 in that event. And while they indicated that the employees would have to bargain over the benefits instead, neither added that the employees could get "more, less, or the same" as a result. Thus, if that was something managers and supervisors were trained to say, it apparently was not emphasized or explained very well or effectively.[197]

Third, Fortino, who was directing the Company's antiunion campaign, likewise indicated at the captive audience meetings that the employees would not get the new benefits on January 1 if the Union was elected. And while Fortino added that the benefits would be subject to negotiations and that the employees could get more, less, or the same as a result, there is no evidence that Leiserowitz had attended any of those meetings prior to his conversation with Shoup.

Fourth, Bailey gave a written statement to the Union about the incident later the same day.[198] The Union provided that statement to Respondent following Bailey's direct testimony but no effort was made to impeach Bailey's testimony with it. Cf. *Advo Systems, Inc.*, supra, 297 NLRB at 931 (crediting the uncorroborated testimony of a single employee witness regarding an alleged interrogation in part because the respondent did not attempt to impeach her credibility on the basis of anything in her prehearing statements); and *Castle Instant Maintenance/Maid, Inc.*, 256 NLRB 130, 135 (1981) (crediting the uncorroborated testimony of a single employee witness regarding a conversation with a manager regarding the reasons for discharging the alleged discriminatee in part because no attempt was made to impeach the witness's testimony based on any inconsistencies with his pre-hearing statement), enfd. mem. 685 F.2d 440 (9th Cir. 1982).[199]

Fifth, as previously discussed, Leiserowitz demonstrated incredibly poor memory regarding why he subsequently excluded Bailey from the captive audience meeting. And Schillig's testimony about the matter was not very credible either.[200]

Accordingly, for the same reasons previously discussed regarding Andrade's, Hernandez', and Fortino's statements, Leiserowitz' statement to Shoup violated Section 8(a)(1) of the Act and was objectionable as alleged.[201]

### 5. Mackelprang's and Martin's Statements to Employees (Dec. 17)

On December 17, after Fortino and Nelson had conducted most of the captive audience meetings, Mackelprang, the VP of catering/banquets, also held a meeting with employees in her department. The meeting was not mandatory, but everyone, including employees, managers, and supervisors, were invited, and approximately 20 employees attended. And like at many other meetings, one of the employees recorded it.

Mackelprang began the meeting by saying she wanted to take a moment to talk to them about the election "because we're a family . . . you guys are my family." She said,

> Guys, this is really, really important that you make a decision that is really educated and that you know the decision you are making. Because . . . when you make your choice, your yes or your no has the ability to completely change how we currently operate. And the things we do every day and way we work together as a team . . . will be jeopardized.
>
> And I want you to really educate yourself so you understand that what the company and the Fertittas are promising is a really, really, really good situation for all of us. We're getting everything that we asked for. . . We have the retirement plan that we want. We have a lot of benefits that we didn't have a week ago. And I want you guys to consider that once this vote happens, if you vote yes and we decide to change our dynamic, all of those promises from the Fertittas are going to go on the table as a bargaining unit. But the thing that's more important to me is that our family is going to change and we won't be able to operate like this. I won't be able to have a meeting like this with you guys.
>
> . . . .
>
> And you guys are all happy. You come in with a smile on your face. This whole management team comes in with a smile on their face. I want this to stay. And the only way I know it will be exactly how it is today on Saturday morning is if you vote no on Thursday and Friday.
>
> . . . .
>
> [G]ive us a chance. You've given us 14 years. Give us one more year to prove that it's worth it. . . Our family is

---

[197] The phrase was in the PowerPoint Fortino used during his "union avoidance" meeting with managers and supervisors three months earlier. However, it was mentioned only generally as something to say to employees about the risks of negotiations, not as a recommended response to questions about whether they would be eligible like other employees for newly announced benefits. Further, it was only one of numerous (18) things listed that could be said to employees, and unlike several of the others, was not highlighted in any way. See R. Exh. 89, p. 17.

[198] See Tr. 3584–88.

[199] Red Rock instead argues that Bailey should not be credited because he had the prior statement in front of him while testifying (Br. 213). However, there is no evidence that Bailey looked at it while testifying. No one objected during his testimony that he appeared to be improperly looking down at something, and it likely would have been noticed if he was doing so, even over Zoom. Rather, the record indicates that Bailey looked at his prior statement after he finished testifying on direct, during a short 2-minute break while counsel for the General Counsel and the Union emailed copies of Bailey's statements to Respondent's counsel to review prior to cross-examination (which did not begin until the following day). See Tr. 3584–14.

[200] As noted above, there is also conflicting testimony about whether Bailey attempted to record Leiserowitz. And there is some reason to

believe Leiserowitz's testimony, as recording managers and supervisors seemed to be a common practice. But there is no evidence Bailey himself had a practice of recording managers and supervisors. For example, there is no contention that he attempted to record the conversation later that day where Leiserowitz told him he could not attend the captive audience meeting. Thus, while Leiserowitz may have thought Bailey was trying to record him, I am not persuaded that Bailey actually did so. Further, it is undisputed that Bailey did not attempt to record the conversation until after the alleged objectionable and unlawful statement was made. Thus, the issue is largely ancillary and, even if I disbelieved Bailey on the point, I would not be inclined to entirely discredit his account of the conversation. Indeed, Respondent's posthearing brief does not even argue that Bailey's account should be discredited on that basis.

[201] Arguably, even Leiserowitz's version of what he said was unlawful and objectionable, either by itself or in the context of Fortino's unlawful and objectionable remarks at the captive audience meetings. Cf. *Liberty Markets*, 236 NLRB 1486, 1489 fn. 13 (1978) (finding that manager unlawfully created the impression of surveillance even if his version of the conversation were credited over the employee's version). However, neither the General Counsel nor the Union make this argument and it is unnecessary to reach it.

worth it. . . . Give us a chance to do all the things that have been promised and make the decision to vote no. Stay with us as we are. . . It's really important to me. It's personal to me. It's about me and you guys, and I want this to stay the way it is. And that's what the message is.

Mackelprang then turned the meeting over to Martin, the banquets room chef. Martin said he had been wanting to talk to them but hadn't had the time because it had been "crazy for the last 2 weeks." He said,

The benefits that they're going to throw at you and some that you're going to get with the company now are unheard of. And they're awesome to come from a company like that. And those are tremendous, without saying. But the only thing that I can really fall back on, that I constantly think of is the personal relationships that I have with each and every one of you.

. . . .

We have done so many awesome things together. And especially now I feel like in the last year we've grown even more, and we're building a better kitchen and team in the last year. And I don't want to see any of that go away. I don't want to see that progression, and that friendship, and that relationship, and that closeness change. And that very well may happen if we go the wrong way.

That's really—that's really all I have. I just—I want you guys to take that extra time to think about, you know, the opportunities that we have, like Kasha says, to be a family because we are. I see all of you more than I see my wife and children. There's some days where I call on you guys and I need you to help or make me laugh. And I hope that I do the same for you, because we put a lot of time in here. And I enjoy being with all of you or else I wouldn't be here. You guys are what holds all of us together. That can change quickly and it will, so think about it. Take that extra chance and make the decision to stay with us. All right?

A few others at the meeting also spoke. Mackelprang then concluded the meeting by saying:

[The Fertittas recognized that there were some things that they needed to do differently and better. And these changes, this retirement plan, it doesn't exist, guys, this does not exist anywhere. There is not another company, there is not an Apple, there is not a Microsoft, there is not an Amazon, there is no other company in the United States that has a plan like this. You guys can do the research. It's not out there.

The Fertittas recognized that they needed to make a change. They recognized that they had gotten away from us, the family. Right? We are family. And they recognize that. And so starting January 1, and starting now because we're talking about it, the focus is back on the family. I implore you just give the company, and give the Fertittas the opportunity to win your hearts and minds back. . . I'd just ask you, your no vote means that we're going to at least try this. This will not be on the bargaining table. This will all be yours. And if anything changes and the promises aren't delivered then let's revisit it. Let's go back and revisit again.

I appreciate you guys. . . you're my family. You're my people. And I want us to continue to have this relationship that we have. . . I hope and pray that you're going to vote no and you're going to stay with us.[202]

The General Counsel alleges that Mackelprang's statements about the new benefits, and her and Martin's statements indicating employees would lose those benefits and no longer have a harmonious relationship with management if they voted for the Union, violated Section 8(a)(1) of the Act (GC Exh. 1(bk), pars. 5(x), (y), 8). The Union alleges that the statements were also objectionable (GC Exh. 1(bo), Objs. 1–5, 7).

Again, the allegations are well supported. For the same reasons previously discussed, Mackelprang's statements touting the unlawfully granted new benefits as a reason to vote against the Union (they are "everything that we asked for," and "do[] not exist anywhere" else) were unlawful and objectionable. Like Fortino's statements at the captive audience meetings, her and Martin's statements indicating that the Culinary employees would not receive those benefits on January 1 if the Union was voted in ("all of those promises . . . are going to go on the table," and "your no vote means . . . [t]his will not be on the bargaining table; this will all be yours") were also unlawful and objectionable.

As for their statements about the employer-employee relationship, it is well established that an employer may tell employees how union representation changes that relationship. For example, as previously discussed, in *Tri-Cast*, 274 NLRB at 377, the Board held that the employer did not commit preelection objectionable conduct by telling employees that the way "we have been able to work on an informal person-to-person basis . . . will change," and that "we will have to runs things by the book, with a stranger, and will not be able to handle personal requests as we have had been doing." And in *Office Depot*, 330 NLRB at 642, the Board held that the employer lawfully told employees that they "wouldn't be able to communicate with management in the same way . . . because there would be a representative from the union that would be the middle person." See also *Holy Cross Hospital*, 370 NLRB No. 16, slip op. at 1 n. 3 (Sept. 11, 2020) (manager lawfully stated that union representation might limit employees' direct access to management); and *Stern Produce Co.*, supra, 368 NLRB No. 31, slip op. at 4 (labor consultant lawfully stated that if employees chose the union to represent them, they would no longer have direct dealings with the employer's owner and would have to wait until the union negotiated with him).

However, there are limits. Such statements become unlawful and objectionable if they indicate, not only that the manner or procedure in which the employer has communicated with employees and addressed their requests or concerns would change, but also that the employer would treat the employees and their requests or concerns less favorably if they voted for a union. For example, as previously discussed regarding Nelson's, Cheney's and Park's statements to employees, the Board has held that it is unlawful for an employer to say that it will no longer "help" employees or grant them any more "favors" or "extras."

The Board has likewise held unlawful employer statements indicating that employees will no longer be treated like "family" if they voted for a union. See, e.g., *Chino Valley Medical Center*, 359 NLRB 992, 1000 (2013), reaff'd. 362 NLRB 283 (2015) (CEO violated 8(a)(1) by telling employees that "there

would be no more family atmosphere" and that the company would more strictly enforce its policies and procedures after the union won the election); enfd. in relevant part 871 F.3d 767 (9th Cir. 2017); *Fieldcrest Cannon, Inc.*, 318 NLRB 470, 494 (1995) (supervisor violated 8(a)(1) by telling a prounion employee that she had considered him to be like her godson, but could no longer give him advice or assist him further), enfd in relevant part 97 F.3d 65 (4th Cir. 1996); and *Rodeway Inn of Las Vegas*, 252 NLRB 344, 350 (1980) (manager violated 8(a)(1) by telling employees that the company's "family atmosphere" would be lost after unionization). See also *Preston Products Co.*, 158 NLRB 322, 346 (1966) (employer violated 8(a)(1) by circulating fliers indicating, among other things, that employees would no longer be "working in a friendly situation" and would be subjected to "dictatorial working conditions" if the union was elected), enfd. in relevant part 392 F.2d 801, 806 (D.C. Cir. 1967), cert. denied 392 U.S. 906 (1968).[203]

Here, that is precisely what Mackelprang and Martin did. Mackelprang told the employees, "We're a family"; "Stay with us as we are . . . [i]t's personal to me"; if the Union is voted in, "the things we do every day and way we work together as a team . . . will be jeopardized" and "you [and] this whole management team" will no longer be "happy" or "come[] in with a smile on their face"; "[Y]ou're my family . . . And I want us to continue to have this relationship that we have" and, "I hope and pray that you're going to vote no and you're going to stay with us."

Similarly, Martin told the employees, "[T]he only thing that . . . I constantly think of is the personal relationships that I have with each and every one of you"; "I don't want to see that . . . . friendship, and that relationship, and that closeness change," which "very well may happen if we go the wrong way"; and "[T]he opportunities that we have . . . to be a family because we are . . . [t]hat can change quickly and it will, so think about it . . . and make the decision to stay with us."

Moreover, again, these statements were not made in isolation. They were accompanied by numerous unlawful and objectionable management threats at the same or other meetings that employees would lose benefits and suffer other unspecified reprisals. As previously discussed regarding Nelson's and Fortino's threats of futility, in these circumstances employees would likely view Mackelprang's and Martin's remarks in their worst light, i.e., managers and supervisors would not only be less helpful and grant them fewer favors or extras, but they would also be less tolerant of mistakes or poor performance and give them fewer second chances than they would for "family."[204]

Accordingly, the statements were unlawful and objectionable as alleged.

16. Serving employees "Vote No!" Steaks (Dec. 17).

Around this same time, Fortino instructed that the team member dining room chefs should grill up several hundred steaks and brand them with the words "VOTE NO!" to serve on the free buffet line for the employees. The chefs did so, grilling and branding at least 500–600 of them. And the branded steaks were

placed on the TDR buffet line for the employees on or about December 17.[205]

This was not the first time Red Rock had served steaks on the TDR buffet line. However, it was a rare event, occurring only on very special occasions such as Red Rock's or Station Casinos' anniversary. In fact, the quality of the regular food Red Rock served in the TDR was a frequent complaint among employees. Red Rock's Culinary managers and supervisors informed Fortino at the September 18 "union avoidance" meeting that it was actually one of the employees' top three issues, along with compensation and benefits/retirement. Further, the steaks had never been branded with a message before.[206]

The General Counsel alleges that serving the branded "VOTE NO!" steaks to employees violated Section 8(a)(1) of the Act (GC Exh. 1(b)(k), pars. 5(z), 8). Specifically, the GC argues that it "concretiz[ed]" and gave "immediacy" to Respondent's prior unlawful promises of benefits (Br. 92, 114). Respondent, on the other hand, argues that serving the steaks was entirely lawful under well-established Board precedent holding that providing food, drink, and parties to employees is a legitimate noncoercive campaign device (Br. 169).

Again, the General Counsel has the better argument. The circumstances here are significantly different than in the cases cited by Respondent. Those cases involved the more typical or common situation where an employer simply offered employees free food, beverages, or a party during or in conjunction with its antiunion campaign. See, e.g., *Waste Management of Palm Beach*, 329 NLRB 198 (1999) (finding no 8(a)(1) violation where employer hosted a dinner party at a local hotel three days before the election), and cases cited there. See also *Bernalillo Academy*, 361 NLRB 1124, 1124–26 (2014) (discussing postelection objections cases involving similar conduct).

Here, in contrast, Respondent offered employees significantly better food in the employee dining room than it usually did. And the record as a whole indicates that it did so, not merely as a campaign device, but because the quality of food in the TDR was one of the top three issues among employees. Further, the employees reasonably would have believed or understood that this was the reason under the circumstances. As previously discussed, Fortino had promised them at his initial meetings in mid-September, following the Union's button-up campaign, to look at improving "everything," not just compensation and benefits, if they "stayed with" the Company and gave him a chance to do so. And he repeated essentially the same message at captive audience meetings with the employees on December 16 and 17. Further, by branding "VOTE NO!" on the better food, he left little doubt that it was being served to help persuade the employees to do just that.

The circumstances here are therefore more akin to those in *Preston Products Co.*, supra. There, like here, the employer committed various unfair labor practices during the union organizing and election campaigns, including promising employees benefits. The employer also thereafter held a reception and catered banquet for its employees two days before the election where it served steak rather than the far less expensive sausage,

---

[203] *C.E. Glass*, 189 NLRB 496, 497 (1971), cited by Respondent, is distinguishable. There, the employer's vice president compared union and nonunion shops generally, saying that in the latter employees "feel like a family." He did not say that the company would no longer treat them like family.

[204] "You don't fire a family member, nor do you put them through performance improvement plans." Joshua A. Luna, "The Toxic Effects

of Branding Your Workplace a 'Family'," Harvard Business Review (Oct. 27, 2021).

[205] Tr. 1143 (Fortino); 3444–3445, 3511 (Gomez); 5130–40 (Chef Katelin Hernandez). See also GC Exh. 251 (pictures of a hot iron branding a steak and a branded "VOTE NO!" steak).

[206] Tr., 813–814, 1144 (Fortino); 3515–20 (Gomez); 4603, 4612 (Herrera); 4683 (Washington); 5140–44 (Katelin Hernandez).

chicken, and meatballs it usually served at its annual spring party around the same time. The employer also distributed gifts at the banquet that were more expensive than the gifts it had given at its prior spring parties. The Board found that, by doing so, the employer violated Section 8(a)(1) of the Act because it "was a demonstration to employees that [the employer] meant what it said" when it had unlawfully promised them benefits if they did not support the union. 158 NLRB at 347, enfd. in relevant part 392 F.2d at 807.

Here, by serving the "VOTE NO!" steaks to employees two days before the election, Respondent likewise demonstrated to employees that it would deliver on its previous unlawful promises to improve "everything" if they voted no in the upcoming election. Accordingly, it violated the Act as alleged.

17.  Posting and distributing antiunion messages
(mid-Dec.–election)

During this same period, and continuing through the December 19 and 20 election, Fortino also directed Red Rock managers and supervisors to post and distribute a number of antiunion messages in both English and Spanish. The messages were posted in the hallways near the employee entrance and time clocks and the HR office, and in the team member dining room, locker room, and bathrooms. They were also shown on television screens in the TDR and above the time clocks and distributed on flyers and laminated cards.[207]

The General Counsel and the Union allege that two of the posted and distributed messages were unlawful and objectionable (GC Exh. 1(bk), pars. 5(bb), (dd), 8; and GC Exh. 1(bo), Objs. 4, 9). The first was in all red lettering and stated:

### IS UNIONIZING WORTH THE RISK???

In 2020 you and your fellow TMs will have FREE INSURANCE, a PAID RETIREMENT PLAN, and 3 LOCAL MEDICAL CENTERS, including one here in your own building.

ALL THOSE THINGS and everything else the Company has put in place, would be part of BARGAINING if the union is voted in.

BARGAINING JUST LIKE BOULDER AND PALACE STATION, where nothing has changed in over 1100 days????

PLEASE DON'T PUT EVERYTHING YOU HAVE AT RISK!!!!!

Remember, we have worked hard together to make Red Rock the best resort in town. Let's keep this FAMILY together!

### VOTE NO TO PUTTING YOUR FUTURE AT RISK!

The second was in both red and green (Christmas-themed) lettering and stated, in relevant part:

### TOP TEN REASONS TO VOTE NO ON THURSDAY/FRIDAY

(10) Almost $600 per year in dues??? For what? You already have it!

(9) Boulder and Palace: Negotiating for 3 years .... Results? Almost NOTHING

(8) The government has ruled that negotiations can be "potentially hazardous for employees." That's because all of your wages and benefits go on the table. If the union comes in, we start bargaining over EVERYTHING AGAIN. Maybe just like Boulder and Palace over 1,100 Days. OR LONGER!!!! . . . .

(4) Unlike those poor Team Members at Boulder and Palace, you have a chance to enjoy what we have already guaranteed! . . .

(3) We have put every one of our guarantees in writing. GUARANTEED. . .

(2) Our rollouts begin January 1. When do the union promises at Boulder and Palace start??? EVER??????????????????

(1) Why vote to have someone else "bargain" with the company over something you already have?? FREE HEALTH CARE / COMPANY BUILT MEDICAL CENTERS and COMPANY PAID RETIREMENT PLAN

PROTECT WHAT YOU ALREAY HAVE.

---

[207] GC Exhs. 41, 42, 91, 136–142, 149, 150, 171, 207, 208, 236; Tr. 518–522 (Nelson), 1124–31, 1132, 1141–42, 1391, 1395–96 (Fortino), 1685–1686, 1697–1718, 1759–1760, 1832 (Hernandez), 1968–70 (Jackson), 2316–22 (Johnson), 2393–94 (Andrade), 2755–56 (Paniagua), 4213–15, 4220 (Franz), 4420–4425 (Duhart), 4476–83, 4516–17 (Christian), 4681–84, 4689–97, 4701–09, 4746–48 (Washington).

### Ho Ho Ho . . . VOTE NO NO NO[208]

As indicated by the General Counsel and the Union, these messages were similar to the unlawful and objectionable statements made to employees by Fortino, Nelson, Andrade, Hernandez, and Leiserowitz in meetings or huddles. The messages touted the new benefits as a reason for employees to vote no and threatened that the benefits would not be implemented on January 1 and that bargaining over them would be futile if employees voted yes. For the same reasons, therefore, both by themselves and in combination with the other similar statements, the messages were unlawful and objectionable as well.

The General Counsel's complaint (pars. 5(cc) and 5(ee)), also alleges that two other messages titled "Local 226 Promises vs. Track Record" and "Big Fat Union Lie?" (GC Exhs. 41, 139, 150, 236) were unlawful for the same or similar reasons. However, the General Counsel's posthearing brief (p. 126, n. 135) partially withdraws the allegations in par. 5(cc). And it is unnecessary to address the remaining allegations as no credibility resolutions are required and the additional violations would be cumulative and would not affect the remedy.

18. Providing Employees with Antiunion Door Hangers
(mid-Dec.)

Around this same time, Red Rock also made yellow door hangers available to its employees that read:

**PLEASE
RESPECT MY
PRIVACY**
NO
Door-to-Door Salesmen,
Cults or Union
Organizers.

**GO AWAY!!**

Fortino had previously used such door hangers during a union decertification campaign when he worked for Eldorado. Station Casinos had likewise used the door hangers as part of a so-called "Home Security Kit" it provided to employees at Fiesta Henderson during its antiunion campaign there. Accordingly, on November 22, the same day the Union filed its election

petition at Red Rock, Johnson forwarded a copy of the door hangers, in both English and Spanish, to Jackson for Red Rock's antiunion preelection campaign. Jackson thereafter had 1000–1500 of them printed up, requesting that they be durable enough to hang on external doors. At Nelson's direction, stacks of the door hangers were then placed, along with the new benefits pamphlets and other company campaign materials, at various locations in the back of the house, including the HR office and the banquets, room service (IRD), and maintenance departments, for employees to take if they wished.[209]

The General Counsel contends that, by doing so, Red Rock violated Section 8(a)(1) of the Act because it effectively promulgated and maintained a rule prohibiting employees from exercising their right to solicit their coworkers during nonworking time to support and vote for the Union (GC Exh. 1(bk), pars 5(ff), 8). The Union argues that the conduct was also unlawful because it encouraged any employees to report and identify any prounion solicitors to management (Br. at 86–89).[210]

However, there are at least three significant problems with these arguments. First, the door hangers cannot reasonably be construed as promulgating a company "rule" prohibiting prounion employees from soliciting their coworkers.[211] Rather, the door hangers were obviously a campaign device to encourage and enable other employees to avoid listening to such prounion solicitations if they didn't want to. And the General Counsel and the Union do not allege or argue that it was unlawful for Red Rock to do so.[212]

Second, on their face, the door hangers were for use, not at work, but at home. That is where there is the greatest expectation of "privacy" and where "door-to-door salesmen" and "cults" typically solicit. Further, there is no evidence that any Red Rock managers, supervisors, or agents did anything to suggest that the door hangers be used at work. For example, there is no evidence that any of them hung the hangers on any doors at the facility.[213] Nor is there any evidence that they told employees they could or should do so.

Third, the door hangers did not in any way encourage employees to report or identify prounion solicitors who contacted them at home. Indeed, the message on the door hangers was that prounion solicitors should not even knock on the door or otherwise announce that they were there. And, again, there is no evidence that any managers, supervisors, or agents told or suggested to employees that they report and identify any prounion solicitors who contacted them at home.[214] Thus, the circumstances here

[208] GC Exhs. 140–142 (underlining in originals)

[209] GC Exhs. 84, 170, 273; Tr. 1953–54, 6216–17 (Jackson), 4215–18 (Franz), 4428–30 (Dawson), 5539–40 (Andrade).

[210] The Union did not file a postelection objection regarding the door hangers. Arguably, the Union's additional argument in support of the GC's 8(a)(1) allegation impermissibly enlarges or changes the General Counsel's theory of the case. See *Hobby Lobby Stores, Inc*., 363 NLRB 1965 n. 2 (2016) ("It is well settled that a charging party cannot enlarge upon or change the General Counsel's theory of a case"), citing *Kimtruss Corp*., 305 NLRB 710, 711 (1991) (judge erred in finding an 8(a)(1) violation based on the charging party's theory as well as the GC's theory). However, it is unnecessary to address this issue given my findings and conclusions below that the Union's theory is without merit.

[211] The team member handbook at that time contained a "No Solicitation and Distribution" rule that prohibited solicitation or distribution "of any kind" during "working time" and in "working areas" at "any time" (GC Exh. 125). There is no allegation here that this rule was unlawfully overbroad on its face or was discriminatorily applied against union activity during the relevant period.

[212] Cf. *Progressive Electric, Inc*., 344 NLRB 426, 427 (2005) (company president lawfully told employees that if they didn't want to listen to the union organizers at or near the jobsite, they could tell the organizers to "shove it" and leave them alone). Thus, as no rule restricting solicitation was promulgated in or by the door hangers, there is no need to address the General Counsel's contention that it was unlawfully overbroad under *Our Way, Inc*. 268 NLRB 394 (1983) and *Stoddard-Quirk Mfg. Co*., 138 NLRB 615 (1962).

[213] Although one employee testified that he saw one of the hangers on the door to the IRD office for a few days (Tr. 4425–26, 4433–38), this was not corroborated by any other witness or evidence. Further, there is no evidence that a manager, supervisor, or agent put it there.

[214] In arguing to the contrary, the Union cites an email Johnson sent to the HR directors at all of the Station Casinos properties on October 10, about two months before the door hangers were distributed. However, that email did not instruct the HR directors to ask employees to report and identify any prounion employees who solicited them. Rather, the email only asked the HR directors to let Johnson know if any employees came to them and complained about being harassed by union

are unlike those in the cases cited by the Union. For example, in in *Boulder City Hospital, Inc.*, 355 NLRB 1247 (2010), the employer's memo, which it posted in response to reports of union card solicitation, advised employees that they had "the right to talk with Human Resources" if they felt harassed or threatened in any way. And in *Shamrock Foods Co.*, supra, 366 NLRB No. 177, slip op. at 11–12, a supervisor said employees who received unwanted solicitations should "raise [their] hand" and let management know the union supporters are "bugging" them.[215]

Accordingly, as the record fails to establish that employees would have reasonably construed the door hangers as either a no-solicitation rule or an invitation to report and identify prounion solicitors, this allegation will be dismissed.

### III. ALLEGED POSTELECTION ULPS

#### A. Factual Background

The Red Rock election was held on December 19 and 20, 2019, as scheduled. The final tally was 534 votes for the Union and 627 votes against, with no challenged ballots. Therefore, the Union was not elected as the unit employees' bargaining representative.[216]

Johnson immediately notified the corporate executive team and the property HR directors of the good news ("Red Rock won!!"). The following morning Fortino also sent a message to post at all the properties ("We are happy to inform you that on Friday night the Team Members at Red Rock Casino voted NO to the Culinary Union . . ."). He also emailed the HR staff later that day to say "thank you" for all their "assistance over the last 3 months" and that he was "looking forward" to "future initiatives" with them. In a subsequent email to one of the property general managers, he also gave credit for the election outcome to the "3rd Floor" (the senior leadership), saying that it "was the most influential in getting things approved . . ."[217]

However, Fortino also predicted, accurately, that the Union would challenge the result. And the Union did so on December 27, alleging, for the reasons discussed above, that Red Rock's preelection conduct was objectionable and materially affected the outcome of the election.[218]

#### B. The Alleged ULPs

#### 1. Implementing the new benefits and programs (Jan.–March 2020)

As planned, Red Rock subsequently began taking steps to implement or move forward with the new benefits and programs it had unlawfully announced and promised or granted before the election. About January 1, it informed employees that it had begun tracking employees' hours in preparation for making contributions to the new retirement plan in the first quarter of 2021. It also lowered the HMO deductible from $500 to $0 and implemented free healthcare plans for employees and their spouses and children at that time. In addition, around late February or early March, it posted signs at the employee entrance and elsewhere cautioning that the new medical center was under construction. It informed employees that it had begun the process of interviewing and hiring physicians for the medical center about that time as well. In February, it also eliminated its time clock audit and discipline program and no longer considered accrued disciplines under TCCA for future discipline.[219]

The General Counsel alleges that the foregoing actions implementing the new benefits and programs from January 1 through mid-March violated Section 8(a)(1) of the Act (GC Exh. 1(b)(k), pars. 5(gg)–(kk), 8; GC Br. 132–133). The allegations are well supported. As discussed above, the preelection announcement, promise, and grant of the new benefits and programs was unlawfully intended to discourage employees from supporting and voting for the Union. It follows that the implementation of those same benefits and programs postelection, while the Union's election objections were pending, was likewise unlawful. See, e.g., *Richland Co. & Assoc.*, 256 NLRB 111, 113 (1981); and *Westminster Community Hospital, Inc.*, 221 NLRB 185, 185–186 (1975), enfd. mem. 566 F.2d 1186 (9th Cir. 1977).

#### 2. Refusing to recall employees Powers and Chavez (June 4)

Unfortunately, the COVID-19 pandemic hit the country shortly thereafter. As a result, on March 17, pursuant to a shutdown order issued by Nevada's Governor, the Red Rock temporarily closed and all employees (except some essential security, engineering, and salaried executive team members) ceased working. The Company at that time therefore stopped the 401(k)

---

supporters. See GC Exh. 189 ("Can you please let me know ASAP if you have TMs on your properties come to you to complain that they are being harassed by the Union committee leaders?"), and Tr. 2137–38, 6129–30 (Johnson).

[215] Given my conclusion that the door hangers did not encourage employees to report or identify prounion solicitors, there is no need to determine whether Red Rock had a legitimate reason to do so. However, in the event the Board disagrees with my conclusion and requires such a determination, I would find that Red Rock failed to establish such a legitimate reason. Although Andrade and William Dawson, the then-general manager of the IRD department, testified that the door hangers were created because employees had complained to them and other managers about union organizers "harassing" them at their homes (Tr. 4945–46, 4953, 5539–40), there is no evidence that either were actually involved in the decision to distribute the door hangers. Indeed, Dawson subsequently admitted under cross-examination that he had no personal knowledge of why they were distributed (Tr. 4953–54). And Andrade admitted that no one in management told him anything about the door hangers; he just saw them in the HR office and took some to his department area (Tr. 5541). Further, no one who actually was involved in the decision corroborated their testimony. Although Fortino testified that he used the door hangers at his prior employer because of reports of union

harassment (Tr. 6955–56), he did not testify that there were such reports at Red Rock. Similarly, while Johnson testified that she had witnessed such "harassment" when she worked at Boulder Station between 2012–2018, she admitted that she could not recall any specific incidents at Red Rock or any other property in 2019, either before or after her October 10 email noted above. Rather, she just assumed it continued. (Tr. 2139, 6130–31.) Finally, neither Andrade nor Dawson testified that Red Rock employees complained that the prounion solicitors were aggressive or abusive. Rather, Dawson testified they just complained that the union organizers were "coming to their homes all hours of the day and night" and were "persistent" (Tr. 4945). Accordingly, if the Board concludes that the door hangers did encourage employees to report or identify prounion solicitors, they would be unlawful under the analysis and reasoning set forth in *Boulder City Hospital*, above, as argued by the Union. See 355 NLRB at 1249 (solicitation does not lose its statutory protection simply because it is persistent or annoying).

[216] Jt. Exh. 6, GC Exh. 292.

[217] GC Exhs. 101, 102, 106, 196; Tr. 1287–91 (Fortino).

[218] GC Exhs. 1(bo), 106.

[219] GC Exhs. 160, 161, 172; Tr. 1803–1811 (Hernandez), 2167–68, 2236 (Johnson), 4474, 4484–87, 4513–14 (Christian).

match and also delayed fully implementing the new programs.[220]

During the first several weeks of the shutdown, the Company continued to pay the Red Rock employees even though they were not working. However, with no clear end to the pandemic in sight, the Company decided to lay off most of them effective May 1. It laid off all on-call and part-time employees. It also laid off all full-time employees in certain outlets and classifications and those with less seniority in others.

In selecting less-senior full-time employees for layoff, the Company did not follow its existing Reductions in Force (RIF) Policy, which stated that layoffs would be conducted by company seniority, i.e., the date employees were hired by the Company. That was the policy all Station Casinos properties had applied previously, including during the 2008 recession and the Company's subsequent bankruptcy (see fn. 33, supra). The only difference was how they had applied it in practice. Some applied it "across the floor," meaning all employees in that position at the property would be grouped together in determining who had more or less company seniority. Others, such as Red Rock, applied it "wall to wall," meaning only those employees in that position in a particular outlet (within the four walls of the outlet) would be grouped together; the same way they were grouped for bidding schedules.

Instead, per Fortino's instructions, the less-senior employees were selected for layoff based on their classification seniority, i.e., how long they had worked full-time in their position in their outlet, regardless of how long they had worked for the Company. Those full-time employees with high classification seniority who were not laid off continued to be paid based on their prior average pay, even though they were still not working.[221]

Eventually, on June 4, the Red Rock reopened, including most of its outlets, and began recalling or reinstating some of the laid off employees back to work along with those who were never laid off. However, again, per Finch's and Fortino's instructions, the laid-off employees were recalled to their former positions by classification seniority rather than company seniority as provided under the RIF Policy ("when business conditions permit") during the first 90 days after a layoff. And if they were reinstated

to work at a different outlet, seniority was not considered at all.[222]

Teresa Powers and Yaneth Chavez were two laid-off union committee leaders with high company seniority who were laid off effective May 1 and were not recalled or reinstated to either their former outlet or any other outlet on or after June 4. The General Counsel does not allege that their May 1 layoff was unlawful. However, the GC does allege that Red Rock refused to recall them on or after June 4 because of their prounion activities in violation of Section 8(a)(3) and (1) of the Act (GC Exh. 1(b)(k), pars. 6(f), (j), 10).[223] Respondent, on the other hand, contends that it had legitimate business reasons for not recalling them, and that they would not have been recalled regardless of their union activity.

As with the previously discussed 8(a)(3) allegations, the parties agree that these allegations are properly analyzed under the *Wright Line* framework. Applying that framework, as discussed below, the General Counsel established that Red Rock unlawfully refused to recall or reinstate Powers but failed to prove that it unlawfully refused to recall or reinstate Chavez.

### Teresa Powers

Teresa Powers was a full-time cook in the feast buffet. At the time she was laid off on May 1, 2020, she had worked in that position for over 14 years, since April 18, 2006, when the Red Rock first opened. She mostly cooked omelets at the Italian and International stations on the buffet line, which was a popular job because the cooks received tips. However, she sometimes also cooked other things, such as fajitas or tacos at the International station.

Powers had also previously worked for six years at the Palace Station property. She was hired to work there on July 25, 2000, initially as a housekeeper and runner, and for the last two years as a cook helper. She continued to work as a cook helper when she initially began working in the feast buffet at the Red Rock, carving and otherwise helping to prepare food for the line. But, after 2–3 months, on July 1, 2006, she became a full-time cook

---

[220] Tr. 561–562 (Nelson), 1304–05, 7085–86 (Fortino), 1547 (Finch), 1988 (Jackson), 2191–2192, 2202, 6685 (Ferris), 5287–88 (Ramirez), 6533 (Cootey).

[221] GC Exhs. 175, 178, 202 (the RIF policy), 238; Tr. 561–565, 574–575 (Nelson), 1988–94, 2006–09, 2013–15, 2023–2027, 2821–2822, 2833–34, 2849–2851 (Jackson), 2237–2243, 2246–48, 2261–2263, 2274, 6123 (Johnson), 2328–34, 2342–2346, 6192–6193, 6204–05 (Striano), 2867–2870 (Hernandez), 3089–3100 (Murzl). In relevant part, the RIF policy stated:

    Purpose
    To set forth procedures to reduce the number of Team Members employed in response to changing business and/or economic conditions.
    Guideline
    . . . .
    2. Reductions in force are administered in the following order:
        a. Temporary Team Members
        b. Introductory Team Members
        c. Non-Introductory On Call Team Members
        d. Non-Introductory Part-time Team Members
        e. Non-Introductory Full-time Team Members
    3. Within each of the above-listed stated categories, length of service with the Company will determine the order of layoffs.
    4. Team Members who are laid off and are interested in other positions should be encouraged to complete a Transfer Request, in order to apply for vacancies.
    5. Team Members affected by a reduction in force will receive a

preference for open positions. If a laid off Team Member returns to a position within the Company within 90 days, the Team Member will be reinstated with his or her original hire date.
    6. When business conditions permit, Team Members are recalled from layoff in the reverse order in which they were laid off. Team Members will not be recalled if layoff extends beyond 90 days. The Company requires Team Members who are recalled past 60 days to submit to a new background check and depending upon the job classification, a drug test.

[222] GC Exhs. 107, 108, 202; Tr. 566–570 (Nelson), 1813 (Hernandez), 2237–2239, 2245–2253, 6124–6125 (Johnson), 2334–2335, 2339–2342, 2346, 2350, 6166–6169 (Striano), 2552–2554, 2559–2561, 2575–2576, 5713–5714 (Pedroza), 2827–2828 (Jackson), 3313–3316, 3324 (Chavez), 7112–7114, 7143 (Fortino). It is unclear from the record how or why it was determined not to consider company or classification seniority when reinstating an employee at a different outlet. Assistant Executive Chef Jose Avila (Chef Lupe) testified that it was "company policy" not to bring back employees by seniority if they were not returning to the same outlet (Tr. 2626). And this appears to be supported by paragraph 5 of the RIF policy, which indicates that laid-off employees must "apply" for other vacant positions. However, as indicated above, the Company decided not to follow other parts of the RIF policy when it reopened.

[223] The Union filed the initial charges alleging that Red Rock unlawfully failed to recall Chavez and Powers on July 6 and August 3, 2020, respectively (GC Exh. 1(at), (ba)).

in the buffet.[224]

Thus, Powers had a total of approximately 20 years company seniority when she was laid off. This placed her first in company seniority among the 19 full-time buffet cooks, and second or third in company seniority among all cooks at the Red Rock. She also had almost 14 years of classification seniority as a full-time buffet cook. This placed her among the top three full-time buffet cooks in classification seniority.[225]

Unlike in some of the other restaurants/outlets, all 19 of the buffet cooks were laid off on May 1; none of the high-seniority full-timers were retained. Thus, when the Red Rock reopened and began recalling or bringing back laid off employees, it had all 19 of them to choose from. Initially, none of them were chosen as the buffet was one of a few outlets that were not reopened on June 4. However, five were eventually brought back on July 17, and a sixth on July 23, to work on the so-called food administration board (FAB), which provided cooks to various outlets when they needed assistance with cooking or basic prep work, typically because of staff shortages due to vacations and leaves of absence.[226]

All six of these reinstated buffet cooks were well below Powers in company seniority. All had been hired by the Company between 2005 and 2018, long after Powers. All of them were also well below Powers in classification seniority. The highest was fifth, and the lowest—who had worked as a buffet cook for only 6 months before the shutdown—was nineteenth (last).[227]

As previously indicated, to prove that the decision not to recall Powers was discriminatory under the *Wright Line* framework, the General Counsel must establish by a preponderance of the direct and/or circumstantial evidence that Power's union activity was a substantial or motivating factor for the decision, i.e., that a causal relationship existed between Power's union activity and the decision. To prove such a causal relationship, the GC must show, at a minimum, that Powers engaged in union activity and that Red Rock knew or suspected it, and that Red Rock had animus against such activity.

The GC satisfied that burden. As indicated above, Powers was an open and active union supporter. She became a union committee leader in March 2019, the only one of 10 cooks on her shift in the buffet, and she wore a red and white button saying so every day both before and after the December election. She also

served as a union coordinator at the Red Rock on election day and wore a red shirt with "Union" on it to identify her as such.

As previously discussed, it is very likely that Red Rock knew Powers was a union committee leader under these circumstances, particularly since its managers were instructed prior to the election to identify who were union supporters. And the record indicates that Red Rock's managers and supervisors, including Hernandez and buffet sous chef Teresa Ramirez, did know. Although Ramirez testified that she didn't recall or remember Powers wearing a red and white union button, I discredit that testimony. Ramirez admitted that she worked with and supervised Powers several days a week and that she saw some employees wearing red and white buttons in 2019. Further, Powers credibly testified that, during a brief conversation about two months after the election, Ramirez looked directly at her union button and frowned. Finally, Ramirez did not present as a credible witness generally. For example, although she admitted she was a supervisor and attended a meeting where Fortino discussed various topics using a PowerPoint, she claimed she could not recall or remember if he ever spoke about unions or MUD lists. However, as previously discussed, that was basically all he talked about his September 18 "union avoidance"/ "right to manage strategy" meeting with all the Culinary managers and supervisors.[228]

As for union animus, as discussed above that is well established by Red Rock's numerous unfair labor practices prior to the election. Further, there is documentary evidence that it was the primary motivating factor in selecting which laid-off buffet cooks to bring back. The July 11 email that Cinthia Pedroza, Red Rock's food and beverage director, sent to Nelson with the recommended list of laid-off buffet cooks for reinstatement specifically indicated that Jose Avila (aka "Chef Lupe"), the assistant executive chef, had selected them because they were "loyal company TMs (team members)." See GC Exh. 162 ("Chef Lupe went through the FT list from Buffet cooks and his recommendation is to reinstate the TMs below that are loyal company TMs with your approval.")

When questioned about this at the hearing, Pedroza testified that, by "loyal company TMs," she meant "the best qualified" employees who would "put Red Rock first and have good attendance and job performance" because it was "very common that most of the team members had two or three jobs" (Tr. 2558–

[224] GC Exhs. 178, 238; Tr. 1815–16 (Hernandez); 3199–3206, 3251, 3256, 3261–63 (Powers), 5248–50 (Avila aka "Chef Lupe"), 5284–5286 (Ramirez). See also Tr. 5140 (K. Hernandez) (indicating when the Red Rock first opened).

[225] See GC Exhs. 178 (spreadsheet Hernandez prepared in response to the General Counsel's hearing subpoena) and 238 (spreadsheet Hernandez prepared in April 2020 for the May 1 layoffs); and Tr. 2864–2865, 2868, 2870, 2894 (Hernandez). Both of the spreadsheets place Powers third in classification seniority behind two other full-time buffet cooks. However, as noted in the GC's posthearing brief (p. 161), the spreadsheets show both of those cooks with classification dates before Red Rock even opened. One is listed as having a classification date of August 18, 2003, 3 years before it opened; and the other March 7, 2006, a month before it opened. This appears inconsistent with Hernandez's and Jackson's testimony about how classification dates are determined. See Tr. 1819, 2006–2009, 2864–2867, 2890 (an employee's classification date is determined by the date the employee started in a particular position, in a particular outlet, in a particular status [on-call, part-time, or full-time], at a particular property, so transferring from another property results in a new classification date). And this inconsistency was never explained.

[226] Tr. 562–563 (Nelson), 2831, 2858 (Jackson), 5186–5189, 5199–5200, 5228–5230, 5233–5235 (Chef Lupe), 5469 (Dempsey).

[227] See GC Exhs. 178 and 238. Some laid-off full-time cooks from catering/banquets (which was likewise not reopened) and the main kitchen were also brought back to different outlets, including the TDR. See, e.g., GC Exh. 217; Tr. 2559–2560, 2575–7256 (Pedroza), 5235–5236 (Chef Lupe), 5433 (Martin). None had high seniority, either by company or classification, among the cooks in their former outlet. Nor did any have higher company and classification seniority than Powers. See GC Exhs. 178 and 238.

[228] GC Exh. 243; Tr. 3208–3214, 3220–22, 3234–36, 3258–59 (Powers), 1691 (Hernandez), 5282–83, 5315, 5323–326, 5296 (Ramirez). Donnalee Park, the assistant buffet manager, testified that she also could not recall if Powers wore a red and white committee leader button. Indeed, she claimed not to even remember an employee named Powers. (Tr. 2526.) However, I discredit this testimony as well. Park regularly worked with and supervised Powers when their schedules coincided or overlapped. She was also responsible for payroll and checking attendance and conducted huddles with the buffet employees about various matters, including the Union and the election. (See Tr. 2520–28 and the discussion above about her huddle in early December.) Moreover, like Ramirez, Park claimed she could not remember attending any meeting where Fortino talked about unions or creating MUD lists, even though she also attended the "union avoidance"/"right to manage strategy" meeting where he did just that. (Tr. 2524–2525.)

2559, 2563). She also later added "versatility," i.e., employees who could work in different outlets or stations (Tr. 2567). However, there is no evidence that Station Casinos and Red Rock considered most employees disloyal because they worked second or third jobs to get extra hours. Nor is there any evidence that they considered employees disloyal (as opposed to simply unsatisfactory) because they had limited qualifications or versatility or poor attendance or performance. On the other hand, as discussed above, there is abundant record evidence that Station Casinos and Red Rock considered it disloyal (not "staying with" the "family") if employees did not respond positively to the Company's preelection pleas and promises by removing their buttons and no longer supporting the Union.[229]

Further, Pedroza admitted that she had no involvement in determining the criteria for selecting which buffet cooks to reinstate to the FAB. She testified that Nelson was the one who did so; that he just told her to select the "best" buffet cooks; and that he did not explain why seniority should be disregarded. She also admitted that she had no involvement in selecting which buffet cooks to bring back. She testified that she instructed Chef Lupe to select them after consulting with Ramirez; that she did not specifically tell Chef Lupe to consider whether the employees also worked other jobs, or their attendance, job performance/ disciplinary history, or versatility; and that she just told Chef Lupe to consult with Ramirez and select the "best" cooks available from the buffet as Nelson had instructed her. Finally, she also admitted that Chef Lupe did not tell her what he and Ramirez considered in selecting who to reinstate but simply gave her the names; and that she had no personal knowledge about the recommended employees as she had only recently started working at Red Rock in May 2020. (Tr. 2563–2567, 5710–5714, 5719–5121.)

When asked how she would know what specific factors Chef Lupe considered under these circumstances, Pedroza claimed that Nelson had explained to her that the best rather than the most senior cooks should be selected because the FAB needed employees who did not also work other jobs, had a good attendance, job performance/disciplinary history, and were versatile (Tr. 2574). However, this was inconsistent with her earlier testimony that Nelson had not explained why seniority was not being followed. Further, it was not corroborated by Nelson. Indeed, he did not even confirm that he spoke to Pedroza about bringing back the buffet cooks to work at the FAB or that seniority was not followed in doing so.[230] Finally, even assuming arguendo

Nelson did explain to Pedroza in such detail what criteria should be considered, there is no direct or credible evidence that Pedroza communicated those details to Chef Lupe or that he communicated them to Ramirez.

As for Chef Lupe's testimony, it was no more credible or believable than Pedroza's. For example, when first questioned about Pedroza's July 11 email to Nelson, which he had been copied on, he denied that the employees' loyalty to the Company was a basis for selecting who to recall. He testified that "we wanted the best back" and that he and Ramirez therefore considered "their abilities as cooks, their reliability as far as attendance and their work facets, how many different stations, how efficient they did their job and their qualifications." (Tr. 2628). However, he later admitted that he saw nothing wrong with Pedroza's suggestion in her email that his recommendation was based on who was "loyal" rather than who was "best" (Tr. 5202–03).

Similarly, when first questioned about why Teresa Powers was not selected, his initial response was, "Who's Teresa Powers?" However, he then immediately launched into a detailed explanation of why Powers was not selected, saying that it was because "she only worked the omelet station and she never really worked any other stations, and she had some issues with some of her fellow team members and she didn't fit the flexibility that all the other cooks had as far as working broilers, doing less prep production, doing mass quantity food production, . . . cooking to specific temperatures." (Tr. 2628–2629.)

Further, when specifically asked where this information came from, he initially testified that it came from Ramirez, who worked with the buffet cooks "way more" than he did and spoke to him at the time about the recommendation. However, on further examination, he admitted that he did not actually get the information from Ramirez at the time; rather, he learned it during a discussion with Red Rock's attorneys the day before he testified. (Tr. 2628–37.)[231]

This leaves Ramirez, who testified after both Pedroza and Chef Lupe and, as previously discussed, was also not a credible witness. Like Chef Lupe, she denied that loyalty to the Company was a consideration. She testified that he and Steve Barr, the executive chef, just told her they wanted a list of buffet cooks who were qualified to help cover other outlets through the FAB. Although they did not specify what the expectations would be for the reinstated cooks, she assumed that they wanted cooks who could cook on an "active line"

---

[229] The Company also sometimes equated "loyalty" with years of service. For example, as previously indicated, Finch stated at the "exciting news" meetings that the Company was granting them the new benefits to "pay back and reward" them for "all the dedication and loyalty that you've given us all these years to keep us where we are" (GC Exh. 120(b), p. 9). However, as discussed above, the overwhelming weight of the evidence shows that the Company was actually doing so to convince them to take their union buttons off and vote no in the election. In any event, at the time the Red Rock reopened, no other laid off Red Rock buffet cook had given more years of service to Station Casinos than Powers.

[230] Nelson was the very first witness called by the General Counsel. He testified that the guidelines for recalling employees were set by Fortino and Finch; that employees were brought back based on classification seniority; and that he was not involved in approving or disapproving particular employees selected for recall or reinstatement (Tr. 566–568, 573–578). However, as indicated above, the evidence later introduced at the hearing clearly showed that classification seniority was not followed in bringing back the buffet cooks to work at the FAB. Further,

Pedroza emailed Nelson the recommended list of buffet cooks for his approval. Moreover, the record shows that Nelson was also involved in approving lists of other laid-off employees to return to work in outlets different from where they worked pre-shutdown, and those employees were likewise not selected by seniority. See GC Exhs. 216, 219, 220, 222; and Tr. 2557, 2590–2591, 2597–2598 (Pedroza).

[231] At the hearing, I overruled Red Rock counsel's objections that the General Counsel's questions about where and when Chef Lupe learned the information infringed on the attorney-client privilege. Although Red Rock's posthearing brief does not further address the matter, after reviewing the transcript, I reaffirm that ruling. The GC's questions were clearly relevant to whether his testimony was based on personal knowledge, whether it was credible, and whether it had been coached. Further, the questions were carefully phrased and did not directly inquire into the substance of the communications with Red Rock's attorneys. Accordingly, I find that they did not violate the privilege under the circumstances. See generally *Geders v. U.S.*, 425 U.S. 80, 89–91 (1976); and *U.S. v. Carillo*, 16 F.3d 1046, 1050 (9th Cir. 1994).

in the T-Bones steakhouse and the Café. She therefore recommended cooks who she thought could do so, considering such things as whether they could work all stations in the buffet; whether they had prior experience working in the FAB, in other outlets, or elsewhere; whether they had experience cooking Asian or other specialty items; and whether they volunteered to work overtime. And she did not recommend Powers because she just cooked omelets and prepped for her station. (Tr. 5291–95, 5298–5301, 5305–06, 5328, 5335, 5350–5354.)

However, Ramirez admitted that she did not provide any of this information to Chef Lupe. Rather, she just texted him the list of recommended cooks and never had any further conversation with him about it. (Tr. 5301–02; see also R. Exh. 8, her text message.) She also admitted on cross-examination that omelets are served in the Café; that the FAB cooks were also being used at the time at other outlets such as in room dining (IRD) and the team member dining room (TDR), which were not specialty outlets like T-Bones; and that several of the buffet cooks she recommended did not have the knowledge or ability to cook some specialty items (Tr. 5313–5314, 5318–5319, 5330–5331, 5336–5339, 5340–5341).[232]

On further cross-examination, Ramirez also admitted that most newly hired cooks start out on the FAB, when they have no prior cooking experience at the Red Rock (Tr. 5328). And Chef Monica Dempsey, who normally hired and oversaw the FAB cooks, later confirmed this. Dempsey testified that historically (pre-shutdown) the FAB "was a really good place for people who didn't have tons of experience to really get their foot in the door"; that anyone with "drive, motivation, and heart" could be hired "with no previous experience" and given the chance to "grow" and "learn"; and that they were not expected to have the qualifications or experience to "pick up a line" in the outlets they worked in, but just to support the full-time staff there (Tr. 5469–5474).

When asked to explain why, then, it was so important to select the best qualified and experienced buffet cooks to work in the FAB when the Red Rock reopened, Ramirez testified that it was because not all the outlets reopened (i.e., because there were fewer outlets) and because so many employees were out for weeks or months with COVID (Tr. 5311–5312). And Dempsey testified that it was because expectations had changed on reopening; that the outlets at that time needed cooks from the FAB who could pick up a line and get the food out the window, which required someone who had actually worked in that particular outlet before (Tr. 5474–5475, 5487–5488).

However, Chef Lupe testified that the FAB cooks still had to

do prep work for the outlets when Red Rock reopened (Tr. 5228–29).[233] Further, as discussed above, the record indicates that neither Pedroza nor Chef Lupe ever explained to Ramirez why the best rather than the most senior cooks should be selected. And Dempsey admitted that she wasn't consulted about or otherwise involved in reinstating the buffet cooks to the FAB; that she didn't even know what their experience was or whether they could pick up a line; and that her testimony about what was required on reopening was just an assumption based on a situation she once had where she needed to have a café cook open up the Gridiron Grill (which she was also overseeing at the time) (Tr. 5466, 5494–5496, 5516).

This is not to suggest that *all* of the facts and circumstances fully support the General Counsel's case. As indicated by Respondent, the record indicates that five of the six reinstated buffet cooks were actually union supporters at some point. All five had signed union authorization cards within 12 months of the election (See Jt. Exh. 1). And Ramirez testified that she saw, "believe[d]" she saw, or "want[ed] to say" she saw, most of the five wearing union buttons (Tr. 5296–5301).

However, the record indicates that all five signed their authorization cards before Finch and Nelson conducted their December 9 and 10 "exciting news" meetings to announce all of the new benefits and programs. And, as indicated in Fortino's subsequent email on December 11, an "amazing" number of employees "thr[ew] away their union buttons" after attending those meetings.[234] Further, Powers was not just a union supporter; she was a union committee leader.[235] And, unlike the hundreds of former union-card signers and numerous brown-button wearers who appeared to change their minds and decide not to support or vote for the Union, she continued to wear her red and white union committee leader button every day at work both

before and after the election until she was laid off.[236] All of these circumstances could explain why the five reinstated buffet cooks who were previous union supporters were considered or believed to be "loyal company TMs" after the election and Powers was not.

Moreover, the General Counsel's case does not rest on Pedroza's description of the reinstated buffet cooks alone. As indicated above, there is also abundant circumstantial evidence of Respondent's unlawful motive, including its numerous unfair labor practices and the false, inconsistent, shifting, and evasive testimony of its managers and supervisors. See *DH Long Point Mgt.*, supra, 369 NLRB No. 18, slip op. at 15 ("False or misleading testimony regarding the relevant facts and circumstances may also support an inference of animus and discriminatory motive."). Thus, this is not a situation, as with Montano's schedule change discussed earlier, where animus and a discriminatory

---

[232] Regarding the omelets served in the Café, Ramirez testified that the cooks folded them three times there rather than two times as in the buffet; that she had never seen Powers do a trifold omelet; and that Powers sometimes did not even fold an omelet twice very well (Tr. 5330–5331). To the extent this uncorroborated testimony suggests that Powers would be unable to make an omelet in the Café, and that this was a reason why she was not recalled to work on the FAB, I discredit it for all the reasons discussed above.

[233] See also the testimony of Germy Musngi, the reinstated buffet cook with the least seniority, who Respondent called as a witness after Chef Lupe. Musngi testified that he mostly just did prep work in the back of the kitchen for T-Bones and other outlets when he worked as an FAB on-call cook for several months before moving to the buffet in September 2019, but that he picked up a line on his first day at work after he was reinstated at the FAB. However, on cross examination, he admitted that

he did not always pick up a line thereafter, but also continued to do prep work. (Tr. 5522–5526.)

[234] Ramirez did not specify precisely when she saw or may have seen any of the reinstated buffet cooks wearing the buttons, other than that it was "in 2019 or later" and "before the shutdown." And she testified that she didn't remember whether any of them took their buttons off after the exciting news meetings (Tr. 5319, 5323).

[235] There is no evidence that any of the six reinstated buffet cooks were union committee leaders.

[236] As previously discussed, although at least 810 of the 1343 unit employees signed union authorization cards, only 534 employees voted for the Union in the election. And, according to Powers, only two of her coworkers in the buffet continued to wear a brown union button after the election (Tr. 3214).

motive are not otherwise well supported by a preponderance of the record evidence. Accordingly, while the recalled buffet cooks' prior union support does not support the General Counsel's case, it does not disprove it either. See ibid. ("The Board has repeatedly held that an otherwise well-supported showing of discriminatory motivation is not disproved by the fact that the employer did not take similar actions against all known union supporters."), and cases cited there.

Finally, Respondent has failed to show, as required under the *Wright Line* framework, that it would not have recalled or reinstated Powers regardless of her union activity. Rather, as indicated above, the overwhelming weight of the direct and circumstantial evidence indicates that the reasons cited by its managers and supervisors for not recalling or reinstating her after reopening were a mere pretext devised and/or directed by Finch, Fortino, and Nelson to ensure that there would be fewer union leaders in the voting unit in the event the Union's pending election objections are sustained and a new election ordered. See *Galicks, Inc.*, 354 NLRB 295, 298–299 (2009), reaff'd. 355 NLRB 366 (2010), enfd. 671 F.3d 602 (6th Cir. 2012); and *George Joseph Orchard Siding, Inc.*, 328 NLRB 320, 328 (1999), enfd. 123 Fed.Appx. 746 (9th Cir. 2004) (employer could not satisfy its burden under *Wright Line* where its proffered reasons for failing to recall employees from layoff were discredited and thus pretextual). See also *Aston Waikiki Beach Hotel*, supra, 367 NLRB No. 27, slip op. at 8, and cases cited there.

Accordingly, Respondent's refusal to recall Powers violated Section 8(a)(3) of the Act, as alleged.

### Yaneth Chavez

Yaneth Chavez was a full-time pantry worker in the garde manger, which was part of the main kitchen and provided cold food for the buffet, TDR, and café. At the time she was laid off on May 1, 2020, she had worked in that position for almost 14 years, since June 26, 2006. She made salads, cut fruits, made dressings, and helped prepare other cold food for the outlets.

Before transferring to the garde manger, Chavez was a pantry worker in the TDR for six months. And before that, she worked as a cook helper at the Fiesta Rancho property for five years, since January 25, 2001.

Thus, Chavez had a total of over 19 years of company seniority when she was laid off. This placed her second in company seniority both among the 10 full-time pantry workers in the garde manger and among all pantry workers at the Red Rock. She also had almost 14 years in classification seniority as a full-time pantry worker in the garde manger. This placed her among the top four in classification seniority among the full-time garde manger pantry workers.[237]

Unlike with the buffet cooks, some of the full-time garde manger pantry workers were not laid off on May 1 but were retained and continued to be paid even though the Red Rock remained closed. Specifically, three of the four pantry workers with highest classification seniority were retained, and the remaining seven, including Chavez, were laid off. Numerous full-time pantry workers in other outlets were likewise not laid off. None of the 16 full-time pantry workers in catering/banquets, none of the three pantry workers in the IRD, and only the least senior pantry worker among the four pantry workers in the T-Bones Steakhouse were laid off.

Also unlike with the buffet cooks, none of the laid-off garde manger pantry workers were recalled or reinstated to the garde manger or any other outlet. However, the laid-off steakhouse pantry worker was recalled to his former position, on May 25, about a week before the Red Rock reopened.[238]

As with Powers, the General Counsel has established that Chavez was a union supporter and that Respondent knew it. She became a union committee leader in mid-October 2019, the only one on her shift in the garde manger, and she wore a committee leader button every day after. She also wore a red t-shirt with the union logo on it before the election and engaged in various activities at the facility, including passing out fliers and brown union buttons. As with Powers, it is very likely in these circumstances that Red Rock managers and supervisors knew Chavez was a union committee leader. And Hernandez admitted that she knew.[239]

As discussed above, the General Counsel also established that Respondent had union animus against such activity and that it failed and refused to recall or reinstate Powers for that reason.

Nevertheless, the General Counsel failed to establish that Respondent had the same unlawful motivation for failing to recall or reinstate Chavez. As indicated above, unlike with respect to the full-time buffet cooks, Respondent did not recall or reinstate any of the full-time garde manger pantry workers who were laid-off on May 1. And the one steakhouse pantry worker who was recalled to his former position was entitled to be recalled for that position based on the seniority provisions of the Company's RIF policy as it historically had been applied on a "wall to wall" (outlet) basis at the Red Rock.

In arguing to the contrary, the General Counsel's posthearing brief focuses on the May 1 partial-layoff. The GC argues that Chavez should have been among the three pantry workers with the highest classification seniority who were retained (see fn. 238, above). The GC also cites various reasons to question Respondent's assertion that it retained certain employees based on its anticipated business levels when it reopened.[240] For example, the GC argues that it made little sense to retain all of the catering/banquets pantry workers if it did not anticipate reopening that outlet. (As previously noted, like the buffet, it was not reopened.) The GC also questions various organizational changes the Respondent reportedly implemented with the May 1 layoff, such as eliminating the main kitchen as a designated separate outlet and reassigning/recoding the retained cooks and pantry workers there (and catering/banquets) as TDR employees.[241]

---

[237] GC Exhs. 177 (spreadsheet prepared by Hernandez in response to the GC's subpoena), 238 (spreadsheet prepared by Hernandez in April 2020 for the May 1 layoffs), 239 (Chavez's electronic personnel record showing her basic employment data); Tr. 564 (Nelson), 1815–16, 2872 (Hernandez), 2937–2939 (Tydingco), 3276–3280, 3308 (Chavez), 5189–90 (Avila/"Chef Lupe"). As with the spreadsheets for the buffet cooks, these spreadsheets list the two garde manger pantry workers with the highest seniority as having classification dates before the Red Rock even opened, one with a date of Jan. 23, 2006, almost 3 months before it opened, and the other March 6, 2006, over a month before it opened.

Again, this appears inconsistent with how classification dates are determined. See fn. 226, above. And this inconsistency was likewise never explained.

[238] GC Exh. 177; Tr. 1816–1819, 1822 (Hernandez), 2633 (Pedroza), 2878 (Hernandez), 5190 (Chef Lupe), 6616 (Mackelprang).

[239] GC Exh. 245; Tr. 1691 (Hernandez), 3297–99, 3300–01, 3304–3307, 3317, 3322–3323 (Chavez).

[240] See Tr. 564–566 (Nelson), 2849–2850 (Jackson).

[241] See Tr. 5186–5190, 5235 (Chef Lupe), 2583–2584, 5740–5742 (Pedroza)). The record indicates that Red Rock did not layoff 2 of the

However, as indicated above, the complaint in this proceeding does not allege that Respondent unlawfully laid off Chavez on May 1, but only that Respondent unlawfully refused to recall her on and after June 4.[242]  Respondent undoubtedly would have litigated the case differently, including by presenting additional evidence to explain how it calculated its anticipated business levels and why it made the organizational changes following the closure, had it known the May 1 layoff was directly at issue.  Cf. *Comfort Inn*, 301 NLRB 714, 717 fn. 17 (1991) (refusing to consider GC's argument that the employer had unlawfully attempted to discipline and thereby constructively discharged the two alleged discriminatees as the complaint alleged only that they were unlawfully discharged and the circumstances of the discipline were not fully litigated).

The GC also argues that Respondent cannot rely on its RIF policy because Respondent admittedly decided not to follow it in the manner it calculated seniority, i.e., by applying classification rather than company seniority.  However, the RIF policy was still the only existing comprehensive layoff policy at the time the Red Rock reopened.  Further, the record indicates that Respondent continued to follow the policy in other respects relevant to the allegations here, including the provisions indicating that laid-off employees had no recall rights to their former position after 90-days had passed since their layoff or to other vacant positions (see fns. 222 and 223, above).  Moreover, the laid-off steakhouse pantry worker was entitled to recall to his former position regardless of whether classification or company seniority was applied.

Alternatively, even assuming the evidence supports a prima facie case that Chavez was not recalled at least in part because of her union activities, unlike with Powers it does not support a finding of pretext.  Thus, it must also be determined whether Respondent adequately showed that it would not have recalled Chavez in any event.  And, for the same reasons indicated above, Respondent made such a showing.

Accordingly, this allegation will be dismissed.

### 3.  Failure to bargain with Union over unilateral changes

In combination, the Respondent's preelection 8(a)(1) violations and objectionable conduct found above clearly warrant setting aside the December 19 and 20 election.  However, the

General Counsel and the Union contend that Respondent's unfair labor practices were so serious and pervasive that the possibility of a fair rerun election is slight if not impossible, and that Respondent should therefore be obligated and ordered under *NLRB v. Gissel Packing*, supra, to recognize and bargain with the Union based on its prelection card majority.  For this same reason, the GC further alleges that certain unilateral changes Respondent made after it commenced its unlawful antiunion campaign and the Union obtained a card majority violated Section 8(a)(5) of the Act. (GC Exh. 1(bk), pars. 7, 11; U. Br. 99–103.)

Requested Gissel bargaining order

As summarized by the Board in *Garvey Marine, Inc.,*

> In *Gissel*, the Supreme Court upheld the Board's use of a remedial order that, despite a union's loss on the tally of ballots, an employer bargain with the union under the following circumstances: where at one time the union had the support of a majority of the bargaining unit, the employer's unfair labor practices have a tendency to undermine the union's majority strength and to impede the election process, and the possibility of erasing the effects of the unlawful conduct and ensuring a fair election is slight, so that the previously expressed employee sentiment is better protected by a bargaining order than by a second election. See also *Davis Supermarkets v. NLRB*, 2 F.3d 1162, 1171 (D.C. Cir. 1993). In determining the propriety of a bargaining order, the Board examines the seriousness of the violations and the pervasive nature of the conduct, considering such factors as the number of employees directly affected by the violations, the size of the unit, the extent of dissemination among employees, and the identity and position of the individuals committing the unfair labor practices. *Holly Farms Corp.*, 311 NLRB 273 (1993).

328 NLRB 991, 993 (1999), enfd. 245 F.3d 819 (D.C. Cir. 2001).

A *Gissel* bargaining order is clearly warranted and appropriate here based on the foregoing principles and factors.  As discussed above:

- The Union had obtained authorization cards from at least 60 percent of the unit employees within 12 months prior to the election.[243]

---

[12] full-time cooks in the main kitchen and 6 of the 18 cooks in catering/banquets.  It also did not layoff any of the seven cooks in the IRD, or any of the cooks in T-Bones.

[242] On April 12, 2021, the Regional Director, on behalf of the General Counsel, issued a new complaint alleging that Station Casinos, Station Holdco LLC, Red Rock Resorts, Inc., Red Rock, and certain other properties, as a single employer, committed numerous additional unfair labor practices, including "lay[ing] off full-time employees" at Red Rock and several other properties on May 1, 2020 in violation of both Section 8(a)(3) and Section 8(a)(5) of the Act (pars. 7(t)(1), 11, 13). The GC filed a motion the same day to consolidate this new 92-page complaint (the Station Casinos complaint) with the 33-page complaint in this proceeding (the Red Rock complaint).  See GC Exh. 294 (the motion and attached new complaint in Cases 28–CA–228052 et al.)  However, Red Rock opposed the motion and I denied it for several reasons, including (1) the motion was not filed until the 40th day of hearing, after all 56 of the GC's witnesses had testified and the GC had conditionally rested with respect to the allegations in the Red Rock complaint; (2) the GC acknowledged that consolidating the Station Casinos complaint would double the number of witnesses and days required to complete the hearing and at least some of the witnesses would need to be recalled; (3) Red Rock was prepared at that time to begin presenting its witnesses and evidence with respect to the allegations and objections in the Red Rock

proceeding; (4) consolidating the Station Casinos complaint would significantly delay moving forward with the hearing in the Red Rock proceeding, both because Red Rock and Station Casinos would now be required to prepare an answer to the new complaint and respond to equally extensive new hearing subpoenas, and because Red Rock would likely and reasonably oppose proceeding with its defense until the GC had rested as to all allegations, including the new ones; (5) this would also delay resolution of the related postelection objections in the Red Rock proceeding, contrary to the Board's general policy favoring expeditious resolution of questions concerning representation (see *Home Care Network*, 347 NLRB 859 n. 8 (2006)); and (6) such additional delay could also render unenforceable the requested *Gissel* bargaining order under D.C. Circuit decisions (see *Sysco Grand Rapids*, supra, 367 NLRB No. 111 (2019), slip op. at 1, and cases cited there). (Tr. 4817–43.)  I also noted that it is common for different ALJs to be assigned to hear and decide allegations raised in complaints issued seriatim against the same respondent (Tr. 4852–58).  The GC did not thereafter file a special appeal of my ruling with the Board.  And the new Station Casinos complaint has since been administratively assigned to another administrative law judge for a hearing and decision.

[243] The parties stipulated that the Union obtained a card majority on or about October 16, 2019 (Jt. Exh. 1; R. Br. 246 fn. 308).

- Respondent committed approximately 20 unfair labor practices in violation of section 8(a)(1) and of the Act during the critical preelection period, including granting its employees "huge," "incredible," and "unheard of" new "free" healthcare, medical, and retirement benefits specifically designed to "devastate" the union organizing and election campaign.

- Although the unit is relatively large, Respondent announced and repeatedly touted the new benefits to each and every unit employee in preelection mandatory meetings, other meetings and huddles, pamphlets mailed to the employees' homes, and antiunion postings and fliers.

- Respondent also repeatedly threatened all of the unit employees with loss of the new benefits and other reprisals if they voted for the Union, promised them even more benefits if they voted against the Union, and indicated that voting for the Union would be futile in preelection antiunion captive audience meetings, other meetings and huddles, and antiunion postings and fliers.

- Respondent's foregoing unlawful actions, statements, and threats were made by senior executives and managers at Red Rock and Station Casinos, as well as by the employees' direct or more immediate managers and supervisors.

It is highly unlikely that the Board's traditional cease and desist and affirmative remedies would be adequate in these circumstances. It is well recognized that granting unit employees new economic benefits designed to impact the outcome of an upcoming election is a "hallmark" violation that has a "highly coercive" impact. *Scott ex rel. NLRB v. Stephen Dunn & Associates*, 241 F.3d 652, 666 (9th Cir. 2001);[244] and *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 212 (2d Cir. 1980). Such conduct "has a particularly longlasting effect on employees and [is] difficult to remedy by traditional means not only because of [its] significance to the employees, but also because the Board's traditional remedies do not require a respondent to withdraw the benefits from the employees." *Hogan Transports, Inc.,* supra, 363 NLRB at 1985, quoting *Evergreen America Corp.*, 348 NLRB 178, 180 (2006), enfd. 531 F.3d 321 (4th Cir. 2008), quoting *Gerig's Dump Trucking*, 320 NLRB 1017, 1018 (1996), enfd. 137 F.3d 936 (7th Cir. 1998). To paraphrase Respondent's own messaging, it is unlikely that employees will vote for a union to get "what [they] already have."

Further, while over two years have passed since Respondent unlawfully announced and granted the new benefits in December 2019, Respondent continued to engage in unfair labor practices thereafter. Specifically, it implemented the new benefits over the following year as they were fully developed and finalized in violation of section 8(a)(1) of the Act. Those implemented benefits will remain as an ongoing "reminder to the employees that the Respondent, not the Union, is the source of such benefits and that they may continue as long as the employees do not support the Union." *Gerig's Dump Trucking*, above, 320 NLRB at 1018. Respondent also discriminatorily refused to recall or reinstate a laid off union committee leader in violation of section 8(a)(3) of the Act. Such postelection violations demonstrate Respondent's continuing hostility toward employee rights under the Act and the likelihood that it will again engage in unlawful and objectionable conduct in the event employees attempt to exercise those rights through another union organizing and election campaign. See *A.S.V., Inc.*, 366 NLRB No. 162, slip op. at 56 (2018); *Garvey Marine*, above, 328 NLRB at 995; and *Long-Airdox Co.,* 277 NLRB 1157, 1160 (1985), and cases cited there.[245]

Moreover, Respondent has not to date contended that a bargaining order would be inappropriate because of substantial employee turnover resulting from the pandemic and temporary layoff or other circumstances over this period. In any event, as indicated above the violations here were "particularly flagrant, . . . pervasive, and likely to persist" as "the lore of the shop, affecting the ability of new hires and veteran employees alike to vote their true preferences in a new election." *Garvey Marine, Inc. v. NLRB*, 245 F.3d 819, 828 (D.C. Cir. 2001).[246]  See also *Hogan Transports, Inc*, above, 363 NLRB at 1986 fn. 17.

Finally, I take judicial notice that Respondent is currently required to recognize and bargain with the Union over the unit employees' terms and conditions of employment pursuant to an interim court injunction issued at the Board's request under Sec. 10(j) of the Act. See *Overstreet ex rel. NLRB v. NP Red Rock, LLC*, No. 2:20-CV-2351-GMN-VCF, 2021 WL 3064120 (D. Nevada July 20, 2021), motion for stay pending appeal denied 2021 WL 6773091 (D. Nevada Aug. 6, 2021), affd. 2021 WL 5542167 (9th Cir. Nov. 26, 2021). Thus, the instant decision and recommended order, if adopted or affirmed by the Board, will not alter or disrupt the status quo, but maintain it. See *Evergreen America Corp.*, above, 348 NLRB at 180.

Accordingly, Respondent will be ordered to recognize and bargain with the Union. As requested by the General Counsel, consistent with Board precedent the effective date of the bargaining obligation will be October 16, 2019, when the parties stipulated that the Union obtained a card majority (Jt. Exh. 1; R. Br. 246 n. 308) and after Respondent had embarked on its course of unlawful conduct. See *Lapeer Foundry & Machine*, 289 NLRB 952 (1988), and cases cited there.

Alleged Unilateral Changes

The General Counsel alleges that Respondent subsequently made two unilateral changes without satisfying its foregoing bargaining obligation in violation of section 8(a)(5) of the Act.

---

[244] Abrogation on other grounds recognized in *McDermott v. Ampersand Publishing, LLC,* 593 F.3d 950, 957 (9th Cir. 2010).

[245] The General Counsel also argues that a remedial bargaining order is warranted because of "Station Casinos' constant challenges to its employees' free choice in Board proceedings" (GC Br. at 185, 219.) In addition to the cases previously discussed (see text accompanying fns. 49 and 50, above), the GC cites *Fiesta Henderson Casino Hotel*, 2021 WL 1815077 (Feb. 12, 2021) (rejecting Fiesta Henderson's challenge to the Culinary Union's election); and *Texas Station Gambling Hall and Hotel*, 370 NLRB No. 11 (2020) (granting Texas Station's motion to dismiss the Culinary Union's election petition subject to reinstatement when it resumed operations). However, employers have a right under the Board's rules to challenge or object to union elections. And the GC has not argued or established that the cited election challenges by Station Casinos and/or its properties were frivolous. Indeed, as indicated by the cited *Texas Station* decision, the Board has not always rejected those challenges.

[246] Although the "hallmark" violations in *Garvey Marine* were threats of discharge, job loss, and business closure, as noted by the Ninth Circuit in *Scott ex rel. NLRB v. Stephen Dunn & Associates*, above, a "wage increase (or grant of a benefit) designed to impact the outcome of a representation election is a 'hallmark' violation of the NLRA and is as 'highly coercive' in its effect as discharges or threats of business failure."

First, on March 27, 2020, Respondent suspended matching contributions on deferrals to the Station Casinos LLC & Affiliates 401(k) Retirement Plan for all eligible employees. Second, on June 4, 2020, Respondent cancelled so-called table swap agreements it had previously made with the Union in 2015 and 2016 (in settlement of the Union's unfair labor practice charges), which provided fair compensation to T-Bones servers when their table assignments were changed due to the Chairman's or a customer's preference (Jt. Exhs. 2, 3).

Respondent offers no defense to the latter, June 4, 2020 unilateral cancellation of the table swap agreements. Accordingly, I find that Respondent violated Section 8(a)(5) of the Act by failing to bargain over that decision and its effects, as alleged.

However, I find that no similar violation occurred regarding Respondent's March 27, 2020 unilateral suspension of 401(k) matching contributions. The record shows that this action was compelled by the COVID-19 pandemic and the Governor's shutdown order.[247] Those circumstances clearly constituted an unexpected "economic exigency" that would have justified Respondent unilaterally laying off all of its employees under Board precedent. Cf. *Port Printing Ad & Specialties*, 351 NLRB 1269, 1270 (2007) (unexpected shutdown due to an impending hurricane and mayor's citywide evacuation order was an economic exigency justifying mass layoff without notice or bargaining over the decision), enfd. 589 F.3d 812 (5th Cir. 2009). That Respondent chose not to take this drastic action at that time, and to instead just suspend 401(k) matching contributions, does not make the decision any less the consequence of the unexpected economic exigency.

As for the effects of the suspension, Respondent was still required to bargain over them even though it was not required to bargain over the suspension itself. See *ibid*. However, the parties have stipulated that Respondent subsequently resumed its 401(k) matching contributions on September 20, 2020, and that it made retroactive contributions for the suspended payments (Jt. Exh. 3). In these unique or unusual circumstances, and given that Respondent will otherwise be ordered to recognize and bargain with the Union over both a first contract and any interim changes, no substantial purpose would be served by finding this additional violation and ordering Respondent to bargain over the effects of the May 27 change at this point. Cf. *Sea Mar Community Health Centers*, 345 NLRB 947, 950–951 (2005) (declining to find an effects-bargaining violation given the "unique circumstances" and "unusual factual context" of the case).[248]

CONCLUSIONS OF LAW

1.  Respondents Red Rock, Boulder Station, and Palace Station engaged in unfair labor practices in violation of Section 8(a)(1) of the Act by posting images of their employees on the Station Casinos' antiunion website on or about November 22, 2019, and thereafter during the preelection period without the employees' consent and without a disclaimer stating that the website did not reflect the views of the employees shown.

2.  Respondent Red Rock also engaged in unfair labor practices in violation of Section 8(a)(1) of the Act by the following conduct:

a.  On September 19 and 20, 2019, informing employees at

mandatory meetings that it would be futile for them to select the Union as their collective-bargaining representative.

b.  Promising employees at the same mandatory meetings that they would receive better benefits and other improved terms and conditions of employment if they rejected the Union as their collective-bargaining representative.

c.  On September 21, 2019, interrogating an employee who had attended one of the mandatory meetings about her union sympathies.

d.  During the same conversation, threatening loss of benefits by telling the employee that supervisors would no longer do any "favors" for employees if they selected the Union as their collective-bargaining representative.

e.  In early December 2019, threatening loss of benefits by telling employees that there would be no more "extras," such as an extra day off to take their children to the doctor, if they selected the Union as their collective-bargaining representative.

f.  On December 10 and 11, 2019, announcing at mandatory meetings that it was granting employees better retirement, healthcare, and medical benefits and other improved terms and conditions of employment, to discourage employees from supporting the Union.

g.  On or about December 13, 2019, mailing a pamphlet to employees describing the new benefits, to discourage them from supporting the Union.

h.  On or about the same date, handing out the same pamphlet to employees at the Red Rock facility to discourage them from supporting the Union.

i.  On or about the same date, discussing the new benefits with employees during a huddle to discourage them from supporting the Union.

j.  On or about the same date, threatening employees during another huddle that they would lose the new benefits if they selected the Union as their collective-bargaining representative.

k.  On or about December 14, 2019, informing employees during huddles that the open enrollment period would be extended for them to sign up for the new healthcare benefits, to discourage them from supporting the Union.

l.  On the same date, rhetorically asking an employee why she would continue supporting the Union after Red Rock had granted employees the new benefits, to discourage her from supporting the Union.

m.  On December 16 and 17, 2019, continuing to tout the new benefits at preelection captive audience meetings with employees to discourage them from supporting the Union.

n.  At the same meetings, promising employees more benefits in the future to discourage them from supporting the Union.

o.  At the same meetings, informing employees that it would be futile to select the Union as their collective-bargaining representative.

p.  At the same meetings, threatening employees with loss of the new benefits if they selected the Union as their collective-bargaining representative.

q.  At the same meetings, threatening employees with unspecified reprisals by telling them that managers could no longer "help" them if they selected the Union as their collective-bargaining representative.

---

[247] See Tr. 6533–6534, 6563–6564 (Cootey) (matching contributions were suspended "to preserve capital and preserve the institution" because "the whole resorts were shut down," there was "zero revenue coming in," and it was unclear when the facility would reopen).

[248] In these unique circumstances, I also reject the General Counsel's argument that a violation should be found and a remedial order issued because Respondent did not publicly and timely "repudiate" its failure to bargain as would normally be required under *Passavant Memorial Area Hospital*, 237 NLRB 138 (1978).

r. At the same meetings, threatening employees that a strike was inevitable and that the striking employees would be permanently replaced, if they selected the Union as their collective-bargaining representative.

s. On December 16, 2019, during a conversation after one of the same meetings, again threatening employees with the loss of the new benefits if they selected the Union as their collective-bargaining representative.

t. On the same date, during another conversation, again threatening employees with the loss of the new benefits if they selected the Union as their collective-bargaining representative.

u. On December 17, 2019, during another meeting with employees, continuing to tout the new benefits to discourage them from supporting the Union.

v. At the same meeting, again threatening employees with loss of the new benefits if they selected the Union as their collective-bargaining representative.

w. At the same meeting, threatening that employees would no longer be treated like "family" if they selected the Union as their collective-bargaining representative.

x. On or about December 17, 2019, serving branded "VOTE NO" steaks to employees to discourage them from supporting the Union.

y. Beginning in mid-December 2019, displaying, posting, and distributing messages to employees titled "IS UNIONIZING WORTH THE RISK???" and "TOP TEN REASONS TO VOTE NO" that continued to tout the new benefits as a reason to vote against the Union and threatened that employees would lose the new benefits and that bargaining would be futile if they voted for the Union.

z. Between early January and early March 2020, implementing and/or informing employees that it was beginning to implement the new benefits and other new terms and conditions of employment it had previously announced to discourage them from supporting the Union.

3. Respondent Red Rock also engaged in unfair labor practices in violation of Section 8(a)(3) and (1) of the Act by the following conduct:

a. On October 1, 2019, issuing employee Claudia Montano a written warning because of her union activities.

b. On October 13, 2019, issuing Montano a final written warning because of her union activities.

c. On October 10, 2019, assigning employee Maria Gutierrez to more arduous and rigorous activities because of her union activities.

d. Since June 4, 2020, refusing to recall or reinstate laid-off employee Teresa Powers because of her union activities.

4. Respondent Red Rock also engaged in unfair labor practices in violation of Section 8(a)(5) and (1) of the Act by failing to provide the Union with prior notice and an opportunity to bargain over its June 4, 2020 termination of its 2015 and 2016 table swap agreements and the effects of that decision.

5. Respondent Red Rock did not otherwise violate the Act as alleged in the complaint.

6. Respondents' unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

7. Respondent Red Rock's preelection unfair labor practices listed above in par. 2.e, f, g, h, i, j, m, n, o, p, s, t, u, v, w, and y, also constitute objectionable conduct.

8. Respondent also engaged in preelection objectionable conduct by refusing to allow off-duty prounion employees to attend the December 16 and 17 captive audience meetings that other off-duty employees were paid to attend.

9. In combination, Respondent's preelection unfair labor practices in pars. 1 and 2.e.–y, its objectionable conduct listed in par. 7, and its objectionable conduct in par. 8, warrant setting aside the results of the election in Case 28–RC–252280.

### REMEDY

Consistent with the Board's policies and procedures, Respondents will be ordered to cease and desist from their unlawful conduct and to take certain affirmative action.

Specifically, to the extent they have not already done so, Respondents will be ordered

to remove, or request Station Casinos to remove, images of their employees that were posted on Station Casinos' antiunion website beginning in late November 2019 who had not volunteered to have their images posted.

In addition, Respondent Red Rock will be ordered to rescind the October 1 and 13 disciplinary warnings it unlawfully issued to Claudia Montano, to remove from its files all references to the unlawful warnings, and to notify Montano in writing that this has been done and that the warnings will not be used against her in any way.

Respondent Red Rock will also be ordered to recall or reinstate from layoff Teresa Powers to her former job or, if that position no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed. The Respondent shall make Powers whole for any loss of earnings and other benefits suffered as a result of its unlawful refusal to recall or reinstate her from layoff since the facility reopened on June 4, 2020. The make-whole whole remedy shall be computed in accordance with *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010).

In accordance with *King Soopers, Inc.*, 364 NLRB 1153 (2016), enfd. in relevant part 859 F.3d 23 (D.C. Cir. 2017), the Respondent will also be ordered to compensate Powers for search-for-work and interim employment expenses regardless of whether those expenses exceed her interim earnings. Search-for-work and interim employment expenses shall be calculated separately from taxable net backpay, with interest at the rate prescribed in *New Horizons*, supra, compounded daily as prescribed in *Kentucky River Medical Center*, supra. In accordance with *Tortillas Don Chavas*, 361 NLRB 101 (2014), the Respondent shall also be ordered to compensate Powers for the adverse tax consequences, if any, of receiving a lump sum backpay award.

In accordance with *AdvoServ of New Jersey, Inc.*, 363 NLRB 1324 (2016), Respondent will also be ordered to file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed either by agreement or Board order, a report allocating backpay to the appropriate calendar year for Powers. The Regional Director will then assume responsibility for transmission of the report to the Social Security Administration at the appropriate time and in the appropriate manner. In accordance with *Cascades Containerboard Packing-Niagara*, 370 NLRB No. 76 (2021), as modified 371 NLRB No. 25 2021), Respondent will also be ordered to file with the Regional Director, within 21 days of the date the amount of backpay is fixed either by agreement or Board order, copies of Powers' corresponding W-2 forms reflecting the backpay awards.

As a remedy for its unfair labor practices, Respondent Red

Rock will also be ordered to recognize and bargain on request with the Union as the exclusive representative of the bargaining unit employees, as modified from January 2020–April 2021,[249] and, if an understanding is reached, embody the understanding in a signed agreement.

Respondent will also be specifically ordered to rescind its unlawful unilateral June 4, 2020 termination of its 2015 and 2016 table swap agreements, and to provide the Union with notice and an opportunity to bargain before implementing any changes in wages, hours, or other terms and conditions of employment.

In addition, Respondent shall be ordered to make the unit employees whole for any loss of earnings resulting from its unlawful unilateral rescission of the table swap agreements as set in forth in *Ogle Protection Service*, 183 NLRB 682 (1970), enfd. 444 F.2d 502 (6th Cir. 1971), with interest as prescribed in *New Horizons*, supra, compounded daily as prescribed in *Kentucky River Medical Center*, supra. As with Powers, Respondent will be ordered to compensate affected employees for the adverse tax consequences, if any, of receiving lump sum backpay awards, and to file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed either by agreement or Board order, a report allocating backpay to the appropriate calendar year(s) for each employee and copies of the employees' corresponding W-2 forms reflecting the backpay awards.

Respondents will also each be ordered to post an appropriate notice to employees, in both English and Spanish. As requested by the General Counsel, a public reading of the notice to Respondent Red Rock's employees in both English and Spanish will also be ordered. Although an extraordinary remedy, a public reading of the notice is warranted and appropriate here given the serious nature and scope of Respondent Red Rock's unlawful conduct and that most of its numerous unlawful statements and threats were made orally to employees in mandatory and captive-audience meetings by high-level managers. A public reading of the notice in both English and Spanish will help to "ensure that the employees 'will fully perceive that the Respondent and its managers are bound by the requirements of the Act.'" *Johnston Fire Services, LLC*, 371 NLRB No. 56, slip op. at 5–6 (2022), citing *Federated Logistics & Operations*, 340 NLRB 255, 258 (2003), affd. 400 F.3d 920, 929-930 (D.C. Cir. 2005); and *Homer D. Bronson Co.*, 349 NLRB 512, 515 (2007), enfd. mem. 273 Fed.Appx. 32 (2d Cir. 2008).

The General Counsel also requests several other so-called "special" remedies for Respondent Red Rock's unlawful conduct.[250] However, the cases cited in support of those remedies are distinguishable. For example, the GC requests that a broad ("in any other manner") cease and desist order be issued and that Respondent be ordered to post an explanation of employee rights in addition to the notice, citing *David Saxe Productions, LLC*, 370 NLRB No. 103, slip op. at 6 (2021); *Pacific Beach Hotel*, 361 NLRB 709, 713–714 (2014), enfd. in part 823 F.3d 668 (D.C. Cir. 2016); and *Purple Communications, Inc.*, 370 NLRB

No. 26 (2020). However, unlike here, the respondents in *David Saxe* and *Pacific Beach* were proven recidivists, i.e., they had also been found in prior cases to have engaged in numerous other unfair labor practices.[251] And the respondent in *Purple Communications* was ordered to post an explanation of employee rights because, unlike here, no public reading of the notice was ordered. See slip op. at 57 fn. 85.

The General Counsel also requests special access remedies; specifically, that Respondent Red Rock be ordered to allow the Union access to deliver a 30-minute speech to all unit employees at a meeting or meetings scheduled to ensure the widest possible attendance during working time; to also allow the Union access to bulletin boards and other places at the facility where notices to employees are customarily posted; to also give the Union notice of, and equal time and facilities for the Union to respond to any speeches Respondent makes to employees about union representation; and to provide the Union with the names and addresses of its current unit employees. In support, the GC cites *Stern Produce Co.*, supra, 368 NLRB No. 31, slip op. at 4–5; *Excel Case Ready*, 334 NLRB 4, 5 (2001); *Audubon Regional Medical Center*, 331 NLRB 374, 377–378 (2000); *Monfort of Colorado*, 298 NLRB 73, 86 (1990), enfd. in relevant part 965 F.2d 1538 (10th Cir. 1992); and *United Dairy Farmers Cooperative Assn.*, 242 NLRB 1026, 1029 (1979), enfd. in relevant part 633 F.2d 1054 (3d Cir. 1980). However, unlike here, in those cases a *Gissel* bargaining order was either not requested or not issued due to lack of dissemination, management turnover, passage of time, absence of a prior card majority, and/or other circumstances.[252]

Accordingly, the General Counsel's request for these additional special remedies is denied.

ORDER[253]

A. Respondent Red Rock, Las Vegas, Nevada, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Threatening employees that selecting union representation would be futile.

(b) Promising employees benefits and improved terms and conditions of

employment in order to discourage them from supporting or selecting union representation.

(c) Granting employees benefits and improved terms and conditions of employment in

order to discourage them from supporting or selecting union representation.

(d) Threatening employees with loss of benefits if they select union representation.

(e) Threatening employees with reprisals if they select union representation.

(f) Threatening employees that a strike is inevitable and they will be permanently replaced if they select union representation.

(g) Threatening employees with less favorable terms and

---

[249] See Jt. Exh. 4 (Joint Stipulation on Unit Appropriateness).

[250] See GC Exhs. 1(bk) and 3; and GC Br. 229–234. The Union (Br. 104) joins in the GC's request for the special remedies.

[251] As previously discussed with respect to Respondent's alleged discriminatory change in Montano's schedule, the Board's 2012 decision in *Station Casinos, LLC*, 358 NLRB 1556, was invalidated for lack of a valid quorum by *NLRB v. Noel Canning*, 573 U.S. 513 (2014), and was never subsequently affirmed by a properly constituted Board.

[252] Assuming the bargaining order here is upheld, the Union will be entitled to the unit employees' names and addresses on request under Sections 8(a)(5) and 8(d) of the Act. See, e.g., *Oberthur Technologies of America Corp.*, 364 NLRB No. 59, slip op. at 1 (2016), enfd. 865 F.3d 719 (D.C. Cir. 2017).

[253] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

conditions of employment by indicating that they will no longer be treated like "family" if they select union representation.

(h) Coercively questioning employees about their union sympathies.

(i) Posting its employees' images on an antiunion website without their consent and
without a disclaimer stating that the website is not intended to reflect the views of the employees appearing on it.

(j) Disciplining employees because they support union representation.

(k) Assigning employees more onerous work because they support union representation.

(l) Refusing to recall or reinstate laid-off employees because they support union representation.

(m) Changing the terms and conditions of employment of its unit employees without first notifying the Local Joint Executive Board of Las Vegas a/w UNITE HERE International Union and giving it an opportunity to bargain.

(n) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) To the extent it has not already done so, remove, or request Station Casinos to remove, images of employees that were posted on Station Casinos' antiunion website beginning in late November 2019 who had not volunteered to have their images posted.

(b) Within 14 days of this Order, rescind the unlawful disciplinary warnings issued to Claudia Montano on October 1 and 13, 2019.

(c) Within 14 days from the date of this Order, remove from its files any reference to
the unlawful disciplinary warnings issued to Montano, and within 3 days thereafter, notify her in writing that this has been done and that the disciplinary warnings will not be used against her in any way.

(d) Within 14 days from the date of the Board's order, offer Teresa Powers full
reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

(e) Make Powers whole for any loss of earnings and benefits suffered as a result of the
discriminatory refusal to recall or reinstate her from layoff since June 4, 2020, in the manner set forth in the remedy section above.

(f) Make Powers whole for her reasonable search-for-work and interim employment
expenses since June 4, 2020, in the manner set forth in the remedy section above.

(g) Compensate Powers for the adverse tax consequences, if any, of receiving a lump-
sum backpay award, and file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

(h) File with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed either by agreement or Board order, or such additional time as the Regional Director may allow for good cause shown, a copy of Powers' corresponding W-2 forms reflecting the backpay awards.

(i) Recognize, and upon request, bargain with the Local Joint Executive Board of Las Vegas a/w UNITE HERE International Union as the exclusive representative of the employees in the following appropriate unit, as modified between January 13, 2020 and April 12, 2021, and if an understanding is reached, embody the understanding in a signed agreement:

> All full-time and regular part-time assistant food servers, bakers (I, II, III), banquet bartenders, banquet porters, banquets setup, bar porters, bartenders, bell porters, bell starters, beverage porters, beverage servers, beverage (Race/Sports), banquet servers, bus persons/bussers, cake decorators (I, II), captains, coffee breakers, concession workers, cooks, cook's helpers, counter attendants, food servers, gourmet hostperson/cashiers, host/cashiers, housekeeping utility porters, ice cream concession workers, kitchen runners, kitchen workers, lead banquet porters, lead counter attendants, lead servers, mini bar attendants, pantry, porters, resort guest room attendants, resort housepersons, resort suite guest room attendants, resort steakhouse cooks, room runners, room service captains, runners, service bartenders, specialty cooks, servers, sprinters, status board, stove persons, team member dining room (TDR) attendants, turndown guest room attendants, utility porters, VIP attendants, VIP bartenders, and VIP lounge attendants employed by the Employer at its facility located at 11011 West Charleston Boulevard, Las Vegas, Nevada; excluding all other employees, front desk employees, valet parkers, retail cashier/clerks, gaming employees (dealers, slot attendants, cage cashiers), inspectresses, engineering and maintenance employees, office clerical employees, guards, managers, and supervisors as defined by the Act.[254]

(j) Notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of the unit employees before implementing any changes in their wages, hours, or other terms and conditions of employment.

(k) Rescind its unlawful June 4, 2020 unilateral termination of its 2015 and 2016 table swap agreements.

(l) Make whole unit employees for any loss of earnings and benefits suffered as a result of its unlawful unilateral termination of the table swap agreements, in the manner set forth in the remedy section above.

(m) Compensate affected unit employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

(n) File with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed either by agreement or Board order, or such additional time as the Regional Director may allow for good cause shown, a copy of the affected unit employees' corresponding W-2 forms reflecting the backpay awards.

---

[254] The following unit positions were added, eliminated, or changed between January 13, 2020 and April 12, 2021: Mini Bar Attendant (eliminated May 1, 2020; added April 12, 2021); Turndown Guest Room Attendant (eliminated May 1, 2020); Baker I, II, and III (changed to Baker Jan. 13, 2020); Cake Decorator I and II (changed to Cake Decorator Jan. 13, 2020); Gourmet VIP Attendant (added Aug. 25, 2020); Interior Ground Porter (added Oct. 13, 2020); Exterior Ground Porter (added Oct. 13, 2020), VIP Host (added Jan. 24, 2021).

(o)  Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of the Board's order.

(p)  Post at its facility in Las Vegas, Nevada copies of the attached notice marked "Appendix A" in both English and Spanish.[255]  Copies of the notice, on forms provided by the Regional Director for Region 28, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since September 19, 2019.

(q) Hold a meeting or meetings during worktime at its facility in Las Vegas, Nevada, scheduled to ensure the widest possible attendance of employees, at which the attached notice marked "Appendix A" will be read to employees in both English and Spanish by a high-ranking management official of the Respondent in the presence of a Board Agent and an agent of the Union if the Region or the Union so desires, or, at the Respondent's option, by a Board agent in the presence of a high-ranking management official of the Respondent and, if Union so desires, the presence of an agent of the Union.[256]

(r) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that the complaint is dismissed insofar as it alleges violations of the Act not specifically found.

IT IS FURTHER ORDERED that the election in Case 28–RC–252280 is set aside.

B.  Respondents Boulder Station and Palace Station, Las Vegas, Nevada, their officers, agents, successors, and assigns, shall

1. Cease and desist from

(a)  Posting their employees' images on an antiunion website without the employees' consent and without a disclaimer stating that the website is not intended to reflect the views of the employees appearing on it.

(b)  In any like or related manner interfering with, restraining, or coercing employees

in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a)  To the extent they have not already done so, remove, or request Station Casinos to remove, images of their employees that were posted on the Station Casinos antiunion website beginning in late November 2019 who had not volunteered to have their images posted.

(b)  Post at their facilities in Las Vegas, Nevada copies of the attached notices marked "Appendix A" and "Appendix B," respectively, in both English and Spanish.[257]  Copies of the notices, on forms provided by the Regional Director for Region 28, after being signed by the Respondents' authorized representatives, shall be posted by the Respondents and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondents customarily communicate with their employees by such means. Reasonable steps shall be taken by the Respondents to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondents have gone out of business or closed the facilities involved in this proceeding, the Respondents shall duplicate and mail, at their own expense, a copy of the notices to all current employees and former employees employed by the Respondents at any time since November 22, 2019.[258]

(c)  Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondents have taken to comply.

Dated, Washington, D.C, April 12, 2022

APPENDIX A

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

---

[255] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

[256] If the facility is open and staffed by a substantial complement of employees, the notice must be posted and read within 14 days after service by the Region. If the facility is closed due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice must be posted and read within 14 days after the facility reopens and a substantial complement of employees have returned to work, and the notice may not be posted until a substantial complement of employees have returned to work. Any delay in the physical posting of paper notices also applies to the electronic distribution of the notice if the Respondent customarily communicates with its employees by electronic means.

[257] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

[258] If the facility is open and staffed by a substantial complement of employees, the notice must be posted within 14 days after service by the Region. If the facility is closed due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work, and the notice may not be posted until a substantial complement of employees have returned to work. Any delay in the physical posting of paper notices also applies to the electronic distribution of the notice if the Respondent customarily communicates with its employees by electronic means.

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT threaten that selecting union representation would be futile.

WE WILL NOT promise benefits and improved terms and conditions of employment to discourage you from supporting or selecting union representation.

WE WILL NOT grant benefits and improved terms and conditions of employment to discourage you from supporting or selecting union representation.

WE WILL NOT threaten loss of benefits if you select union representation.

WE WILL NOT threaten reprisals if you select union representation.

WE WILL NOT threaten that a strike is inevitable and you will be permanently replaced if you select union representation.

WE WILL NOT threaten less favorable terms and conditions of employment by indicating that you will no longer be treated like "family" if you select union representation.

WE WILL NOT coercively question you about your union sympathies.

WE WILL NOT post your images on an antiunion website without your consent and without a disclaimer stating that the website is not intended to reflect your views.

WE WILL NOT discipline you because you support union representation.

WE WILL NOT assign you more onerous work because you support union representation.

WE WILL NOT refuse to recall or reinstate you from layoff because you support union representation.

WE WILL NOT change your terms and conditions of employment without first notifying the Local Joint Executive Board of Las Vegas a/w UNITE HERE International Union and giving it an opportunity to bargain.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, to the extent we have not already done so, remove, or request Station Casinos to remove, images of employees that were posted on Station Casinos' antiunion website beginning in late November 2019 who had not volunteered to have their images posted.

WE WILL, within 14 days of the Board's order, rescind the unlawful disciplinary warnings we issued to Claudia Montano on October 1 and 13, 2019.

WE WILL, within 14 days from the date of the Board's order, remove from our files any reference to the unlawful disciplinary warnings issued to Montano, and within 3 days thereafter, notify her in writing that this has been done and that the disciplinary warnings will not be used against her in any way.

WE WILL, within 14 days from the date of the Board's order, offer Teresa Powers full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

WE WILL make Powers whole for any loss of earnings and benefits suffered as a result of our discriminatory refusal to recall or reinstate her from layoff since June 4, 2020, plus interest.

WE WILL make Powers whole for her reasonable search-for-work and interim employment expenses since June 4, 2020, plus interest.

WE WILL compensate Powers for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

WE WILL file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of Powers' corresponding W-2 forms reflecting the backpay award.

WE WILL recognize, and upon request, bargain with the Local Joint Executive Board of Las Vegas a/w UNITE HERE International Union as the exclusive representative of the employees in the following appropriate unit, as modified between January 13, 2020 and April 12, 2021, and if an understanding is reached, embody the understanding in a signed agreement:

All full-time and regular part-time assistant food servers, bakers (I, II, III), banquet bartenders, banquet porters, banquets setup, bar porters, bartenders, bell persons, bell starters, beverage porters, beverage servers, beverage (Race/Sports), banquet servers, bus persons/bussers, cake decorators (I, II), captains, coffee breakers, concession workers, cooks, cook's helpers, counter attendants, food servers, gourmet hostperson/cashiers, host/cashiers, housekeeping utility porters, ice cream concession workers, kitchen runners, kitchen workers, lead banquet porters, lead counter attendants, lead servers, mini bar attendants, pantry, porters, resort guest room attendants, resort housepersons, resort suite guest room attendants, resort steakhouse cooks, room runners, room service captains, runners, service bartenders, specialty cooks, servers, sprinters, status board, stove persons, team member dining room (TDR) attendants, turndown guest room attendants, utility porters, VIP attendants, VIP bartenders, and VIP lounge attendants employed by the Employer at its facility located at 11011 West Charleston Boulevard, Las Vegas, Nevada; excluding all other employees, front desk employees, valet parkers, retail cashier/clerks, gaming employees (dealers, slot attendants, cage cashiers), inspectresses, engineering and maintenance employees, office clerical employees, guards, managers, and supervisors as defined by the Act.

WE WILL notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of the unit employees before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees.

WE WILL rescind our unlawful June 4, 2020 unilateral termination of our 2015 and 2016 table swap agreements.

WE WILL make whole unit employees for any loss of earnings and benefits suffered as a result of our unlawful unilateral termination of the table swap agreements, plus interest.

WE WILL compensate affected unit employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file with the Regional Director for Region

28, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the back-pay award to the appropriate calendar year(s).

We will file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each affected unit employee's corresponding W-2 forms reflecting the backpay award.

NP Red Rock LLC d/b/a Red Rock Casino Resort Spa

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/28-CA-244484 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273–1940.



### APPENDIX B

Notice to Employees
Posted by Order of the
National Labor Relations Board
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

We will not post your images on an antiunion website without your consent and without a disclaimer stating that the website is not intended to reflect your views.

We will not in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

We will, to the extent we have not already done so, remove, or request Station Casinos to remove, images of employees that were posted on Station Casinos' antiunion website beginning in late November 2019 who had not volunteered to have their images posted.

NP Boulder LLC d/b/a Boulder Station Hotel & Casino

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/28-CA-244484 or by using the QR code below. Alternatively, you can obtain a copy of the decision from

the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273–1940.



### APPENDIX C

Notice to Employees
Posted by Order of the
National Labor Relations Board
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

We will not post your images on an antiunion website without your consent and without a disclaimer stating that the website is not intended to reflect your views.

We will not in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

We will, to the extent we have not already done so, remove, or request Station Casinos to remove, images of employees that were posted on Station Casinos' antiunion website beginning in late November 2019 who had not volunteered to have their images posted.

NP Palace LLC d/b/a Palace Station Hotel & Casino

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/28-CA-244484 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273–1940.

